**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel.* JAMES MARCILLA, and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the COMMONWEALTH OF MASSACHUSETTS, the COMMONWEALTH OF VIRGINIA, the COMMONWEALTH OF PUERTO RICO, the DISTRICT OF COLUMBIA, the CITY OF CHICAGO, the CITY OF HALLANDALE BEACH, BROWARD COUNTY, and MIAMI-DADE COUNTY,**<br><br>**Plaintiff-Relator,**<br><br>**v.**<br><br>**WALMART INC.,**<br><br>**Defendant.** | Case Number:<br><br>**Jury Trial Demanded**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, STATE LAW COUNTERPARTS, AND LOCAL LAW COUNTERPARTS** |

# TABLE OF CONTENTS


I. INTRODUCTION ........ 3

II. JURISDICTION AND VENUE ........ 7

III. THE PARTIES ........ 8

A. Relator ........ 8

B. Walmart, Inc. ........ 10

IV. GENERAL ALLEGATIONS ........ 11

A. The Nationwide Opioid Crisis ........ 11

B. Defendant's Recognition of Opioid Crisis ........ 16

V. THE APPLICABLE STATUTES ........ 17

A. The Controlled Substances Act ........ 17

B. The False Claims Act ("FCA") ........ 22

C. Opioid Use by Government Program Beneficiaries and Opioid Use Disorder Coverage by Government Programs ........ 23

1. Medicaid Coverage for Opioids and Opioids Use Disorder ........ 23

2. Medicare Beneficiary Opioid Use and Abuse ........ 26

3. Reimbursement under other Government Programs ........ 28

D. Federal Guidance and State Law Governing Pharmacy Dispensing of Opioids ........ 29

E. Use of State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping ........ 36

F. Unlawfulness of a Prescription Is Material to Government Program Opioid Payments ........ 41

VI. WALMART'S PHARMACY OPERATIONS ........ 42

A. Walmart's Pharmacy Operations ........ 42

B. Walmart Profit: Incentives to Fill ........ 45

C. Immense Pressure to Fill Quickly to Drive Sales ........ 48

D. Lack of Training on How to Properly and Adequately Handle Inappropriate Opioid Prescriptions ..... 50

E. Lack of Dispensing Protocols or Policies ..... 53

F. 2016: Walmart Implements New Protocols and Policies, But Its Half-Hearted Measures Did Little to Address the Opioids Epidemic ..... 56

G. Walmart Turned a Blind Eye to the Opioids Crisis ..... 58

H. Walmart's Unique Opioids Return Policy Led to Further Abuse ..... 59

VII. DEFENDANTS' UNLAWFUL CONDUCT ..... 60

A. Walmart's Scheme to Defraud Government Programs ..... 61

B. Specific Examples of Unlawful Dispensing Conduct ..... 63

1. Mayfield (Graves County, Kentucky) ..... 63

2. Carrollton, Texas ..... 65

3. Deptford Township (Gloucester County, New Jersey) ..... 66

C. Specific Examples of Unlawful Dispensing Conduct: The Heroin Highway ..... 69

1. Charles Town (Jefferson County, West Virginia) ..... 69

2. Martinsburg (Berkeley County, West Virginia) ..... 72

3. Winchester (Frederick County, Virginia) ..... 77

4. Luray (Page County, Virginia) ..... 79

D. Specific Examples of Unlawful Dispensing Conduct: New Mexico ..... 82

1. Alamogordo (Otero County) ..... 83

2. Albuquerque (Bernalillo County) ..... 86

3. Española (Rio Arriba County) ..... 90

4. Farmington (San Juan County) ..... 93

5. Las Cruces (Doña Ana County) ..... 96

6. Silver City (Grant County) ..... 100

E. Injury to Government Programs Resulting from Walmart's Actions ..... 102

VIII. CAUSES OF ACTION ........ 104

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)) 104

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)) 105

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C)) 105

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G)) 106

COUNT V (Violation of California False Claims Act) 106

COUNT VI (Violation of Colorado Medicaid False Claims Act) 107

COUNT VII (Violation of Connecticut False Claims Act for Medical Assistance Programs) 109

COUNT VIII (Violation of Delaware False Claims and Reporting Act) 110

COUNT IX (Violation of District of Columbia False Claims Act) 111

COUNT X (Violation of Florida False Claims Act) 112

COUNT XI (Violation of Georgia False Medicaid Claims Act) 113

COUNT XII (Violation of Hawaii False Claims Act) 114

COUNT XIII (Violation of Illinois False Claims Act) 116

COUNT XIV (Violation of Indiana False Claims and Whistleblower Protection Act) 117

COUNT XV (Violation of Iowa False Claims Act) 118

COUNT XVI (Violation of Louisiana Medical Assistance Programs Integrity Law) 119

COUNT XVII (Violation of Maryland False Health Claims Act) 120

COUNT XVIII (Violation of Massachusetts False Claims Act) 121

COUNT XIX (Violation of Michigan Medicaid False Claims Act) 123

COUNT XX (Violation of Minnesota False Claims Act) 124

COUNT XXI (Violation of Montana False Claims Act) 125

COUNT XXII (Violation of Nevada False Claims Act) 126

COUNT XXIII (Violation of New Jersey False Claims Act) 127

COUNT XXIV (Violation of New Mexico Fraud Against Taxpayers Act) 129

COUNT XXV (Violation of New York False Claims Act) 130

COUNT XXVI (Violation of North Carolina False Claims Act) 131

COUNT XXVII (Violation of Oklahoma Medicaid False Claims Act) 132

COUNT XXVIII (Violation of Rhode Island False Claims Act) 133

COUNT XXIX (Violation of Tennessee Medicaid False Claims Act) 134

COUNT XXX (Violation of Texas Medical Assistance Program, Damages, and Penalties Act) 136

COUNT XXXI (Violation of Vermont False Claims Act) 137

COUNT XXXII (Violation of Virginia Fraud Against Taxpayers Act) 139

COUNT XXXIII (Violation of Washington Medicaid False Claims Act) 140

COUNT XXXVI (Violation of Chicago False Claims Act) 141

COUNT XXXVI (Violation of Hallandale Beach False Claims Ordinance) 142

COUNT XXXVII (Violation of Broward County False Claims Ordinance) 143

COUNT XXXVIII (Violation of Miami-Dade False Claims Ordinance) 143

IX. PRAYER FOR RELIEF .......................................................................................... 144

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729, *ET SEQ.*, STATE LAW COUNTERPARTS, AND LOCAL LAW COUNTERPARTS**

1. On behalf of the United States of America ("United States"); twenty-six States, the District of Columbia, and the Commonwealths of Massachusetts, Puerto Rico, and Virginia (collectively, the "Whistleblower States"), the City of Chicago, Miami-Dade County, Relator hereby files this Complaint against Defendant Walmart, Inc. (hereinafter "Walmart" or "Defendant"), pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"); the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. tit. 4 Ch. 55e §§ 4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; the Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; the New Mexico Fraud Against Taxpayers Act, N.M. Stat.

Ann. §§ 44-9-3(C)(1) *et seq.*; the New York False Claims Act, N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; the Texas Medical Assistance Program, Damages, and Penalties Act, Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32 §§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*; the Washington State Medicaid False Claims Act, Wash. Rev. Code. §§ 74.66.005 *et seq.*; and the False Claims to Government of Puerto Rico Programs, Contracts, and Services Act, 2018 P.R. Act 154 (H.B. 1627) (the aforementioned statutes referred to collectively as the "state Whistleblower Statutes"); pursuant to the Chicago False Claims Ordinance, Chicago Mun. Code §§ 1-21-010 to -060, the City of Hallandale Beach False Claims Ordinance, Hallandale Beach Code of Ordinances §§ 8-201 to -210, the Broward County False Claims Ordinance, Broward Cnty. Code of Ordinances §§ 1-276 to -287, and the Miami-Dade County False Claims Ordinance, Miami-Dade Cty. Code §§ 21-255 to -266 (the aforementioned ordinances referred to collectively as the "Locality Whistleblower Ordinances").

2. Relator James Marcilla brings this action against Walmart seeking civil monetary penalties for Defendant's violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "CSA") and its implementing regulations, 21 C.F.R. § 1301, *et seq.* Those violations include: (a) knowingly dispensing controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and intentionally distributing and dispensing controlled substances outside the usual course of the professional practice of pharmacy, in violation

of 21 U.S.C. § 841(a). Relator also seeks to recover monies that Defendant caused the Government Programs to pay for controlled substances that were medically unnecessary and/or lacked a legitimate medical purpose in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, as well as State and Locality *qui tam* laws.

## I. INTRODUCTION

3. The nation is experiencing a national public health emergency involving opioid abuse. The dispensing of controlled substances, including prescription opioid painkillers, without a legitimate medical purpose and outside the usual course of professional practice exacerbate this crisis. This crisis impacts nearly all individuals and families as well as Medicare, Medicaid, and other state and federal health benefit programs (collectively, "Government Programs") when their funds are used to pay for improperly dispensed and/or medically unnecessary controlled substances.

4. Walmart has both fueled and profited from this epidemic by repeatedly dispensing opioids and other controlled substances prone to abuse without a legitimate medical purpose and outside the usual course of professional medical practice.

5. Walmart formally incentivized and informally pressured its pharmacists to fill all prescriptions—regardless of validity—resulting in scores of suspicious prescriptions that were clearly not medically necessary being filled in furtherance of profit, the public health and public fisc be damned.

6. As alleged herein, Walmart violated its duties under state pharmacy laws and regulations in its capacity as a dispensing pharmacy. Pharmacists serve as the last line of defense between dangerous opioids and the public. For this reason, they are subject to duties under federal and state law, to take special care before dispensing these addictive and dangerous drugs.

Walmart violated these duties by dispensing extremely large amounts of opioids from its retail pharmacy stores throughout the United States and this District as alleged in more detail below, all while claiming misleadingly to the public that it was fulfilling its duties as a pharmacy.

7. At all times material hereto, Walmart tracked which of its stores were top sellers of particular drugs. But instead of using that information and data to prevent the filling of suspicious prescriptions, Walmart joined the race to sell as many opioids as possible, including by failing to institute safeguards and by selling opioids from its vast network of retail pharmacy stores and in-store pharmacies and pharmacists.

8. Armed with knowledge of its own sales and industry-wide data, Defendant knew or should have known that the quantity of opioids being dispensed in the U.S. (and in this District) far exceeds the medical need of U.S. citizens. Walmart knew or should have known that it was dispensing more opioids than could possibly be medically appropriate, and that a significant number of opioids in the U.S. (and in this District) were being diverted from legitimate medical uses. Opioid dispensing continues to be far greater than medically justified.

9. Walmart breached its duties under the Controlled Substances Act ("CSA") and violated state pharmacy laws and regulations. The CSA, state pharmacy laws, and state pharmacy regulations impose obligations on pharmacies, and required Walmart to review each controlled substance prescription prior to dispensing and make a determination that the prescription is both effective and valid; ensure that each prescription for an opioid is valid and issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice; refuse to dispense medication if there is reason to believe that the prescription was not issued for a legitimate medical purpose; and provide effective systems, controls, and procedures to prevent theft and diversion of opioids. Under the CSA and state

pharmacy laws and regulations, a pharmacist's duty to use due care when filling prescriptions goes beyond simply following the prescription's directions – pharmacies that are on notice of red flags and signs of diversion or abuse may not simply robotically fill prescriptions, particularly where those prescriptions are unreasonable on their face because they are written in a quantity, frequency, or other manner that a reasonable pharmacist would do additional investigation and due diligence. Walmart did not fulfill these duties.

10. Walmart was aware of red flags that should have caused its pharmacies to investigate a prescription before filling it. Examples of such red flags include doctors who write unusually large amounts of opioid prescriptions when compared with similar practitioners in the area; early refills for opioid prescriptions; prescriptions with unusual quantities or dosages; patients seeking to fill a prescription written for someone else; multiple consumers appearing at or near the same time with opioid prescriptions from the same physician; patients who drive long distances to have a prescription filled; consumers who seek large volumes of controlled substances in the highest strength for each prescription type; patients who appear to be creating cocktails with muscle relaxants or tranquilizers; and consumers who pay large amounts of cash for opioid prescriptions rather than using some form of insurance.

11. Walmart filled opioid prescriptions throughout the U.S. (and in New Mexico) under circumstances showing red flags for opioid diversion or abuse, in violation of its duties under the CSA and state pharmacies laws and regulations.

12. Walmart failed to train or instruct its employees with respect to proper policies and protocols to follow to prevent diversion and abuse of opioids. This has the direct, readily foreseeable and intended result of employees continuing to fill prescriptions despite clear red flags.

13. Walmart's failure to identify, monitor, detect, investigate, report, and refuse to sell, fill, or dispense suspicious prescriptions of opioids also violated its duty to act reasonably in light of the serious and foreseeable harms associated with opioid diversion and abuse. Walmart's failure to take reasonable steps to prevent opioid abuse and diversion is a direct and proximate cause of, and/or substantial factor contributing to, the diversion of prescription opioids around the U.S. (and in New Mexico) for consumption for non-medical, non-scientific purposes.

14. Walmart knew that widespread diversion of opioids was occurring throughout the U.S. (and in this District), but turned a blind eye in order to earn higher profits. The foreseeable result of Walmart's decision to continue dispensing vast quantities of opioids had no medical justification and led to widespread addiction, overdoses, death, harms to Government Programs, and the societal and economic harms that flow from prescription opioid abuse.

15. Walmart's conduct led to precisely the harm that the CSA and state pharmacy laws and regulations were designed to prevent. The CSA and state pharmacy laws and regulations are designed to, among other things, protect consumers from harmful dispensing practices. Walmart's unlawful practices leading to the diversion of opioids is a direct and proximate cause of and/or a substantial factor leading to opioid abuse, addiction, morbidity, and mortality throughout the U.S. (and in this district). Walmart's unlawful practices leading to the diversion of opioids is a direct and proximate cause of—and a substantial factor leading to—the opioid epidemic and the past and ongoing damages incurred by the Government Programs.

16. Walmart is one of the largest corporations in the world. This is in large part due to its mastery of data—data about its customers, its stores, and its business. But when the use of that data expertise would cut into its profits, instead of drive them, Walmart chose to ignore it.

17. Despite its obligation as a CSA registrant to identify, investigate, and report

suspicious orders and dispensing, Walmart chose to ignore the data it had from its national pharmacy network. Walmart chose to ignore data about the dangerous number of opioids it was dispensing, the bad doctors, the red flags, and the medically inappropriate combination of prescriptions.

18. Walmart could have—and was required to—leverage its network of pharmacies all over the country to combat the scourge of inappropriate and medically unnecessary opioid prescriptions. Instead it timed how quickly its pharmacists could increase prescription counts year after year with ever leaner staffing, making it impossible for them to have sufficient time to investigate, report, and halt suspicious, inappropriate, or medically unnecessary prescriptions of controlled substances.

19. While individual pharmacists here and there were able to identify bad prescriptions occasionally, Walmart as a company intentionally ignored the vast amount of data from its pharmacies to identify increasingly rampant prescribing abuse, identify medically inappropriate prescriptions and provide its individual pharmacy locations the benefit of Walmart's whole pharmacy infrastructure and corporate resources.

20. Walmart did not because doing so would have meant it would not have been as profitable, which to Walmart is more important than any financial impact on Government Programs and on people's lives.

21. The conduct alleged herein is ongoing.

## II. JURISDICTION AND VENUE

22. According to 28 U.S.C. §§ 1331 & 1345, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States—in particular, the FCA. In addition, the FCA specifically confers jurisdiction upon the

United States District Court. 31 U.S.C. § 3732(b).

23. This District Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this district and engaged in wrongdoing in this district. Likewise, the FCA authorizes nationwide service of process and the Defendant have sufficient minimum contacts with the United States of America.

24. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b). Defendant has transacted business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

25. Relator is unaware of any public disclosure of the information or allegations that are the basis of the Complaint. If there has been a public disclosure, Relator is the original source of the information and allegations contained in this Complaint. Prior to the filing of this action, Relator voluntarily provided the United States Government with information regarding the false claims that are the subject of this Complaint.

26. The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendant to conceal from the United States its wrongdoing in connection with the allegations made herein.

## III. THE PARTIES

### A. Relator

27. Relator James Marcilla (hereinafter "Relator"), brings this action on behalf of himself, the United States of America, the Whistleblower States and Localities.

28. Relator got his undergraduate degree from University of New Mexico, graduating in 1997 with a Bachelor of Science degree.

29. Relator received his Doctor of Pharmacy ("PharmD.") in 2005 from the

University of New Mexico.

30. Relator is a registered pharmacist in the State of New Mexico with license number RP00006782. His license was first issued on June 25, 2005 and is current.

31. Relator worked as a pharmacist for numerous Walmart stores in New Mexico from 2007-2016, primarily as a "floater" pharmacist. He worked at the Walmart pharmacies in Farmington in 2015-2016 (4600 E Main St, Farmington, NM 87402; 1400 W Main St, Farmington, NM 87401); Española in 2011 (1610 N Riverside Dr, Española, NM 87532); Santa Fe in 2011, 2015-2016 (5701 Herrera Drive, Santa Fe, NM 87507); Gallup (1650 W Maloney Ave, Gallup, NM 87301); Grants in 2015-2016 (1000 Robert Rd, Grants, NM 87020); Albuquerque in 2015-2016 (8511 Golf Course Rd NW, Albuquerque, NM 87114; 2550 Coors Blvd NW, Albuquerque, NM 87120; 2701 Carlisle Blvd NE, Albuquerque, NM 87110; 2266 Wyoming Blvd NE, Albuquerque, NM 87112; 301 San Mateo Blvd SE, Albuquerque, NM 87108); Los Lunas in 2016 (2250 Main St NW, Los Lunas, NM 87031); Belen in 2016 (1125 Bypass, Belen, NM 87002); Clovis in 2014-2015 (3728 N Prince St, Clovis, NM 88101); Portales in 2014-2015 (1604 E Spruce St, Portales, NM 88130); Roswell in 2014-2015 (4500 N Main St a, Roswell, NM 88201); Ruidoso in 2014-2015 (26180 US-70, Ruidoso Downs, NM 88346); Artesia in 2013 (604 N 26th St, Artesia, NM 88210); and Carlsbad in 2014 (2401 S Canal St, Carlsbad, NM 88220).

32. Relator also was a clinical pharmacist at a clinic and pharmacy he owned from 2011 to 2013. While there, he developed a keen appreciation for the steps that easily could be taken at the pharmacy level to prevent inappropriate dispensing thereby combatting the rampant opioid abuse and its attendant effects on the community and public health programs.

33. For example, at the clinic and pharmacy he owned, Relator routinely spent time

counseling patients directly about their medications and conditions. Additionally, Relator instituted mandatory urinalysis for patients that were on opioids. This was done to detect any mismatch between the opioids in the patient's body with the amount being dispensed. If the two measures did not correspond appropriately, the patient was likely diverting the prescription.

**B. Walmart, Inc.**

34. Defendant Walmart Inc., formerly known as Walmart Stores, Inc ("Walmart") is a publicly traded Delaware corporation with a principal place of business located at 702 SW 8th Street, Bentonville, Arkansas 60555, but doing business throughout all of the Party States and Localities.

35. At all times relevant to this Complaint, Walmart dispensed prescription opioids throughout the United States, including in this district.

36. In 2018, Walmart had a total revenue of $500.3 billion with 11,700 stores in twenty-eight countries.[1] That revenue has increased to now $514 billion.[2]

37. As of 2018, Walmart employs 10,743 pharmacists in 4,473 Walmart pharmacies, making its retail pharmacy operations in the United States third in size, behind only CVS Health and Walgreens.[3]

38. In 2018, Walmart ranked fifth in the country in prescription drug market share at

---

[1] Walmart, Inc., *Walmart 2018 Annual Report* 39 (2018), https://s2.q4cdn.com/056532643/files/doc_financials/2018/annual/WMT-2018_Annual-Report.pdf.

[2] Walmart, Inc., *2019 Annual Report: Defining the Future of Retail*, 36 (2019), https://s2.q4cdn.com/056532643/files/doc_financials/2019/annual/Walmart-2019-AR-Final.pdf.

[3] IQVIA, *U.S. National Pharmacy Market Summary*, 2 (2019), https://www.onekeydata.com/reports/most-powerful-pharmacies.

4.9 percent.[4]

## IV. GENERAL ALLEGATIONS

### A. The Nationwide Opioid Crisis

39. Opioids are a class of drugs that range from pain relievers available legally by prescription—such as oxycodone, hydrocodone, codeine, morphine, and fentanyl—to illegal narcotics such as heroin. According to the Medicaid and CHIP Payment and Access Commission ("MACPAC"), "the origins of widespread prescription opioid use can be traced back to the 1990s."[5] That is when the medical profession began using pain as a so-called fifth vital sign, and drug manufacturers heightened their marketing campaigns.

40. All opioids are chemically related and interact with opioid receptors on nerve cells in the body and brain. Opioid pain relievers are generally safe when taken for a short time and as prescribed by a doctor, but because they produce euphoria in addition to pain relief, they can be misused (taken in a different way or in a larger quantity than prescribed or taken without a doctor's prescription). Regular use—even as prescribed by a doctor—can lead to dependence and, when misused, opioid pain relievers can lead to addiction, overdose incidents, and deaths.[6]

41. Deaths from prescription opioid overdoses quadrupled from 1999 to 2011,[7] as

---

[4] Statista, TOP U.S. PHARMACIES RANKED BY PRESCRIPTION DRUGS MARKET SHARE IN 2018 (2019), https://www.statista.com/statistics/734171/pharmacies-ranked-by-rx-market-share-in-us/ (last visited Aug. 15, 2019).

[5] Medicaid & CHIP Payment Access Comm'n, *Report to Congress on Medicaid and CHIP: Chapter 2: Medicaid And The Opioid Epidemic,* 79 (2017), https://www.macpac.gov/wp-content/uploads/2017/06/Medicaid-and-the-Opioid-Epidemic.pdf.

[6] NIH National Institute on Drug Abuse: Advancing Addiction Science, https://www.drugabuse.gov/drugs-abuse/opioids#summary-of-the-issue (last visited Aug. 16, 2019).

[7] Vikki Wachino, *CMCS Informational Bulletin: Best Practices for Addressing Prescription*

did opioid prescriptions, even though pain levels reported by Americans had not changed.[8] By 2013, drug overdoses were the nation's leading cause of deaths from injury, prompting one author to write: "The opioid epidemic . . . that has been ravaging and shortening lives from coast to coast is a new plague for our new century."[9]

42. 70,237 drug overdose deaths occurred in the United States in 2017. The age-adjusted rate of overdose deaths increased significantly by 9.6 percent from 2016 (19.8 per 100,000) to 2017 (21.7 per 100,000). Opioids—mainly synthetic opioids (other than methadone)—are currently the main driver of drug overdose deaths. Opioids were involved in 47,600 overdose deaths in 2017 (67.8 percent of all drug overdose deaths).[10]

43. In 2017, the states with the highest rates of death due to drug overdose were West Virginia (57.8 per 100,000), Ohio (46.3 per 100,000), Pennsylvania (44.3 per 100,000), the District of Columbia (44.0 per 100,000), and Kentucky (37.2 per 100,000).[11]

44. States with statistically significant increases in drug overdose death rates from 2016 to 2017 included Alabama, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Michigan, New Jersey, New York,

---

*Opioid Overdoses, Misuse and Addiction*, 1 (Jan. 28, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-02-02-16.pdf.

[8] Ctrs. For Medicare & Medicaid Servs., Centers For Medicare & Medicaid Services (CMS), *Opioid Misuse Strategy 2016,* 2 (Jan. 5, 2017), https://www.cms.gov/Outreach-and-Education/Outreach/Partnerships/Downloads/CMS-Opioid-Misuse-Strategy-2016.pdf.

[9] Nicholas N. Eberstadt, *Our Miserable 21st Century*, COMMENTARY MAG. (Feb. 2017), https://www.commentarymagazine.com/articles/our-miserable-21st-century/.

[10] U.S. Centers for Disease Control and Prevention, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html (last visited Aug. 16, 2019).

[11] Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017*. Morb Mortal Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, West Virginia, and Wisconsin.[12]

45. Every day, more than 130 people in the United States die after overdosing on opioids.[13] The misuse of and addiction to opioids—including prescription pain relievers, heroin, and synthetic opioids such as fentanyl—is a serious national crisis that affects public health as well as social and economic welfare. The Centers for Disease Control and Prevention ("CDC") estimates that the total "economic burden" of prescription opioid misuse alone in the United States is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement.[14]

46. Between July 2016 and September 2017, the number of emergency room visits for opioid-related overdoses jumped nearly 30 percent.

47. Recently, the congressionally-chartered National Safety Council revealed that, for the first time in U.S. history, a person is more likely to die from an accidental opioid overdose than from a motor vehicle crash. The analysis showed that the odds of dying from opioid overdose are also higher than from falls, drowning, gun assault, or choking.[15]

---

[12] CDC, National Center for Health Statistics, *Multiple Causes of Death 1999–2017, Wide-ranging Online Data for Epidemiologic Research* (CDC WONDER) (2019), https://wonder.cdc.gov/wonder/help/mcd.html.

[13] CDC/NCHS, *National Vital Statistics System, Mortality*, (2018), https://wonder.cdc.gov.

[14] Florence CS, Zhou C, Luo F, Xu L., *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States*, 54 Med Care. 901-906 (2016), doi:10.1097/MLR.0000000000000625.

[15] Nat'l Safety Council, *Injury Facts*, https://injuryfacts.nsc.org/all-injuries/ preventable-death-overview/odds-of-dying/; *see also* Press Release, Nat'l Safety Council, *For the First Time, We're More Likely to Die from Accidental Opioid Overdose than Motor Vehicle Crash* (Jan. 14, 2019) (https://www.nsc.org/in-the- newsroom/ for-the-first-time-were-more-likely-to-die-from-accidental-opioid-overdose-than motor-vehicle-crash) (last visited Aug. 16, 2019).

48. According to the CDC, retail opioid prescriptions were dispensed in 2017 at a national rate of 58.7 prescriptions per 100 persons.[16]

49. From 1999-2017, almost 400,000 people have died from an overdose involving any opioid, including prescription and illicit opioids.[17] This rise in opioid overdose deaths can be outlined in three distinct waves.

- The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1999.
- The second wave began in 2010, with rapid increases in overdose deaths involving heroin.
- The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids – particularly those involving fentanyl.[18]

50. The harm is real. In 2017, there were 491 deaths in New Mexico from prescription opioid overdoses.

51. The misuse and abuse of prescription drugs, along with the associated morbidity and mortality, has been identified as one of the most serious and costly issues facing New Mexicans today. In 2017, New Mexico had the 17th highest drug overdose mortality rate in the U.S., most of which was due to prescription drugs.

---

[16] U.S. Ctrs. for Disease Control & Prevention, *U.S. Opioid Prescribing Rate Maps,* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Aug. 16, 2019).

[17] Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017*. Morb Mortal Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

[18] *Id. See also* Rudd RA, Aleshire N, Zibbell JE, Gladden RM. *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*. 64 Morb. Mortal Wkly. Rep. 1378-82 (2016).

52. Over the past decade, New Mexico's drug overdose death rate has ranked at the top of the Country. In 2012, New Mexico's age-adjusted drug overdose rate was 24.2 per 100,000 persons. The CDC reported that New Mexico had the second highest drug overdose rate in the nation in 2010, nearly double the U.S. rate.

53. Since 2001, New Mexico's drug overdose death rate has increased 79.9 percent. Since 1990, almost 300 percent.

54. Between 2001 and 2012, oxycodone sales in New Mexico more than tripled.

55. In 2011, the prescriptions written by New Mexico providers peaked at 81.6 opioid prescriptions for every 100 persons.[19]

56. Neonatal abstinence syndrome ("NAS") or neonatal opioid withdrawal syndrome ("NOWS") may occur when a pregnant woman uses drugs such as opioids during pregnancy. A recent national study showed a fivefold increase in the incidence of NAS/NOWS between 2004 and 2014, from 1.5 cases per 1,000 hospital births to 8.0 cases per 1,000 hospital births. That is one baby born with NAS/NOWS every 15 minutes in the United States. During the same period, hospital costs for NAS/NOWS births increased from $91 million to $563 million, after adjusting for inflation.[20]

57. In March 2016, the CDC, in order to reduce opioid addictions, overdoses, and deaths, published specific recommendations for clinicians who prescribe opioids outside of cancer

---

[19] U.S. Centers for Disease Control and Prevention, *U.S. State Prescribing Rates, 2011*, (Jul. 21, 2017), https://www.cdc.gov/drugoverdose/maps/rxstate2011.html.

[20] National Institutes for Health, National Institute on Drug Abuse, *Opioid-Involved Overdose Deaths* (Mar. 2019), https://www.drugabuse.gov/opioid-summaries-by-state/new-mexico-opioid-summary.

treatment, palliative care, and end-of-life care.[21] The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (*e.g.*, high-dose prescribing, overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain)."[22]

58. Congress found that pharmacies are partly responsible for the crisis: "The opioid epidemic…has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[23]

59. The grave statistics about the human toll of the opioid crisis are shocking enough. But the crisis goes beyond the human toll. Not only have millions of lives been lost or squandered to opioid addiction, millions of dollars have been spent by Government Programs on fraudulent or otherwise medically unnecessary opioid prescriptions.

60. Pharmacies such as Walmart have put profits over patients and indiscriminately dispensed opioid prescriptions that were medically unnecessary or inappropriate.

61. As alleged herein, Walmart knowingly ignored the obviously medically inappropriate and unnecessary prescriptions, filled them nonetheless, and fraudulently charged Government Programs.

### B. Defendant's Recognition of Opioid Crisis

[21] *See generally* Deborah Dowell, M.D. *et al.*, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. Mortal. Wkly Rep. 1 (Mar. 18, 2016) [hereinafter, *CDC Guideline*].

[22] *Id*. at 3.

[23] U.S. S. Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement 4 (July 12, 2017) https://www.hsdl.org/?view&did=812961.

62. Walmart recognizes the severity of the opioid crisis. Walmart admits that "[t]he abuse of and addiction to prescription opioids is a serious public health issue."[24]

63. Walmart supported the President's State of Emergency Declaration.[25]

64. Walmart publicly claims that it has "a comprehensive program with policies, programs and tools aimed at helping to curb opioid abuse and misuse" and is "committed to being part of the solution both in our pharmacies and in our communities."[26]

65. But, in reality, by dispensing controlled substances without a legitimate medical purpose and outside the usual course of professional practice, Walmart has unlawfully perpetuated this serious public health crisis.

66. In fact, Walmart pharmacies held no staff meetings to address the ongoing opioid epidemic and to update employees on policies, procedures, and laws for dispensing prescriptions of controlled substances and recognizing and handling over-prescribers. (Pharmacy Technician No. 1 (employed 2016-2018)).

## V. THE APPLICABLE STATUTES

### A. The Controlled Substances Act

67. The Controlled Substances Act ("CSA") and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion of drugs

---

[24] Opioid Stewardship, Walmart, https://corporate.walmart.com/opioid-stewardship (last visited Aug. 19, 2019).

[25] Press Release, Walmart, *Walmart Supports State of Emergency Declaration on Opioids* (Oct. 26, 2017), https://corporate.walmart.com/newsroom/2017/10/26/walmart-supports-state-of-emergency-declaration-on-opioids.

[26] Opioid Stewardship, Walmart, https://corporate.walmart.com/opioid-stewardship (last visited Aug. 19, 2019).

from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[27]

68. The CSA categorizes controlled substances in five schedules.

69. Schedule II contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence" but nonetheless have "a currently accepted medical use in treatment."[28]

70. Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[29] Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[30]

71. Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.[31]

72. The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[32]

73. Accordingly, the CSA requires those who manufacture, distribute, or dispense

[27] *See* 21 U.S.C. § 841(a).

[28] 21 U.S.C. § 812(b)(2).

[29] 21 U.S.C. § 812(b)(3).

[30] 21 U.S.C. § 812(b)(4).

[31] 21 U.S.C. § 812(b)(5).

[32] 21 U.S.C. § 841(a)(1).

controlled substances to obtain a registration from the DEA.[33] A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."[34]

74. A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[35] An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.[36] The pharmacy knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

75. A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license.[37]

[33] 21 U.S.C. § 822(a).

[34] 21 U.S.C. § 822(b).

[35] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, Pharmacist's Manual: An Informational Outline of the Controlled Substances Act 29 (Rev. 2010).

[36] 21 U.S.C. § 829.

[37] *See, e.g., U.S. v. Kershman*, 555 F.2d 198 (8th Cir. 1977).

76. At all times relevant to this Complaint, Walmart had registered its retail pharmacies with the DEA in Schedule II–V controlled substances.

77. Those DEA registrations authorize Walmart pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner."[38]

78. Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered pharmacy like Walmart, are not required to register with the DEA, "if such agent or employee is acting in the usual course of his business or employment."[39]

79. Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.[40]

80. Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency.[41] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.[42]

81. Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he

---

[38] 21 U.S.C. §§ 823(f), 802(10).

[39] 21 U.S.C. § 822(c)(1).

[40] *See generally* 21 C.F.R. § 1306.

[41] 21 U.S.C. § 829(a).

[42] 21 U.S.C. § 829(b).

is licensed to practice his profession" and (b) registered with the DEA.[43]

82. A prescription, whether written or oral, is legally valid under the CSA **only** if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[44] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and **the person knowingly filling such a purported prescription**, as well as the person issuing it, **shall be subject to the penalties** provided for violations of the provisions of law relating to controlled substances."[45] (emphasis added)

83. As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[46] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

84. Moreover, "[a] prescription for a controlled substance may **only** be filled by a pharmacist, **acting in the usual course of his professional practice** and either registered individually, or employed in a registered pharmacy…."[47] (emphasis added)

85. Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice – *i.e.*, "the usual course of his [or her] professional practice" of

[43] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[44] 21 C.F.R. § 1306.04(a).

[45] *Id*. (emphasis added).

[46] *Id*.

[47] 21 C.F.R. § 1306.06 (emphasis added).

pharmacy.[48]

86. Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.[49]

87. This requires a pharmacist to use sound professional judgment in determining the legitimacy of a controlled substance prescription, which includes paying attention to the number of prescriptions issued, the number of dosage units prescribed, the doctor writing the prescriptions, and whether the drugs prescribed have a high rate of abuse. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.

**B. The False Claims Act ("FCA")**

88. The FCA[50] prohibits "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval.

89. The FCA[51] prohibits "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim.

90. The FCA[52] further imposes liability upon any person who conspires to commit a

---

[48] *Id.*

[49] *See* 21 C.F.R. §§ 1306.04, 1306.06.

[50] 31 U.S.C § 3729(a)(1)(A).

[51] 31 U.S.C § 3729(a)(1)(B).

[52] 31 U.S.C § 3729(a)(1)(C).

violation of the FCA.

91. The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient. Any claim submitted by a Government Program provider for a payment constitutes a claim under the FCA. Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a "claim" for purposes of the FCA.

92. The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation for violations that occurred before November 2, 2015 and, for violations that occurred after that date, a civil penalty of between $11,181 and $22,363.[53]

### C. Opioid Use by Government Program Beneficiaries and Opioid Use Disorder Coverage by Government Programs

93. There is an array of health care programs operated and funded by the United States and the Qui Tam States (the "Government Programs") whose purpose is to facilitate the delivery of safe and effective health care through payment or reimbursement of eligible prescription drugs for covered beneficiaries. Several of these Government Programs are described below.

#### 1. *Medicaid Coverage for Opioids and Opioids Use Disorder*

94. Medicaid is a public assistance program providing for payment of medical

[53] 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

expenses for approximately 55 million low-income patients. Funding for Medicaid is shared between the federal Government and state governments.

95. While Medicaid undoubtedly helps many deserving recipients, it also creates a series of incentives for potential abuse of opioids, which are rooted in federal law itself. Patients on Medicaid typically "pay no part of costs for covered medical expenses," other than perhaps a small co-payment.[54] Federal law requires that Medicaid co-payments and other "cost-sharing" borne by Medicaid recipients at lower income levels be nominal. CMS has determined that states could charge those on Medicaid no more than $4 for certain classes of drugs.[55] For dangerous opioids such as oxycodone, Medicaid co-pays can run as low as $1 for as many as 240 pills—pills that can be sold for up to $4,000 on the street.

96. As one longtime local prosecutor in opioid-ravaged eastern Kentucky recounted in DREAMLAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC: "We can talk morality all day long, but if you're drawing five hundred dollars a month and you have a Medicaid card that allows you to get a monthly supply of pills worth several thousand dollars, you're going to sell your pills."[56]

97. Although Medicaid is administered on a state-by-state basis, the state programs

---

[54] U.S. Dep't of Health & Hum. Servs., *Frequently Asked Questions: What is the Difference* Between *Medicare and Medicaid?*, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-the-difference-between-medicare-medicaid/index.html. (last visited Aug. 19, 2019).

[55] *See* Final Rule, Medicaid and Children's Health Insurance Programs: Essential Health Benefits in Alternative Benefit Plans, Eligibility Notices, Fair Hearing and Appeal Processes, and Premiums and Cost Sharing; Exchanges: Eligibility and Eligibility and Enrollment, 78 Fed. Reg. 42159-42322 (July 15, 2013) (codified in scattered pts. of 42 C.F.R.), https://www.gpo.gov/fdsys/pkg/FR-2013-07-15/html/2013-16271.htm.

[56] Sam Quinones, DREAM LAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC 211 (2015).

adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the federal Government will pay for through its funding of state Medicaid programs. Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs." Covered outpatient drugs are drugs that are used for "a medically accepted indication."

98. Medicaid covered over half of all nonelderly adults with opioid use disorder ("OUD") who received drug and/or alcohol treatment in the past year. In 2017, 617,000 nonelderly adults with OUD reported receiving treatment during the previous year. Of these individuals, 54 percent had Medicaid coverage while only 26 percent had private insurance and 20 percent were uninsured.[57]

99. State Medicaid programs cover numerous substance use disorder treatment services that fit into several state plan categories, including outpatient treatment, inpatient treatment, prescription drugs, and rehabilitation services. The standard of care for OUD is medication-assisted treatment (MAT), which combines one of three medications (methadone, buprenorphine, or naltrexone) with counseling and other support services.[58]

100. All state Medicaid programs cover at least one medication used as part of MAT and most cover all three of these medications.[59] State Medicaid programs also cover many

---

[57] Kendal Orgera and Jennifer Tolbert, Henry J. Kaiser Foundation, *The Opioid Epidemic and Medicaid's Role in Facilitating Access to Treatment* (May 24, 2019), https://www.kff.org/medicaid/issue-brief/the-opioid-epidemic-and-medicaids-role-in-facilitating-access-to-treatment/.

[58] Substance Abuse and Mental Health Services Administration, *Medication-Assisted Treatment (MAT)* (Apr. 26, 2019), https://www.samhsa.gov/medication-assisted-treatment/ (last visited Aug. 19, 2019).

[59] Kathleen Gifford, et al., Kaiser Family Foundation, States Focus on Quality and Outcomes Amid Waiver Changes: Results from a 50-State Medicaid Budget Survey for State Fiscal Years

counseling and other support services, delivered either as part of MAT or separately. Most of these services are delivered at state option and include detoxification, intensive outpatient treatment, psychotherapy, peer support, supported employment, partial hospitalization, and inpatient treatment.[60]

101. Medicaid finances a substantial proportion of substance use disorder treatment. In 2014, Medicaid financed more than one-fifth (21 percent) of substance use disorder treatment, which was slightly less than the share covered by all private insurers (22 percent). Nine percent of all spending on addiction treatment came from out-of-pocket payments by individuals.[61] By 2020, it is projected that Medicaid will finance 28 percent of substance use disorder treatment services, while other payer types are projected to remain the same.[62]

### 2. *Medicare Beneficiary Opioid Use and Abuse*

102. Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases. The program is administered by third-party contractors known as "carriers," which have some discretion to make coverage determinations, but must do so within statutory and regulatory confines.

---

2018 and 2019 78 (Oct. 25, 2018), https://www.kff.org/medicaid/report/states-focus-on-quality-and-outcomes-amid-waiver-changes-results-from-a-50-state-medicaid-budget-survey-for-state-fiscal-years-2018-and-2019/.

[60] Medicaid and CHIP Payment and Access Comm., *State Policies for Behavioral Health Services Covered Under the State Plan* (June 2016), https://www.macpac.gov/publication/behavioral-health-state-plan-services/.

[61] Tami L. Mark, et al., Insurance Financing Increased For Mental Health Conditions But Not For Substance Use Disorders, 1986-2014, 35 Health Affairs 961 (June 2016).

[62] Substance Abuse and Mental Health Services Admin., *Projections of National Expenditures for Treatment of Mental and Substance Use Disorders, 2010–2020*, 31 HHS Publication No. SMA-14-4883, https://store.samhsa.gov/system/files/sma14-4883.pdf (last visited August 21, 2019).

103. Starting in January 2006, Part D of the Medicare Program provided subsidized coverage for pharmacy-dispensed outpatient drugs for all beneficiaries, with low-income individuals receiving the greatest subsidies. However, a "covered Part D drug" must be used for a "medically accepted indication."

104. Medicare's Prescription Drug Program, known as Part D, provides optional drug benefits to Medicare beneficiaries. CMS contracts with private insurance companies, called sponsors, to provide Part D prescription drug coverage to beneficiaries who choose to enroll. Sponsors offer drug coverage to beneficiaries through Part D prescription drug plans. These Part D programs are subsidized by the federal Government, which covers the cost of drug payments.

105. In 2016, one out of every three beneficiaries received at least one prescription opioid through Medicare Part D. In total, 14.4 million of the 43.6 million beneficiaries enrolled in Medicare Part D received opioids. Medicare Part D paid almost $4.1 billion for 79.4 million opioid prescriptions for these beneficiaries. The vast majority of these opioids (80 percent) were Schedule II or III controlled substances, meaning they have the highest potential for abuse among legally available drugs.[63]

106. Several states had higher proportions of beneficiaries receiving opioids than the United States overall, which was 33 percent. Alabama and Mississippi had the highest proportions, with almost half of the State's Part D beneficiaries receiving at least one opioid—46 percent and 45 percent, respectively. Arkansas had 44 percent of beneficiaries receiving opioids,

[63] Dept. of Health & Human Services OIG, *Opioids in Medicare Part D: Concerns about Extreme Use and Questionable Prescribing*, 2 (July 2017), HHS OIG Data Brief OEI-20-17-00250. https://oig.hhs.gov/oei/reports/oei-02-17-00250.pdf.

while Oklahoma, Tennessee, and Louisiana each had 42 percent.[64]

107. In addition, 1 in 10 Medicare Part D beneficiaries nationwide received opioids on a regular basis. Specifically, 5 million beneficiaries received opioids for 3 months or more in 2016. Research shows that the risk of opioid dependence increases substantially for patients receiving opioids continuously for 3 months. Of these 5 million beneficiaries, 3.6 million received opioids for 6 or more months and nearly 610,000 received opioids for the entire year.[65]

108. A total of 501,008 beneficiaries received high amounts of opioids through Medicare Part D in 2016. This does not include beneficiaries who had cancer or were in hospice care. Each of the 501,008 beneficiaries received an average morphine equivalent dose (MED) of greater than 120 mg a day for at least 3 months. MED is a measure that equates all the various opioids and strengths into one standard value. A daily MED of 120 mg is equivalent to taking 12 tablets a day of Vicodin 10 mg or 16 tablets a day of Percocet 5 mg. These dosages far exceed the amounts that the manufacturers recommend for both of these drugs. They also exceed the 90 mg MED level that CDC recommends avoiding for patients with chronic pain.[66]

109. As the statistics make clear, there is a real problem with inappropriate opioid prescriptions being filled by Medicare patients. Pharmacies should not be dispensing most, if not all, of the prescriptions that are clearly for excessive amounts of opioids or for patients who have been doctor shopping. However, pharmacies like Walmart have failed to do this and instead chose to bill Medicare for those medically unnecessary prescriptions.

### 3. *Reimbursement under other Government Programs*

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

110. In addition to Medicaid and Medicare, at all times material hereto, the federal Government has reimbursed a significant portion of the cost of opioid prescriptions and opioid use disorder under several other Government Programs. For example:

- CHAMPUS/TRICARE is a health care program administered by the Department of Defense for individuals and dependents affiliated with the armed forces;
- CHAMPVA is a health care program administered by the Department of Veterans Affairs for families of veterans with 100-percent service-connected disabilities; and
- The Federal Employee Health Benefit Program ("FEHBP") is a health care program administered by the Office of Personnel Management that provides health insurance for federal employees, retirees, and survivors.

111. Moreover, at all times material hereto, the States and Localities have offered their employees, retirees and their beneficiaries and survivors health insurance coverage, including coverage for opioids and opioid use disorder.

112. Coverage of opioids and addiction treatment under these other Government Programs is similar to the coverage provided by the Medicaid and Medicare programs.

**D. Federal Guidance and State Law Governing Pharmacy Dispensing of Opioids**

113. The CDC has published guidelines regarding the proper use of opioids.[67] The guidelines explicitly state that "Opioid pain medication use presents serious risks, including overdose and opioid use disorder." Furthermore, "Sales of opioid pain medication have

[67] CDC, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. & Mort. Wkly. Rep. (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

increased in parallel with opioid-related overdose deaths."

114. The CDC guidelines, and many state laws, rely on Morphine Milligram Equivalents ("MME"). As the name suggests, MME is an opioid's dosage's equivalency to morphine. Using MME is useful because it provides a constant metric to compare opioids of varying types, strengths, and delivery methods. This is particularly useful for patients who may be using a combination of different opioid products or have changed products over time.

115. The CDC has a conversion chart of the most common opioids in mg to MMEs.[68] So, for example, 10 tablets of hydrocodone/acetaminophen 5mg/300mg would equal 50 MME (10 tablets x 5mg of hydrocodone x 1 hydrocodone oxycodone conversion factor = 50 MME). 2 tablets of oxycodone 30mg would equal 90 MME (2 tablets x 30mg of oxycodone x 1.5 oxycodone conversion factor = 90 MME).[69]

116. The CDC determined that in "[h]aving a history of a prescription for an opioid pain medication increases the risk for overdose and opioid use disorder, highlighting the value of guidance on safer prescribing practices for clinicians. For example, a recent study of patients aged 15–64 years receiving opioids for chronic noncancer pain and followed for up to 13 years revealed that one in 550 patients died from opioid-related overdose at a median of 2.6 years from their first opioid prescription, and one in 32 patients who escalated to opioid dosages >200 morphine milligram equivalents (MME) died from opioid-related overdose."

---

[68] Opioid Oral Morphine Milligram Equivalent (MME) Conversion Factors, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Opioid-Morphine-EQ-Conversion-Factors-Aug-2017.pdf (last visited Aug. 19, 2019).

[69] Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf (last visited Aug. 19, 2019).

117. In addition, the CDC found that "opioid-related overdose risk is dose-dependent, with higher opioid dosages associated with increased overdose risk. Two … studies … evaluated similar MME/day dose ranges for association with overdose risk. In these four studies, compared with opioids prescribed at <20 MME/day, the odds of overdose among patients prescribed opioids for chronic nonmalignant pain were between 1.3 and 1.9 for dosages of 20 to <50 MME/day, between 1.9 and 4.6 for dosages of 50 to <100 MME/day, and between 2.0 and 8.9 for dosages of ≥100 MME/day. Compared with dosages of 1-<20 MME/day, absolute risk difference approximation for 50-<100 MME/day was 0.15% for fatal overdose and 1.40% for any overdose, and for ≥100 MME/day was 0.25% for fatal overdose and 4.04% for any overdose. A recent study of Veterans Health Administration patients with chronic pain found that patients who died of overdoses related to opioids were prescribed higher opioid dosages (mean: 98 MME/day; median: 60 MME/day) than controls (mean: 48 MME/day, median: 25 MME/day). Finally, another recent study of overdose deaths among state residents with and without opioid prescriptions revealed that prescription opioid-related overdose mortality rates rose rapidly up to prescribed doses of 200 MME/day, after which the mortality rates continued to increase but grew more gradually."[70]

118. Furthermore, "epidemiologic studies suggest that concurrent use of benzodiazepines and opioids might put patients at greater risk for potentially fatal overdose. Three studies of fatal overdose deaths found evidence of concurrent benzodiazepine use in 31%–61% of decedents. In one of these studies, among decedents who received an opioid prescription, those whose deaths were related to opioids were more likely to have obtained opioids from

[70] *Id.*

multiple physicians and pharmacies than decedents whose deaths were not related to opioids."[71]

119. "[M]ost fatal overdoses could be identified retrospectively on the basis of two pieces of information, multiple prescribers and high total daily opioid dosage, both important risk factors for overdose that are available to prescribers in the PDMP."[72]

120. In those guidelines, the CDC recommends numerous strategies to reduce inappropriate opioid prescribing. Of particular relevance here, the CDC recommends that clinicians "should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day."[73]

121. Dosages at or above 50 MME/day increase the risks of overdose by at least 2x over the risk at <20 MME/day. In a national sample of Veterans Health Administration (VHA) patients with chronic pain receiving opioids from 2004–2009, patients who died of opioid overdose were prescribed an average of 98 MME/day, while other patients were prescribed an average of 48 MME/day.[74]

122. In 2016, Massachusetts became the first state in the nation to pass a law limiting first time opioid prescriptions to 7 days.[75] Since then, over half of all states have enacted laws

---

[71] *Id.*

[72] *Id.*

[73] CDC Guidelines for Prescribing Opioids for Chronic Pain, https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf (last visited Aug. 19, 2019).

[74] Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf (last visited Aug. 19, 2019)

[75] National Conference of State Legislators ("NCSL"), Prescribing Policies: States Confront

that restrict the prescribing or dispensing of opioids for acute pain. Fifteen states have passed laws limiting opioid prescribing for acute pain in an opioid naive patient to a 7-day supply. These states include Alaska, Hawaii, Colorado, Utah, Oklahoma, Louisiana, Missouri, Indiana, West Virginia, South Carolina, Pennsylvania, New York, Maine, Connecticut, Massachusetts. In addition, Arizona, North Carolina, and New Jersey limit initial prescribing to 5 days.[76]

123. Following surgical procedures, Arizona allows for a 14-day supply and North Carolina a 7-day supply. Nevada is the only state with an initial 14-day prescription limit.[2] The strictest limits are in Tennessee, Kentucky, and Florida where initial prescribing is limited to 3 to 4 days.[77] Minnesota also has a 4-day limit, but only for acute dental or ophthalmic pain.[78]

124. When addressing risks for drug overdose, studies support the need to monitor not only duration of initial therapy, but also total daily dosing for patients. This is particularly important for those patients who are receiving 50 to 99 daily morphine milligram equivalents (MME) or more per day.[79] Nevada and Arizona have limited prescribing doses of opioids to 90 MMEs per day.[80] Maine's limit is 100 MME per day and Rhode Island limits prescriptions to 50

---

Opioid Overdose Epidemic (Published October 31, 2018) http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx (last visited Aug. 19, 2019).

[76] *Id*.

[77] *Id*.

[78] *Id*.

[79] Liang, Y., Turner, B.J., Assessing risk for drug overdose in a national cohort: role for both daily and total opioid dose?, 16 J. Pain 318-25 (2014).

[80] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018) http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx (last visited Aug. 19, 2019).

MME per day.[81] Tennessee allows 60 MME per day if it is for 3 days or less, otherwise the prescriptions are restricted to 50 MME daily.[82]

125. While the majority of states focuses on general opioid prescribing limits, Alaska, Connecticut, Indiana, Louisiana, Massachusetts, Nebraska, Pennsylvania and West Virginia also set requirements regarding opioid prescribing to minors, such as discussing their risk with the minor and parent or guardian.[83]

126. Rather than setting opioid limits by statute, a few state laws direct or authorize other entities to do so (*e.g.*, New Hampshire, Ohio, Oregon, Vermont, Virginia, Washington and Wisconsin). These entities may include the Department of Health, a designated state health official, or regulatory boards, such as the Board of Medicine, Nursing and/or Dentistry. Other states, such as Rhode Island and Utah, have prescribing limits by statute, and allow other entities to adopt prescribing policies.[84]

127. In addition, state laws may provide guidance or direction related to opioid prescribing. Maryland requires providers to prescribe the lowest effective dose of an opioid for a quantity that is not greater than that needed for the expected duration of pain.[85] Utah, in addition to its 7-day prescribing limit, authorizes commercial insurers, the state Medicaid program, workers' compensation insurers and public employee insurers to implement policies for

---

[81] *Id*.

[82] *Id*.

[83] *Id*.

[84] *Id*.

[85] *Id*.

prescribing certain controlled substances.[86] The policies must include evidence-based guidelines for prescribing opioids.

128. Consequently, the dispensing of controlled substances, when faced with warning signals and without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates the pharmacist's corresponding responsibility under the CSA[87] to ensure the legitimacy of the prescription[88] as well as pharmacy laws and regulations in a majority of the states.

129. New Mexico law defines the "Practice of Pharmacy" to mean "continually optimizing medication safety, patient wellness, and quality of services through the effective use of pharmaceutical care and emerging technologies and competency-based and performance-based training."[89]

130. That same statute further explains that the "(1) Practice of pharmacy may include, but is not limited to, (2) specialty pharmacy practice including pharmacists working for licensed pharmaceutical manufacturers or wholesalers; (3) practice of telepharmacy within and across state lines; (4) engaging in health care educational activities; (5) pharmacy-specific academia; (6) provision of those acts or services necessary to provide pharmaceutical care in all areas of patient care including patient counseling, prescriptive authority, drug administration, primary care, medication therapy management, collaborative practice, and monitoring dangerous

---

[86] *Id*.

[87] 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829).

[88] 21 C.F.R. § 1306.04 and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA) because the prescription was filled outside of the pharmacist's usual course of professional practice. *See also* 21 C.F.R. § 1306.06

[89] N.M.A.C. § 16.19.4.7.

drug therapy; (7) inspecting on a full time basis to ensure compliance with the practice of pharmacy; (8) provision of pharmaceutical and drug information services, as well as consultant pharmacy services; (9) engaging in other phases of the pharmaceutical profession including those with research or investigational or dangerous drugs; or (10) engaging in functions that relate directly to the administrative, advisory, or executive responsibilities pursuant to the practice of pharmacy in this state; (11) the responsibility for compounding and labeling of drugs and devices; (12) the proper and safe storage of drugs and devices; and (13) the maintenance of proper records."[90]

131. New Mexico pharmacists also have requirements regarding the dispensing of controlled substances.[91]

132. Prescribing or dispensing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice. Prescribing or dispensing controlled substances for pain will be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication misuse or diversion.

### E. Use of State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping

133. It is undeniable that illicit street opiates and prescription opioid medications can often be linked, with legitimate prescriptions initiating the addiction, often followed by the person seeking the chemical from illegal sources once the prescription has ended. Sometimes,

---

[90] *Id.*

[91] N.M.S.A. § 16.19.20.

however, they will resort to "doctor shopping" – i.e., visiting multiple physicians in various ambulatory settings to obtain more of the same opioid medications if the patient's own health care provider is unwilling or unable to renew or refill the prescription. State prescription drug monitoring programs ("PDMPs") make a significant contribution to fighting the opioid epidemic by preventing and inhibiting doctor shopping.

134. PDMPs, or PMPs (prescription monitoring programs) as they are alternatively known, are utilized by 49 states, as well as Guam and the District of Columbia.[92] Although requirements vary by state, they generally collect data from dispensers and report to authorized users of a state's database the number of prescriptions that have been filled for scheduled drugs for each recipient. Access to the information contained in such databases is typically limited to prescribers and state officials. State pharmacy boards and health departments operate most PDMPs, but a minority relies on professional licensing agencies, law enforcement, state substance abuse agencies, or in the case of Connecticut, the Department of Consumer Protection.

135. All PMDPs monitor at least Schedule II through IV Drugs, with some also monitoring Schedule V and "Drugs of Concern" as designated by an authorized state agency. Eighteen states and the District of Columbia maintain a voluntary system, with no mandatory enrollment required of either prescribers or dispensers.[93] Still, the majority of state legislatures understand that the sum total is only as good as its parts. For example, recent Georgia and Mississippi legislation tied mandatory PMDP registration to the licensed practitioner's ability to

---

[92] Missouri is the only state not to have a statewide PDMP, though an Executive Order was issued in July 2017 directing its formulation. PDMP TTAC, *Status of Prescription Drug Monitoring Programs (PDMP)*, www.pdmpassist.org/pdf/PDMP_Program_Status_20170824.pdf (last visited August 21, 2019).

[93] PDMP TTAC, *PDMP Mandatory Query by Prescribers and Dispensers*, www.pdmpassist.org/pdf/Mandatory_Query_20170824.pdf (last visited August 21, 2019).

secure or renew a DEA number.[94] Maine adopted mandatory registration of both prescribers and dispensers in light of "an unprecedented 272 overdose related fatalities."[95] In an effort to combat the opioid epidemic through ensuring reliable information is accessible to prescribers, Kentucky and North Carolina have each added penalties for failure of pharmacies to comply with reporting requirements, including sanctions and a monetary penalty per offense.[96]

136. Statutory requirements for submitting and gathering prescription data are of little value if the statutes fail to specify how the data will be used. At least fifteen states enhanced their "query" requirements or how a prescriber or dispenser must check the state's PDMP system for patient information before prescribing a controlled substance. Checking the PDMP for opioid prescriptions from other sources is a recommended step in the CDC's "Checklist for prescribing opioids for chronic pain."[97] The Arkansas legislature directed licensing boards to adopt regulations requiring prescribers to query the PDMP when prescribing an opioid from Schedules II or III for each time a medication was prescribed to a patient.[98] Texas followed suit by naming specific categories of drugs that require a query prior to being prescribed ("opioids, benzodiazepines, barbiturates, or carisoprodol").[99] Some states (*e.g.*, Georgia, Louisiana,

---

[94] H.B. 249 (Ga. 2017), www.legis.ga.gov/Legislation/20172018/170657.pdf [hereinafter H.B. 249]; H.B. 1032 (Miss. 2017), http://billstatus.ls.state.ms.us/2017/pdf/history/HB/HB1032.xml.

[95] Weekly Notices of State Rule-Making: Public Input for Proposed and Adopted Rules, Maine.gov., www.maine.gov/sos/cec/rules/notices/2017/010417.html (last visited Nov. 4, 2017).

[96] H.B. 314 (Ky. 2017); H.B. 243 (N.C. 2017).

[97] CDC, *Checklist for Prescribing Opioids for Chronic Pain*, https://www.cdc.gov/drugoverdose/pdf/pdo_checklist-a.pdf.

[98] S.B. 339, 91st Gen. Assemb., Reg. Sess. (Ark. 2017), http://www.arkleg.state.ar.us/assembly/2017/2017R/Bills/SB339.pdf.

[99] H.B. 2561 (Tex. 2017), https://legiscan.com/TX/text/HB2561/id/1625193/Texas2017-HB2561-Enrolled.html.

Pennsylvania, and North Carolina) do not require query of all controlled substance prescriptions in certain situations. For example, the query requirement may not be applicable to providers of certain specialties if the prescription is for less than a three-day supply and contains less than 26 pills, the patient is terminally ill, or when the controlled substance is administered in a hospital. Georgia and South Carolina's legislatures added consequences for those practitioners who fail to query the PDMP, requiring them to be reported to their licensure boards for disciplinary action.[100]

137. In New Mexico, pharmacists are required to consult the PMP if the following conditions are present: "(a) a pharmacist becomes aware of a person currently exhibiting potential abuse or misuse of opioids (*i.e.* over-utilization, early refills, multiple prescribers, appears overly sedated or intoxicated upon presenting a prescription for an opioid or an unfamiliar patient requesting an opioid by specific name, street name, color, or identifying marks, or paying cash when the patient has prescription insurance); (b) a pharmacist receives an opioid prescription issued by a prescriber with whom the pharmacist is unfamiliar (i.e. prescriber is located out-of-state or prescriber is outside the usual pharmacy geographic prescriber care area); (c) a pharmacist receives an opioid prescription for an unfamiliar patient who resides outside the usual pharmacy geographic patient population area; (d) a pharmacist receives an initial prescription for any long-acting opioid formulations, including oral and transdermal dosage forms (e.g fentanyl or methadone); or (e) a pharmacist becomes aware of a patient receiving an opioid concurrently with a benzodiazepine or carisoprodol."[101] The pharmacist is also required to document the review of the PMP reports.

[100] H.B. 3824 (S.C. 2017); H.B. 249 (Georgia 2017).

[101] N.M.A.C. 16.19.4.16.

138. Mandatory use of PDMP programs has proven successful. In 2011 and 2012 respectively, Ohio and Kentucky mandated clinicians to review PDMP data and implemented pain clinic regulation. In these states, MME per capita decreased in 85 percent and 62 percent of counties, respectively, from 2010 to 2015.[102] New York, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, New York saw a 75 percent drop in patients' seeing multiple prescribers for the same drugs. Likewise, Tennessee, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, Tennessee saw a 36 percent drop in patients' seeing multiple prescribers for the same drugs.

139. Research has shed light on how a PDMP affects these Medicare patient behaviors.[103] A study compared Medicare opioid prescription data in 10 states that enacted use mandates from 2007-2013 with 17 other states implementing PDMPs without use mandates. In states with mandates, the percentage of Medicare enrollees who obtained prescriptions from five or more doctors was eight percent lower, compared with other states. The percentage of people getting opioids from five or more pharmacies was 15 percent lower.

140. States with use mandates also saw a decline in the number of Medicare enrollees filling opioid prescriptions before the previous one had run out or obtaining more than a seven-month supply of opioids in a half-year period. These states also saw a 15 percent reduction in the number of Medicare enrollees with four or more new patient visits in six months. The authors estimate that Medicare would save $348 million annually in unnecessary new patient visits if

[102] CDC, *State Successes*, https://www.cdc.gov/drugoverdose/policy/successes.html (last visited August 19, 2019).

[103] NBER Working Paper Series, *The Effect of Prescription Drug Monitoring Programs on Opioid Utilization in Medicare* 23148 (2017), https://www.nber.org/papers/w23148.pdf.

every state mandated use of its PDMP.[104]

### F. Unlawfulness of a Prescription Is Material to Government Program Opioid Payments

141. Compliance with federal and state requirements relating to pharmacies' dispensing of controlled substances was and remains material to a Government Program's decision to pay the Walmart's claims for reimbursement of controlled substances. Compliance with these requirements is central to Government Program benefits and is a condition of these medications being covered.

142. The government routinely denies payment for controlled substance medications, or seeks to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medication is intended for purposes of addiction or recreational abuse.

143. The United States Department of Justice ("DOJ") has litigated or settled numerous actions where it was alleged that medical providers and/or pharmacies submitted claims for controlled substance medications to Government Programs that lacked a valid prescription, were not for a legitimate medical purpose and lacked a medically accepted indication, or that did not comply with State law.[105]

---

[104] *Id.*

[105] *See, e.g.*, Press Release, U.S. Attorney's Office, Middle District of Tennessee, *Tennessee Chiropractor Pays More Than $1.45 Million to Resolve False Claims Act Allegations* https://www.justice.gov/opa/pr/tennessee-chiropractor-pays-more-145-million-resolve-false-claims-act-allegations (detailing $1.4 million settlement resolving allegations of improper billing for painkillers, including opioids, and including a nurse practitioner's surrender of her DEA registration); *United States ex rel. Norris v. Florence*, Civ. Action No. 2:13-cv-00035 (M.D. Tenn.) (ongoing FCA litigation against a physician for causing the submission of false claims by pharmacies for controlled substances that were not for a legitimate medical purpose); https://www.justice.gov/opa/pr/long-term-care-pharmacy-pay-315-million-settle-lawsuit-

144. The HHS Secretary's declaration that the opioid epidemic is a national public health emergency under federal law reflects the government's stance to deny payment for improperly dispensed controlled substances.

145. Accordingly, at all times material hereto, Walmart knew that Government Programs would not pay for opioid prescriptions if they had known that the controlled substance prescriptions at issues were invalid, did not comply with the CSA or with state pharmacy laws and regulations, or lacked a legitimate medical purpose or were medically unnecessary. Alternatively, Walmart knew (or had reason to know) that Government Programs would not pay claims submitted if these Programs knew that the controlled substance prescriptions were invalid as described.

## VI. WALMART'S PHARMACY OPERATIONS

### A. Walmart's Pharmacy Operations

146. Walmart utilizes certain corporate-developed and enforced Standard Operating Procedures ("SOPs") that govern pharmacy operations for all Walmart pharmacies throughout the United States.

147. The individual SOPs are contained on Walmart's corporate Pharmacy Operations Manual, which is available electronically to all Walmart employees assigned to its pharmacies via Walmart's intranet, an internal system called "the Wire."

148. An in-person drop-off triggers an SOP referred to by Walmart as "Drop Off for Success," which lays out a basic script beginning with "Good morning/afternoon" for staff to follow upon first receiving a patient's prescription. The process ends with the staff scheduling a

alleging-violations-controlled (Pharmerica CSA and FCA settlement for improper dispensing of and billing Medicare for unlawfully dispensed prescriptions).

pickup time for the patient to come and retrieve their filled prescription and entering it into the Connexus system.

149. The Walmart staff then proceeds to the "Input" station, where other Walmart staff enter the prescription information into Walmart's Connexus software system described below.

150. The "fill" process, POM 1008, is completed entirely by technicians when the time approaches for a prescription to be picked up. The process hinges on the use of a hand-held "Scanning for Accuracy" ("SFA") device, which lists patients with prescriptions that are ready to be filled based on the scheduled "patient promise [pickup] time." The Walmart staff then generally scans the "will-call" bag, retrieves the medication from the shelf, scans it, retrieves an empty package, and then proceeds to a "Fill Station," a cubicle-like desk area where the medication is to be counted and the package filled.

151. An average Walmart pharmacy fills approximately one hundred and seventy-five to two hundred (175-200) prescriptions daily, with the goal to continuously increase this amount. Many Walmart pharmacies, however, fill many more scripts per day than that.

152. Walmart's corporate managers, including the Pharmacy Market Directors, closely monitor the speed at which Walmart staff fill prescriptions. These Walmart Pharmacy Market Directors time and track the number of prescriptions filled as well as the precise percentage of those that are filled "on time," generally defined as within twenty (20) minutes of the schedule pickup time with regard to in-store pickups. These performance metrics are recorded in "Order Completion Performance" reports that are mandatory based on Walmart corporate requirements.

153. However, to increase the pressure to meet these performance metrics, Walmart

employs a computer-based real-time prescription-filling progress monitoring system that monitors the prescriptions coming "due" for pickup within thirty (30) minutes, two (2) hours, and forty-eight (48) hours. When a pharmacist is "falling behind" based on an internal, computer-generated schedule to which its pharmacists are not privy, the system begins to flash yellow or red depending on how "behind" the pharmacist is, based on the above, arbitrary fill-time expectations intended only to maximize fill speed with a conscious, reckless disregard of the negative impact such a system has on the accuracy of the prescription filling process. There is no ability for the timing system to adjust to the complexity of the prescription that needs to be filled or circumstances suggesting the prescription is inappropriate and/or medically unnecessary.

154. To process and track prescriptions and inventory and to submit claims for payment by payors and Government Programs, Walmart uses its own proprietary software, Connexus, which electronically records and tracks prescription data manually entered or verified by staff, including the name, dose, quantity, and date of the prescription along with the name of the prescriber and patient.

155. This beneficiary and prescription information is then aggregated by Connexus and used to determine an electronically stored and updated "Perpetual Inventory," which is the amount of medication left in stock after a prescription is filled.

156. As alleged below, Walmart requires its pharmacy managers to regularly conduct audits of inventory and prescription records. These audits, conducted pursuant to corporate-wide "checklists" and SOPs, require the pharmacy manager to review and analyze *both* the electronic Connexus records and the physical records prescription and inventory records to determine the "actual" inventory. These inventory checks, referenced in further detail below, occur daily and

are referred to as "cycle counts."

157. These regular audits never examined the dispensing practices of the individual pharmacy. They did not audit things like compliance with state or federal law dispensing laws or whether pharmacists were doing their proper due diligence. The audits were exclusively inventory-focused.

158. While most Walmart pharmacists worked at one store regularly, Walmart routinely used pharmacists that worked at multiple different Walmart pharmacies depending on where they were needed. These pharmacists were known as "floaters."

**B. Walmart Profit: Incentives to Fill**

159. Walmart's singular, overarching goal is profitability. Pharmacies play an important role at Walmart and Walmart strives to ensure that its pharmacies contribute to overall profitability. In light of its goal, Walmart pharmacies need to fill prescriptions quickly to ensure large volume of prescriptions being filled. This focus on driving prescription volume above all else drives Walmart's pharmacy strategy.

160. Focus on speed and increasing "sales" has coincided with Walmart's launch of initiatives such as "express lanes" and mobile web applications intended to maximize the daily flow of filled prescriptions.[106]

161. The Affordable Care Act greatly reduced the reimbursements pharmacies would get from government health care programs. By 2013, the reimbursements were down over 20

---

[106] Sarah Halzack, *Walmart's plan to get you in and out of stores faster*, Wash. Post (Feb. 28, 2017), https://www.washingtonpost.com/news/business/wp/2017/02/28/walmarts-plan-to-get-you-in-and-out-of-stores-faster/.

percent.[107]

162. Indeed, in 2015, Walmart's pharmacy business, expanded only recently in 2006, was struggling to make a profit. Then-Chief Executive Officer Greg Foran warned investors during an August 18, 2015 quarterly earnings call that Walmart's pharmacy operations were "negatively impacting gross margin" and under "pressure" in the wake of more Americans receiving drug insurance coverage through the Affordable Care Act and "reduced reimbursement rates from Pharmacy Benefit Managers."

163. The lowering of pharmacy reimbursements could only be offset by filling a greater number of prescriptions. Unfortunately for the public and the Government Programs, the timing was perfect for Walmart to capitalize on the opioid epidemic's explosion of pills to recoup the lost reimbursements by filling a greater volume of prescriptions much more quickly.

164. These efforts succeeded so much so that, by mid-2017 Walmart, had reported nine (9) consecutive quarters with increased comparable sales, specifically citing "growth" in pharmacy "script counts" and "better in-stock levels of [over the counter] drugs" as "highlights" of its positive sales numbers in multiple quarterly public filings describing its earnings.

165. According to Relator, performance metrics and prescription quotas adopted by Walmart for its retail stores contributed to its failure to prevent medically unnecessary prescriptions from being filled. Walmart only recognized how the pharmacy affected the business; there was never recognition of anything clinical.

166. Walmart emphasized sales over safety. "You understood that you needed to grow the business," she said. "The pharmacies that grew the business, they sold a lot of

---

[107] *Obamacare Will Squeeze Pharmacy Profits,* Drugchannels.net (Oct. 8, 2013). https://www.drugchannels.net/2013/10/obamacare-will-squeeze-pharmacy-profits.html.

controlled substances."

167. Pharmacists are directed to meet high prescription count goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety, or compliance with the CSA or state pharmacy laws and regulations.

168. Often pharmacists would need to fill a prescription every 30 seconds in order to meet the metrics and sales goals. For example, at the Walmart store in Clovis, New Mexico where Relator worked as a floater, during the entire 10-hour shift he was the lone pharmacist, often working with two pharmacy technicians to fill in excess of 500 prescriptions. That is more nearly one prescription per minute—not factoring in any breaks. Such overwhelming volume was typical. In Relator's experience, pushing medications out the door as quickly as possible is how Walmart makes its money.

169. Only if those sales goals and metrics were met were pharmacists eligible for bonuses. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year.

170. If the pharmacists did not meet the metrics, they would receive negative performance reviews and could be (and were) fired. For example, Relator was reprimanded once for spending too much time with patients at the counseling window. He felt that was the place where the pharmacist could spend a moment and check the accuracy of prescriptions and make other assessments.

171. Walmart pharmacy managers were evaluated annually as well. Fifty percent of the evaluation was based on subjective factors and the other 50 percent was based on objective metrics. Of the objective metrics, the largest component—a total of 25 percent of the whole

evaluation—was weighted on the profitability of the pharmacy. The profitability metric was heavily dependent on the number of controlled substance prescriptions that were filled at that pharmacy.

172. Walmart emphasized sales over safety. "You understood that you needed to grow the business," one pharmacist said. "The pharmacies that grew the business, they sold a lot of controlled substances." (Pharmacist No. 5)

173. Walmart had no incentives to report suspicious prescribers, patients, or prescriptions.

174. The only things Walmart measured (and thus rewarded) were the sales metrics. This has created a culture where the number of prescriptions filled, their speed, and their corresponding reimbursements were the measures of success at Walmart. The role of the pharmacist as a healthcare professional serving and counseling patients has been completely lost. Furthermore, the pharmacists have been pressured to be cogs in a prescription filling machine, rather than the last line of defense against inappropriate and/or medically unnecessary prescriptions (and the corresponding fraudulent billing).

175. The result is both deeply troubling and entirely predictable: inappropriate and medically unnecessary prescriptions for opioids flowed out of Walmart and into communities throughout the country. The policies have remained in place even as the epidemic ravaged the nation.

**C. Immense Pressure to Fill Quickly to Drive Sales**

176. Walmart put immense pressure on its pharmacists to not only fill all prescriptions but to fill them quickly. Often, this pressure was directly applied by pharmacy managers.

177. Every day, pharmacy managers would get a printout showing the previous day's data for reimbursement, what the sales volume was, how fast prescriptions were moved, how many prescriptions were filled and other sales metrics. Pharmacy managers were required to review these metrics every day.

178. Relying on that data, managers would then pressure the pharmacists to increase the speed and, consequently, the volume of dispensing.

179. The culture of filling prescriptions quickly to drive volume was built into the electronic software used by Walmart. The order-filling software would start a countdown to pressure pharmacists to fill the prescriptions more quickly. The system used a stoplight system to ensure that the pharmacist worked quickly. The system pressured the pharmacist to get "back in the green" and on track about prescriptions with yellow flashing to warn off being close to off schedule and red indicating that the pharmacist was not working quickly enough. This system did not take into account the complexities of each prescription, so the system would assign the same amount of time to fill for a customer presenting with numerous red flags the same as one without.

180. Unlike the data about sales metrics, the pharmacy managers did not get information on the pharmacists who were counseling patients, fully evaluating prescriptions, and otherwise acting properly as pharmacists.

181. Although pharmacists were supposed to be customer service people, at Walmart they could not do customer service because it takes too much time. Relator and other Walmart pharmacists got into health care because they wanted to help people and Walmart would not allow them to do that.

182. The pressure to fill every prescription was also compounded through the lack of

adequate staffing. Often, pharmacists were left as the only pharmacist at a location for entire shifts. This greatly cut into the ability of the pharmacist to evaluate each prescription carefully and in accordance with the law.

183. At a Walmart store in Clovis where Relator worked, there was only one pharmacist at a time, aided by two technicians. Despite asking Walmart for help, he received none. He and the technicians filled over 500 prescriptions in a typical ten-hour shift. In Relator's experience working at Walmart, the priority was always how much, how fast. Given the pressure to fill prescriptions quickly, it was simply impossible to investigate, report, and halt suspicious, inappropriate, or medically unnecessary prescriptions of controlled substances.

### D. Lack of Training on How to Properly and Adequately Handle Inappropriate Opioid Prescriptions

184. Walmart failed to adequately train its pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for controlled substances, including opioid painkillers. Walmart neglected to train its pharmacists on what constituted a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills supplied for the purpose of illegal diversion and drug trafficking.

185. The Department of Health & Human Services' Office of the Inspector General ("HHS OIG") has long highlighted the dangerous link between corporate cultures of disregard for compliance, like the one existing at Walmart's pharmacies, and Medicare fraud, finding that "vulnerabilities identified within pharmacies raise concerns about the extent to which sponsors

have complied with CMS's requirement to provide effective training and whether fraud, waste, and abuse may be undetected in a pharmacy setting."[108]

186. The DEA,[109] state pharmacy boards,[110] and national industry associations[111] have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient.[112] The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

187. For instance, the industry guidance tells pharmacists how to recognize (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

[108] *See* OIG, *Medicare Drug Plan Sponsors' Training to Prevent Fraud, Waste, and Abuse*, OEI-01-10-00060 (July 2011), https://oig.hhs.gov/oei/reports/oei-01-10-00060.pdf; *see also* OIG, *Medicare Drug Plan Sponsors' Identification of Potential Fraud and Abuse*, OEI-03-07-00380, (October 2008), https://oig.hhs.gov/oei/reports/oei-03-07-00380.pdf.

[109] Michele Leonhart *et al*., *Pharmacist's Manual: An informational outline of the controlled substances act*, Drug Enf't Admin., Diversion Control Div. (Revised 2010), https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/.

[110] *See* OIG, *Medicare Drug Plan Sponsors' Training to Prevent Fraud, Waste, and Abuse*, OEI-01-10-00060 (July 2011), https://oig.hhs.gov/oei/reports/oei-01-10-00060.pdf; *see also* OIG, *Medicare Drug Plan Sponsors' Identification of Potential Fraud and Abuse*, OEI-03-07-00380, (October 2008), https://oig.hhs.gov/oei/reports/oei-03-07-00380.pdf.

[111] Philip Brummond, et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 Am. J. of Health-Sys. Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

[112] Va. Bd. of Pharmacy, *Prescription Drug Abuse: Red flags for pharmacists and pharmacy technicians* (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8; Philip W. Brummond et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 Am. J. of Health-System Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

188. Until very recently, there was a total lack of training given by Walmart to its pharmacists about how to identify suspicious prescription and medically inappropriate prescriptions. This failure was particularly egregious given the raging opioid crisis.

189. Essentially, Walmart abdicated its own responsibility, and left it completely up to the pharmacists to figure out on their own how to identify suspicious and inappropriate prescriptions. One pharmacist described the situation as Walmart just leaving "it up to the feel of the pharmacist." (Pharmacist No. 1). Another described the decision whether or not to fill a prescription as "mostly at the discretion of the pharmacist… Nothing formal." She further added that "the pharmacists would police dispensing themselves." (Pharmacy Technician No. 1)

190. One pharmacy technician in Kentucky said that when she filled prescriptions, she was unaware of the prescribing physician's names and was never trained or instructed to note that information. Even if trained, she said that her crushing workload prevented her from doing even basic things like that. (Pharmacy Technician No. 1) A different pharmacy technician said that, despite the epidemic environment in her state and the large numbers of opioid patients, she had "absolutely no formal training on what to do" to identify fraudulent patients or doctors and was made aware of no policies or procedures on when to refuse to fill such prescriptions or how to handle such customers. (Pharmacy Technician No. 2)

191. Any training that Walmart pharmacy employees did get was largely limited to how to use the pharmacy computer system, how to input prescriptions, and how to operate a handheld scanner used to process medications from distributors. (Pharmacy Technician No. 1)

192. The lack of training by Walmart did more than just leave its pharmacists and technicians unprepared, it was a signal to them that rigorous evaluation of prescriptions was not important to the company as a whole. Instead, the company only focused on filling prescriptions

regardless of validity.

**E. Lack of Dispensing Protocols or Policies**

193. Walmart's singular focus on filling all prescriptions as quickly as possible meant that it did not have rigorous dispensing protocols or policies. Such policies would not have only resulted in denying more suspicious prescriptions, but would also slow down the speed at which prescriptions were filled. Instead, Walmart has insisted its dispensing practices to operate as a production line.

194. Walmart's procedure for filling prescriptions, including opioids, was limited to a basic nine-point check – patient name, date of birth, check the physician's name, check the medication, verify the signature, verify the dosage, confirm the patient instructions, check the photo of the drug to see if it is the right one, approve it, then make it ready to dispense.

195. In Relator's experience working at over 20 Walmart pharmacies in New Mexico, in such a busy, chaotic environment, the last thing Walmart was going to do was have pharmacists and technicians go over some policies and procedures about dispensing narcotics. It simply was not done during the time Relator was there.

196. Critically, Walmart pharmacies did not have any policies or protocols about how to address suspicious prescriptions. There were no Walmart guidelines for a pharmacist or technicians to consult to determine whether a particular prescription was suspicious or medically inappropriate. Walmart had no checklist, guidance, training, or resources for pharmacists or technicians to consult about whether a prescription was medically appropriate and should or should not be filled.

197. A pharmacy technician said that in her years working at Walmart she never had any discussions with management about suspicious physicians or what to do in the event the

came across one. (Pharmacy Technician No. 1)

198. Even if a pharmacist or technician did identify a prescription that was not medically appropriate, there was a total lack of policies and procedures for the pharmacist to follow after identification. Walmart had no protocol about how to flag prescribers who consistently were writing suspicious or medically inappropriate prescriptions, no protocol about how to flag prescription shopping by customers, or communicate information about trends they were seeing.

199. Despite filling large quantities of controlled substances, including opioids, and even though Walmart regularly acknowledged publicly that the opioid crisis raging nationally, Walmart did not maintain or share with its pharmacy staff a list or database of suspicious health care providers. “There was nothing put in place for that,” said one pharmacy technician. “It was purely up to the discretion of who was working and the pharmacist who was on duty.” (Pharmacy Technician No. 2). Ultimately, it was up to the individual stores to keep informal lists (if even that) compiled through word of mouth among pharmacists and technicians.

200. As one of the largest corporations in the world, Walmart could have easily invested some of its vast resources into developing uniform protocols that would have given concrete guidance to its pharmacy staff. But Walmart did not even use any of the available public guidance to incorporate into its own practices. Instead, it emphasized its profitability metrics, leaving it up to the pharmacy staff to refuse prescriptions at their own risk.

201. Walmart pharmacies essentially left the pharmacists and technicians on their own to evaluate prescriptions. This led to endemic inconsistency, with many choosing to fill as many prescriptions as possible, especially given the pressures and incentives to do so built into the structure of Walmart pharmacies’ operations.

202. This problem was particularly acute for hydrocodone prescriptions before 2014. Before that time, hydrocodone was a CIII, not a CII as it is now. That meant that Walmart pharmacies paid even less attention to what any reasonable pharmacist knew was a potent and powerful opioid.

203. This complete lack of a compliance function to check the tide of inappropriate and/or medically unnecessary prescriptions for opioids meant that pharmacy staff varied in the kind of diligence they practiced when it came to assessing suspicious customers and prescriptions. "There were unscrupulous pharmacists who really didn't care … and some were just too busy." (Pharmacist No. 1) Another pharmacist said "[s]ome pharmacists were able to get away with anything and everything they were doing." (Pharmacist No. 5)

204. With some pharmacists being particularly lax in their dispensing habits, there were routinely inappropriate and/or medically unnecessary prescriptions that were filled at Walmart pharmacies, including hundreds of thousands of opioid prescriptions paid for by Government Programs.

205. Despite reasonably diligent pharmacists who, had they been given the tools and time, might have able to recognize the steadily growing influx of inappropriate opioid prescriptions, Walmart continued to not have pharmacy policies to help the opioid problem from "going off the rails." (Pharmacist No. 1)

206. Of note, Walmart did not require its pharmacists to check state PDMP databases despite the evidence that using this data reduces overdose deaths, doctor shopping, and inappropriate or medically unnecessary reimbursements. In fact, one pharmacist recalled that many pharmacists at her location in Florida did not use the state's PDMP database, and that one pharmacist at her store did not even know her password to logon to Florida's E-FORCSE system.

(Pharmacist No. 5)

207. Having such a requirement would have greatly increased the time it took to fill prescription and would have identified many more prescriptions that were medically inappropriate. Predictably, Walmart chose its bottom line over public health.

### F. 2016: Walmart Implements New Protocols and Policies, But Its Half-Hearted Measures Did Little to Address the Opioids Epidemic

208. Walmart's laisse-faire attitude towards dispensing guidelines has continued through the peak of the opioid crisis. Only in 2016 did Walmart begin to implement a limited standard process for filling controlled substances. The process was a simple handout that advised pharmacists to check for less than ten warning signs. These warnings signs included the basic red flags such as patients not from the geographic area, paying cash, and customers who seemed rushed or nervous. The guidance also emphasized awareness of local prescribers and their habits. This information was also added to a single online training module.

209. Only at this point in 2016 did Walmart ask that pharmacists note in the Connexus system that a Walmart pharmacy had refused to fill a prescription for a patient. The pharmacist was also supposed to – but was not required to – make a more substantive note in the system about why the prescription was refused. This is called a SCRT and is used to document what Walmart calls "qualifying events."

210. However, Walmart did not institute this requirement of noting refused prescriptions to help cut down on the amount of inappropriate prescriptions being dispensed. Rather, Walmart started recording the information to better defend itself from Board of Pharmacy investigations started as a result of customer complaints about being denied prescriptions.

211. But, even though the notation that a prescription had been refused was supposed to be a Walmart requirement, compliance was never audited (or rewarded) so compliance was uneven at best. Given the enormous pressures they were under, many Walmart pharmacists simply did not have the time to enter the information. Additionally, there were no incentives for pharmacists to make it easier to track the refusals to fill inappropriate prescriptions above and beyond their regular duties.

212. Walmart instead incentivized its pharmacists to fill prescriptions just to avoid customer complaints, particularly after this new policy went into effect. "A lot of pharmacists are doing things that may not be clinically sound or safe for the patient," one pharmacist said. "They don't want anyone to complain. Walmart does not want to hear any complaints from their customers." (Pharmacist No. 5)

213. Also, in 2016 did Walmart start formally blocking its pharmacies from filling certain doctor's prescriptions. The list was compiled from the reports of dispensing refusals entered by pharmacists. Even then, one pharmacist in New Jersey remembered only 4-5 doctors' prescription ever being blocked. (Pharmacist No. 1)

214. Only in 2018, faced with a tidal wave of litigation accusing the industry of fueling the opioid epidemic, did Walmart begin to restrict "initial acute opioid prescriptions to no more than a seven-day supply, with up to a 50 morphine milligram equivalent maximum per day."[113]

215. These attempts to stem the tide of inappropriate dispensing at Walmart

[113] Press Release, *Walmart Introduces Additional Measures to Help Curb Opioid Abuse and Misuse* (May 7, 2018), https://corporate.walmart.com/newsroom/2018/05/07/walmart-introduces-additional-measures-to-help-curb-opioid-abuse-and-misuse.

pharmacies were a belated recognition by Walmart that it had a problem with its prior dispensing practices. Yet, while Walmart had now instituted some policies designed at curbing some of the inappropriate and/or medically unnecessary prescriptions from being dispensed at its pharmacies, Walmart's efforts were too little, too late.

### G. Walmart Turned a Blind Eye to the Opioids Crisis

216. For years Walmart had failed to respond effectively to concerns raised by its own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

217. Walmart also failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to use data available to it to do statistical analysis to prevent the filling of prescriptions that were illegally diverted, dispensed, or otherwise contributed to the opioid crisis.

218. Walmart knew (or should have known) that its pharmacies were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling prescriptions of unusual size and frequency paid for in cash; (f) filling prescriptions of unusual size and frequency from the same prescribing physician; (g) filling prescriptions of unusual size and frequency from out-of-state physicians; and (h) filing prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.

219. Had it bothered to find out, it would have been clear from its own data that the volumes of opioids dispensed by these Walmart pharmacies were disproportionate to non-

controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.

220. Walmart had complete access to, and full visibility into, all prescription opioid dispensing data related Walmart pharmacies nationally.

221. Walmart had complete access to information revealing the doctors who prescribed the prescription opioids dispensed in Walmart pharmacies nationally.

222. Walmart had complete access to information revealing the customers who had filled (or sought to fill) prescriptions for opioids in Walmart nationally.

223. Despite this access, Walmart failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

224. On information and belief, Walmart also failed to conduct adequate internal or external audits of its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly. Even if it had conducted such audits, it failed to take any meaningful action as a result.

225. Walmart was, or should have been, fully aware that the quantity of opioids being dispensed was untenable, and in many areas patently absurd; yet it did not take meaningful actions to investigate and/or to ensure that it was complying with its duties and obligations under the law with regard to controlled substances.

### H. Walmart's Unique Opioids Return Policy Led to Further Abuse

226. Walmart's return policy also attracted inappropriate prescriptions to its pharmacies in particular.

227. Walmart stores have a generous return policy that allows many items to be returned to a Walmart store without a receipt for store credit.[114] This policy led to a cycle of addicts, dealers, and others shoplifting items from a Walmart store, "returning" the stolen merchandise for store credit, then using the credit to fill prescriptions for controlled substances, particularly opioids. Often, these fraudulently obtained prescriptions were then sold on the street for multiples of their retail value.

228. The practice was so widespread that a judge in Westmoreland County Pennsylvania dubbed her court "Walmart court." The judge remarked that "With the amount of fraudulent returns I'm seeing, the volume is on a scale that has to be enormous. I don't understand how Walmart can't know that this is a means to an end for an addict. This is how addicts are paying for their drugs." The judge laid the blame at Walmart's feet: "Walmart has to know that they are a huge part of the problem … that they are contributing to this epidemic."[115]

## VII. DEFENDANTS' UNLAWFUL CONDUCT

229. Walmart is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

---

[114] Walmart Policies and Guidelines: Return Policy, Walmart Inc., https://corporate.walmart.com/policies (last visited August 19, 2019).

[115] Stephen Huba, *Judge takes on Wal-Mart in opioids fight*, TRIBLIVE (Oct. 14, 2017) https://archive.triblive.com/local/westmoreland/12825084-74/judge-takes-on-wal-mart-in-opioids-fight.

230. For years, long after the opioid crisis had begun, the giant pharmacy chain Walmart did almost nothing to fulfill its legal duty to monitor inappropriate and/or medically unnecessary prescriptions. While it was supposed to block such prescriptions and alert the DEA, it did so rarely, if at all.

231. Walmart had been on notice of these issues for years. In 2009, Walmart paid $637,000 to resolve allegations of numerous record-keeping violations at its pharmacies in Texas. Those allegations included that Walmart had failed to timely file records with the DEA indicating loss or theft of drugs, in violation of the CSA.[116] Not only that, but its competitors CVS and Walgreens had been cited for numerous violations, including an $80 million fine levied against Walgreens for record-keeping and dispensing violations under the CSA.

**A. Walmart's Scheme to Defraud Government Programs**

232. Walmart has participated in Government Programs at all times material hereto. As alleged herein, Walmart schemed to obtain from Government Programs substantial, improper reimbursements for opioids.

233. Scores of opioid prescriptions dispensed by Walmart did not constitute valid prescriptions that complied with federal and state law and were not issued for a legitimate medical purpose and/or were medically unnecessary. At all times material hereto, Government Programs would not have paid for the tainted controlled substances medications if these Programs had known that the prescriptions were illegitimate and invalid.

234. From at least 2006 to the present, Defendant has violated the CSA by dispensing

---

[116] *See generally* Emma Perez-Trevino, *Walmart Fined for Alleged Recording Keeping Violations*, Brownsville Herald (Jan. 7, 2009) https://www.brownsvilleherald.com/news/local/wal-mart-fined-for-alleged-recording-keeping-violations/article_1a19f348-e9ad-534f-a1a1-8423736b0df9.html

controlled substances in violation of the pharmacist's corresponding responsibility in violation of 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice in violation of 21 C.F.R. § 1306.06.

235. Walmart pharmacists repeatedly failed to identify (or ignored) suspicious circumstances and indicia of abuse and diversion, filling controlled substance prescriptions without resolving those indicia, or "red flags," including, but not limited to:

- Patients presenting with prescriptions for drugs which are known to be drugs of abuse, particularly at high dosage levels;
- Patients traveling unusual distances to obtain a prescription or fill a prescription;
- Patients paying high cash (or cash equivalent) prices for prescriptions; and
- Patients presenting prescriptions for combinations of or multiple drugs which are known to used together by drug abusers as a "cocktail" for their synergistic effect.

236. Walmart violated the CSA each time it filled a controlled substance prescription without identifying and resolving those red flags because:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. § 829 and thereby violated 21 U.S.C. § 842(a)(1).
- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violated 21 U.S.C. § 841(a).

237. Because scores of controlled substance prescriptions were dispensed, or caused to be dispensed, by Walmart lacked a legitimate medical purpose, were not for a medically accepted indication, and did not constitute valid prescriptions under the CSA and state pharmacy laws and regulations, at all relevant times material hereto, Government Programs would not have paid for those medications.

### B. Specific Examples of Unlawful Dispensing Conduct

#### 1. *Mayfield (Graves County, Kentucky)*

238. Mayfield, Kentucky is a community of just over 10,000 residents in Western Kentucky located about two hours northeast of Nashville, three hours southwest of St. Louis, and three hours west of Louisville. A quick look at the town's website shows upcoming events like the Mayfield Food Fest, a Rodeo at the Mayfield-Graves County Fairgrounds, an Antique Tractor show, and Religious Art Show hosted by the Mayfield-Graves County Art Guild.[117]

239. At first blush, Mayfield is not the type of town one might associate with the opioid epidemic. But that is the nature of the opioid epidemic in 2019. It reaches into every corner of our society, from tough inner cities to peaceful country towns like Mayfield where opioids have been pouring in.

240. In Graves County, where Mayfield is located, there were twenty-three opioid overdose deaths between 2009 and 2013, or an annual rate of 27.1 per 100,000 population.[118]

241. Walmart's failures under the CSA and state pharmacy laws and regulations have

[117] *See* http://mayfieldky.gov/.

[118] Svetla Savova, et al., Kentucky Injury Prevention and Research Center, *Drug Overdose Deaths in Kentucky, 2000 – 2013*, at 10 (March 6, 2015), http://www.mc.uky.edu/kiprc/projects/ddmarpdak/pdf/KyDrugOverdoseDeaths-2000-2013.pdf.

been at the center of the problem in Mayfield. Its pharmacy at 1225 Paris Road dispensed a total of 1,241,855 opioid pills between 2006 and 2012 for a total of 7,953,677 MME.

242. That means that at the CDC's highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of nearly 36 opioid prescriptions per day. Here is a summary of this Walmart store's dispensing by type of opioid during this time period, particularly Hydrocodone:




243. Despite the opioid epidemic raging in Mayfield, Kentucky at that time, Walmart provided no training on how to recognize and deal with physicians who were suspected of over-prescribing opioids. Nor did Walmart provide a list of physicians suspected of over-prescribing or of patients suspected of pill shopping.

244. One Walmart pharmacy technician who worked at the Paris Road Walmart store between October 2016 and October 2018 said her pharmacy never provided her with any training on "red flags" for inappropriate prescriptions, nor did the Walmart pharmacy have a policy or protocol on how to deal with suspicions physicians. (Pharmacy Technician No. 1)

245. Because of the significant volume of prescriptions coming through the Paris Road Walmart, she never looked at the Kentucky PDMP for potential pill shopping because her job responsibilities did not give her sufficient time to do so.

246. At no time during the two years of her employment did the pharmacy do anything to address the ongoing opioid epidemic. In fact, she was aware of only two patients who were ever denied prescriptions at this pharmacy.

**2. *Carrollton, Texas***

247. One former Walmart clinical pharmacist (Pharmacist No. 4) who worked at its huge mail pharmacy in Carrollton, Texas from February 2015 to January 2018 (whose job it was to perform medication therapy reviews for patients around the U.S.) explained how little Walmart was doing to fulfill its obligations to control inappropriate prescribing.

248. His job was to speak with patients around the country and review the patient's medication list to determine whether it reflected an accurate record. He frequently dealt with patients receiving drugs as beneficiaries of Government Programs and counseled them on potential issues with their taking opioids. Despite the fact that nearly every patient he talked with appeared to be taking too many opioids, Walmart provided no training on what to do when confronted with a provider suspected of dispensing or a patient suspected of taking opioids too frequently.

249. This former employee estimated that at least once a week he encountered situations with patients where he suspected provider fraud, but he was told by Walmart management "not to address that."

250. Even though he felt they should be reporting these instances of fraud to the DEA, Walmart's policy was to require his team to report such cases only internally because they

were to "let corporate deal with it."

251. Even though he reported these cases at least once a week, he was quite certain his reports never went beyond that, nor did he ever receive any reports back about any actions taken by Walmart.

252. He also explained that bonus payments for Walmart pharmacists were based on performance metrics, including how many prescriptions were filled, and how many drugs you "push out the door," not whether they complied with the law. (Pharmacist No. 4)

### 3. *Deptford Township (Gloucester County, New Jersey)*

253. Gloucester County, New Jersey is made up of largely quiet suburbs just across the river from Philadelphia and northwest of Atlantic City with a population of just over 290,000 people. New Jersey state statistics show, however, that in 2015 the opioid epidemic not only infested New Jersey's urban areas, but the more unlikely places where suburban stories of abuse have developed into a sad, profound narrative. Largely suburban Gloucester County is on that list.[119]

254. In Gloucester County, the heroin death rate was 17.3 deaths per 100,000 people in 2014 – nearly seven times the national average, according to the New Jersey Department of Health.[120] Between 2004 and 2014, at least 53 people died of heroin or opiate overdoses in Williamstown, an unincorporated community located almost entirely in Monroe Township,

[119] Tom Davis, *30 N.J. Towns With The Most Heroin Abuse, New Data Says*, Morristown Patch, (Sept. 1, 2016) https://patch.com/new-jersey/morristown/30-new-jersey-towns-most-heroin-abuse-latest-2016-data-released.

[120] Amy Polhamus, *Inside the N.J. town with a heroin death-rate 25 times the national average,* NJ.com, (Jan. 28, 2016) https://www.nj.com/gloucester-county/2016/01/meet_the_town_leading_the_fight_against_gloucester.html.

Gloucester County. Williamstown is not alone. From 2004 to 2014, Washington Township, with a population of about 50,000, was the site of at least 23 heroin and opiate-related deaths. Glassboro, home to 20,000 people, had 11 in the same period, and Deptford, which has a population of 30,000, had about 18. Even tiny Newfield, a town of fewer than 2,000 people, had four overdose deaths.

255. The two Walmart stores in Deptford Township dispensed significant amounts of opioids. Its pharmacy at 2000 Clements Bridge Road between 2006 and 2012 dispensed some 664,405 doses of opioids, or 7,384,960 MME.

256. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 32 opioid prescriptions per day.

257. The pharmacy at 820 Cooper Street between 2006 and 2012 dispensed some 670,525 doses of opioids, or 6,957,217 MME.

258. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 30 opioid prescriptions per day.

259. A former Walmart pharmacist (Pharmacist No. 1) who was the store manager at the Deptford, New Jersey store from 2010 to 2019 specifically remembered that, despite concerns that he may be prescribing inappropriate opioids prescriptions, they dispensed opioids even though they suspected the prescribers to be writing inappropriate prescriptions.

260. One such doctor was Dr. Steven Forman, a podiatrist with a practice in Gloucester County. This former Walmart pharmacy manager recalls the two pharmacies where he worked regularly filled prescriptions for Dr. Forman even though they suspected he was over-prescribing opioids. Dr. Forman regularly wrote prescriptions for 120 30mg oxycodone tablets (the most often abused oxycodone formulation). Dr. Forman would later lose his medical license

and pay fines[121] related to investigations going back several years which accused him of indiscriminately prescribing controlled dangerous substances.[122]

261. This former store manager said that, despite a steadily worsening opioid epidemic in New Jersey, Walmart provided no corporate policies, protocols or requirements for opioids for what to do when they encountered suspicious prescriptions. This was the case in spite of the fact that the opioid problem in Gloucester County was "going off the rails" as early as 2012.

262. This changed somewhat in or around 2016. That year, Walmart provided a list of warning signs for which pharmacists should look out when filling prescriptions. The company also later added a computer-based learning module to its corporate training courses that outlined how to handle warning signs for suspicious prescriptions. Even then, however, Walmart did not provide its pharmacists with lists of physicians it suspected of over-prescribing nor of patients it suspected of abusing opioids.

263. Also, in 2016, Walmart instituted a policy requiring pharmacists to fill out an online form and submit it through the company internal electronic channels if they refused to fill a prescription. The form asked for the name of the patient, the doctor and the reason for refusing to fill.

264. According to this former employee, occasionally, but not often, Walmart would

---

[121] Tom Davis, *31 N.J. Doctors Lost Jobs In Statewide Opioid Crackdown*, Toms River Patch (March 2, 2017) https://patch.com/new-jersey/tomsriver/31-n-j-doctors-lost-jobs-statewide-opioid-crackdown.

[122] Kevin Kelly, *State disciplines four South Jersey medical providers to combat opioid crises*, Philly Voice (March 2, 2017) https://www.phillyvoice.com/state-disciplines-four-south-jersey-medical-providers-combat-opioid-crises.

issue an internal report about a doctor who had been cut off because the company had received multiple reports that pharmacists were refusing to fill prescriptions.

265. Even then, Walmart management still put extraordinary pressure on pharmacists to meet prescription volume goals. The metrics of profit margin and prescription count accounted for 25 percent of the goals needs to be eligible for bonuses and raises. Nothing in the metrics measured or held them accountable for ensuring only appropriate and/or medically prescriptions were filled.

266. And bonuses could be significant. This former manager said he had earned a $19,000 bonus for several years because his prescription volume had grown more exponentially than forecast.

267. As the epidemic worsened, Walmart eventually eliminated counting the number of prescriptions for controlled substances in the bonus calculation. However, the company still continued to measure store profit margins, which did include the sale of controlled substances and opioids.

**C. Specific Examples of Unlawful Dispensing Conduct: The Heroin Highway**

268. From Baltimore, Maryland to Winchester, Virginia, Interstate 70 and Interstate 81 weave through (and near) towns like Frederick, Maryland, Hagerstown, Maryland, Charles Town, West Virginia, Martinsburg, West Virginia, Luray, Virginia, and Winchester, Virginia. This strip of roadway has become sorrowfully known as the "Heroin Highway" due to the high trafficking of the substance through these once unsuspecting towns. But it was prescription opioids (much of it dispensed at Walmart pharmacies which dotted the landscape) that ignited the conflagration along the Heroin Highway.

***1. Charles Town (Jefferson County, West Virginia)***

269. Opioid abuse and trafficking in West Virginia is widespread. The state has one of the highest prescription rates for opioids in the United States. Statistics show that illicit pharmaceutical drug use contributed to approximately 61 percent of state overdose deaths in 2015.[123] The extraordinarily high abuse rate of opioids is attributed in part to the large number of jobs in heavy manual labor such as mining, timbering, and manufacturing. These professions often cause injuries to workers that are treated with opioid pain relievers, which in turn can lead to addiction.[124]

270. Opioid abusers and traffickers in West Virginia obtain the drugs from either licensed providers or out-of-state drug traffickers who have expanded into West Virginia. In some instances, doctors and other health care providers, acting outside medical guidelines, write prescriptions for prescription opioids without a legitimate need on the part of the "patient." In other cases, the prescriptions are written by doctors in good faith, for unsuspected "doctor shoppers" who are providing for their own addictions, supplying pills to dealers, or both.

271. Charles Town is located in Jefferson County. Jefferson County Attorney Matt Harvey recently requested the West Virginia governor declare a "state of emergency" to provide the Eastern Panhandle with the resources needed to fight the opioid crisis. "We are losing a generation of people to opioid addiction," Harvey said in a letter to the governor. "Our local police, firefighters, EMS and my office are committing all our resources to fighting back, but we need help," he said. Harvey cited state figures that were released in January that show 23 people

[123] Drug Enforcement Agency Intelligence Report, *The West Virginia Drug Situation*, 2 (May 2017), https://www.dea.gov/sites/default/files/2018-07/DEA-WAS-DIR-024-17%20West%20Virginia%20Drug%20Situation%20-UNCLASSIFIED.pdf.

[124] David Gutman, *How did WV come to lead the nation in overdoses*?, Charleston Gazette-Mail; (October 17, 2015), https://www.wvgazettemail.com/news/health/how-did-wv-come-to-lead-the-nation-in-overdoses/article_60c46a00-eec5-5c42-b6b0-2050439074f5.html.

died in Jefferson County due to an overdose in 2016, and 21 of those deaths involved at least one opioid.[125]

272. On April 17, 2018, the Charles Town City Council unanimously passed a Resolution declaring a public nuisance related to the opioids epidemic, stating (in part): "The dumping of millions of pain pills into our state and community has spawned a public health and safety hazard to the residents of the City of Charles Town, devastated our families, hurt our economy, wasted our public resources, and created a generation of narcotic dependence."[126] The Resolution also stated that "the data collected from the City's Police CAD system from September 2014 to March 2018 reveal that, over the past several months, the Police Department responded to 56 overdoses and the overwhelming majority of overdoses were directly tied to heroin followed by prescription pills. Of the 56 reported overdoses, 11 were fatal and 45 survived."[127]

273. Contributing to the flood of opioids that has been drowning Charles Town was the Walmart pharmacy at 188 Flowing Springs Rd., which from 2006 to 2012 dispensed some 2,626,500 doses of opioids or 21,159,486 MME.

274. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 92 opioid prescriptions per day every day for seven years. Below is a table taken from the DEA's ARCOS database graphically illustrating the

---

[125] Matthew Umstead, *Prosecutor: W.Va. needs to declare opioid emergency*, HeraldMedia.com (March 17, 2017), https://www.heraldmailmedia.com/news/tri_state/west_virginia/prosecutor-w-va-needs-to-declare-opioid-emergency/article_b8280ba8-0b63-11e7-9ed9-577186995115.html.

[126] The City of Charles Town, West Virginia Resolution on the Opioid Epidemic: Resolution No. 2018-002 (April 18, 2018).

[127] *Id*.

glut of opioids that came through the Flowing Springs Walmart during this time:




275. According to a former pharmacist who worked at the Flowing Springs Walmart (Pharmacist No. 3), he was not aware of any database that Walmart created or maintained concerning potentially inappropriate prescriptions. Nor did Walmart maintain a database or list of potential pill mill doctors. Occasionally, but rarely, pharmacy staff would receive an email about a suspected pill mill doctor or questionable prescriber.

**2. *Martinsburg (Berkeley County, West Virginia)***

276. West Virginia has the highest overdose death rate in the country. Opioids have devastated the state's Eastern Panhandle, which includes the town Martinsburg, the county seat for Berkeley County. Like nearly all of the residents there, the majority of the addicts are white, were born in the area, and have modest incomes.[128]

[128] Margaret Talbot, *The Addicts Next Door*, The New Yorker (May 29, 2017),

277. In Berkeley County, which has a population of 114,000, when someone under sixty dies, and the cause of death is not mentioned in the paper, locals assume that it was an opioids overdose. It has become the default explanation when an ambulance stops outside a neighbor's house, and the best guess for why someone is sitting in his car on the side of the road in the middle of the afternoon.[129]

278. One well known pill mill doctor, Dr. Tressie Duffy, M.D., ran a wellness clinic in Martinsburg. A grand jury in U.S. District Court in Martinsburg indicted Dr. Duffy on 100 felony counts of aiding and abetting the distribution of four controlled substances from April 2010 to February 2012. Duffy was accused of signing blank prescription orders, then allowing employees to issue 157 of them to 96 patients without being seen by a physician. The substances involved were oxycodone, oxymorphone, methadone, and methylphenidate, a drug used to treat attention deficit-hyperactivity disorder.[130] In 2016, she was sentenced to a year in federal prison, was ordered to give up her West Virginia medical license, and was barred from ever applying for another license anywhere in the United States.[131]

279. The Walmart pharmacy at 800 Fox Croft Ave. has been a major contributor to the flow of opioids that has been devastating Martinsburg. Located mere yards from I-81, the

---

https://www.newyorker.com/magazine/2017/06/05/the-addicts-next-door.

[129] *Id.*

[130] John Raby, *Martinsburg doctor accused of illegal pill prescriptions*, Times West Virginian (Sept. 18, 2014), https://www.timeswv.com/news/west_virginia/martinsburg-doctor-accused-of-illegal-pill-prescriptions/article_9d9754ce-3ef1-11e4-a376-631dcf004465.html.

[131] Joel Ebert, *Martinsburg doctor faces prison time after pleading guilty to drug charges*, Charleston Gazette-Mail (Dec. 23, 2015), https://www.wvgazettemail.com/news/cops_and_courts/martinsburg-doctor-faces-prison-time-after-pleading-guilty-to-drug/article_d21dbe9f-8189-5ee0-9971-e7dc8ada140a.html.

store saw immense prescription volume. Often the store filled more than 1,000 prescriptions per day, with around 30% being for controlled substances.

280. Despite the immense prescription volume, Walmart did not adequately staff the pharmacy. Often there was only one pharmacist and two pharmacy technicians to handle all of the volume. This forced the pharmacists to spend less time doing their due diligence on prescriptions than they should have been. This was especially true for dispensing controlled substances – there simply was not enough time to do all of steps necessary. (Pharmacist No. 3)

281. For example, only pharmacists are allowed to get the CIIs (which includes nearly all the opioids) from the control cabinet, count the pills, print the label, enter them the information into the perpetual inventory system, and dispense the drugs. This means that the pharmacy technicians were not able to relieve the crush of the volume when it came to dispensing CII controlled substances.

282. As with all the high-volume Walmart stores, the inadequate staffing meant that instead of having around 15 minutes or more to properly vet controlled substance prescriptions, Walmart pharmacists typically had less than five minutes.

283. The Fox Croft Walmart pharmacy from 2006 to 2012 dispensed some 3,911,990 doses of opioids or 43,919,216 MME.

284. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 190 opioid prescriptions per day every day for seven years. Below is a table taken from the DEA's ARCOS database depicting the glut of opioids dispensed at this Walmart which saturated Martinsburg:




285. One former pharmacist who worked at the Fox Croft Walmart (Pharmacist No. 3) recalled that, despite the epidemic of opioids overwhelming the area surrounding Martinsburg, "[t]here was nothing specific [provided by Walmart] about being on the lookout for opioid addicts or anything like that," he said. That type of information was passed on only by word of mouth between the pharmacists and the technicians, and the level of information varied from store to store and usually depended on who the pharmacist in charge was.

286. Another topic of discussion among the pharmacists was the nickname for the cluster of pharmacies in the area: "the Devil's Triangle." The pharmacists gave this moniker to the area because of the high rates of addicts and pill pushers that frequented the surrounding pharmacies.

287. Despite these half-hearted attempts from Walmart's corporate office, Walmart still dispensed inappropriate prescriptions. In one instance, a pharmacist denied a patient who

had identical prescriptions for both oxycodone and Xanax (a potentially deadly combination) from multiple doctors. But a few days later, a different customer came in with the very same prescription for both oxycodone and Xanax. Because the patient had matching ID to the prescription and did not have multiple prescriptions, the pharmacist dispensed the mediation. Subsequently, the pharmacist then saw the patient walk out and hand the prescription directly to the same woman whose prescription he had denied to fill earlier.

288. While this former employee assumed that this information was passed up the chain to corporate management but “what they ended up doing with it, I’m not sure.”

289. For 2006 and 2007, the Walmart at 800 Fox Croft Ave. had been in the top 5% of all pharmacies in the state of West Virginia in MME dispensed.

290. Instead of cracking down on the inappropriate dispensing in the “Devil’s Triangle” Walmart chose to exploit it. Eventually the high volume of prescriptions at the Fox Croft Walmart induced Walmart to open a second Walmart with a pharmacy up the road in Martinsburg. The new Walmart at 580 Hammonds Mill Road in Martinsburg was under 9 miles away, and it too was mere yards from the Heroin Highway, I-81. Walmart had no qualms about opening the new store despite the notorious reputation of the area as the Heroin Highway and the extremely high dispensing of opioids at its other location just down the road.

291. As a result of the Hammonds Mill store opening, in 2008 the Fox Croft store dropped to top 8% in all of West Virginia in MME dispensed.

292. The Hammonds Mill Walmart pharmacy from 2008 to 2012 dispensed some 1,114,290 doses of opioids or 10,152,671 MME.

293. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 44 opioid prescriptions per day.

294. From 2008-2012, the two Walmart pharmacies in Martinsburg, both right next to I-81 and a mere 9 miles apart, dispensed a total of 38,084,817 MME (27,932,145 at the Fox Croft store and 10,152,672 MME at the Hammonds Mill store).

295. That means that at the highest bounds of the recommended MME per day (90 MME/day) the stores were supplying an average of 231 opioid prescriptions per day.

296. The Hammonds Mill store also suffered from the same lack of training and short staffing issues as the other Walmart stores, causing its pharmacists to not properly vet controlled substance prescriptions.

### 3. *Winchester (Frederick County, Virginia)*

297. According to the town website, Winchester, Virginia has long been known as the "Apple Capital" surrounded as it is by vast orchards and constituting one of the largest apple export markets of the nation.[132] Its agricultural heritage belies the more sinister impact the opioid epidemic has had on the city. Winchester is a small city of less than 28,000 people that has suffered particularly from the opioid epidemic ravaging the United States.

298. In Virginia, fatal drug overdoses are the leading cause of unnatural death, and have been since 2013. In Winchester and its five surrounding counties, opioids killed 40 people in 2017; as of June 2018, they had already killed 13 people.[133]

299. Winchester City Police Chief Kevin Sauzenbacher explained that "[w]e are on what is known as the Heroin Highway." The area surrounding Winchester faced a jump of one

[132] Discover Winchester Virginia, *About the Area;* https://visitwinchesterva.com/about-the-area/ (last visited August 19, 2019).

[133] Annabelle Timsit, *One city has created a blueprint for tackling the opioid epidemic*, Quartz (October 21, 2018), https://qz.com/1429001/the-opioid-epidemic-is-tearing-communities-apart-heres-how-one-city-came-together-to-fight-it/.

fatal opioids overdose in 2012 to 33 deaths in 2014. "You can see the chart rise in the number of kids in foster care almost directly correlated with the number of deaths we've had from heroin overdoses," explained the chief.[134]

300. Newborn babies of opioid addicted mothers in Winchester were also falling victim to the heroin epidemic. "We typically will have somewhere between three and five babies in the NICU on a daily basis that are being treated for withdrawal," said Dr. Teresa Clawson, a neonatologist with Mednex, Winchester Medical Center.[135]

301. Contributing to the torrent of opioids that has been overwhelming Winchester has been the Walmart pharmacy at 501 Walmart Drive, which from 2006 to 2012 dispensed some 3,181,261 doses of opioids or 31,221,050 MME, the largest number of opioids dispensed by any pharmacy in Frederick County, Virginia.

302. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 135 opioid prescriptions per day. Below is a table taken from the DEA's ARCOS database graphically illustrating the glut of opioids that came through this Walmart during this time:

[134] Jeniffer Donelan and Dwayne Myers, *Heroin Highway: Part 3 - Virginia, A Commonwealth in Crisis*, ABC 7-WJLA (Feb. 17, 2016), https://wjla.com/features/hooked-on-heroin/heroin-highway-part-three-virginia-a-commonwealth-in-crisis.

[135] *Id*.




303. A former pharmacist who worked at this Walmart pharmacy from 2012 to 2013 (Pharmacist No. 3) recalled that the Walmart store in Winchester was located next to Interstate 81, the "Heroin Highway." Despite this reputation, Walmart did nothing to ensure appropriate and/or medically necessary scripts were being filled, nor did provide its pharmacy staff with corporate training on warning signs to help identify fraudulent prescriptions or patients. Instead its corporate training regimen for pharmacy staff focused on other policies and procedures, such as how to handle hazardous materials.

**4. *Luray (Page County, Virginia)***

304. A former Walmart pharmacist (Pharmacist No. 3) who worked as a floater at the Walmart store at 1036 U.S. Hwy 211 West, Luray, which was located just east of I-81, the Heroin Highway, described that this pharmacy "was filling crazy amounts of opioids." He worked as a floater there about 20 times and always dreaded it because it was such a high-

volume and hectic store.

305. He recalled the store filled close to 1,000 prescriptions a day. At least half, or perhaps up to 75 percent, was in Schedule 2 drugs and the "vast majority" of those were opioids, particularly oxycodone. "It would be an assembly line of Schedule 2s," he said. "That area stuck out in my mind as a real high-volume area for that."

306. The Luray Walmart pharmacy has been a major contributor to the flow of opioids that has been devastating the area. The Luray Walmart pharmacy from 2006 to 2012 dispensed some 2,520,025 doses of opioids or 21,381,326 MME.

307. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 92 opioid prescriptions per day. Below is a table taken from the DEA's ARCOS database depicting the glut of opioids dispensed at this Walmart which saturated the Luray area:



308. From his pharmacist's post, Pharmacist No. 3 could look out and see the line of people waiting to fill their prescriptions at the Luray Walmart store. He half-jokingly remembered seeing someone in line and a half-hour later seeing the same person at the same spot in line.

309. Because he was a floater, he relied on full-time staff and management to determine policy and protocol for filling these prescriptions. At the Luray store, "their thing was, if they've filled here before, go ahead and fill it. If it's new, then verify it. Otherwise, keep the assembly line going."

310. This assembly-line attitude meant that as long as one prescription had been filled previously, subsequent prescriptions would receive little to no scrutiny – an enormous loophole of which unscrupulous customers took full advantage. In fact, there was an unwritten policy at the Luray Walmart that pharmacists were not supposed to check the Virginia PMP database. If the PMP was routinely checked it would mean that fewer prescriptions would be filled because of the time it took it took to check the database, but also because the PMP would reveal large numbers of suspicious or inappropriate prescriptions.

311. This protocol was communicated by word of mouth, usually during an overlapping time at the end of one pharmacist's shift and the beginning of another's. He believes word got out among addicts and opioid abusers about the lenient practices at the store, which only increased the intensity of the traffic in opioids. It was a common sight to see lines that snaked through the entire pharmacy area and spilled out into the rest of the retail store area.

312. Many of the customers of the worst Walmart pharmacies paid for their prescriptions through Government Programs. Pharmacist No. 3 estimated that nearly 50% of the opioid prescriptions filled at the Luray store were paid for by Government Programs. At the

other locations, the percentage of customers paying with Government Programs varied between 25% and 50%.

313. At the Luray store especially, but also at the other Walmart stores where he worked, the company did not hire enough staff to deal the prescription volume. A typical Sunday shift would be a pharmacist and an intern, not even a technician.

314. When he complained about staffing, management replied that if volume at the store increased, then staffing would be increased. Staffing was based on volume of prescriptions, which he thought was unrealistic. "You want us to double that (volume) just to get one more person in here?" he said.

315. There was also regular pressure from management and corporate staff to increase sales and grow volume. That made it difficult to make even a cursory evaluation of opioids prescriptions or to check the state prescription monitoring programs. "It was just a 'keep it rolling' kind of thing," he said of the pharmacy environment.

**D. Specific Examples of Unlawful Dispensing Conduct: New Mexico**

316. Since 2008, New Mexico has had one of the highest rates of drug overdose death in the United States. Between 2008 and 2012, almost every county in New Mexico had a higher drug overdose death rate than the rate for the entire United States. In some New Mexico counties, the overdose death rates were more than five times the national rate. According to CDC, New Mexico had the third highest drug overdose death rate in the nation in 2013, the second highest in 2014, and remained in the highest age-adjusted rate category in the nation in

2015.[136]

317. The New Mexico Department of Health estimates that in 2007 alone prescription opioid abuse and misuse cost New Mexico $890 million, taking into account costs such as excess medical and prescription costs, lost earnings from premature deaths, and the costs of correctional facility and police services.[137]

**1. *Alamogordo (Otero County)***

318. The opioid epidemic has been particularly devastating in Otero County. From 2014 to 2016, there have been 42 drug overdose deaths in Otero County for a drug overdose mortality rate of 22 deaths per 100,000 residents.[138] From 2012 to 2014, there were 41 deaths, and from 2004 to 2010 there were 84 drug poisoning deaths.[139]

319. According to the New Mexico Department of Health, from 2012 to 2016 there were 66 deaths due to drug overdoses in Otero County for a drug overdose death rate of 20.7.[140] Of those deaths, at least 37 involved prescription opioids.[141] In 2015 there were 14 deaths and in

---

[136] Hector Balderas, New Mexico Attorney General, *Fighting the Opioids Crisis in New Mexico*, https://www.nmag.gov/fighting-the-opioid-crisis-in-new-mexico.aspx (last visited August 19, 2019).

[137] *Id.*

[138] Drug Overdose Deaths, 2016 tab, *County Health Rankings & Roadmaps*, http://www.countyhealthrankings.org/app/new-mexico/2018/measure/factors/138/data.

[139] *Id.* at 2014 tab.

[140] *New Mexico's Indicator-Based Information System (NM-IBIS)*, NEW MEXICO DEP'T OF HEALTH, https://ibis.health.state.nm.us/indicator/view/DrugOverdoseDth.Cnty.html.

[141] New Mexico Dep't Of Health, *New Mexico Substance Abuse Epidemiology Profile (November 2017)* 35, http://www.nmprevention.org/Project_Docs/NM%20Substance%20Abuse%20State%20Epi%20Profile%202017Nov.pdf.

2014 there were 16 deaths for a death rate of 24.6 that year.[142]

320. The opioid epidemic is also increasing hospital visits and costs. From 2012 to 2016 there were 101 opioid overdose related Emergency Department visits in the County.[143]

321. The opioid epidemic is also impacting children. In 2015, 9.9% of 9 to 12th graders in the County had used a painkiller to get high. In addition, 3.9% of those in the County in grades 9 to 12 had used heroin.[144]

322. According to a former Walmart pharmacy technician who worked at the Alamogordo Walmart at 233 S. New York Avenue, pharmacists would see patients every day who were prescribed relatively large quantities of opioids and for multiple varieties that included hydrocodone, oxycodone and methadone. (Pharmacy Technician No. 2)

323. This pharmacy technician explained that pharmacies were "ground zero for the [opioids] epidemic." Despite the epidemic environment and that large numbers of patients who filled prescriptions at her pharmacy, she had "absolutely no formal training on what to do" to identify fraudulent patients or doctors. Nor did Walmart have any policies or procedures in place on when to refuse to fill such prescriptions or how to handle such customers.

324. The Alamogordo Walmart pharmacy filled enormous amounts of opioids between 2006 and 2012, filling 3,293,346 dosage units or 36,304,509 MME.

325. That means that at the highest bounds of the recommended MME per day (90

---

[142] *Overdose Deaths Decline in Nearly Two-Thirds of New Mexico's 33 Counties*, New Mexico Dep't Of Health (September 20, 2016), https://nmhealth.org/news/information/2016/9/?view=484.

[143] New Mexico Dep't of Health, New Mexico Substance Abuse Epidemiology Profile, *supra*, at 38.

[144] *Id.* at 110.

MME/day) the store was supplying an average of 157 opioid prescriptions per day. Here is a chart showing the dispensing at this one Walmart between 2006 and 2012:




326. Despite being a town of approximately 30,000 people, the Alamogordo Walmart was routinely in the top 3-4% of dispensing pharmacies in all of New Mexico, ranking in the top 4% in 2006, top 3% in 2007 and 2008, top 2 % in 2009, top 1% in 2011, and top 4% in 2012.

327. Many former Walmart pharmacy employees recall filling prescriptions at Walmart for "pill mill" doctors. One former pharmacist who worked in Alamogordo, New Mexico recalled Dr. Mark Beale as being a heavy prescriber. Beale was in his Alamogordo, New Mexico office on Tuesdays and, because of his copious prescriptions, Tuesdays were usually busy days at the pharmacy. "If you were doctor shopping, that was the doctor you wanted," she said. "He would pretty much write everything you wanted." (Pharmacy Technician No. 2).

328. Dr. Mark Beale was arrested in April of 2019 for raping six (6) of his patients and also "may have prescribed medications to some of the women without properly diagnosing

their symptoms."[145] Twenty-two percent of Dr. Beale's 206 patients had filled at least one prescription for an opioid, compared to an average of 3 percent.[146]

329. The same pharmacy technician also remembered Dr. Brett Butz as being a heavy opioid prescriber. "We got a ton of scripts from him," she said. "He seemed excessive." Despite Dr. Butz's suspicious prescribing habits, the pharmacy technician did not recall any instances when the pharmacy refused to fill one of his prescriptions.

330. Despite what it knew was a dire epidemic ravaging the country, including the fact that it was aware of over-prescribing by clearly pill mill doctors whose patients were receiving opioids prescriptions, Walmart did not maintain or share with its pharmacy staffs a list or database of suspicious health care providers who were prescribing or patients who were receiving inappropriate amounts of opioids. (Pharmacy Technician No. 2)

**2. *Albuquerque (Bernalillo County)***

331. The opioid epidemic has been particularly devastating in Bernalillo County. According to the New Mexico Department of Health, from 2013 to 2017 there were 902 deaths due to drug overdoses in Bernalillo County for a drug overdose death rate of 26.3 per 100,000 residents.[147]

332. Similarly, from 2012 to 2016 there were 923 drug overdose deaths in Bernalillo

---

[145] Bethany Freudenthal, *Las Cruces psychiatrist who allegedly had sex with patients charged with rape*, LAS CRUCES SUN NEWS, April 2, 2019, https://www.lcsun-news.com/story/news/local/2019/04/12/las-cruces-psychiatrist-mark-beale-who-allegedly-had-sex-patients-charged-rape/3451904002/.

[146] ProPublica, *Prescriber Checkup: The Doctors and Drugs in Medicare Part D*, https://projects.propublica.org/checkup/providers/1164547709 (last visited August 19, 2019).

[147] *New Mexico's Indicator-Based Information System (NM-IBIS)*, NEW MEXICO DEP'T OF HEALTH, https://ibis.health.state.nm.us/indicator/view/DrugOverdoseDth.Cnty.html (last visited August 21, 2019).

County for a death rate of 27.1 during that period.[148] Of those deaths, at least 448 involved prescription opioids.[149] More people have died in Bernalillo County due to drugs – and opioids specifically – than in any other county in New Mexico.[150]

333. The opioid epidemic is also increasing hospital visits and costs. From 2012 to 2016 there were 2,482 opioid overdose related Emergency Department visits in the County for a rate of 72.8 such visits per 100,000 residents.[151]

334. The opioid epidemic is also impacting children. In 2015, 6.4% of 9th to 12th graders in the County had used a painkiller to get high.[152] In addition, 2.1% of those in the County in grades 9 through 12 had used heroin.[153]

335. Walmart store-level data shows the inappropriate and fraudulent dispensing at the 11 Walmart pharmacies in Bernalillo County. According to DEA ARCOS data, the 10 Bernalillo County Walmart stores dispensed 20,365,421 doses of opioids or 229,015,358 MME between 2006 and 2012. The annual average was 32,716,479 MME per year.

336. That means that at the highest bounds of the recommended MME per day (90 MME/day) the Walmart stores in Bernalillo were supplying enough opioid prescriptions for an average of 996 regimens of 90 MME/every day for seven years.

337. Relator worked from 2011 to 2016 at numerous Bernalillo County Walmart

[148] New Mexico Dep't of Health, New Mexico Substance Abuse Epidemiology Profile, *supra*, at 32.

[149] *Id.* at 35.

[150] *Id.* at 32, 35.

[151] *Id.* at 38.

[152] *Id.* at 110.

[153] *Id.*

pharmacies, including at 310 San Mateo Blvd, 2550 Coors Blvd., NW, 2701 Carlisle Blvd, NE, and 2266 Wyoming Blvd, NE.

338. During Relator's time working as a floater pharmacist at these Bernalillo County Walmart stores, training for pharmacists was generally limited to how to use the prescription dispensing software, Connexus. The company also trained pharmacy managers in all other policies and procedures that other managers in the store needed to know, but these policies rarely, if ever, applied to the pharmacies.

339. Relator was totally unprepared for the types of patients he saw at the Bernalillo Walmart pharmacies he worked at, patients who were being treated with multiple medications and some who were being prescribed high doses of opiates.

340. It was not until New Mexico mandated the use of its PDMP in 2012 that Relator felt he had the data and support needed to identify problem patients and prescribers.

341. The difficulty then, however, was the PDMP data was not part of the pharmacist's work station computer, which had limited internet access only to Walmart's Connexus database, and no external internet access. This meant that, in order to check the PDMP database, pharmacists were required to check a computer being used by the technicians. This inconvenience only added to the pharmacist's intense working environment to meet Walmart's metrics.

342. And, in Relator's experience, Bernalillo Walmart pharmacists were under extraordinary pressure to meet customer demands and to meet the company's volume- and profit-based performance metrics. In Relator's experience working at more than 20 Walmart stores, pharmacists were evaluated on prescription volume using metrics that are all focused in on profits. These metrics had no measurements for patient outcomes. Rather, pharmacists were

tasked with filling prescriptions quickly and with meeting other volume-based measurements.

343. The company had perhaps a dozen or more goals that it set for pharmacists, including the number of prescriptions filled, and number of vaccinations given. District managers reviewed that information with the store multiple times a week, even daily if the store was behind on meeting the goals.

344. However, Walmart never provided any guidance on what pharmacists should do when they found a suspicious patient through the New Mexico PDMP.

345. At these Bernalillo Walmart pharmacies, he regularly saw examples of suspicious or inappropriate dispensing. For example, he was asked in 2011 to take over for the Pharmacy Manager, Mike Black, at the 8511 Golf Course Road, NW Walmart pharmacy. When he arrived at the pharmacy, he saw that Black was being escorted from the premises by several Walmart Loss Prevention employees and the District Manager, Jarvis Mixon. He found out later from others working in the pharmacy that Black had been terminated for alleged diversion of controlled substances. Two weeks later, Black died of an apparent opioids overdose.[154]

346. Relator worked for approximately six months at the Golf Course Road Walmart pharmacy. During that time, he saw numerous questionable prescriptions being filled, including numerous scripts for Phernergan, a drug used with opioids to augment opioid-induced euphoria. In a number of instances, Relator noted that the Phenergan prescriptions had expired, so he refused to fill them. When he told customers he would not fill these scripts, they told him that the prior pharmacist (Black) had regularly filled these prescriptions even though there were

[154] Obituary for Dr. Michael Joseph Black, Pharm.D (May 8, 1981-May 9, 2011), ObitTree, . https://obittree.com/obituary/us/new-mexico/albuquerque/daniels-family-funeral-services/dr-michael-black-pharmd/883951/index.php.

expired.

347. Relator also noted that a large Cadillac Escalade being driven by a patient on Medicaid and welfare would regularly appear at the pick-up window to pick up high dose Oxycodone tablets. He recalls the technicians telling him that they believed the driver of the Escalade was engaged in diversion and had some kind of arrangement with Black to fill scripts that otherwise were questionable.

348. Relator mentioned these concerns to the replacement store manager at the Golf Course Road store, but to his knowledge nothing was ever done to investigate whether Black had been engaged in any inappropriate activity. Nor did any Walmart management provide any kind of guidance, nor instruct the Golf Course Road employees about what the diversion issues were that led to Black's being terminated.

### 3. *Española (Rio Arriba County)*

349. Rio Arriba County, just north of Santa Fe, is a Georgia O'Keeffe landscape of juniper-dotted desert and mountain valleys populated mostly by Hispanics who proudly trace their lineage to settlers of the 1600s — and who, two decades ago, discovered that their county had the nation's highest per capita rate of deaths from opioid overdoses. Hundreds of Rio Arriba families have been struggling to live with a multigenerational plague of opioids.[155]

350. Rio Arriba County was reputedly the first U.S. county to be struck by the opioid epidemic in the late 1990s and has been ranked by the CDC as the county with the highest rate of opioid overdose deaths for two decades, only recently dropping to fourth place nationally.[156] Rio

[155] Eric Eckhold, *A Grim Tradition, and a Long Struggle to End It*, New York Times (April 2, 2008), https://www.nytimes.com/2008/04/02/us/02overdose.html.

[156] Resolution No. 2018-064, Rio Arriba County Board of Commissioners, *A Resolution*

Arriba County had the highest total drug overdose death rate (85.8 deaths per 100,000) among all New Mexico counties during 2011-2015.[157]

351. Walmart's failures under the CSA and state pharmacy laws and regulations have been at the center of the problem in Española and Rio Arriba County. According to DEA ARCOS data, its pharmacy at 1610 North Riverside Drive dispensed a total of 2,006,889 opioid pills between 2006 and 2012 for a total of 14,583,685 MME into this town of 10,495 people, or 1,385 MME for every man, woman and child in Española.

352. That means that at the CDC's highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of nearly 63 opioid prescriptions every day for seven years. Below is a summary taken from DEA ARCOS data of this Walmart store's dispensing by type of opioid during this time period, particularly Hydrocodone:

*Protesting CDC Designation Of Counties Prioritized For Opioid Funding* (May 31, 2018), http://www.rio-arriba.org/pdf/agendas_and_calendars/2018_05_24/resolution_2018_064.pdf.

[157] New Mexico's Indicator-Based Information System (NM-IBIS), NEW MEXICO DEP'T OF HEALTH, https://ibis.health.state.nm.us/indicator/view/DrugOverdoseDth.Cnty.html (last visited Aug. 21, 2019).




353. Relator worked as a floater pharmacist at the Española Walmart and saw first-hand the impact of the opioid epidemic and how little the company was doing to monitor inappropriate prescribing. He estimates that between 70% and 80% of the customers at the Española store were Medicaid beneficiaries and that at least 40% to 50% of the prescriptions filled were for opioids and benzodiazepines.

354. Daily there were lines of 10-30 customers all day long at the Española Walmart, seeking opioid prescriptions (frequently multiple prescriptions of hydrocodone in combination with sedative hypnotics, anxiolytics, antiemetics, muscle relaxants and anticonvulsants). Nearly every day when he arrived to open the Española pharmacy in the morning, there would be a line of 3-4 customers who had received enough opiates at the local hospital emergency room to make it through the night and were wanting their prescriptions filled to feed their addiction.

355. The lines at the pharmacy were not limited to just the Española Walmart. Relator recalled line similar to the ones in Española at nearby stores in Sante Fe and nearly every

Walmart where he worked, often snaking from the pharmacy section and out into the other sections in the store.

356. Nearly daily Relator learned from family members, technicians, or the store manager that a customer had overdosed and died. He regularly received affidavits stating a patient had overdosed and died from family members who were there seeking the patient's prescription drug history. These affidavits were required by Walmart in order to release the drug history, and were stored by the company as part of its HIPAA records. Clearly, the company was on notice of the magnitude of the deaths occurring in Española and Rio Arriba County and the patient's associated history of taking opioids.

357. Despite what was clearly an environment where the Española Walmart was fueling the epidemic, Walmart did nothing to change its dispensing practices to enhance its compliance with its obligations under the CSA or state pharmacy laws and regulations. There was no list provided of physicians who were suspected of writing inappropriate and medically unnecessary prescriptions, nor any training about how they were to handle patients seeking to fill these suspect prescriptions. Nor did Walmart make any effort to limit the volume of opioids being dispensed at the Española store.

358. Effectively, Walmart's inaction in the face of this environment at the Española Walmart turned what should have been a place where patients could trust pharmacists to provide medical assistance and appropriate prescriptions into the exact opposite, a place where patients were receiving inappropriate and medically unnecessary prescriptions and then were regularly overdosing and dying.

#### 4. ***Farmington (San Juan County)***

359. Farmington, New Mexico and San Juan County have been deeply affected by the

opioid crisis. San Juan County reported 111 overdose deaths from 2010 to 2014. In 2016, San Juan County experienced a death due to opioid overdose rate of 17.5 per 100,000 persons.

360. The opioid crisis has reshaped daily reality for San Juan County in numerous ways, including but not limited to increased and intensified emergency medical responses to overdoses; increased drug-related offenses affecting law enforcement, jails, and courts; enormous resources spent on community and social programs to treat those with opioid use disorders; higher workers' compensation costs for prescription opioids and opioid-related claims; and ultimately prevalent opioid abuse throughout the County, including in public places.

361. Walmart store-level data shows the inappropriate and fraudulent dispensing at the Farmington Walmart pharmacies at 4600 E Main Street and 1400 West Main Street. Farmington has a population of 45,626 people. According to DEA ARCOS data, between 2006-2012 the two Farmington Walmart stores dispensed 4,612,504 doses of opioids 61,434,645 MME. The annual average was 8,776,377 MME.

362. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying enough opioid prescriptions for an average of 267 regimens per day.

363. Relator worked as a floater pharmacist at the Farmington Walmart stores in 2015-2016 and saw first-hand the impact of the opioid epidemic and how little the company was doing to monitor inappropriate prescribing. He estimates that between 70% and 80% of the customers at the Farmington store were Medicaid beneficiaries and that at least 40% to or more of the prescriptions filled were for opioids, anxiolytics, and muscle relaxants.

364. The Farmington West store served as the closest pharmacy to the Navajo Reservation, another community that has been particularly hard hit with substance use disorders.

Many native patients received high dose narcotics despite multiple co-morbidities related to alcoholism, diabetes and advanced cardiovascular disease.

365. Daily there were lines of 10-20 customers all day long at the Farmington Walmart stores, most seeking opioid prescriptions. Nearly every day when he arrived to open the Farmington pharmacy in the morning, there would be a line of 3-4 customers who had had received enough opiates at the hospital emergency room to make it through the night and were wanting their prescriptions filled to feed their addiction.

366. Nearly daily Relator learned from family members, technicians, or the store manager that a customer had overdosed and died. He regularly received affidavits stating a patient had overdosed and died from family members seeking the prescription drug history. These affidavits were required by Walmart in order to release the drug history, and were stored by the company as part of its HIPAA records. Clearly, the company was on notice of the magnitude of the deaths occurring in Farmington and San Juan County and the patient's associated history of taking opioids.

367. Despite what was clearly an environment where the Farmington Walmart stores were fueling the epidemic, Walmart did nothing to change its dispensing practices to enhance compliance with its obligations under the CSA or state pharmacy laws and regulations. There was no list provided of physicians who were suspected of writing inappropriate and medically unnecessary prescriptions, nor any training about how they were to handle patients seeking to fill these suspect prescriptions. Nor did Walmart make any effort to limit the volume of opioids being dispensed at the Farmington stores.

368. In fact, most of the pharmacist's time, when not dispensing, was spent either reviewing sales and inventory data or reviewing/researching/writing SCRT reports which had

become a priority to district managers as a result of high volume of customer complaints.

369. Effectively, Walmart's inaction in the face of this environment at the Farmington Walmart stores turned what should have been a place where patients could trust pharmacists to provide medical assistance and appropriate prescriptions into the exact opposite, a place where patients were receiving inappropriate and medically unnecessary prescriptions and then regularly overdosing and dying.

### 5. *Las Cruces (Doña Ana County)*

370. Doña Ana County, home to Las Cruces, in particular, is no stranger to drug overdoses and drug arrests. Doña Ana County ranks 4th out of 33 counties in New Mexico for opioid-related overdoses.

371. Las Cruces is the seat of Doña Ana County. In 2017 the estimated population was 101,712, making it the second largest city in the state, after Albuquerque. Las Cruces is the economic and geographic center of the Mesilla Valley, the agricultural region on the floodplain of the Rio Grande.

372. The County has the fourth highest number of opioid-related deaths out of 33 counties in New Mexico.[158]

373. From 2014 to 2016, 104 people died from drug overdoses in Doña Ana County, for a drug overdose mortality rate of 16 deaths per 100,000 population.[159] Similarly, from 2012

[158] Jamie Warren, *Federal grant will help Dona Ana County address opioid abuse*, KVIA, (March 28, 2017), https://www.kvia.com/news/new-mexico/federal-grant-will-help-dona-ana-county-address-opioidabuse/ 421157015.

[159] County Health Rankings & Roadmap, Drug overdose deaths, 2018 tab, http://www.countyhealthrankings.org/app/new-mexico/2018/measure/factors/138/data.

to 2014, another 104 people died from drug overdoses in the County.[160]

374. From 2012 to 2016, the overdose death rate per 100,000 residents in the County was 17.3 per 100,000 people.[161]

375. A large contributor to the epidemic in the County was Dr. Pawankumar Jain, a notorious pill mill doctor who operated in Las Cruces, in 2016 pled guilty to prescribing painkillers to patients—including Government Program beneficiaries—with no legitimate medical purpose.[162] Jain had been a licensed physician with a neurology subspecialty who operated a pain management medical practice in Las Cruces. Jain's medical license was suspended in June 2012, and subsequently revoked in December 2012 by the New Mexico Medical Board.

376. Jain specifically admitted examining one patient on Nov. 25, 2009, who is identified in the indictment as "M.E.B." Jain admitted that he conducted only a superficial examination of M.E.B. before writing M.E.B. two prescriptions for methadone that were outside the usual course of medical practice and not for any legitimate medical purpose. Each prescription was for 270 tablets of 10 mg methadone. Jain further admitted that he committed health care fraud because he knew these unlawful prescriptions would be submitted to Medicare

---

[160] *Id.* at 2016 tab.

[161] NEW MEXICO DEP'T OF HEALTH, *New Mexico's Indicator-Based Information System (NM-IBIS)*, https://ibis.health.state.nm.us/community/highlight/profile/DrugOverdoseDth.Cnty/GeoCnty/13.html.

[162] Press Release, Dist. of New Mexico U.S. Attorney's Office, Former Dona Ana County Doctor Sentenced to 108 Months for Conviction on Unlawful Distribution of Prescription Painkillers and Health Care Fraud Charges (May 9, 2019), https://www.justice.gov/usao-nm/pr/former-dona-ana-county-doctor-sentenced-108-months-conviction-unlawful-distribution.

for payment and that he intended for Medicare to pay for the prescriptions.[163]

377. Jain also acknowledged that M.E.B. died two days after filling the second methadone prescription. According to evidence at the sentencing hearing, M.E.B. died of respiratory depression due to the methadone Jain prescribed.

378. The New Mexico Medical Board suspended Jain's license in June 2012, and revoked his license in December 2012. In 2011, Dr. Jain had been the top prescriber of pain medicines in all of New Mexico, writing prescriptions for more than three million doses of medication to more than 3,200 patients. The second-ranked prescriber was the *entire staff* of residents at the University of New Mexico Hospital, which prescribed 500,000 fewer doses for seven times as many patients.[164]

379. As an example, for just one patient over the course of one year, Jain prescribed 960 tablets of the oxycodone 80mg (the strongest formulation of oxycodone available), 1260 tablets of oxycodone/APAP 10/325mg, and 270 tablets of oxycodone 30mg tablets (the most commonly abused formulation). This included individual prescriptions as high as 180 tablets of oxycodone 80mg and 270 tablets of oxycodone 30mg prescribed the same day.

380. Many of Jain's patients were Government Program beneficiaries. In fact, Jain specifically targeted patients who were Medicare or Medicaid beneficiaries to fill his inappropriate prescriptions.

381. Despite the insane number of opioids prescribed by Jain and the inappropriate combinations of opioids, Walmart filled those prescriptions without hesitation.

382. The Walmart location at 1550 S. Valley Drive in Las Cruces was a prime

[163] *Id.*

[164] *Id.*

supplier for Dr. Jain. In fact, the Walmart store filled so many prescriptions of controlled substances as a result of Jain's prescribing that the store had to build an extra storeroom just to make room for all the narcotics he was dispensing. (Pharmacist No. 2)

383. From 2006-2012, that Walmart in Las Cruces received 3,960,793 opioid pills (4th most in Doña Ana County), for a total of 60,202,357 MME.

384. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 261 opioid prescriptions per day.

385. Below is a table taken from the DEA's ARCOS database summarizing its filling of opioid prescriptions between 2006 and 2012, showing the huge spike related to prescribing of Oxycodone in 2011 and 2012 (for those years, the Walmart in Las Cruces was a top 6% dispenser of opioids in the entire state of New Mexico), particularly oxycodone:




386. Clearly, Walmart should have recognized that the volume of opioids as excessive and not medically appropriate. Walmart had visibility into the amounts of opioids

being dispensed at its stores yet did nothing, continuing to fill the inappropriate prescriptions and flatulently billing Government Programs.

387. Not only did Walmart ignore that the individual prescriptions were for inappropriate amounts for a single individual, Walmart knew how many total opioid prescriptions were coming from Jain across all its pharmacies and ignored the red flags of Jain's prescribing.

**6. *Silver City (Grant County)***

388. Silver City is a small city with a population of just over 10,000 citizens located in Grant County in southwest New Mexico. The Silver City website describes it as "a vibrant community in Grant County, nestled alongside more than 3 million acres of the Gila Wilderness. With historic ties to mining, ranching and agriculture, our community has grown into a modern town with friendly people, growing businesses and a terrific year-round climate." But it is also the center for opioid abuse and addiction in southwest New Mexico.

389. Dr. John A. Flores was a pill mill doctor who operated out of Silver City. His medical license was revoked on May 22, 2017. Flores prescribed a significant number of opioids to Government Program beneficiaries.[165]

390. Between just August 2014 and August 2015, Flores wrote prescriptions for 510,406 oxycodone units. In total in 2015, Flores prescribed 10,113 opioid contro1led substances amounting to 36,316,511 MME to 680 patients.

391. In 2016, Dr. Flores wrote 1,281 prescriptions for opioids that were billed to Medicare, with 38 percent of his patients being prescribed generic oxycodone. Another 13

[165] ProPublica, *Prescriber Checkup: The Doctors and Drugs in Medicare Part D*, https://projects.propublica.org/checkup/providers/1801883533 (last visited August 19, 2019)

percent of patients were prescribed oxycodone-acetaminophen, and nine percent got OxyContin prescriptions.

392. On several occasions, Flores placed patients on a regimen of an opioid, a benzodiazepine, and carisoprodol—a combination of controlled substances that is known the "Holy Trinity" because it can cause fatal drug interactions when prescribed together.

393. In 2015 alone, Flores prescribed such high amounts and dangerous combinations of controlled substances to four patients causing their deaths. At least one of these deaths was the direct result of toxic effects from multiple controlled substances prescribed to the patient by Flores.

394. Flores' numerous customers regularly filled prescriptions at Walmart pharmacies. The Walmart pharmacy in Silver City, New Mexico, a mere five-minute drive away from Flores' practice, was one of the top 10 dispensers of opioids by dosage units in the entire state of New Mexico.

395. Walmart store-level data shows the inappropriate and fraudulent dispensing at the Silver City Walmart pharmacy. Silver City has a population of 9,647. The Silver City Walmart dispensed 63,302,594 MME between 2006-2012. The annual average was 10,550,432 MME per year, and the per day average was 28,905 MME.

396. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 321 opioid prescriptions per day. Below is a table from the DEA's ARCOS database showing the prescriptions filled at the Silver City Walmart between 2006 and 2012.




397. One former Walmart pharmacist who worked at the Silver City store between 2013 and 2014 explained that the company did not provide any training or direction on refusing to fill prescriptions for known or suspected over-prescribers, nor did Walmart maintain any database or list of prescribers known to be or suspected of over-prescribing or operating "pill mills." (Pharmacist No. 2).

**E. Injury to Government Programs Resulting from Walmart's Actions**

398. Walmart is a registered pharmacy which owned, operated, and was in charge of DEA-registered pharmacies throughout the U.S., and (a) knowingly or recklessly dispensed controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and intentionally dispensed controlled substances outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C.§ 841(a) and corresponding state statutes.

399. Walmart repeatedly failed to exercise its corresponding responsibility as a DEA

registrant to ensure that controlled substances were dispensed only pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice. Walmart knowingly and/or recklessly ignored readily identifiable red flags that the controlled substances prescribed were being diverted, abused, or otherwise were not for legitimate medical purposes and dispensed these prescriptions despite unresolved red flags.

400. Walmart's pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances when its pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer.

401. Moreover, even in instances in which a prescriber told a Walmart pharmacist that a suspicious prescription had been issued for a legitimate medical purpose, Walmart willfully ignored its independent, legally-mandated duty to examine the other, often glaring, evidence that the prescription had, in fact, not been issued for a legitimate medical purpose or that the prescriber had acted outside of the usual course of his or her professional practice and dispensed the prescription.

402. Despite the fact that Walmart knew, or had reason to know, from its own robust data collection databases and from red flags, including the sheer volume of opioid drugs being dispensed at numerous of its pharmacies, that many hundreds of thousands of prescriptions were not valid, it nonetheless failed to use its own readily-available and extensive information and resources from its own data bases to fulfill its obligations under the CSA and ensure that the prescriptions it dispensed were issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice.

403. Walmart knew, or had reason to know, the prescriptions were not valid and not only dispensed those prescriptions, but also failed to notify any authority of these issues. Instead, Walmart committed affirmative acts to conceal the ongoing and rampant fraud under way, such as by its continued filling inappropriate and medically unnecessary prescriptions for opioids. By filling these prescriptions while the fraud was ongoing, Walmart dispensed many hundreds of thousands of opioid pills based on illegitimate and/or medically unnecessary prescriptions.

404. Government Programs have been damaged by Walmart's unfair, false, misleading, or deceptive acts or practices in the conduct of the pharmaceutical business by failing to investigate, report, and cease fulfilling suspicious, inappropriate, and/or medically unnecessary prescriptions of controlled substances in its pharmacies.

405. Government Programs have been damaged by Walmart's negligent and/or intentional and reckless actions by its failing to investigate, report, and halt suspicious, inappropriate, or medically unnecessary prescriptions of controlled substances dispensed at its pharmacies.

## VIII. CAUSES OF ACTION

### COUNT I

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

406. The United States incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

407. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval of Opioids, in

violation of 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A).

408. Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

**COUNT II**

**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))**

409. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

407. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2)and 31 U.S.C. § 3729(a)(1)(B).

408. The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Opioids prescribed to patients enrolled in Federal Programs.

409. Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

**COUNT III**

**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))**

410. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

411. Defendant knowingly conspired, and may still be conspiring, with the various health care professionals identified and alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. § 3729(a)(1) & (a)(2), and 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B). Defendant and these health care professionals committed overt acts in furtherance of the conspiracy as alleged above.

412. Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

**COUNT IV**

**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G))**

413. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

414. Walmart knowingly avoided or decreased its obligation to pay or transmit money to the Government. Specifically, Walmart: (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) Walmart knew that the records or statements were false.

415. Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

**COUNT V**

**(Violation of California False Claims Act)**

416. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

417. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

418. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

419. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

420. The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

421. Because of Defendant's actions, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT VI**

**(Violation of Colorado Medicaid False Claims Act)**

422. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

423. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

424. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

425. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

426. The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

427. Because of Defendant's actions, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VII

## (Violation of Connecticut False Claims Act for Medical Assistance Programs)

428. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

429. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of Conn. Gen. Stat. § 4-275(a)(1).

430. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of Conn. Gen. Stat. § 4-275(a)(2).

431. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions in violation of Conn. Gen. Stat. § 4-275(a)(7).

432. The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

433. Because of Defendant's actions, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT VIII**

**(Violation of Delaware False Claims and Reporting Act)**

434. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

435. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201(a)(1).

436. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

437. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or

transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

438. The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health care programs funded by the State of Delaware.

439. Because of Defendant's actions, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT IX**

**(Violation of District of Columbia False Claims Act)**

440. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

441. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381.02(a)(l).

442. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(2).

443. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(6).

444. The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the District.

445. Because of Defendant's actions, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT X**

**(Violation of Florida False Claims Act)**

446. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

447. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

448. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made

or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

449. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

450. The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance plans funded by the State of Florida or its agencies.

451. Because of Defendant's actions, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**COUNT XI**

**(Violation of Georgia False Medicaid Claims Act)**

452. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

453. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

454. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

455. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

456. The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

457. Because of Defendant's actions, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XII**

**(Violation of Hawaii False Claims Act)**

458. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

459. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

460. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made and used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

461. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

462. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

463. Because of Defendant's actions, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIII**

**(Violation of Illinois False Claims Act)**

464. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

465. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

466. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

467. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

468. The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims

and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

469. Because of Defendant's actions, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIV**

**(Violation of Indiana False Claims and Whistleblower Protection Act)**

470. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

471. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

472. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

473. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit

money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

474. The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

475. Because of Defendant's actions, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XV**

**(Violation of Iowa False Claims Act)**

476. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

477. Defendant, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

478. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

479. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

480. The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

481. Because of Defendant's actions, the State of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVI**

**(Violation of Louisiana Medical Assistance Programs Integrity Law)**

482. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

483. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

484. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

485. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

486. The State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department, unaware of the falsity of the claims and/or statements made by Defendant, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendant's claims and/or statements in paying for Opioids prescriptions for medical assistance program recipients.

487. Because of Defendant's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department have been, and may continue to be, severely damaged.

**COUNT XVII**

**(Violation of Maryland False Health Claims Act)**

488. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

489. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

490. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

491. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

492. The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

493. Because of Defendant's actions, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVIII**

**(Violation of Massachusetts False Claims Act)**

494. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

495. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

496. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

497. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

498. The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

499. Because of Defendant’s actions, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIX**

**(Violation of Michigan Medicaid False Claims Act)**

500. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

501. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

502. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

503. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendant has applied for or is receiving a benefit with intent to obtain a benefit to which Defendant were not entitled or in an amount greater than that to which Defendant were entitled, in violation of Mich. Comp. Laws § 400.603(3).

504. Defendant, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented, or caused to be made or presented, and may

still be making, presenting, or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

505. The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

506. Because of Defendant's actions, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XX**

**(Violation of Minnesota False Claims Act)**

507. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

508. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

509. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

510. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

511. The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

512. Because of Defendant's actions, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXI**

**(Violation of Montana False Claims Act)**

513. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

514. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

515. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

516. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

517. The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

518. Because of Defendant's actions, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXII**

**(Violation of Nevada False Claims Act)**

519. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

520. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

521. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

522. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

523. The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

524. Because of Defendant's actions, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIII**

**(Violation of New Jersey False Claims Act)**

525. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

526. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer, or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

527. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

528. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

529. The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

530. Because of Defendant's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIV**

**(Violation of New Mexico Fraud Against Taxpayers Act)**

531. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

532. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of New Mexico, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 44-9-3(A)(1).

533. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the State of New Mexico, or its political subdivisions, in violation of N.M. Stat. Ann. § 44-9-3(A)(2).

534. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico, or its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 44-9-3(A)(8).

535. The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

536. Because of Defendant's actions, as set forth above, the State of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXV**

**(Violation of New York False Claims Act)**

537. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

538. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

539. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

540. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

541. The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

542. Because of Defendant's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVI**

**(Violation of North Carolina False Claims Act)**

543. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

544. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

545. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

546. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

547. The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

548. Because of Defendant's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVII**

**(Violation of Oklahoma Medicaid False Claims Act)**

549. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

550. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

551. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

552. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

553. The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

554. Because of Defendant's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVIII**

**(Violation of Rhode Island False Claims Act)**

555. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

556. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

557. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

558. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

559. The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

560. Because of Defendant's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIX**

**(Violation of Tennessee Medicaid False Claims Act)**

561. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

562. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

563. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

564. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

565. The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of the Medicaid program.

566. Because of Defendant's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXX**

**(Violation of Texas Medical Assistance Program, Damages, and Penalties Act)**

567. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

568. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

569. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

570. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and may still be making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or

provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

571. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

572. The State of Texas, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

573. Because of Defendant's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXI**

**(Violation of Vermont False Claims Act)**

574. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

575. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(1)-(2).

576. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

577. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and may still be making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(2).

578. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for products that were inappropriate, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

579. The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

580. Because of Defendant's actions, as set forth above, the State of Vermont and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXII**

**(Violation of Virginia Fraud Against Taxpayers Act)**

581. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

582. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

583. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

584. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

585. The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

586. Because of Defendant's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXIII**

**(Violation of Washington Medicaid False Claims Act)**

587. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

588. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of Wash. Rev. Code § 74.66.020(1)(a).

589. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

590. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of Washington, or its political subdivisions, in violation of Wash. Rev. Code § 74.66.020(1)(g).

591. The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

592. Because of Defendant's actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXVI**

**(Violation of Chicago False Claims Act)**

593. Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

594. This is a claim for treble damages and penalties against all Defendant on behalf of the City of Chicago under the Chicago False Claims Act, Municipal Code of Chicago § 1-22-010-§1-22-060.

595. By virtue of the above-alleged acts, among others, Defendant knowingly and willfully promoted Opioids for unapproved and unsafe uses.

596. By virtue of the above-alleged acts, Defendant knowingly made or caused to be made false claims for Defendant's drugs to the City of Chicago.

597. By virtue of the above-alleged acts, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the City of Chicago to approve and pay such false and fraudulent claims.

598. The Chicago City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements and/or business practices.

599. By reason of the Defendant's unlawful acts, the City of Chicago has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**COUNT XXXVI**

**(Violation of Hallandale Beach False Claims Ordinance)**

600. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

601. By virtue of the above-described acts, Defendants knowingly and willfully promoted Opioids for unapproved and unsafe uses.

602. By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Hallandale Beach City Government.

603. By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hallandale Beach City Government to approve and pay such false and fraudulent claims.

604. The Hallandale Beach City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

605. By reason of the Defendants' unlawful acts, the City of Hallandale Beach has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**COUNT XXXVII**

**(Violation of Broward County False Claims Ordinance)**

606. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

607. By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Broward County Government.

608. By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Broward County Government to approve and pay such false and fraudulent claims.

609. The Broward County Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

610. By reason of the Defendants' unlawful acts, Broward County has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**COUNT XXXVIII**

**(Violation of Miami-Dade False Claims Ordinance)**

611. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

612. By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Miami-Dade County Government.

613. By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Miami-Dade County Government to approve and pay such false and fraudulent claims.

614. The Miami-Dade County Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

615. By reason of the Defendants' unlawful acts, Miami-Dade County has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## IX. PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against Defendant as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; Conn. Gen. Stat. §§ 4-274 *et seq.*; Del. Code Ann. tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*; Ga. Code Ann. §§ 49-4-168 *et seq.*; Haw. Rev. Stat. §§ 661-21 *et seq.*; 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; Ind. Code §§ 5-11-5.7 *et seq.*; Iowa Code tit. 15 §§ 685.1 *et seq.*; La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; Md. Code Ann., Health Gen. §§ 2-601 *et seq.*; Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; Mich. Comp. Laws §§ 400.601 *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code Ann. §§ 17-8-401 *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*; N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; N.M. Stat. Ann. §§ 44-9-3(C)(1) *et seq.*; N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; Okla. Stat. tit. 63, §§ 5053 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code Ann. §§ 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; Va. Code Ann. §§ 8.01-216.1 *et seq.*; Vt. Stat. Ann. tit. 32, §§ 630 *et seq.*; Wash Rev. Code §§ 74.66.005 *et seq.*; 2018 P.R. Act 154 (H.B.

1627); Chicago Mun. Code §§ 1-21-010 *et seq.*; Hallandale Beach Code of Ordinances §§ 8-201 *et seq.*; Broward Cnty. Code of Ordinances §§ 1-276 *et seq.*; Miami-Dade Cty. Code §§ 21-255 *et seq.*;

B. That judgment be entered against Defendants in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3),[166] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Cal. Gov't Code § 12651(a),[167] to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

---

[166] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

[167] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

D. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Conn. Gen. Stat. § 4-275(b)(1),[168] to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per

[168] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

false claim, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty

of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim, as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim,[169] as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no less than five thousand five hundred dollars ($5,500) and no more than eleven thousand dollars ($11,000) per false claim, plus payment of interest as provided for in La. Rev. Stat. Ann. § 46:438.6(C)(1)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance

[169] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) per false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P. That judgment be entered in Relator's favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch. 12. § 5B,[170] to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by

[170] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendants' unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, pursuant to Nev. Rev. Stat. § 357.040(2)(c),[171] to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of

[171] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V. That judgment be entered in Relator's favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. Stat. Ann. § 44-9-3(C), multiplied as provided for in N.M. Stat. Ann. § 44-9-3(C)(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided by N.M. Stat. Ann. § 44-9-3(C)(2), to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by N.M. Stat. Ann. § 44-9-3(C)(3)-(4);

W. That judgment be entered in Relator's favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) per false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties

shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X. That judgment be entered in Relator's favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of

not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) per false claim, pursuant to Tenn. Code Ann. § 71-5-182(a)(l),[172] to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB. That judgment be entered in Relator's favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a) and Tex. Hum. Res. Code Ann. § 32.039, multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the

[172] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus an administrative penalty not to exceed twice the amount paid, as provided by Tex. Hum. Res. Code. Ann. § 32.039(c)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Tex. Hum. Res. Code Ann. § 36.052(a)(3)(A) & (B), plus an administrative penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act, pursuant to Tex. Hum. Res. Code. Ann. § 32.039(c)(2)(A) & (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

CC. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Vermont or its political subdivisions, multiplied as provided for in Vt. Stat. Ann. tit. 32, § 631(b)(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per false claim, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(1), as well as the costs incurred by the State of Vermont, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(3), in order to fairly compensate the State of Vermont or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as

provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

EE. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in Wash. Rev. Code § 74.66.020 (1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Wash. Rev. Code § 74.66.020(1) and Wash. Admin. Code § 44-02-010,[173] to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

FF. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Puerto Rico and its political subdivisions, multiplied as provided for in 2018 P.R. Act 154 (H.B. 1627), § 4.01(1)(d), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 2018 P.R. Act 154

[173] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

(H.B. 1627), § 4.01(1)(d),[174] as well as the costs incurred by Relator and the Commonwealth of Puerto Rico, as provided by 2018 P.R. Act 154 (H.B. 1627), § 4.01(3), in order to fairly compensate the Commonwealth of Puerto Rico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

GG. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the City of Chicago, multiplied as provided for in Chicago Mun. Code § 1-22-020, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Chicago Mun. Code § 1-22-020, as well as the costs incurred by Relator and the City of Chicago, as provided by Chicago Mun. Code § 1-22-020, in order to fairly compensate the City of Chicago for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

HH. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the City of Hallandale Beach, multiplied as provided for in Hallandale Beach Code of Ordinances § 8-204(c)(1), plus civil penalties, as provided by Hallandale Beach Code of Ordinances § 8-204(c)(5), as well as the costs incurred by Relator and the City of Hallandale Beach, as provided by Hallandale Beach Code of Ordinances § 8-207(a), in order to fairly compensate the City of Hallandale Beach for losses resulting from the various schemes

[174] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

II. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Broward County, multiplied as provided for in Broward Cty. Code of Ordinances § 1-279(c)(1), as well as the costs incurred by Relator and Broward County, as provided by Broward Cty. Code of Ordinances § 1-283(a)-(b), in order to fairly compensate Broward County for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

JJ. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Miami-Dade County, multiplied as provided for in Miami-Dade Cty. Code § 21-258(3)(a), as well as the costs incurred by Relator and Broward County, as provided by Miami-Dade Cty. Code §§ 21-258(3)(c), -262(1)-(2), in order to fairly compensate Miami-Dade County for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

KK. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

LL. That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

MM. That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein; and

NN. That this Court award such further relief as it deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated: August 23, 2019

BARON & BUDD, P.C.

By: */s/ Scott Simmer* ______________________

Maureen A. Sanders
**SANDERS & WESTBROOK, P.C.**
102 Granite Ave NW
Albuquerque, NM 87102
mas@sanwestlaw.com
Telephone: (505) 243-2243

W. Scott Simmer (*pro hac vice* pending)
ssimmer@baronbudd.com
Will Powers (*pro hac vice* pending)
wpowers@baronbudd.com
**BARON & BUDD, P.C.**
The Watergate, 10th Floor
600 New Hampshire Ave. NW
Washington, DC 20037
Telephone: (202) 333-7352
Facsimile: (202) 337-1039

Attorneys for Plaintiff/Relator