# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [SEALED], and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the COMMONWEALTH OF MASSACHUSETTS, the COMMONWEALTH OF VIRGINIA, the COMMONWEALTH OF PUERTO RICO, the DISTRICT OF COLUMBIA, the CITY OF CHICAGO, the CITY OF HALLANDALE BEACH, BROWARD COUNTY, and MIAMI-DADE COUNTY,<br><br>   Plaintiffs-Relators,<br><br>v.<br><br>[SEALED],<br><br>   Defendant. | Case Number: 1:19-cv-00771 [UNDER SEAL]<br><br>**Jury Trial Demanded**<br><br>**QUI TAM FALSE CLAIMS ACT COMPLAINT**<br><br>**FILED UNDER SEAL**<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, STATE LAW COUNTERPARTS, AND LOCAL LAW COUNTERPARTS** |

i

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES MARCILLA and ISELA CHAVEZ, and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the COMMONWEALTH OF MASSACHUSETTS, the COMMONWEALTH OF VIRGINIA, the COMMONWEALTH OF PUERTO RICO, the DISTRICT OF COLUMBIA, the CITY OF CHICAGO, the CITY OF HALLANDALE BEACH, BROWARD COUNTY, and MIAMI-DADE COUNTY,<br><br>  Plaintiffs-Relators,<br><br>v.<br><br>WALMART INC.,<br><br>  Defendant. | Case Number: 1:19-cv-00771<br><br>**Jury Trial Demanded**<br><br><br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, STATE LAW COUNTERPARTS, AND LOCAL LAW COUNTERPARTS** |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 2

II.   JURISDICTION AND VENUE ............................................................ 9

III.  THE PARTIES..................................................................................... 10

    A.    Relators ..................................................................................... 10

    B.    Walmart, Inc. ........................................................................... 12

IV.  GENERAL ALLEGATIONS ............................................................... 14

    A.    The Nationwide Opioid Crisis ................................................ 14

    B.    Defendant's Recognition of Opioid Crisis.............................. 20

V.   THE APPLICABLE STATUTES ........................................................ 21

    A.    The Controlled Substances Act............................................... 21

          1.    Pharmacies Are Obligated Not to Fill Prescriptions Until Red Flags Are Resolved.............................................................. 26

          2.    Pharmacy Chains Are Responsible for the Dispensing Practices in Their Stores........................................................ 27

          3.    The CSA Applies to All Persons Who Dispense Controlled Substances . 28

          4.    The Chain Pharmacies Cannot Escape Liability for Their Corporate Malfeasance by Blaming the Pharmacists Who Work for Them ............ 31

          5.    The Purpose and Intent of the CSA Bolsters Finding Liability of Chain Pharmacy Corporate Parents................................................... 34

    B.    The False Claims Act ("FCA")............................................... 35

    C.    Opioid Coverage and Use by Government Program Beneficiaries ..................... 38

          1.    Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications.................................................................. 38

          2.    Medicaid Coverage for Opioids and Opioids Use Disorder .................... 40

          3.    Medicare Beneficiary Opioid Use and Abuse ......................... 43

          4.    Opioid Coverage under TRICARE......................................... 45

5.  Opioid Coverage under FEHB ................................................................ 46

6.  Reimbursement under Other Government Programs ............................... 46

D.  Federal Guidance and State Law Governing Pharmacy Dispensing of Opioids .. 47

E.  Use of State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping ........................................................................ 54

F.  Unlawfulness of a Prescription Is Material to Government Program Opioid Payments ............................................................................................. 59

VI.  WALMART'S PHARMACY OPERATIONS ................................................. 60

A.  Walmart's Pharmacy Operations ................................................................ 60

B.  Walmart Profit:  Incentives to Fill ............................................................. 64

C.  Immense Pressure to Fill Quickly to Drive Sales ...................................... 69

D.  Lack of Training on How to Properly and Adequately Handle Inappropriate Opioid Prescriptions ....................................................................... 76

E.  Lack of Dispensing Protocols or Policies .................................................. 79

F.  Walmart's Unique Opioids Return Policy Led to Further Abuse ............. 83

G.  Walmart Was Well Aware of the Opioid Crisis and Failed to Take Steps to Curtail and Prevent Expansion of the Problem at Its Stores Throughout the U.S. ........... 84

H.  Too Little, Too Late: Walmart's Response to the Opioid Epidemic ................... 85

1.  February 2017:  Walmart Institutes Revised POM 1311 "Blanket Refusal to Fill" Policy ........................................................................ 86

2.  May 7, 2018:  Walmart Institutes New Policies Limiting MME and Days' Supply for Opioid Prescriptions ............................................. 88

3.  Walmart's 2018 Training on "Resolution of Red Flags" Illustrates that It Has No Interest in Ensuring that Inappropriate and/or Medically Unnecessary Opioid Prescriptions Are Filled .................................. 89

4.  September 2019:  Walmart Finally Institutes Central Blocking of Prescribers ............................................................................... 99

5.  Walmart Failed to Use Its Databases to Monitor and  Control Inappropriate and/or Medically Unnecessary Prescribing, and Instead Focused on Speed and Volume of Opioids Prescriptions ...................... 100

6.    Walmart Did Not Audit Its Pharmacies' Inappropriate Prescribing ....... 102

VII.    DEFENDANTS' UNLAWFUL CONDUCT ................................................. 102

A.    Specific Examples of Unlawful Dispensing Conduct: Colorado ........................ 112

1.    Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Colorado ...................... 112

2.    Alamosa, Colorado (Dr. Chavez) ............................................. 114

3.    Walmart Continues to Fill Inappropriate Prescriptions from Patients of Debra Rice, N.P. .................................................. 120

4.    Walmart Discourages Internal Reporting and Notetaking that Would Assist the DEA and the Colorado State Board of Medicine .................. 131

B.    Specific Examples of Unlawful Dispensing Conduct: Florida ........................... 133

1.    Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Florida ........................... 133

2.    Orlando, Florida (Pharmacist No. 5) ......................................... 136

C.    Specific Examples of Unlawful Dispensing Conduct: Kentucky ...................... 138

1.    Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Kentucky ...................... 138

2.    Mayfield, Kentucky (Pharmacy Technician No. 1) ............................... 140

D.    Specific Examples of Unlawful Dispensing Conduct: New Jersey ................... 143

1.    Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in New Jersey ................... 143

2.    Deptford Township, New Jersey (Pharmacist No. 1) ............................ 149

E.    Specific Examples of Unlawful Dispensing Conduct:  New Mexico ................ 152

1.    Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in New Mexico ................ 152

2.    Alamogordo (Pharmacy Technician No. 2) ............................................. 154

3.    Albuquerque (Dr. Marcilla) ................................................... 157

4.    Española (Dr. Marcilla) ......................................................... 161

5.    Farmington (Dr. Marcilla) ........................................................ 165

6.    Las Cruces (Pharmacist No. 2) ................................................ 167

7.    Silver City (Pharmacist No. 2)................................................. 171

F.    Specific Examples of Unlawful Dispensing Conduct: Texas ............................ 174

1.    Walmart failed to investigate or halt dispensing of inappropriate or
medically unnecessary opioid prescriptions in Texas............................ 174

2.    Carrollton, Texas (Pharmacist No. 4) ...................................... 177

G.    Specific Examples of Unlawful Dispensing Conduct: Virginia ......................... 178

1.    Walmart failed to investigate or halt dispensing of inappropriate or
medically unnecessary opioid prescriptions in Virginia......................... 178

2.    Winchester, Virginia (Pharmacist No. 3).................................. 180

3.    Luray, Virginia (Pharmacist No. 3) ....................................... 182

H.    Specific Examples of Unlawful Dispensing Conduct:  West Virginia .............. 185

1.    Walmart failed to investigate or halt dispensing of inappropriate or
medically unnecessary opioid prescriptions in West Virginia............... 185

2.    Charles Town, West Virginia (Pharmacist No. 3) .................................. 188

3.    Martinsburg, West Virginia (Pharmacist No. 3)...................................... 190

IX.    CAUSES OF ACTION ................................................................................... 197

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. §
3729(a)(1)(A))                                                              197

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. §
3729(a)(1)(B))                                                              198

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. §
3729(a)(1)(C))                                                              198

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. §
3729(a)(1)(G))                                                              199

COUNT V (Violation of California False Claims Act)                          199

COUNT VI (Violation of Colorado Medicaid False Claims Act)                  200

COUNT VII (Violation of Connecticut False Claims Act for Medical Assistance Programs) 202

COUNT VIII (Violation of Delaware False Claims and Reporting Act) 203

COUNT IX (Violation of District of Columbia False Claims Act) 204

COUNT X (Violation of Florida False Claims Act) 205

COUNT XI (Violation of Georgia False Medicaid Claims Act) 206

COUNT XII (Violation of Hawaii False Claims Act) 207

COUNT XIII (Violation of Illinois False Claims Act) 208

COUNT XIV (Violation of Indiana False Claims and Whistleblower Protection Act) 210

COUNT XV (Violation of Iowa False Claims Act) 211

COUNT XVI (Violation of Louisiana Medical Assistance Programs Integrity Law) 212

COUNT XVII (Violation of Maryland False Health Claims Act) 213

COUNT XVIII (Violation of Massachusetts False Claims Act) 214

COUNT XIX (Violation of Michigan Medicaid False Claims Act) 215

COUNT XX (Violation of Minnesota False Claims Act) 217

COUNT XXI (Violation of Montana False Claims Act) 218

COUNT XXII (Violation of Nevada False Claims Act) 219

COUNT XXIII (Violation of New Jersey False Claims Act) 220

COUNT XXIV (Violation of New Mexico Fraud Against Taxpayers Act) 221

COUNT XXV (Violation of New York False Claims Act) 222

COUNT XXVI (Violation of North Carolina False Claims Act) 223

COUNT XXVII (Violation of Oklahoma Medicaid False Claims Act) 224

COUNT XXVIII (Violation of Rhode Island False Claims Act) 226

COUNT XXIX (Violation of Tennessee Medicaid False Claims Act) 227

COUNT XXX (Violation of Texas Medical Assistance Program, Damages, and Penalties Act) 228

COUNT XXXI (Violation of Vermont False Claims Act)      229

COUNT XXXII (Violation of Virginia Fraud Against Taxpayers Act)      231

COUNT XXXIII (Violation of Washington Medicaid False Claims Act)      232

COUNT XXXVI (Violation of Chicago False Claims Act)      233

COUNT XXXVI (Violation of Hallandale Beach False Claims Ordinance)      234

COUNT XXXVII (Violation of Broward County False Claims Ordinance)      235

COUNT XXXVIII (Violation of Miami-Dade False Claims Ordinance)      235

X.      PRAYER FOR RELIEF ................................................................................ 236

## FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729, *ET SEQ.*, STATE LAW COUNTERPARTS, AND LOCAL LAW COUNTERPARTS

1.       On behalf of the United States of America ("United States"); twenty-six States, the District of Columbia, the Commonwealths of Massachusetts, Puerto Rico, and Virginia (collectively, the "Whistleblower States"), and the City of Chicago, Miami-Dade County, the City of Hallandale Beach, and Broward County, Relators hereby file this First Amended Complaint against Defendant Walmart, Inc. (hereinafter "Walmart" or "Defendant"), pursuant to the *qui tam* provisions of the federal False Claims Act, State Whistleblower Statutes and Locality Whistleblowers Ordinances.[1]

---

[1] *See* 31 U.S.C. §§ 3729 *et seq.* ("FCA"); the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. tit. 4 Ch. 55e §§ 4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; the Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-3(C)(1) *et seq.*; the New York False Claims Act, N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; the Texas Medical Assistance Program, Damages, and Penalties Act, Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32 §§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*; the Washington State Medicaid False Claims Act, Wash. Rev. Code. §§ 74.66.005 *et seq.*; and the False Claims to

2.      Relators James Marcilla and Isela Chavez bring this action against Walmart under the False Claims Act, State Whistleblower Statutes and Locality Whistleblower Ordinances for Defendant's violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "CSA") and its implementing regulations, 21 C.F.R. § 1301, *et seq.* and state pharmacy laws and regulations. Those violations include: (a) knowingly dispensing controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1) and state pharmacy laws and regulations; and (b) knowingly and intentionally dispensing controlled substances outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C. § 841(a) and state pharmacy laws and regulations. Defendant's fraudulent conduct caused the Government Programs to pay for controlled substances that were medically unnecessary and/or lacked a legitimate medical purpose in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, as well as State and Locality *qui tam* laws.

## I.      INTRODUCTION

3.      The nation is experiencing a national public health emergency involving opioid abuse. The dispensing of controlled substances, including prescription opioid painkillers, without a legitimate medical purpose and outside the usual course of professional practice exacerbate this

---

Government of Puerto Rico Programs, Contracts, and Services Act, 2018 P.R. Act 154 (H.B. 1627) (the aforementioned statutes referred to collectively as the "State Whistleblower Statutes"); pursuant to the Chicago False Claims Ordinance, Chicago Mun. Code §§ 1-21-010 to -060, the City of Hallandale Beach False Claims Ordinance, Hallandale Beach Code of Ordinances §§ 8-201 to -210, the Broward County False Claims Ordinance, Broward Cnty. Code of Ordinances §§ 1-276 to -287, and the Miami-Dade County False Claims Ordinance, Miami-Dade Cty. Code §§ 21-255 to -266 (the aforementioned ordinances referred to collectively as the "Locality Whistleblower Ordinances").

crisis. This crisis has touched, and continues to touch, nearly all American individuals and families in some way or another.

4.     In addition to the opioid epidemic's human cost, the epidemic has had a monetary one as well. Besides financial impacts like the increased costs for health care, substance abuse treatment, and law enforcement, the cost of the epidemic has also been felt by Government Programs such as Medicare and Medicaid. The Government Programs have paid for inappropriate opioid prescriptions because Walmart has intentionally and knowingly disregarded its duties under the law to properly examine and ensure that it only dispensed drugs pursuant to a proper prescription and for a legitimate medical purpose.

5.     Working at numerous Walmart locations in New Mexico and Colorado between 2007 through the present day, Relators have had front-row seats on how Walmart has both fueled and profited from this epidemic by repeatedly dispensing opioids and other controlled substances prone to diversion and abuse without a legitimate medical purpose and outside the usual course of professional medical practice.

6.     Relators witnessed numerous incidents of drug-seeking behaviors at the stores where they worked, including the manager of an Albuquerque Walmart pharmacy being escorted from the premises by several Walmart employees for alleged diversion of controlled substances; long lines all day of customers who were seeking opioid prescriptions (frequently multiple prescriptions of hydrocodone in combination with sedative hypnotics, anxiolytics, antiemetics, muscle relaxants and anticonvulsants) at the Española and Farmington Walmart pharmacies; and customers who were engaged in drug use and illegal transactions selling their opioids right in the Walmart parking lots.

7.      Even while rampant drug diversion and abuse was occurring at and around the Walmart pharmacies themselves, Relators saw firsthand how Walmart incentivized and pressured its pharmacists to fill all prescriptions—regardless of validity—resulting in scores of suspicious prescriptions that were clearly inappropriate and/or not medically necessary being filled in furtherance of its own profit, the public health and public fisc be damned.

8.      Walmart has been subject to duties under the CSA and under state pharmacy law and regulations to take special care before dispensing these addictive and dangerous drugs. These laws and regulations required Walmart to review each opioid prescription prior to dispensing and to make a determination that the prescription is both effective and valid; ensure that each prescription for an opioid had been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice; refuse to dispense medication if there were reason to believe that the prescription was not issued for a legitimate medical purpose; and provide effective systems, controls, and procedures to prevent diversion and abuse of opioids. Walmart violated these duties of care by dispensing extremely large amounts of opioids from its over 4,400 retail pharmacy stores throughout the United States and this District, as alleged in more detail below.

9.      Relators have witnessed Walmart's serial violations.  For example, Dr. Marcilla worked in the Walmart in Farmington, NM, which has a population of 45,626 people. According to DEA ARCOS data, between 2006-2012 the two Farmington Walmart stores dispensed a total of 4,612,504 doses of opioids for a total of 61,434,645 MME. The annual average for the Farmington Walmarts was 8,776,377 MME. That means that at the highest bounds of the recommended MME per day (90 MME/day) the stores were supplying enough opioid prescriptions for an average of 267 regimens per day. As the name suggests (and as explained in detail below),

4

MME is an opioid's dosage equivalency to morphine, providing a constant metric to compare opioids of varying types, strengths, and delivery methods.

10.    For her part, Dr. Chavez worked in the Walmart in Alamosa Colorado, which has a population of 8,780 people. According to DEA ARCOS data, between 2006-2014 the Alamosa Walmart store dispensed a total of 2,332,060 doses of opioids for a total of 25,215,745 MME. That means that at the highest bounds of the recommended MME per day (90 MME/day) the stores were supplying enough opioid prescriptions for an average of 85 regimens per day.

11.    Walmart pharmacies around the United States served as the last line of defense between dangerous opioids and the public. For this reason, under the CSA and state pharmacy laws and regulations, Walmart had the duty to use due care when filling prescriptions and that duty went beyond reflexively following the prescription's directions. Walmart was on notice of signs of diversion and abuse, prescriptions which were not medically appropriate, and could not simply insist its pharmacists robotically fill prescriptions. This was particularly true when the prescriptions were unreasonable on their face because they are written in a quantity, frequency, or other manner that a reasonable pharmacy could not dispense or would need to do additional investigation and due diligence. Walmart did not fulfill these duties even in instances when it was (or reasonably could have been) aware of red flags of diversion and abuse. For example, until only very recently Walmart did nothing as a corporation to block prescriptions from physicians who had been indicted or whose licenses had been suspended, instead insisting that its pharmacists must continue to fill these prescriptions.

12.    In Relators' experience, Walmart has been aware of red flags that should have caused its pharmacies to reject or, at the very least, investigate prescriptions before filling them. Examples of such red flags have included: doctors who wrote unusually large amounts of opioid

5

prescriptions when compared with similar practitioners in the area; customers with early refills for opioid prescriptions and prescriptions with unusual quantities or dosages; customers seeking to fill prescriptions written for someone else; multiple consumers appearing at or near the same time with opioid prescriptions from the same physician; patients who had driven long distances to have a prescription filled; consumers who sought large volumes of controlled substances in the highest strength for each prescription type; patients who appeared to be creating cocktails with muscle relaxants or tranquilizers; or consumers who paid large amounts of cash for opioid prescriptions rather than using some form of insurance.

13.    Walmart is one of the largest corporations in the world. This is in large part due to its mastery of data—data about its customers, its stores, and its business. But when the use of that data expertise would cut into its profits, instead of drive them, Walmart chose to ignore it. Walmart could have—and was required to—leverage its network of over 4,400 pharmacies all over the country to combat the scourge of inappropriate and/or medically unnecessary opioid prescriptions.

14.    Walmart had full visibility into vast amounts of data about dispensing both at its pharmacies and industry-wide. Instead of leveraging that information and data to limit the filling of inappropriate prescriptions, Walmart failed to use its own trove of data from its over 4,400 pharmacies to identify increasingly rampant prescribing abuse, identify medically inappropriate prescriptions, and provide its individual pharmacy locations the benefit of its whole pharmacy infrastructure and corporate resources.

15.    Rather, Walmart further undermined the ability of its pharmacies to identify and block suspicious prescriptions by drastically reducing staffing and increasing its demands on pharmacists. Even while the epidemic was ravaging communities across America into which it was pouring enormous amounts of opioid drugs, Walmart instead timed how quickly Relators and

its other pharmacists could increase prescription counts year after year with ever leaner staffing, making it impossible for them to have sufficient time to investigate, report, or halt dispensing of inappropriate or medically unnecessary opioid prescriptions.

16.     Despite medically unnecessary and/or inappropriate opioid prescriptions being filled at the Walmart stores where Relators worked in New Mexico and Colorado and the frequently chaotic environment related to drug addiction and abuse going on right in front of them, most of the time each Relator would be the only pharmacist on site. With such understaffing of pharmacists and technicians, it became impossible to look at each patient to determine whether there were red flags of diversion or abuse.  Often, Relators only had a minute on average during each shift to evaluate and dispense each prescription. The reality was that Relators and the other Walmart pharmacists only had enough time to do what was needed to keep up with the workflow, so doing the necessary (and substantial) due diligence to check opioid prescriptions (including things like checking the state PDMP databases) regularly fell through the cracks.

17.     Until only recently, Walmart did next to nothing to reduce inappropriate dispensing because doing so would have meant the company would have been less profitable, which to Walmart has been more important than any financial impact on Government Programs and on people's lives.

18.     Walmart pharmacies dispensed opioid prescriptions throughout the U.S. (and in New Mexico and Colorado) under circumstances exhibiting red flags for opioid diversion and abuse, in violation of its duties under the CSA and state pharmacies laws and regulations.

19.     Walmart failed to train or instruct its employees with respect to proper policies and protocols to follow to prevent diversion and abuse of opioids. This has had the direct, readily

7

foreseeable (and intended) result of its pharmacies throughout the nation continuing to fill prescriptions despite clear red flags of diversion and abuse.

20.    Walmart's failure to identify, monitor, detect, investigate, report, refuse to sell, fill, or dispense inappropriate prescriptions of opioids also violated its duty to act reasonably in light of the serious and foreseeable harms associated with opioid diversion and abuse. Walmart's failure to take reasonable steps to prevent opioid diversion and abuse is a direct and proximate cause of, and/or substantial factor contributing to, the diversion of prescription opioids around the U.S. (and in New Mexico and Colorado) for consumption for non-medical, non-scientific purposes.

21.    Walmart knew that widespread diversion and abuse of opioids was occurring throughout the U.S. (and in this District) at a staggering rate, but until only very recently turned a blind eye in order to earn higher profits. The foreseeable result of Walmart's dispensing vast quantities of opioids having no medical justification has led to widespread addiction, overdoses, death, harms to Government Programs, and the societal and economic harms that flow from prescription opioid diversion and abuse.

22.    Compliance with the requirements of federal and state law governing pharmacy dispensing is central to Government Program benefits and is a condition of these medications being covered and reimbursed by these programs.

23.    But for Walmart's widespread fraud, Government Programs would have denied payment for controlled substance medications, or sought to recoup payments already made, when such prescriptions were not issued or dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medications were intended for purposes of addiction or recreational abuse.

24.    The conduct alleged herein is ongoing.

## II.     JURISDICTION AND VENUE

25.     According to 28 U.S.C. §§ 1331 & 1345, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States—in particular, the FCA.  In addition, the FCA specifically confers jurisdiction upon the United States District Court.  31 U.S.C. § 3732(b).

26.     This District Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this District and engaged in wrongdoing in this District.  Likewise, the FCA authorizes nationwide service of process and the Defendant have sufficient minimum contacts with the United States of America.

27.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b). Defendant has transacted business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

28.     Relators are unaware of any public disclosure of the information or allegations that are the basis of the First Amended Complaint.  If there has been a public disclosure, Relators are the original sources of the information and allegations contained in this First Amended Complaint. Prior to the filing of this action, Relators voluntarily provided the United States Government, the States and the Localities with information regarding the false claims that are the subject of this First Amended Complaint.

29.     The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendant to conceal from the United States its wrongdoing in connection with the allegations made herein.

III.    **THE PARTIES**

A.    **Relators**

30.    Relators James Marcilla and Isela Chavez (hereinafter "Relators") bring this action on behalf of themselves, the United States of America, the Whistleblower States and the Localities.

31.    Dr. Marcilla got his undergraduate degree from University of New Mexico, graduating in 1997 with a Bachelor of Science degree. He received his Doctor of Pharmacy ("PharmD.") in 2005 from the University of New Mexico.

32.    Dr. Marcilla is a registered pharmacist in the State of New Mexico with license number RP00006782. His license was first issued on June 25, 2005 and is current.

33.    Dr. Marcilla worked as a pharmacist for numerous Walmart stores in New Mexico from 2007-2016, primarily as a "floater" pharmacist. He worked at the Walmart pharmacies in Farmington in 2015-2016 (4600 E Main St, Farmington, NM 87402; 1400 W Main St, Farmington, NM 87401); Española in 2011 (1610 N Riverside Dr, Española, NM 87532); Santa Fe in 2011, 2015-2016 (5701 Herrera Drive, Santa Fe, NM 87507); Gallup (1650 W Maloney Ave, Gallup, NM 87301); Grants in 2015-2016 (1000 Robert Rd, Grants, NM 87020); Albuquerque in 2015-2016 (8511 Golf Course Rd NW, Albuquerque, NM 87114; 2550 Coors Blvd NW, Albuquerque, NM 87120; 2701 Carlisle Blvd NE, Albuquerque, NM 87110; 2266 Wyoming Blvd NE, Albuquerque, NM 87112; 301 San Mateo Blvd SE, Albuquerque, NM 87108); Los Lunas in 2016 (2250 Main St NW, Los Lunas, NM 87031); Belen in 2016 (1125 Bypass, Belen, NM 87002); Clovis in 2014-2015 (3728 N Prince St, Clovis, NM 88101); Portales in 2014-2015 (1604 E Spruce St, Portales, NM 88130); Roswell in 2014-2015 (4500 N Main St. Ste A, Roswell, NM 88201); Ruidoso in 2014-2015 (26180 US-70, Ruidoso Downs, NM 88346); Artesia in 2013 (604 N 26th St, Artesia, NM 88210); and Carlsbad in 2014 (2401 S Canal St, Carlsbad, NM 88220).

34.     Dr. Marcilla also was a clinical pharmacist at a clinic and pharmacy he owned from 2011 to 2013. While there, he developed a keen appreciation for the steps that easily could be taken at the pharmacy level to prevent inappropriate dispensing thereby combatting the rampant opioid abuse and its attendant effects on the community and public health programs.

35.     For example, at the clinic and pharmacy he owned, Dr. Marcilla routinely spent time counseling patients directly about their medications and conditions. Additionally, Dr. Marcilla instituted mandatory urinalysis for patients that were on opioids. This was done to detect any mismatch between the opioids in the patient's body with the amount being dispensed. If the two measures did not correspond appropriately, the patient was likely diverting the prescription.

36.     Dr. Chavez received her Doctor of Pharmacy (PharmD) from the University of New Mexico in 2004, completed a residency in Nephrology & Pharmacotherapy in 2005 and a fellowship at the New Mexico Poison & Drug Information Center in 2007, and a Master of Science in Biomedical Science (MSBS) from the University of New Mexico in 2008.

37.     She has worked as a Pharmacy Manager at the Alamosa, Colorado Walmart from 2014 to the present.  Prior to that, she was a Pharmacy Manager at the Alamosa Safeway Pharmacy from 2010 to 2014, a Staff Pharmacist at the Taos Pharmacy in Taos, New Mexico from 2009 to 2010, and a Manager at the Western New York Poison Center in Buffalo, New York from 2008 to 2009.

38.     She holds current licenses as a registered pharmacist in New Mexico and Colorado. Her NPI Number is 1174824668 and License No. is 18580 (Colorado).

39.     Dr. Chavez has served as a teacher/lecturer at the University of New Mexico, College of Pharmacy, Clinical Toxicology in 2014, the University at Buffalo (SUNY), College of Pharmacy, Buffalo, NY in 2008, and also has Residency Teaching/Lecture Experience at the

University of New Mexico, College Of Pharmacy, 2006, in Clinical Toxicology at the University of New Mexico, College of Pharmacy in 2006-2007, Poison Information Clerkship at the University of New Mexico, College of Pharmacy in 2004-2005, Problem Based Learning at the University of New Mexico, Department of Emergency Medicine in 2006 -2007.

40.     She has considerable research experience, including in Ah receptor and endothelin-dependent hypertension, oxidative stress and inflammation in chronic kidney disease, and a shingles vaccine study.  She is widely published on drug use rates in patients undergoing hemodialysis, use of antibiotic lock solutions in hemodialysis catheter-related bloodstream infections, herbal n-acetylcysteine as an antidote for acetaminophen toxicity, analysis of pediatric aripiprazole poisonings, and the frequency of hyperkalemia in hemodialysis patients on angiotensin-converting enzyme inhibitors (ACE-1) and angiotensin receptor blocker therapy.

41.     Finally, Dr. Chavez has worked on community health projects, including the Syringe Access Program-Harm Reduction (Alamosa, CO) 2018, and IT MATTTRs (Implementing Technology and Medication Assisted Treatment and Team Training in Rural Colorado) (Collaboration with the University Of Colorado).

**B.     Walmart, Inc.**

42.     Defendant Walmart Inc., formerly known as Walmart Stores, Inc. ("Walmart") is a publicly traded Delaware corporation with a principal place of business located at 702 SW 8th Street, Bentonville, Arkansas 60555, but doing business throughout all of the Party States and Localities.

43.     Walmart's operations are divided into three business segments, Walmart U.S., Walmart International and Sam's Club.  Walmart U.S. is its largest segment and operates in the U.S., including in all 50 states, Washington D.C. and Puerto Rico. Walmart U.S. is a mass

12

merchandiser of consumer products, operating under the "Walmart" and "Walmart Neighborhood Market" brands, as well as walmart.com, jet.com and other eCommerce brands. Walmart U.S. had net sales of $331.7 billion for fiscal 2019, representing 65% of its fiscal 2019 consolidated net sales, and had net sales of $318.5 billion and $307.8 billion for fiscal 2018 and 2017, respectively.

44.     Sam's Club operates in 44 states in the U.S. and in Puerto Rico. Sam's Club is a membership-only warehouse club that also operates samsclub.com. Sam's Club had net sales of $57.8 billion for fiscal 2019, representing 11% of Walmart's consolidated fiscal 2019 net sales, and had net sales of $59.2 billion and $57.4 billion for fiscal 2018 and 2017, respectively.

45.     Walmart has retail pharmacy operations in its Walmart U.S. and Sam's Club segments.  As of January 31, 2019, Walmart operated 3,570 Supercenters, 386 Discount Stores, 813 Neighborhood Markets, and 599 Sam's Clubs throughout the United States, including 53 stores in this District.

46.     Walmart's pharmacy operations are part of its Health and Wellness Division, which are highly centralized with all policy-making and training controlled from its Bentonville headquarters.  Pharmacy operations are highly uniform and its pharmacies are subject to extraordinary levels of real-time monitoring conducted electronically and by regular visits from Bentonville-based management.

47.     At all times relevant to this First Amended Complaint, Walmart dispensed prescription opioids throughout the United States, including in this District.

48.     Walmart, one of the largest pharmacy chains in the nation, has pharmacies in almost all of its over 4,700 U.S. locations, and its Health and Wellness Unit (described in detail below) accounted for 11% of its nearly $332 billion in U.S. revenue.[2]

## IV.    GENERAL ALLEGATIONS

### A.    The Nationwide Opioid Crisis

49.     Opioids are a class of drugs that range from pain relievers available legally by prescription—such as oxycodone, hydrocodone, codeine, morphine, and fentanyl—to illegal narcotics such as heroin. According to the Medicaid and CHIP Payment and Access Commission ("MACPAC"), "the origins of widespread prescription opioid use can be traced back to the 1990s."[3] That is when the medical profession began using pain as a so-called fifth vital sign, and drug manufacturers heightened their marketing campaigns.

50.     All opioids are chemically related and interact with opioid receptors on nerve cells in the body and brain. Opioid pain relievers are generally safe when taken for a short time and as prescribed by a doctor, but because they produce euphoria in addition to pain relief, they can be misused (taken in a different way or in a larger quantity than prescribed or taken without a doctor's prescription). Regular use—even as prescribed by a doctor—can lead to dependence and, when misused, opioid pain relievers can lead to addiction, overdose incidents, and deaths.[4]

---

[2] Matthew Boyle, *Walmart Trims Pharmacy Jobs as Company Mulls Health Strategy*, Bloomberg, June 26, 2019, https://www.bloomberg.com/news/articles/2019-06-26/walmart-eliminating-some-pharmacy-jobs-as-retailer-streamlines.

[3] Medicaid & CHIP Payment Access Comm'n, *Report to Congress on Medicaid and CHIP: Chapter 2: Medicaid And The Opioid Epidemic,* 79 (2017), https://www.macpac.gov/wp-content/uploads/2017/06/Medicaid-and-the-Opioid-Epidemic.pdf.

[4]    NIH    National    Institute    on    Drug    Abuse:    Advancing    Addiction    Science,

51.     Deaths from prescription opioid overdoses quadrupled from 1999 to 2011,[5] as did opioid prescriptions, even though pain levels reported by Americans had not changed.[6] By 2013, drug overdoses were the nation's leading cause of deaths from injury, prompting one author to write: "The opioid epidemic . . . that has been ravaging and shortening lives from coast to coast is a new plague for our new century."[7]

52.     70,237 drug overdose deaths occurred in the United States in 2017. The age-adjusted rate of overdose deaths increased significantly by 9.6 percent from 2016 (19.8 per 100,000) to 2017 (21.7 per 100,000). Opioids—mainly synthetic opioids (other than methadone)—are currently the main driver of drug overdose deaths. Opioids were involved in 47,600 overdose deaths in 2017 (67.8 percent of all drug overdose deaths).[8]

53.     In 2017, the states with the highest rates of death due to drug overdose were West Virginia (57.8 per 100,000), Ohio (46.3 per 100,000), Pennsylvania (44.3 per 100,000), the District of Columbia (44.0 per 100,000), and Kentucky (37.2 per 100,000).[9]

---

https://www.drugabuse.gov/drugs-abuse/opioids#summary-of-the-issue.

[5] Vikki Wachino, *CMCS Informational Bulletin: Best Practices for Addressing Prescription Opioid Overdoses, Misuse and Addiction,* 1 (Jan. 28, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-02-02-16.pdf.

[6] Centers For Medicare & Medicaid Services (CMS), *Opioid Misuse Strategy 2016,* 2 (Jan. 5, 2017), https://www.cms.gov/Outreach-and-Education/Outreach/Partnerships/Downloads/CMS-Opioid-Misuse-Strategy-2016.pdf.

[7] Nicholas N. Eberstadt, *Our Miserable 21st Century*, COMMENTARY MAG. (Feb. 2017), https://www.commentarymagazine.com/articles/our-miserable-21st-century/.

[8] U.S. Centers for Disease Control and Prevention, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html.

[9] Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017*. Morb Mortal Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

54.    States with statistically significant increases in drug overdose death rates from 2016 to 2017 included Alabama, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, West Virginia, and Wisconsin.[10]

55.    Every day, more than 130 people in the United States die after overdosing on opioids.[11] The misuse of and addiction to opioids—including prescription pain relievers, heroin, and synthetic opioids such as fentanyl—is a serious national crisis that affects public health as well as social and economic welfare. The Centers for Disease Control and Prevention ("CDC") estimates that the total "economic burden" of prescription opioid misuse alone in the United States is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement.[12]

56.    Between July 2016 and September 2017, the number of emergency room visits for opioid-related overdoses jumped nearly 30 percent.[13]

57.    Recently, the congressionally-chartered National Safety Council revealed that, for the first time in U.S. history, a person is more likely to die from an accidental opioid overdose than

---

[10] CDC, National Center for Health Statistics, *Multiple Causes of Death 1999–2017, Wide-ranging Online Data for Epidemiologic Research* (CDC WONDER) (2019), https://wonder.cdc.gov/wonder/help/mcd.html.

[11] CDC/NCHS, *National Vital Statistics System, Mortality*, (2018), https://wonder.cdc.gov.

[12] Florence CS, Zhou C, Luo F, Xu L., *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States*, 54 Med Care. 901-906 (2016), doi:10.1097/MLR.0000000000000625.

[13] Vivolo-Kantor AM, Seth P, Gladden RM, et al., *Vital Signs: Trends in Emergency Department Visits for Suspected Opioid Overdoses — United States, July 2016–September 2017*. MMWR Morb Mortal Wkly Rep 2018;67:279–285. DOI: http://dx.doi.org/10.15585/mmwr.mm6709e1.

from a motor vehicle crash. The analysis showed that the odds of dying from opioid overdose are also higher than from falls, drowning, gun assault, or choking.[14]

58.     According to the CDC, retail opioid prescriptions were dispensed in 2017 at a national rate of 58.7 prescriptions per 100 persons.[15]

59.     From 1999-2017, almost 400,000 people have died from an overdose involving any opioid, including prescription and illicit opioids.[16]  This rise in opioid overdose deaths can be outlined in three distinct waves.

- The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1999.

- The second wave began in 2010, with rapid increases in overdose deaths involving heroin.

- The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids – particularly those involving fentanyl.[17]

60.     The harm is real. In 2017, there were 491 deaths in New Mexico from prescription opioid overdoses.

---

[14] Nat'l Safety Council, *Injury Facts*, https://injuryfacts.nsc.org/all-injuries/ preventable-death-overview/odds-of-dying/; *see also* Press Release, Nat'l Safety Council, *For the First Time, We're More Likely to Die from Accidental Opioid Overdose than Motor Vehicle Crash* (Jan. 14, 2019) (https://www.nsc.org/in-the- newsroom/ for-the-first-time-were-more-likely-to-die-from-accidental-opioid-overdose-than motor-vehicle-crash).

[15] U.S. Centers. for Disease Control & Prevention, *U.S. Opioid Prescribing Rate Maps,* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.

[16] Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017*. Morb Mortal Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

[17] *Id. See also* Rudd RA, Aleshire N, Zibbell JE, Gladden RM. *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*. 64 Morb. Mortal Wkly. Rep. 1378-82 (2016).

61.    The diversion and abuse of prescription drugs, along with the associated morbidity and mortality, have been identified as one of the most serious and costly issues facing New Mexicans today. In 2017, New Mexico had the 17th highest drug overdose mortality rate in the U.S., most of which was due to prescription drugs.

62.    Over the past decade, New Mexico's drug overdose death rate has ranked at the top of the Country. In 2012, New Mexico's age-adjusted drug overdose rate was 24.2 per 100,000 persons. The CDC reported that New Mexico had the second highest drug overdose rate in the nation in 2010, nearly double the U.S. rate.

63.    Since 2001, New Mexico's drug overdose death rate has increased 79.9 percent. Since 1990, almost 300 percent.

64.    Between 2001 and 2012, oxycodone sales in New Mexico more than tripled.

65.    In 2011, the prescriptions written by New Mexico providers peaked at 81.6 opioid prescriptions for every 100 persons.[18]

66.    Neonatal abstinence syndrome ("NAS") or neonatal opioid withdrawal syndrome ("NOWS") may occur when a pregnant woman uses drugs such as opioids during pregnancy. A recent national study showed a fivefold increase in the incidence of NAS/NOWS between 2004 and 2014, from 1.5 cases per 1,000 hospital births to 8.0 cases per 1,000 hospital births. That is one baby born with NAS/NOWS every 15 minutes in the United States. During the same period,

---

[18] U.S. Centers for Disease Control and Prevention, *U.S. State Prescribing Rates, 2011*, (Jul. 21, 2017), https://www.cdc.gov/drugoverdose/maps/rxstate2011.html.

hospital costs for NAS/NOWS births increased from $91 million to $563 million, after adjusting for inflation.[19]

67. In March 2016, the CDC, in order to reduce opioid addictions, overdoses, and deaths, published specific recommendations for clinicians who prescribe opioids outside of cancer treatment, palliative care, and end-of-life care.[20] The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (*e.g.*, high-dose prescribing, overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain)."[21]

68. Congress found that pharmacies are partly responsible for the crisis: "The opioid epidemic… has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[22]

69. The grave statistics about the human toll of the opioid crisis are shocking enough. But the crisis goes beyond the human toll. Not only have millions of lives been lost or squandered to opioid addiction, millions of dollars have been spent by Government Programs on fraudulent or otherwise medically unnecessary opioid prescriptions.

---

[19] National Institutes for Health, National Institute on Drug Abuse, *Opioid-Involved Overdose Deaths* (Mar. 2019), https://www.drugabuse.gov/opioid-summaries-by-state/new-mexico-opioid-summary.

[20] *See generally* Deborah Dowell, M.D. *et al.*, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. Mortal. Wkly Rep. 1 (Mar. 18, 2016) [hereinafter, *CDC Guideline*].

[21] *Id.* at 3.

[22] U.S. Senate Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., *Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement* 4 (July 12, 2017) https://www.hsdl.org/?view&did=812961.

70.     Pharmacies such as Walmart have put profits over patients and indiscriminately dispensed opioid prescriptions that were medically unnecessary or inappropriate.

71.     As alleged herein, Walmart knowingly ignored the obviously medically inappropriate and unnecessary prescriptions, filled them nonetheless, and fraudulently billed or caused to be billed Government Programs.

**B.     Defendant's Recognition of Opioid Crisis**

72.     Walmart recognizes the severity of the opioid crisis. Walmart admits that "[t]he abuse of and addiction to prescription opioids is a serious public health issue."[23]

73.     Walmart supported the President's State of Emergency Declaration.[24]

74.     Walmart publicly claims that it has "a comprehensive program with policies, programs and tools aimed at helping to curb opioid abuse and misuse" and is "committed to being part of the solution both in our pharmacies and in our communities."[25]

75.     But, in reality, by dispensing controlled substances without a legitimate medical purpose and outside the usual course of professional practice, Walmart has unlawfully perpetuated this serious public health crisis.

76.     In fact, as detailed below, even while the opioid epidemic has ravaged communities throughout the U.S., Walmart pharmacies did very little to address the ongoing opioid epidemic and to update employees on policies, procedures, and laws for dispensing prescriptions of

---

[23] Opioid Stewardship, Walmart, https://corporate.walmart.com/opioid-stewardship.

[24] Press Release, Walmart, *Walmart Supports State of Emergency Declaration on Opioids* (Oct. 26, 2017), https://corporate.walmart.com/newsroom/2017/10/26/walmart-supports-state-of-emergency-declaration-on-opioids.

[25] Opioid Stewardship, Walmart, https://corporate.walmart.com/opioid-stewardship.

controlled substances and recognizing and handling over-prescribers.   (Pharmacy Technician No. 1, employed 2016-2018).

## V.    THE APPLICABLE STATUTES

### A.    The Controlled Substances Act

77.    The Controlled Substances Act ("CSA") and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[26]

78.    The CSA categorizes controlled substances in five "Schedules."

79.    Schedule II contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."[27]

80.    Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[28] Schedule IV

---

[26] *See* 21 U.S.C. § 841(a).

[27] 21 U.S.C. § 812(b)(2).

[28] 21 U.S.C. § 812(b)(3).

contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[29]

81.     Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.[30]

82.     The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[31]

83.     Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[32] A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."[33]

84.     A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[34] An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.[35] The pharmacy knowingly filling such a

---

[29] 21 U.S.C. § 812(b)(4).

[30] 21 U.S.C. § 812(b)(5).

[31] 21 U.S.C. § 841(a)(1).

[32] 21 U.S.C. § 822(a).

[33] 21 U.S.C. § 822(b).

[34] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, Pharmacist's Manual:  An Informational Outline of the Controlled Substances Act 29 (Rev. 2010).

[35] 21 U.S.C. § 829.

purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

85.     A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license.[36]

86.     At all times relevant to this First Amended Complaint, Walmart had registered its retail pharmacies with the DEA in Schedule II–V controlled substances. Those DEA registrations authorize Walmart pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner."[37]

87.     Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered pharmacy like Walmart, are not  required to register with the DEA, "if such agent or employee is acting in the usual course of his business or employment."[38]

---

[36] *See, e.g., U.S. v. Kershman*, 555 F.2d 198 (8th Cir. 1977).

[37] 21 U.S.C. §§ 823(f), 802(10).

[38] 21 U.S.C. § 822(c)(1).

88.     Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.[39]

89.     Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency.[40] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.[41]

90.     Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[42]

91.     A prescription, whether written or oral, is legally valid under the CSA **only** if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[43] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and **the person knowingly filling such a purported prescription**, as well as the person issuing it, **shall be subject to the penalties** provided for violations of the provisions of law relating to controlled substances."[44] (emphasis added)

---

[39] *See generally* 21 C.F.R. § 1306.

[40] 21 U.S.C. § 829(a).

[41] 21 U.S.C. § 829(b).

[42] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[43] 21 C.F.R. § 1306.04(a).

[44] *Id*. (emphasis added).

92. As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[45] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

93. Moreover, "[a] prescription for a controlled substance may **only** be filled by a pharmacist, **acting in the usual course of his professional practice** and either registered individually, or employed in a registered pharmacy…."[46] (emphasis added)

94. Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice – *i.e.,* "the usual course of his [or her] professional practice" of pharmacy.[47]

95. Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.[48]

96. This requires a pharmacist to use sound professional judgment in determining the legitimacy of a controlled substance prescription, which includes paying attention to the number of prescriptions issued, the number of dosage units prescribed, the doctor writing the prescriptions, and whether the drugs prescribed have a high rate of abuse. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates

---

[45] *Id*.

[46] 21 C.F.R. § 1306.06 (emphasis added).

[47] *Id*.

[48] *See* 21 C.F.R. §§ 1306.04, 1306.06.

the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.

1.    ***Pharmacies Are Obligated Not to Fill Prescriptions Until Red Flags Are Resolved***

97.    A pharmacy cannot ignore red flags indicative of diversion. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."[49] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions."[50] Thus, § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse.[51] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[52]

---

[49] *Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044, 1990 WL 328750 (Dep't of Justice July 24, 1990).

[50] *East Main Street Pharmacy*; Affirmance of Suspension Order, 75 Fed. Reg. 66149-01, 2010 WL 4218766 (Dep't of Justice Oct. 27, 2010).

[51] *Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed. Reg. 4,729, 4,730, 1990 WL 352775 (Dep't of Justice Feb. 9, 1990).

[52] *Id.; see also Townwood Pharmacy*; 63 Fed Reg. 8,477, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*; 77 Fed. Reg. 44070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*; 76 Fed. Reg. 20,039, 2011 WL 1343276 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*; 73 Fed. Reg. 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008) (revocation of registration); *Notice of United Prescriptions Services, Inc.*; 72

98.    Courts, too, have recognized the obligation *not* to dispense until red flags are resolved.[53] In *Medicine Shoppe-Jonesborough,* the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Court held that "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[54] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[55] "[B]y filling these prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[56]

### 2.    *Pharmacy Chains Are Responsible for the Dispensing Practices in Their Stores*

99.    The responsibility for dispensing is not limited to pharmacists, pharmacies, or holders of DEA dispensing registrations. Rather, the corporate parent of a pharmacy may be responsible for the dispensing practices of its pharmacies and pharmacists.[57] This is so regardless

---

Fed. Reg. 50397- 01, 50407-8, 2007 WL 2455578 (Aug. 31, 2007) (revocation of registration).

[53] *See Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008); *United States v. Henry*, 727 F.2d 1373, 1378-79 (5th Cir.1984); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145 (D.D.C. 2012).

[54] *Id*. at 412 (emphasis added).

[55] *Id*.

[56] *Id*.

[57] *See United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D.Ala.1996); *United States v.*

of whether the parent is a registrant under the CSA or whether the parent is the entity or person actually doing the dispensing.

100.    In short, case law discussed below holds that individuals or entities who have the ultimate responsibility for the dispensing of controlled substances can be liable for violations of the CSA, regardless of whether they are DEA registrants.  To the extent that a corporate parent of a chain pharmacy defendant exerts sufficient control over the pharmacy operations at its stores, which the large national chains likely do, these corporate parents can be held liable for dispensing violations.  Moreover, to the extent that the chain pharmacy defendants attempt to blame the individual pharmacists themselves, cases hold that parent company liability can be imposed on top of and in addition to any individual pharmacist's liability.

101.    Courts routinely find that liability can attach to a broad array of persons or entities under Section 842.  In particular, courts reject two arguments for limiting liability under Section 842 and its regulations.  First, courts find that Section 842 can impose liability on non-registrants.  Second, courts find that Section 1306.4 can be the basis for liability of pharmacy owners in addition the pharmacists themselves.  The holdings are based on the purpose and structure of the CSA:  those who have the ultimate responsibility for the controlled substances and ensuring compliance with the CSA should be held liable for violations, regardless of whether they are registered with the DEA.

**3.**    ***The CSA Applies to All Persons Who Dispense Controlled Substances***

---

*Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass.1996); *United States v. Robinson,* No. 12-20319-CIV, 2012 WL 3984786, (S.D. Fla. Sept. 11, 2012).

102.    Courts have found that because the plain language of Section 842 extends its requirements to "all persons," registrants and non-registrants alike are responsible for complying with the law.[58]  Importantly, in those cases, the courts found that because the pharmacy owners, who were not registrants, essentially operated the facilities on a day-to-day basis, they were not exempted from the requirements of Section 842.[59]

103.    At least one court has explicitly held that a non-registrant pharmacy owner can be held liable for dispensing controlled substances without valid prescriptions.  In *USA v. City Pharmacy*, the court found that the owner of the pharmacy could be held liable in his personal capacity for violations of Section 842(a)(1) even though he was not a registrant and the pharmacies he owned were separately incorporated.[60] The United States brought an action alleging that City Pharmacy LLC and City Pharmacy of Charles Town, Inc. violated Section 842(a)(1) by filling illegitimate prescriptions for controlled substances that raised one or more red flags, such as customers traveling long distances or customer receiving drug cocktails.[61]

---

[58] *See United States v. Blanton*, 730 F.2d 1425, 1434 (11th Cir. 1984) (Section 842(a)(5) applied to a physician who was not properly registered with the DEA); *United States v. Clinical Leasing Serv., Inc.*, 759 F. Supp. 310, 313–14 (E.D. La. 1990), *aff'd*, 925 F.2d 120 (5th Cir. 1991) ("Had Congress intended to limit the applicability of § 842(a)(5) to registrants only, it would have done so"); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass. 1996).

[59] *Stidman*, 938 F. Supp. at 809, 814 (the owner of a clinic, who was not a registrant, could be liable because he "shouldered [the] responsibility [to provide a system for the control of drug traffic and to prevent the abuse of drugs] and derived the benefits and profits from operating a methadone clinic."); *Poulin*, 926 F. Supp. at 249, 253 ("Although Mattapoisett Pharmacy, Inc. was listed as the registrant, the statute specifically makes the stated obligations to produce required records applicable to all persons, not simply to registrants.").

[60] *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016).

[61] *Id*. at *2.

104.    The Court held that Section "842(a)(1) applies to non-registrants."[62] The Court continued, explaining that "because part C of the CSA applies broadly to all persons involved in the manufacture, distribution, and dispensing of controlled substances, including lay-persons, defendant Lewis may potentially be held liable for his conduct."[63]  To support its conclusion, the Court concentrated on Defendant Lewis' involvement with the pharmacies at issue, looking specifically at his investment of the funds to organize and open the pharmacy, the active role he played in the management of the pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

105.    The *City Pharmacy* Court also found that the individual defendant could not use the pharmacies' separate incorporation to shield himself from CSA liability.  Evaluating various legal mechanisms for piercing the corporate form, the court concluded that the pharmacies "were being used to evade the legal requirements within and undermine the public policy foundations of the CSA."[64] Thus, the Court held, "given the nature of these criminally-grounded allegations, it is not a defense to liability in this case for defendant Lewis to assert that he is shielded by the corporate form. [The pharmacies] were allegedly the entities used to evade and subvert the requirements of the CSA."[65]

---

[62] *Id*. at *2 (citing *United States v. Moore*, 423 U.S. 122, 134 n.11 (1975) and *United States v. Stidham*, 938 F. Supp. 808, 813-814 (S.D. Ala. 1996)).

[63] *Id*.

[64] *Id*. at *4.

[65] *Id*.; *see also Poulin*, 926 F. Supp. at 249 *("*Mattapoisett Pharmacy, Inc. is also the alter ego of its sole owner, David Poulin, and thus David Poulin cannot use the corporate name to shield himself from personal liability."); *S & S Pharmacy*; 46 Fed. Reg. 13051-52 (Dep't of Justice Feb. 19, 1981) ("[T]he Administrator has in the past looked behind the corporate-veil to revoke or deny a registration when a responsible official of a corporate registrant has been convicted of violating

106.    Just like the defendant in *City Pharmacy*, Walmart invests the funds to organize and open its numerous pharmacies and plays a very active role in the management of its pharmacies including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

### 4.    *The Chain Pharmacies Cannot Escape Liability for Their Corporate Malfeasance by Blaming the Pharmacists Who Work for Them*

107.    In addition to finding that individuals or entities who own and control pharmacies can be liable for CSA violations, irrespective of their DEA registration status, the case law also makes it clear that pharmacies cannot escape liability under the CSA by simply blaming the pharmacists who work for them.  Even though the "corresponding responsibility" of pharmacists is discussed in terms of what a pharmacist – not a pharmacy – must do, courts have found that a narrow reading of the language to insulate pharmacies from liability is not supported by the language or structure of the regulations.

108.    In *United States v. Appalachian Reg'l Healthcare, Inc.,* 246 F. Supp. 3d 1184, 1186 (E.D. Ky. 2017), the Court looked at the regulations regarding dispensing under Section 842, finding that the pharmacy owner could be held personally liable for dispensing violations.

---

the laws relating to controlled substances."); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, (S.D. Fla. Sept. 11, 2012), (finding a non-registrant owner of a pharmacy could be held liable for violations of Section 842 because the defendant was "alleged to have had responsibility over the controlled substances" and holding that "[w]here corporate officers have been in a position to prevent or correct the violations at issue, courts have found that there is individual liability under the [Section 842], which plainly applies to all 'persons.'"); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019) (an owner receiving the "benefits and profit" of a pharmacy, but who was not a registrant or a medical professional, can be liable for violations of the CSA because he was still "responsible for making sure that [CSA] requirements were met.").

109.    Defendant Appalachian Regional Healthcare ("ARH") unsuccessfully argued that it could not be held liable as a corporate pharmacy under Section 842(a)(1) because its implementing regulations, namely 21 C.F.R. § 1306.04, articulated the duties under that section in terms of the "pharmacist" or "practitioner," not the corporate pharmacy entity.[66] The court rejected ARH's narrow, technical reading, instead holding that "when § 1306.04(a) states that the person knowingly filling the prescription is subject to penalties, it contemplates liability for corporate entities as well."[67]    The court continued, finding that there is "nothing inconsistent about articulating the responsibilities of individual practitioners and pharmacists while simultaneously indicating that other entities may be subject to penalties for their role in issuing and filling invalid prescriptions."[68]

110.    Likewise, other federal courts have found pharmacies and other DEA registrants liable for violations of the CSA and CSA Regulations.[69]    For example, in *Medicine Shoppe-*

---

[66] *See e.g.* § 1306.4(a) ("The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.").

[67] *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d at 1189.

[68] *Id.* at 1189-1190; *see also Moore v. Covenant Care Ohio, Inc.*, 18 N.E.3d 1260, 1270 (Oh. App. 2014) (a corporate pharmacy whose subsidiary voluntarily undertook to provide pharmaceutical services to a nursing home owed a duty to exercise reasonable care in providing such services and also owed a common law duty to exercise reasonable care in dispensing and labeling of medicines).

[69] *See United States v. Green Drugs*, 905 F.2d 694, 694-5 (3rd Cir. 1990) (affirming retail pharmacy liability for violating Section 842(a)); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-3 (5th Cir. 1991) (affirming liability under Section 842(a) for corporate operator of clinic that illegally distributed controlled substances); *United States v. Cap Quality Care, Inc.*, 486 F. Supp. 2d 47, 54 (D. Maine 2007) (granting summary judgment to the United States on claims that DEA registrant clinic improperly dispensed controlled substances in violation of Sections 829 and 842); *United States v. Grab Bag Distrib.*, 189 F. Supp. 2d 1072, 1082 (E.D. Cal. 2002) (granting summary judgment to the United States on liability); *United States v. Little*, 59 F. Supp. 2d 177, 186-8 (D. Mass. 1999) (granting summary judgment to Government for pharmacy's

*Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008), the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated Section 829 of the CSA and Section 1306.04 of the CSA Regulations.

111.    Specifically, the Court held that "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[70]  "Medicine Shoppe fell asleep at the wheel in honoring prescriptions no reasonable pharmacist would fill without further inquiry."[71] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[72] "[B]y filling these prescriptions anyway . . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[73]

---

violations of § 842(a) and concluding "a pharmacy empowered to dispense controlled substances will now be held liable . . . if it knew or should have known about an illegal diversion, or inaccurate records, and chose to do nothing"); *Poulin*, 926 F. Supp. at 252-3 (holding pharmacy liable for "filling a total of six invalid prescriptions"); *United States v. Queen Village Pharm.*, No. 89-2778, 1990 WL 165907, *2-4 (E.D. Pa. Oct. 25, 1990) (finding retail pharmacy liable for violating Section 842(a)).

[70] *Id.* at 412 (emphasis added).

[71] *Id.* at 413.

[72] *Id.*

[73] *Id.*

The Sixth Circuit made no distinction between the pharmacy and the pharmacists employed there when determining liability.[74]

112.    These decisions make clear that the dispensing obligations under the CSA are not imposed solely on pharmacists, but on pharmacies and their corporate owners. For this reason, this Court should find that the chain pharmacy parent corporations like Walmart, Inc. had a responsibility, under the CSA, not to dispense opioids in the face of unresolved red flags about the legitimacy of the prescriptions.

### 5.    *The Purpose and Intent of the CSA Bolsters Finding Liability of Chain Pharmacy Corporate Parents*

113.    The logic of the authority above is consistent with the purpose and intent of the CSA. The Supreme Court explained that with the CSA "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels."[75] So, to address this concern, courts do not want defendants using the DEA registration process and requirements, *i.e.* the structure of the legitimate channels, to somehow shield those responsible from liability. As one court put it, "[t]o accept [defendant's] argument that the Act does not apply to her [because she was not a registrant], even though she was responsible for the drugs, would eviscerate the goal of ensuring the movement of drugs is closely controlled."[76] "The legislative history [of the CSA]

---

[74] *See also Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*, 881 F.3d 823 (11th Cir. 2018) (affirming revocation of pharmacy registration for, among other things, pharmacists dispensing prescriptions that prescriptions presented various red flags, *i.e.*, indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

[75] *United States v. Moore*, 423 U.S. 122, 135 (1975).

[76] *Robinson,* 2012 WL 3984786 at *7.

indicates that Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant."[77]

114.    The DEA made a similar finding in *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*.[78] The Administrative Law Judge rejected CVS's argument that the corporate parent of a chain pharmacy was not responsible for the actions of its pharmacies. In its analysis of whether or not CVS took responsibility for its actions, the ALJ held that:

> [T]he Agency's rule is clear and the fact that CVS is a large corporation provides no reason to excuse it from explicitly acknowledging the misconduct of Respondents and their pharmacists. Therefore, I decline to create one rule for chain pharmacies and another rule for closely held or sole proprietor owned pharmacies. Because Respondents have failed to satisfy this requirement, the ALJ properly held that they have not accepted responsibility for their misconduct.[79]

115.    At the most fundamental level, the purpose of the CSA and CSA regulations is to create a closed system for delivery of controlled substances and prevent the distribution of controlled substances outside of that system. To allow the entity that fully controls the operations of the registrants (such as the corporate parent of a chain pharmacy like Walmart) to escape responsibility because of corporate structure thus would defeat the purpose and intent of the CSA.

### B.    The False Claims Act ("FCA")

116.    The FCA[80] prohibits "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval.

---

[77] *United States v. Moore*, 423 U.S. at 134.

[78] 77 Fed. Reg. 62316-01, 62321-2; 2012 WL 4832770 (D.E.A. Oct. 12, 2012).

[79] *Id.*

[80] 31 U.S.C § 3729(a)(1)(A).

117.    The FCA[81] prohibits "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim.

118.    The FCA[82] further imposes liability upon any person who conspires to commit a violation of the FCA.

119.    The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient.  Any claim submitted by a Government Program provider for a payment constitutes a claim under the FCA.  Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a "claim" for purposes of the FCA.

120.    Under the FCA, a "claim" is defined broadly to include any request or demand for money that is presented to the United States, or is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest.[83]

121.    In the Medicare Part D context, the claim is the Prescription Drug Event (PDE) that is sent by the dispensing pharmacy to a Part D plan sponsor or Pharmacy Benefit Manager ("PBM"), and then forwarded to CMS as part of the payment process.

---

[81] 31 U.S.C § 3729(a)(1)(B).

[82] 31 U.S.C. § 3729(a)(1)(C).

[83] 31 U.S.C. § 3729(b)(2).

122.    The Part D statute provides that drugs may only be reimbursed under the program if the drug is a "covered outpatient drug." Consequently, one of the elements of the PDE is to designate whether a dispensed drug is a covered outpatient drug. Covered outpatient drugs must be dispensed pursuant to a valid prescription. Under the CSA and many parallel state laws, a prescription must satisfy a number of requirements. For example, the prescriber must be authorized to prescribe controlled substances in the jurisdiction in which he or she is licensed to practice, and must be either registered with DEA or exempt from registration.[84] Perhaps most significantly, in order to be valid, a prescription must be issued "for a legitimate medical purpose by an individual practitioner acting in the usual course of his [or her] professional practice."[85] This requirement "ensures that patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse.[86] It also "bars doctors from peddling to patients who crave the drugs for those prohibited uses."[87] Violation of any one of the above requirements potentially satisfies the FCA falsity requirement.

123.    The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation for violations that occurred before November 2,

---

[84] 21 C.F.R. § 1306.03(a).

[85] 21 C.F.R. § 1306.04(a).

[86] *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).

[87] *Id*.

2015 and, for violations that occurred after that date, a civil penalty of between $11,181 and $22,363.[88]

124.    Relevant here, Department of Justice counsel have argued that the "combining the CSA and FCA enforcement schemes can be an effective tool to address violations of the CSA that may lead to diversion of narcotics and Part D fraud,"[89] particularly in combatting the "twin evils of opioid addiction" and Government Program fraud.[90]

## C.    Opioid Coverage and Use by Government Program Beneficiaries

125.    There is an array of health care programs operated and funded by the United States and the Qui Tam States (the "Government Programs") whose purpose is to facilitate the delivery of safe and effective health care through payment or reimbursement of eligible prescription drugs for covered beneficiaries.  Several of these Government Programs are described below.

126.    One method for preventing the over-prescribing of potentially harmful opioids is to pursue those who cause the submission of false or fraudulent claims for payment for those drugs under Medicare Part D, Medicaid, and other federal programs. The treble damages and civil penalties awardable under the FCA can provide a powerful incentive for physicians and others to avoid prescribing and dispensing these substances for indications that are not supported by the approved drug compendia.

### 1.    *Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications*

---

[88] 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

[89] Edward A. Baker, Stacy Gerber Ward, *Pursuing False Claims Act Liability for Controlled Substances Act Violations*, 64 United States Attorneys' Bulletin 101, 113  (Nov. 2016).

[90] *Id.* at 102.

127.    Medicare coverage for opioid medications is provided in Part D, the prescription drug benefit program available to Medicare recipients who voluntarily enroll.[91] To participate in Part D, beneficiaries must enroll in a Part D Plan of their choice. The beneficiary pays premiums to the Plan's sponsor, which is a private entity approved by the Centers for Medicare and Medicaid Services ("CMS"). Coverage in the Plan includes deductibles, copayments, and benefit caps. The beneficiary fills the prescription at a pharmacy, which submits a claim to the Plan sponsor, and the sponsor pays the pharmacy directly or through a subcontractor. CMS reimburses the sponsor for varying portions of the prescription costs.[92]

128.    To be a "covered Part D drug," a drug must be: (1) dispensable only by prescription; (2) one of the three types of "covered outpatient drug" defined in 42 U.S.C. § 1396r-8(k)(2)(A) (2016); and (3) used for a "medically accepted indication."[93]

129.    The most important of these three requirements for present purposes is the third, that the drug be used for a medically accepted indication. The statute and the regulation define this term by incorporating the Medicaid definition in 42 U.S.C. §§ 1396r-8(k)(6) (2016).[94]

130.    The definition is: "The term 'medically accepted indication' means any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 301 *et seq.*] or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection (g)(1)(B)(i) of this

---

[91] 42 U.S.C. §§ 1395w-102 (2010).

[92] *See Omnicare, Inc. v. UnitedHealth Group, Inc*., 594 F. Supp.2d 945, 948-49 (N.D. Ill. 2009).

[93] 42 U.S.C. §§ 1395w-102(e)(1) (2010).

[94] *See* 42 U.S.C. §§ 1395w-102(e)(4)(A)(ii)(2010); 42 CFR § 423.100 (2016).

section."[95] The compendia referred to are "(I) American Hospital Formulary Service Drug Information; (II) United States Pharmacopeia-Drug Information (or its successor publications); and (III) the DRUGDEX Information System."[96]

131.    The Medicare manuals provide additional guidance on Part D drug coverage. The MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL, Ch. 6, § 10.6 (Rev. 18, Jan. 15, 2016), states that a medically accepted indication "refers to the diagnosis or condition for which a drug is being prescribed, not the dose being prescribed for such indication."[97]

132.    Therefore, Medicare Part D and Medicaid cover only prescription drugs used for a "medically accepted indication," which means used either for an indication approved on the Food and Drug Administration (FDA) label, or for an "off-label" indication which is "supported" by one of the approved compendia. If a drug is prescribed outside of these limitations, it is not a "covered drug," and a claim for payment based on the prescription is a false claim.

### 2.    *Medicaid Coverage for Opioids and Opioids Use Disorder*

133.    Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients.  Funding for Medicaid is shared between the federal Government and state governments.

134.    While Medicaid undoubtedly helps many deserving recipients, it also creates a series of incentives for potential abuse of opioids, which are rooted in federal law itself. Patients on Medicaid typically "pay no part of costs for covered medical expenses," other than perhaps a

---

[95] 42 U.S.C. §§ 1396r-8(k)(6) (2016).

[96] 42 U.S.C. §§ 1396r-8(g)(1)(B)(i).

[97] *Id.*

small co-payment.[98] Federal law requires that Medicaid co-payments and other "cost-sharing" borne by Medicaid recipients at lower income levels be nominal. CMS has determined that states could charge those on Medicaid no more than $4 for certain classes of drugs.[99] For dangerous opioids such as oxycodone, Medicaid co-pays can run as low as $1 for as many as 240 pills—pills that can be sold for up to $4,000 on the street.

135.    As one longtime local prosecutor in opioid-ravaged eastern Kentucky recounted in DREAMLAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC: "We can talk morality all day long, but if you're drawing five hundred dollars a month and you have a Medicaid card that allows you to get a monthly supply of pills worth several thousand dollars, you're going to sell your pills."[100]

136.    Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the drugs and drug uses that the federal Government will pay for through its funding of state Medicaid programs.  Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs."  "Covered outpatient drugs" are drugs that are used for "a medically accepted indication."

---

[98] U.S. Dep't of Health & Hum. Servs., *Frequently Asked Questions: What is the Difference Between Medicare and Medicaid?*, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-the-difference-between-medicare-medicaid/index.html.

[99] *See* Final Rule, Medicaid and Children's Health Insurance Programs: Essential Health Benefits in Alternative Benefit Plans, Eligibility Notices, Fair Hearing and Appeal Processes, and Premiums and Cost Sharing; Exchanges: Eligibility and Eligibility and Enrollment, 78 Fed. Reg. 42159-42322 (July 15, 2013) (codified in scattered pts. of 42 C.F.R.), https://www.gpo.gov/fdsys/pkg/FR-2013-07-15/html/2013-16271.htm.

[100] Sam Quinones, DREAM LAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC 211 (2015).

137.    Medicaid covered over half of all nonelderly adults with opioid use disorder ("OUD") who received drug and/or alcohol treatment in the past year. In 2017, 617,000 nonelderly adults with OUD reported receiving treatment during the previous year. Of these individuals, 54 percent had Medicaid coverage while only 26 percent had private insurance and 20 percent were uninsured.[101]

138.    State Medicaid programs cover numerous substance use disorder treatment services that fit into several state plan categories, including outpatient treatment, inpatient treatment, prescription drugs, and rehabilitation services. The standard of care for OUD is medication-assisted treatment (MAT), which combines one of three medications (methadone, buprenorphine, or naltrexone) with counseling and other support services.[102]

139.    All state Medicaid programs cover at least one medication used as part of MAT and most cover all three of these medications.[103] State Medicaid programs also cover many counseling and other support services, delivered either as part of MAT or separately. Most of these services are delivered at state option and include detoxification, intensive outpatient treatment,

---

[101] Kendal Orgera and Jennifer Tolbert, Henry J. Kaiser Foundation, *The Opioid Epidemic and Medicaid's Role in Facilitating Access to Treatment* (May 24, 2019), https://www.kff.org/medicaid/issue-brief/the-opioid-epidemic-and-medicaids-role-in-facilitating-access-to-treatment/.

[102] Substance Abuse and Mental Health Services Administration, *Medication-Assisted Treatment (MAT)* (Apr. 26, 2019), https://www.samhsa.gov/medication-assisted-treatment/

[103] Kathleen Gifford, et al., Kaiser Family Foundation, States Focus on Quality and Outcomes Amid Waiver Changes: Results from a 50-State Medicaid Budget Survey for State Fiscal Years 2018 and 2019, at 78 (Oct. 25, 2018), https://www.kff.org/medicaid/report/states-focus-on-quality-and-outcomes-amid-waiver-changes-results-from-a-50-state-medicaid-budget-survey-for-state-fiscal-years-2018-and-2019/.

psychotherapy, peer support, supported employment, partial hospitalization, and inpatient treatment.[104]

140.    Medicaid finances a substantial proportion of substance use disorder treatment. In 2014, Medicaid financed more than one-fifth (21 percent) of substance use disorder treatment, which was slightly less than the share covered by all private insurers (22 percent). Nine percent of all spending on addiction treatment came from out-of-pocket payments by individuals.[105] By 2020, it is projected that Medicaid will finance 28 percent of substance use disorder treatment services, while other payer types are projected to remain the same.[106]

### 3.    *Medicare Beneficiary Opioid Use and Abuse*

141.    Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases.  The program is administered by third-party contractors known as "carriers," which have some discretion to make coverage determinations, but must do so within statutory and regulatory confines.

142.    Starting in January 2006, Part D of the Medicare Program provided subsidized coverage for pharmacy-dispensed outpatient drugs for all beneficiaries, with low-income individuals receiving the greatest subsidies.  However, a "covered Part D drug" must be used for a "medically accepted indication."

---

[104] Medicaid and CHIP Payment and Access Comm., *State Policies for Behavioral Health Services Covered Under the State Plan* (June 2016), https://www.macpac.gov/publication/behavioral-health-state-plan-services/.

[105] Tami L. Mark, et al., Insurance Financing Increased For Mental Health Conditions But Not For Substance Use Disorders, 1986-2014, 35 Health Affairs 961 (June 2016).

[106] Substance Abuse and Mental Health Services Admin., *Projections of National Expenditures for Treatment of Mental and Substance Use Disorders, 2010–2020*, 31 HHS Publication No. SMA-14-4883, https://store.samhsa.gov/system/files/sma14-4883.pdf.

143.    Medicare's Prescription Drug Program, known as Part D, provides optional drug benefits to Medicare beneficiaries.  CMS contracts with private insurance companies, called sponsors, to provide Part D prescription drug coverage to beneficiaries who choose to enroll. Sponsors offer drug coverage to beneficiaries through Part D prescription drug plans.  These Part D programs are subsidized by the federal Government, which covers the cost of drug payments.

144.    In 2016, one out of every three beneficiaries received at least one prescription opioid through Medicare Part D. In total, 14.4 million of the 43.6 million beneficiaries enrolled in Medicare Part D received opioids. Medicare Part D paid almost $4.1 billion for 79.4 million opioid prescriptions for these beneficiaries. The vast majority of these opioids (80 percent) were Schedule II or III controlled substances, meaning they have the highest potential for abuse among legally available drugs.[107]

145.    Several states had higher proportions of beneficiaries receiving opioids than the United States overall, which was 33 percent. Alabama and Mississippi had the highest proportions, with almost half of the State's Part D beneficiaries receiving at least one opioid—46 percent and 45 percent, respectively. Arkansas had 44 percent of beneficiaries receiving opioids, while Oklahoma, Tennessee, and Louisiana each had 42 percent.[108]

146.    In addition, 1 in 10 Medicare Part D beneficiaries nationwide received opioids on a regular basis. Specifically, 5 million beneficiaries received opioids for 3 months or more in 2016. Research shows that the risk of opioid dependence increases substantially for patients receiving

---

[107] Dept. of Health & Human Services OIG, *Opioids in Medicare Part D: Concerns about Extreme Use and Questionable Prescribing*, 2 (July 2017), HHS OIG Data Brief OEI-20-17-00250. https://oig.hhs.gov/oei/reports/oei-02-17-00250.pdf.
[108] *Id*.

opioids continuously for 3 months. Of these 5 million beneficiaries, 3.6 million received opioids for 6 or more months and nearly 610,000 received opioids for the entire year.[109]

147.    A total of 501,008 beneficiaries received high amounts of opioids through Medicare Part D in 2016. This does not include beneficiaries who had cancer or were in hospice care. Each of the 501,008 beneficiaries received an average morphine equivalent dose (MED) of greater than 120 mg a day for at least 3 months. MED is a measure that equates all the various opioids and strengths into one standard value. A daily MED of 120 mg is equivalent to taking 12 tablets a day of Vicodin 10 mg or 16 tablets a day of Percocet 5 mg. These dosages far exceed the amounts that the manufacturers recommend for both of these drugs. They also exceed the 90 mg MED level that CDC recommends avoiding for patients with chronic pain.[110]

148.    As the statistics make clear, there is a real problem with inappropriate opioid prescriptions being filled by Medicare patients. Pharmacies should not be dispensing most, if not all, of the prescriptions that are clearly for excessive amounts of opioids or for patients who have been doctor shopping. However, pharmacies like Walmart have failed to do this and instead chose to bill Medicare for those medically unnecessary prescriptions.

### 4.    *Opioid Coverage under TRICARE*

149.    Drug coverage under the TRICARE program differs from that under Medicare and Medicaid. TRICARE's regulations provide that TRICARE "will consider coverage of off-label uses of drugs and devices that meet the definition of Off–Label Use of a Drug or Device in 32 C.F.R. § 199.2(b). Approval for reimbursement of off-label uses requires review for medical

---

[109] *Id.*

[110] *Id.*

necessity and also requires demonstrations from medical literature, national organizations, or technology assessment bodies that the off-label use of the drug or device is safe, effective, and in accordance with nationally accepted standards of practice in the medical community."[111] The definition of Off-Label Use in 32 C.F.R. § 199.2(b) (2016), referred to in the quote above, essentially includes any use not approved on a drug's label.

### 5.    *Opioid Coverage under FEHB*

150.    The drug coverage provided under the Federal Employee Health Benefit Plan (FEHB) is also different from that provided by Medicare and Medicaid. No law or regulation defines when a drug is "medically necessary" for FEHB purposes. Instead, that coverage is spelled out by the plan document applicable to each private plan that administers FEHB coverage for its members.

### 6.    *Reimbursement under Other Government Programs*

151.    In addition to Medicaid, Medicare, TRICARE, FEHB, Mailhandlers, the U.S. Secret Service Employees Health Association, the Indian Health Service, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as TRICARE), the Veterans Health Administrative ("VHA"), at all times material hereto, the States have offered their employees, retirees and their beneficiaries and survivors, prisoners health insurance coverage, including coverage for prescription opioid drugs.

---

[111] 32 CFR § 199.4(g)(15)(i)(A), n. 3 (2016).

### D.     Federal Guidance and State Law Governing Pharmacy Dispensing of Opioids

152.     The CDC has published guidelines regarding the proper use of opioids.[112] The guidelines explicitly state that "Opioid pain medication use presents serious risks, including overdose and opioid use disorder."  Furthermore, "Sales of opioid pain medication have increased in parallel with opioid-related overdose deaths."

153.     The CDC guidelines, and many state laws, rely on Morphine Milligram Equivalents ("MME"). As the name suggests, MME is an opioid's dosage's equivalency to morphine. Using MME is useful because it provides a constant metric to compare opioids of varying types, strengths, and delivery methods. This is particularly useful for patients who may be using a combination of different opioid products or have changed products over time.

154.     The CDC has a conversion chart of the most common opioids in mg to MMEs.[113] So, for example, 10 tablets of hydrocodone/acetaminophen 5mg/300mg would equal 50 MME (10 tablets x 5mg of hydrocodone x 1 hydrocodone oxycodone conversion factor = 50 MME). 2 tablets of oxycodone 30mg would equal 90 MME (2 tablets x 30mg of oxycodone x 1.5 oxycodone conversion factor = 90 MME).[114]

---

[112] CDC, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. & Mort. Wkly. Rep. (Mar. 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

[113] Opioid Oral Morphine Milligram Equivalent (MME) Conversion Factors, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Opioid-Morphine-EQ-Conversion-Factors-Aug-2017.pdf.

[114] Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.

155.    The CDC determined that in "[h]aving a history of a prescription for an opioid pain medication increases the risk for overdose and opioid use disorder, highlighting the value of guidance on safer prescribing practices for clinicians. For example, a recent study of patients aged 15–64 years receiving opioids for chronic noncancer pain and followed for up to 13 years revealed that one in 550 patients died from opioid-related overdose at a median of 2.6 years from their first opioid prescription, and one in 32 patients who escalated to opioid dosages >200 morphine milligram equivalents (MME) died from opioid-related overdose."

156.    In addition, the CDC found that "opioid-related overdose risk is dose-dependent, with higher opioid dosages associated with increased overdose risk. Two … studies … evaluated similar MME/day dose ranges for association with overdose risk. In these four studies, compared with opioids prescribed at <20 MME/day, the odds of overdose among patients prescribed opioids for chronic nonmalignant pain were between 1.3 and 1.9 for dosages of 20 to <50 MME/day, between 1.9 and 4.6 for dosages of 50 to <100 MME/day, and between 2.0 and 8.9 for dosages of ≥100 MME/day. Compared with dosages of 1-<20 MME/day, absolute risk difference approximation for 50-<100 MME/day was 0.15% for fatal overdose and 1.40% for any overdose, and for ≥100 MME/day was 0.25% for fatal overdose and 4.04% for any overdose.

157.    A recent study of Veterans Health Administration patients with chronic pain found that patients who died of overdoses related to opioids were prescribed higher opioid dosages (mean: 98 MME/day; median: 60 MME/day) than controls (mean: 48 MME/day, median: 25 MME/day). Finally, another recent study of overdose deaths among state residents with and without opioid prescriptions revealed that prescription opioid-related overdose mortality rates rose

rapidly up to prescribed doses of 200 MME/day, after which the mortality rates continued to increase but grew more gradually."[115]

158.    Furthermore, "epidemiologic studies suggest that concurrent use of benzodiazepines and opioids might put patients at greater risk for potentially fatal overdose. Three studies of fatal overdose deaths found evidence of concurrent benzodiazepine use in 31%–61% of decedents. In one of these studies, among decedents who received an opioid prescription, those whose deaths were related to opioids were more likely to have obtained opioids from multiple physicians and pharmacies than decedents whose deaths were not related to opioids."[116]

159.    "[M]ost fatal overdoses could be identified retrospectively on the basis of two pieces of information, multiple prescribers and high total daily opioid dosage, both important risk factors for overdose that are available to prescribers in the PDMP."[117]

160.    In those guidelines, the CDC recommends numerous strategies to reduce inappropriate opioid prescribing. Of particular relevance here, the CDC recommends that clinicians "should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day."[118]

---

[115]  *Id.*

[116]  *Id.*

[117]  *Id.*

[118]    CDC Guidelines for Prescribing Opioids for Chronic Pain, https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf.

161.    Dosages at or above 50 MME/day increase the risks of overdose by at least 2x over the risk at <20 MME/day. In a national sample of Veterans Health Administration (VHA) patients with chronic pain receiving opioids from 2004–2009, patients who died of opioid overdose were prescribed an average of 98 MME/day, while other patients were prescribed an average of 48 MME/day.[119]

162.    In 2016, Massachusetts became the first state in the nation to pass a law limiting first time opioid prescriptions to 7 days.[120] Since then, over half of all states have enacted laws that restrict the prescribing or dispensing of opioids for acute pain. Fifteen states have passed laws limiting opioid prescribing for acute pain in an opioid naive patient to a 7-day supply. These states include Alaska, Hawaii, Colorado, Utah, Oklahoma, Louisiana, Missouri, Indiana, West Virginia, South Carolina, Pennsylvania, New York, Maine, Connecticut, and Massachusetts. In addition, Arizona, North Carolina, and New Jersey limit initial prescribing to 5 days.[121]

163.    Following surgical procedures, Arizona allows for a 14-day supply and North Carolina a 7-day supply. Nevada is the only state with an initial 14-day prescription limit.[2] The

---

[119] Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.

[120] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018) http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx

[121] *Id*.

strictest limits are in Tennessee, Kentucky, and Florida where initial prescribing is limited to 3 to 4 days.[122] Minnesota also has a 4-day limit, but only for acute dental or ophthalmic pain.[123]

164.    When addressing risks for drug overdose, studies support the need to monitor not only duration of initial therapy, but also total daily dosing for patients. This is particularly important for those patients who are receiving 50 to 99 daily morphine milligram equivalents (MME) or more per day.[124] Nevada and Arizona have limited prescribing doses of opioids to 90 MMEs per day.[125] Maine's limit is 100 MME per day and Rhode Island limits prescriptions to 50 MME per day.[126] Tennessee allows 60 MME per day if it is for 3 days or less, otherwise the prescriptions are restricted to 50 MME daily.[127]

165.    While the majority of states focuses on general opioid prescribing limits, Alaska, Connecticut, Indiana, Louisiana, Massachusetts, Nebraska, Pennsylvania and West Virginia also set requirements regarding opioid prescribing to minors, such as discussing their risk with the minor and parent or guardian.[128]

---

[122] *Id.*

[123] *Id.*

[124] Liang, Y., Turner, B.J., Assessing risk for drug overdose in a national cohort: role for both daily and total opioid dose?, 16 J. Pain 318-25 (2014).

[125] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018) http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx.

[126] *Id.*

[127] *Id.*

[128] *Id.*

166.     Rather than setting opioid limits by statute, a few state laws direct or authorize other entities to do so (*e.g*., New Hampshire, Ohio, Oregon, Vermont, Virginia, Washington and Wisconsin). These entities may include the Department of Health, a designated state health official, or regulatory boards, such as the Board of Medicine, Nursing and/or Dentistry. Other states, such as Rhode Island and Utah, have prescribing limits by statute, and allow other entities to adopt prescribing policies.[129]

167.     In addition, state laws may provide guidance or direction related to opioid prescribing. Maryland requires providers to prescribe the lowest effective dose of an opioid for a quantity that is not greater than that needed for the expected duration of pain.[130] Utah, in addition to its 7-day prescribing limit, authorizes commercial insurers, the state Medicaid program, workers' compensation insurers and public employee insurers to implement policies for prescribing certain controlled substances.[131] The policies must include evidence-based guidelines for prescribing opioids.

168.     Consequently, the dispensing of controlled substances, when faced with warning signals and without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates the pharmacist's

---

[129] *Id*.

[130] *Id*.

[131] *Id*.

corresponding responsibility under the CSA[132] to ensure the legitimacy of the prescription[133] as well as pharmacy laws and regulations in a majority of the states.

169.    New Mexico law defines the "Practice of Pharmacy" to mean "continually optimizing medication safety, patient wellness, and quality of services through the effective use of pharmaceutical care and emerging technologies and competency-based and performance-based training."[134]

170.    That same statute further explains that the "(1) Practice of pharmacy may include, but is not limited to, (2) specialty pharmacy practice including pharmacists working for licensed pharmaceutical manufacturers or wholesalers; (3) practice of telepharmacy within and across state lines; (4) engaging in health care educational activities; (5) pharmacy-specific academia; (6) provision of those acts or services necessary to provide pharmaceutical care in all areas of patient care including patient counseling, prescriptive authority, drug administration, primary care, medication therapy management, collaborative practice, and monitoring dangerous drug therapy; (7) inspecting on a full time basis to ensure compliance with the practice of pharmacy; (8) provision of pharmaceutical and drug information services, as well as consultant pharmacy services; (9) engaging in other phases of the pharmaceutical profession including those with research or investigational or dangerous drugs; or (10) engaging in functions that relate directly to

---

[132] 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829).

[133] 21 C.F.R. § 1306.04 and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA) because the prescription was filled outside of the pharmacist's usual course of professional practice. *See also* 21 C.F.R. § 1306.06

[134] N.M.A.C. § 16.19.4.7.

the administrative, advisory, or executive responsibilities pursuant to the practice of pharmacy in this state; (11) the responsibility for compounding and labeling of drugs and devices; (12) the proper and safe storage of drugs and devices; and (13) the maintenance of proper records."[135]

171.    New Mexico pharmacists also have requirements regarding the dispensing of controlled substances.[136]

172.    Prescribing or dispensing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice. Prescribing or dispensing controlled substances for pain will be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication diversion and abuse.

E.    **Use of State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping**

173.    It is undeniable that illicit street opiates and prescription opioid medications can often be linked, with legitimate prescriptions initiating the addiction, often followed by the person seeking the chemical from illegal sources once the prescription has ended. Sometimes, however, they will resort to "doctor shopping" – i.e., visiting multiple physicians in various ambulatory settings to obtain more of the same opioid medications if the patient's own health care provider is unwilling or unable to renew or refill the prescription. State prescription drug monitoring programs ("PDMPs") make a significant contribution to fighting the opioid epidemic by preventing and inhibiting doctor shopping.

---

[135] *Id.*

[136] N.M.S.A. § 16.19.20.

174.    PDMPs, or PMPs (prescription monitoring programs) as they are alternatively known, are utilized by 49 states, as well as Guam and the District of Columbia.[137] Although requirements vary by state, they generally collect data from dispensers and report to authorized users of a state's database the number of prescriptions that have been filled for scheduled drugs for each recipient. Access to the information contained in such databases is typically limited to prescribers and state officials. State pharmacy boards and health departments operate most PDMPs, but a minority relies on professional licensing agencies, law enforcement, state substance abuse agencies, or in the case of Connecticut, the Department of Consumer Protection.

175.    All PMDPs monitor at least Schedule II through IV Drugs, with some also monitoring Schedule V and "Drugs of Concern" as designated by an authorized state agency. Eight states, the District of Columbia and Puerto Rico maintain a voluntary system, with no mandatory enrollment required of either prescribers or dispensers.[138] Still, the majority of state legislatures understand that the sum total is only as good as its parts. For example, recent Georgia and Mississippi legislation tied mandatory PMDP registration to the licensed practitioner's ability to secure or renew a DEA number.[139] Maine adopted mandatory registration of both prescribers and dispensers in light of "an unprecedented 272 overdose related fatalities."[140] In an effort to combat

---

[137] Missouri is the only state not to have a statewide PDMP, though an Executive Order was issued in July 2017 directing its formulation. PDMP TTAC, *PDMP Legislation and Operational Dates*, https://www.pdmpassist.org/pdf/Legislative_Operational_Dates_20200207.pdf.

[138] PDMP TTAC, *PDMP Mandatory Enrollment by Prescribers and Dispensers*, https://www.pdmpassist.org/pdf/Mandatory_Enrollment_20190731.pdf.

[139] H.B. 249 (Ga. 2017), www.legis.ga.gov/Legislation/20172018/170657.pdf [hereinafter H.B. 249]; H.B. 1032 (Miss. 2017), http://billstatus.ls.state.ms.us/2017/pdf/history/HB/HB1032.xml.

[140] Weekly Notices of State Rule-Making: Public Input for Proposed and Adopted Rules, Maine.gov., www.maine.gov/sos/cec/rules/notices/2017/010417.html.

the opioid epidemic through ensuring reliable information is accessible to prescribers, Kentucky and North Carolina have each added penalties for failure of pharmacies to comply with reporting requirements, including sanctions and a monetary penalty per offense.[141]

176.    Statutory requirements for submitting and gathering prescription data are of little value if the statutes fail to specify how the data will be used. At least fifteen states enhanced their "query" requirements or how a prescriber or dispenser must check the state's PDMP system for patient information before prescribing a controlled substance. Checking the PDMP for opioid prescriptions from other sources is a recommended step in the CDC's "Checklist for prescribing opioids for chronic pain."[142] The Arkansas legislature directed licensing boards to adopt regulations requiring prescribers to query the PDMP when prescribing an opioid from Schedules II or III for each time a medication was prescribed to a patient.[143] Texas followed suit by naming specific categories of drugs that require a query prior to being prescribed ("opioids, benzodiazepines, barbiturates, or carisoprodol").[144] Some states (*e.g.*, Georgia, Louisiana, Pennsylvania, and North Carolina) do not require query of all controlled substance prescriptions in certain situations. For example, the query requirement may not be applicable to providers of certain specialties if the prescription is for less than a three-day supply and contains less than 26 pills, the patient is terminally ill, or when the controlled substance is administered in a hospital.

---

[141]   H.B. 314 (Ky. 2017); H.B. 243 (N.C. 2017).

[142]   CDC, *Checklist    for    Prescribing    Opioids    for    Chronic    Pain*, https://www.cdc.gov/drugoverdose/pdf/pdo_checklist-a.pdf.

[143]   S.B.    339,    91st    Gen.    Assemb.,    Reg.    Sess.    (Ark.    2017), http://www.arkleg.state.ar.us/assembly/2017/2017R/Bills/SB339.pdf.

[144]   H.B. 2561 (Tex. 2017), https://legiscan.com/TX/text/HB2561/id/1625193/Texas2017-HB2561-Enrolled.html.

Georgia and South Carolina's legislatures added consequences for those practitioners who fail to query the PDMP, requiring them to be reported to their licensure boards for disciplinary action.[145]

177.    In New Mexico, pharmacists are required to consult the PMP if the following conditions are present: "(a) a pharmacist becomes aware of a person currently exhibiting potential abuse or misuse of opioids (*i.e.* over-utilization, early refills, multiple prescribers, appears overly sedated or intoxicated upon presenting a prescription for an opioid or an unfamiliar patient requesting an opioid by specific name, street name, color, or identifying marks, or paying cash when the patient has prescription insurance); (b) a pharmacist receives an opioid prescription issued by a prescriber with whom the pharmacist is unfamiliar (i.e. prescriber is located out-of-state or prescriber is outside the usual pharmacy geographic prescriber care area); (c) a pharmacist receives an opioid prescription for an unfamiliar patient who resides outside the usual pharmacy geographic patient population area; (d) a pharmacist receives an initial prescription for any long-acting opioid formulations, including oral and transdermal dosage forms (*e.g.*, fentanyl or methadone); or (e) a pharmacist becomes aware of a patient receiving an opioid concurrently with a benzodiazepine or carisoprodol."[146] The pharmacist is also required to document the review of the PMP reports.

178.    Mandatory use of PDMP programs has proven successful. In 2011 and 2012 respectively, Ohio and Kentucky mandated clinicians to review PDMP data and implemented pain clinic regulation. In these states, MME per capita decreased in 85 percent and 62 percent of

---

[145] H.B. 3824 (S.C. 2017); H.B. 249 (Georgia 2017).

[146] N.M.A.C. 16.19.4.16.

counties, respectively, from 2010 to 2015.[147] New York, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, New York saw a 75 percent drop in patients' seeing multiple prescribers for the same drugs. Likewise, Tennessee, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, Tennessee saw a 36 percent drop in patients' seeing multiple prescribers for the same drugs.

179.    Research has shed light on how a PDMP affects these Medicare patient behaviors.[148] A study compared Medicare opioid prescription data in 10 states that enacted use mandates from 2007-2013 with 17 other states implementing PDMPs without use mandates. In states with mandates, the percentage of Medicare enrollees who obtained prescriptions from five or more doctors was eight percent lower, compared with other states. The percentage of people getting opioids from five or more pharmacies was 15 percent lower.

180.    States with use mandates also saw a decline in the number of Medicare enrollees filling opioid prescriptions before the previous one had run out or obtaining more than a seven-month supply of opioids in a half-year period. These states also saw a 15 percent reduction in the number of Medicare enrollees with four or more new patient visits in six months. The authors estimate that Medicare would save $348 million annually in unnecessary new patient visits if every state mandated use of its PDMP.[149]

---

[147] CDC, *State Successes*, https://www.cdc.gov/drugoverdose/policy/successes.html.

[148] NBER Working Paper Series, *The Effect of Prescription Drug Monitoring Programs on Opioid Utilization in Medicare* 23148 (2017), https://www.nber.org/papers/w23148.pdf.

[149] *Id.*

**F.    Unlawfulness of a Prescription Is Material to Government Program Opioid Payments**

181.    Compliance with federal and state requirements relating to pharmacies' dispensing of controlled substances was and remains material to a Government Program's decision to pay Walmart's claims for reimbursement of controlled substances. Compliance with these requirements is central to Government Program benefits and is a condition of these medications being covered.

182.    The government routinely denies payment for controlled substance medications, or seeks to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medication is intended for purposes of addiction or recreational abuse.

183.    The United States Department of Justice ("DOJ") has litigated or settled numerous actions where it was alleged that medical providers and/or pharmacies submitted claims for controlled substance medications to Government Programs that lacked a valid prescription, were not for a legitimate medical purpose and lacked a medically accepted indication, or that did not comply with State law.[150]

---

[150] *See, e.g.*, Press Release, U.S. Attorney's Office, Middle District of Tennessee, *Tennessee Chiropractor Pays More Than $1.45 Million to Resolve False Claims Act Allegations* https://www.justice.gov/opa/pr/tennessee-chiropractor-pays-more-145-million-resolve-false-claims-act-allegations (detailing $1.4 million settlement resolving allegations of improper billing for painkillers, including opioids, and including a nurse practitioner's surrender of her DEA registration); *United States ex rel. Norris v. Florence*, Civ. Action No. 2:13-cv-00035 (M.D. Tenn.) (ongoing FCA litigation against a physician for causing the submission of false claims by pharmacies for controlled substances that were not for a legitimate medical purpose); Press Release, Department of Justice, *Long-Term Care Pharmacy to Pay $31.5 Million to Settle Lawsuit Alleging Violations of Controlled Substances Act and False Claims Act*, https://www.justice.gov/opa/pr/long-term-care-pharmacy-pay-315-million-settle-lawsuit-alleging-violations-controlled (Pharmerica CSA and FCA settlement for improper dispensing of

184. The HHS Secretary's declaration that the opioid epidemic is a national public health emergency under federal law reflects the government's stance to deny payment for improperly dispensed controlled substances.

185. Accordingly, at all times material hereto, Walmart knew that Government Programs would not pay for opioid prescriptions if they had known that the controlled substance prescriptions at issues were invalid, did not comply with the CSA or with state pharmacy laws and regulations, or lacked a legitimate medical purpose or were medically unnecessary. Alternatively, Walmart knew (or had reason to know) that Government Programs would not pay claims submitted if these Programs knew that the controlled substance prescriptions were invalid as described.

## VI.    WALMART'S PHARMACY OPERATIONS

### A.    Walmart's Pharmacy Operations

186. The largest company in the world by revenue, Walmart has grown into a multinational retail corporation famous for its discount department and grocery stores.

187. As of January 31, 2018, Walmart has 11,718 stores worldwide, with over 5,000 of its stores located in the United States of America. 4,473 of the Walmart stores in the United States include pharmacies, with 20 of those pharmacies comprising the New Mexico region where Relator Dr. Marcilla worked. Each Walmart pharmacy dispenses about 175 to 700 prescriptions daily, but some dispense many more than that amount.  In Alamosa, Colorado, the Walmart super center #869 completes 200 to 240 prescriptions daily. The pharmacy operates a 62-hour work week: Monday – Friday 9-7, Saturday 9-6 and Sunday 11-5, with mandated lunch closing of 130-2 pm daily.

---

and billing Medicare for unlawfully dispensed prescriptions).

188.    About half of Walmart's dispensed prescription drugs are for Government beneficiaries.

189.    In 2018 in the United States, Walmart filled 1,053,753,647 Medicare prescriptions and 616,957,721 Medicaid prescriptions.

190.    In recent years, Walmart's operations in the United States have focused on the development of its "Supercenter" stores, which average 178,000 square feet and include full-service supermarkets and auto servicing and other specialty departments, in addition to department store products. Most of these Supercenters also include a retail pharmacy.

191.    Walmart organizes its business into three Merchandise Units: Grocery, General Merchandise, and Health and Wellness ("H&W").

192.    Walmart's H&W Unit oversees its over 4,400 pharmacies scattered across all 50 states plus Washington, D.C. and Puerto Rico. Each pharmacy has its own Pharmacy Manager, who manages the day-to-day operations.[151] Each Pharmacy Manager reports to a Market Director, each of whom oversees approximately 10-12 pharmacies.[152] Although the reporting structures, geographic regions, and numbers of Directors have changed over time, there have been approximately 400 Market Directors at any given time during the relevant period.[153] Each of those Market Directors has reported to a Regional Director, of which there have approximately 45

---

[151]    Declaration of Alfred Rodriguez in Support of Opposition to Plaintiffs' Conditional Certification, *Nikmanesh v. Wal-Mart Stores, Inc., et al.*, Civ. No. 8:15-cv-00202-AG-JCG (C.D. Cal.), ¶ 3.

[152]    *Id.*

[153]    *Id.* at ¶ 4.

throughout the U.S.[154] In turn, each Regional Director reports to a Divisional Director, of which there have been between six and ten across the U.S.[155] Finally, the Divisional Directors all report to the Senior Vice President of H&W Operations (currently Sean Slovenski).[156]

193.    Walmart utilizes certain corporate-developed and enforced Standard Operating Procedures ("SOPs") that govern pharmacy operations for all Walmart pharmacies throughout the United States. They are contained in its Pharmacy Operations Manual ("POM"). The POM covers everything from the routine, such as Walmart's basic beliefs and tenets, to specific, detailed pharmacy operations, such as inventory and prescription filling. The Manual is maintained online through Walmart's intranet website, The Wire, and is available to all employees electronically.

194.    Walmart pharmacies nationwide use the pharmacy management software "Connexus," which receives, contains, and generates the information and documentation necessary to complete the prescription-filling process laid out in Walmart's SOPs.

195.    The process begins when a patient's prescription is first submitted to the pharmacy, either in-person by the patient or electronically, in which case some information may be automatically entered by Connexus, but must be verified by technicians pursuant to the nine-step SOP.

196.    The in-person drop-off triggers an SOP referred to by Walmart as "Drop Off for Success," which lays out a basic script beginning with "Good morning/afternoon" for staff to follow up on first receiving a patient's prescription. The process ends with the staff scheduling a

---

[154] *Id.*

[155] *Id.*

[156] *Id.*

pickup time for the patient to retrieve the filled prescription and entering it into the Connexus system. Patient information is to be automatically entered by Connexus, but must be verified by technicians pursuant to the nine-step SOP.

197.    The Walmart staff then proceeds to the "Input" station, where other Walmart staff enter the prescription information into Walmart's Connexus software system described below.

198.    The "fill" process, POM 1008, is completed entirely by technicians when the time approaches for a prescription to be picked up. The process hinges on the use of a hand-held "Scanning for Accuracy" ("SFA") device, which lists patients with prescriptions that are ready to be filled based on the scheduled "patient promise [pickup] time." The Walmart staff then generally scans the "will-call" bag, retrieves the medication from the shelf, scans it, retrieves an empty package, and then proceeds to a "Fill Station," a cubicle-like desk area where the medication is to be counted and the package filled.

199.    Pharmacists are also expected to perform technician duties in regard to filling and bagging. Until recently, hours for technicians were determined by script count and state board of pharmacy laws.  In Colorado, they could have three technicians to a pharmacist, but there was stipulation that required one technician be certified. More recently, managers were informed that generated hours based on how long each task would take on "average." Over time, for example, Dr. Chavez's store lost hours for technicians and pharmacist overlap diminished. Rural settings like her Alamosa store were most impacted because they do not have access to a floater pool and the nearest store to contact to ask for technician help is two hours' drive away.

200.    All staff and pharmacy managers are considered salaried members of management. Therefore, Dr. Chavez has had to put in extra hours to keep up with expected tasks that she could not complete during her shifts. Examples include, but are not limited to, writing plans of actions,

coaching other associates, travelling to doctor's offices to promote Walmart, prepping for annual inventory, meeting with market directors on days off and giving staff evaluations.

### B.    Walmart Profit:  Incentives to Fill

201.    Walmart's singular, overarching goal has been its profitability. Pharmacies play an important role at Walmart and Walmart strives to ensure that its pharmacies contribute to overall profitability. In light of its goal, Walmart pharmacies need to fill prescriptions quickly to ensure large volume of prescriptions being filled. This focus on driving prescription volume above all else drives Walmart's pharmacy strategy.

202.    Focus on speed and increasing "sales" has coincided with Walmart's launch of initiatives such as "express lanes" and mobile web applications intended to maximize the daily flow of filled prescriptions.[157]

203.    The Affordable Care Act greatly reduced the reimbursements pharmacies would get from government health care programs. By 2013, the reimbursements were down over 20 percent.[158]

204.    Indeed, in 2015, Walmart's pharmacy business, expanded only recently in 2006, was struggling to make a profit. Then-Chief Executive Officer Greg Foran warned investors during an August 18, 2015 quarterly earnings call that Walmart's pharmacy operations were "negatively impacting gross margin" and under "pressure" in the wake of more Americans receiving drug

---

[157] Sarah Halzack, *Walmart's plan to get you in and out of stores faster*, Wash. Post (Feb. 28, 2017), https://www.washingtonpost.com/news/business/wp/2017/02/28/walmarts-plan-to-get-you-in-and-out-of-stores-faster/.

[158] *Obamacare Will Squeeze Pharmacy Profits,* Drugchannels.net (Oct. 8, 2013). https://www.drugchannels.net/2013/10/obamacare-will-squeeze-pharmacy-profits.html.

insurance coverage through the Affordable Care Act and "reduced reimbursement rates from Pharmacy Benefit Managers."

205. The lowering of pharmacy reimbursements could only be offset by filling a greater number of prescriptions. Unfortunately for the public and the Government Programs, the timing was perfect for Walmart to capitalize on the opioid epidemic's explosion of pills to recoup the lost reimbursements by filling a greater volume of prescriptions much more quickly.

206. These efforts succeeded so much so that, by mid-2017 Walmart, had reported nine (9) consecutive quarters with increased comparable sales, specifically citing "growth" in pharmacy "script counts" and "better in-stock levels of [over the counter] drugs" as "highlights" of its positive sales numbers in multiple quarterly public filings describing its earnings.

207. According to Relators, performance metrics and prescription quotas adopted by Walmart for its retail stores contributed to its failure to prevent medically unnecessary prescriptions from being filled. Walmart only recognized how the pharmacy affected the business; there was never recognition of anything clinical.

208. Pharmacists are directed to meet high prescription count goals that make it difficult, if not impossible, to comply with applicable laws and regulations. In Relators' experience, there has been little (or no) measurement for pharmacy accuracy or customer safety, or compliance with the CSA or state pharmacy laws and regulations.

209. Walmart's constant elevation of the metrics related to prescription count, profitability, and getting prescriptions filled quickly showed its pharmacists what was truly important to Walmart corporate management. Walmart had numerous, in-depth tools that tracked pharmacy performance. These metrics, however, overwhelmingly focused on the profitability of the pharmacy, not patient safety or compliance.

210.    Even beyond making it clear that Walmart's priority is making money, these metrics and measurements show how much data Walmart had about the prescriptions being filled at its pharmacies. But instead of leveraging the data to effectively root our inappropriate prescriptions, the data was used to squeeze every ounce of profit from its pharmacies at the expense of safety.

211.    Walmart's focus on its metrics can be seen in the Weekly Key Metrics Report. Emailed each week to its stores, the Key Metric Report includes various data points about each store's performance that week. It stresses such metrics related to prescription count, profitability, and the speed at which prescriptions are filled. The report measures such things as "Rx Count", "Rx Count % change", "Script Count % to Plan (Monthly)", "Script Count % to Plan (YTD)", "Sales $", "Sales % vs Plan (Monthly)", "Sales % vs Plan (YTD)", and "Avg. Minutes over Due Time." In other words, the Key Metrics focused almost exclusively on the store's profit margins and the number of prescriptions it was churning out the door under the time expectations. Nothing in the Weekly Key Metrics report indicates that controlled substances are excluded from the any of the metrics like prescription count numbers, profitability measures, or time.

212.    Dr. Chavez's store (#869) averaged around 1400-1500 prescriptions per week and the average of the stores in the market was around 1600-1700 prescriptions per week. Dr. Chavez's pharmacy was open a total of 65 hours in a given week meaning that, on average, the store was filling between 21 and 23 prescriptions per hour not factoring in any breaks.

213.    At their busiest, often pharmacists would need to fill a prescription every 30 seconds in order to meet the metrics and sales goals. For example, at the Walmart store in Clovis, New Mexico where Dr. Marcilla worked as a floater, during the entire 10-hour shift he was the lone pharmacist, often working with two pharmacy technicians to fill in excess of 500

66

prescriptions. That is more nearly one prescription per minute—not factoring in any breaks. Such overwhelming volume was typical. In Relators' experience, pushing medications out the door as quickly as possible is how Walmart makes its money.

214.    Walmart pharmacies also received data about their sales performance in a summary for each market. Dr. Chavez's "Opportunity Report" was called the "Pharmacy Order Performance Opportunity Report for Market 488." In it, the various pharmacies that made up Market 488 were compared on various metrics. The report was based on five metrics: % Orders 'Instore,' Average 'Instore' Order Performance, Average 'Instore' Order Performance including TS (Minutes), % Orders 'Instore' On Time, and % Patient Expectations Met. The 'Instore' orders were orders where a customer was waiting in Walmart for his or her prescription to be filled. The stated goal for "instore" orders was "20 minutes or Less." For example, for one day the total number of prescriptions filled for the ten stores in Market 488 ranged from a low of 116 to a high of 486. The % of Orders Instore ranged from .87% to 34.15%.

215.    The reports outlining store performance were consistently sent to the various pharmacies on a weekly and daily basis. As shown below, reports on bad doctors, inappropriate prescriptions and other potentially useful information for pharmacists in exercising their corresponding responsibility were not included in the reports provided to Walmart pharmacies.

216.    Only if sales goals and metrics were met were pharmacists eligible for bonuses. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year.

217.    If the Walmart pharmacists did not meet the metrics, they would receive negative performance reviews and could be (and were) fired. For example, Dr. Marcilla was reprimanded once for spending too much time with patients at the counseling window. He felt that was the place

where the pharmacist could spend a moment and check the accuracy of prescriptions and make other assessments.

218.    Walmart pharmacy managers were evaluated annually as well. Fifty percent of the evaluation was based on subjective factors and the other 50% was based on objective metrics. Of the objective metrics, the largest component—a total of 25% of the whole evaluation—was weighted on the profitability of the pharmacy. The profitability metric was heavily dependent on the number of controlled substance prescriptions that were filled at that pharmacy.

219.    According to one former Walmart pharmacist, the Company emphasized sales over safety. "You understood that you needed to grow the business," one pharmacist said. "The pharmacies that grew the business, they sold a lot of controlled substances." (Pharmacist No. 5)

220.    Even if controlled substances are no longer technically included in prescription count metrics, pharmacists would never know that from the closely-tracked metrics disseminated daily. So even if a pharmacist read the fine print buried in pharmacy manuals, the metrics that were actually distributed on a frequent, indeed daily, basis made no effort to exclude controlled substances.

221.    Similarly, even if controlled substances were not included in the bonus structure for Walmart pharmacists, denying a customer his or her controlled substances often times would lead to the customer taking all of his or her prescriptions elsewhere. So, for example, if a customer came in with a Holy Trinity cocktail, and the pharmacist properly denied the dispensing of the opioid, the customer would also not fill the benzodiazepine and the muscle relaxer. Frequently, customers would have other prescriptions, like diabetes medications or other maintenance medications, at the pharmacy as well. If they were denied opioid prescriptions, the customers would in all likelihood take all their business elsewhere. Thus, denying a controlled substance

prescription often resulted in losing multiple prescriptions, not just the opioid prescription. For pharmacies like Walmart which put so such emphasis on overall prescription count and profitability, this dynamic further incentivized pharmacies to fill *all* prescriptions regardless of validity.

222.    Walmart had no incentives to report suspicious prescribers, patients, or prescriptions.

223.    In Relators' experience, the only things Walmart measured (and thus rewarded) were the sales metrics. This has created a culture where the number of prescriptions filled, their speed, and their corresponding reimbursements were the measures of success at Walmart. The role of the pharmacist as a healthcare professional serving and counseling patients has been completely lost. Furthermore, the pharmacists have been pressured to be cogs in a prescription filling machine, rather than the last line of defense against inappropriate and/or medically unnecessary prescriptions (and the corresponding fraudulent billing).

224.    The result is both deeply troubling and entirely predictable: inappropriate and medically unnecessary prescriptions for opioids flowed out of Walmart and into communities throughout the country. The policies have remained in place even as the epidemic ravaged the nation.

### C.    Immense Pressure to Fill Quickly to Drive Sales

225.    In 2016, The Chicago Tribune investigated how pharmacies, including chain pharmacies, fostered environments where "safety laws are not being followed, computer alert systems designed to flag drug interactions either don't work or are ignored, and some pharmacies

emphasize fast service over patient safety."[159] The Tribune tested 255 pharmacies to see how often pharmacies would dispense dangerous drug pairs without warning patients. As part of the investigation, the Tribune selected pairs of drugs that had serious interactions, including life-threating risks.

226.     The results were stark: "Fifty-two percent of the pharmacies sold the medications without mentioning the potential interaction, striking evidence of an industrywide failure that places millions of consumers at risk." As the Tribune detailed, "in test after test, other pharmacists dispensed dangerous drug pairs at a fast-food pace, with little attention paid to customers." Chain pharmacies "overall failed 49 percent of their tests" and Walmart failed 43% of its tests.

227.     While acknowledging the difficulty in pinning the failure of the pharmacies to catch the dangerous interaction on a single cause, the Tribune concluded its interviews and studies pointed to the pharmacies' emphasis on speed as a possible explanation. Several pharmacies dispensed risky drug pairs with no warning in less than 15 minutes, and the Tribune found that "pharmacists frequently race through legally required drug safety reviews — or skip them altogether." The Tribune also noted that The New Hampshire Board of Pharmacy sampled data from two retail chains in the state and found that "pharmacists spent an average of 80 seconds on safety checks for each prescription filled." Also, "of the pharmacists at stores that advertised quick service, 4 in 10 said they had made a medication error as a result of hurrying to fill a prescription within a set time." And even though most pharmacies use computer software designed to flag drug

---

[159] Sam Roe, Ray Long, and Karisa King, Pharmacies miss half of dangerous drug combinations, CHICAGO TRIBUNE, Dec. 15, 2016, https://www.chicagotribune.com/investigations/ct-drug-interactions-pharmacy-met-20161214-story.html.

interactions, experts say computer alerts are so common that pharmacists can get "alert fatigue" and ignore many of the warnings.

228.    Mayuri Patel, a pharmacist at a Walmart in west suburban Northlake, said to the Tribune that she typically filled 200 prescriptions in a nine-hour shift, or one every 2.7 minutes. At another Walmart where she was trained, it was even busier, she said: "We were doing 600 a day with two pharmacists with 10-hour shifts." That works out to one prescription every two minutes.

229.    In response to the Tribune article, Walmart said it would update and improve its pharmacy alert system and train pharmacists on the changes. Walmart also said it will send a notification to all of its pharmacists reminding them of best practices in terms of identifying drug interactions and warning patients. Wal-Mart said it will reinforce that pharmacists should counsel all patients filling new prescriptions.

230.    The National Association of Boards of Pharmacy (NABP) also recognized that performance metrics pose a dangerous problem in pharmacies. In 2013, it adopted Resolution 109-7-13 entitled "Metrics and Quotas in the Practice of Pharmacy."[160] The Resolution tasked NABP to "assist the state boards of pharmacy to regulate, restrict, or prohibit the use in pharmacies of performance metrics or quotas that are proven to cause distractions and unsafe environments for pharmacists and technicians." The resolution specifically cited to a survey conducted by the Institute for Safe Medication Practices (ISMP) of 673 pharmacists that revealed that 83% believed

---

[160] *Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13)*, National Association of Boards of Pharmacy, June 5, 2013, https://nabp.pharmacy/newsroom/news/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/.

that distractions due to performance metrics or measured wait times contributed to dispensing

errors and that 49% felt specific time measurements were a significant contributing factor.

231.    In September 2014, the NABP announced that it had amended the *Model State*

*Pharmacy Act and Model Rules of the National Association of Boards of Pharmacy* (*Model Act*).

Reflecting Resolution 109-7-13, the Model Act now states that requiring pharmacy personnel to

meet production and/or performance metrics and/or quotas that negatively impact patient safety

may be grounds for discipline.[161]

232.    Building on the issues discussed in the Chicago Tribune article, The New York

Times also published two articles highlighting the various issues at chain pharmacies such as

Walmart. The first article, entitled *How Chaos at Chain Pharmacies is Putting Patients at Risk*, is

an in-depth look at the crushing demands pharmacists face and the resulting consequences for

public safety.[162]  Similar to the allegations in this complaint, the article goes through numerous

examples of pharmacists in dozens of states who have accused Walmart, Walgreens, CVS and

other major drugstore chains of putting the public at risk of medication errors because of

understaffed and chaotic workplaces.

233.    The article chronicles letters to state pharmacy boards and interviews, in which

pharmacists said they struggled to keep up with an increasing number of tasks—filling

---

[161] *Newsletter*, National Association of Boards of Pharmacy, September 2014, Vol. 48, No. 8, https://nabp.pharmacy/wp-content/uploads/2016/07/Final-September-2014-NABP-Newsletter.pdf;    *Model Act/Rules*, National Association of Boards of Pharmacy, https://nabp.pharmacy/publications-reports/resource-documents/model-pharmacy-act-rules/.

[162] Gabler, Ellen, *How Chaos at Chain Pharmacies is Putting Patients at Risk*, THE NEW YORK TIMES (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

prescriptions, giving flu shots, answering phones and tending the drive-through, to name a few—"all the while racing to meet Corporate performance metrics that [the pharmacists] characterized as unreasonable and unsafe in an industry squeezed to do more with less."

234.    Multiple surveys of pharmacists in states like Missouri, Maryland, and Tennessee reveal the widespread nature of the problems. For example, a survey of over 1,000 Missouri pharmacists revealed that a majority of pharmacists (60%) "said they 'agree' or 'strongly agree' that they 'feel pressured or intimidated to meet standards or metrics that may interfere with safe patient care.' Of those surveyed in Missouri, '[a]bout 60 percent of respondents worked for retail chains, as opposed to hospitals or independent pharmacies.'"

235.    The article also described how the large chain pharmacies stifle dissent among pharmacists, who often feel intimidated and powerless as cogs in the chain pharmacy prescription machine.

236.    The second article is entitled *At Walgreens, Complaints of Medication Errors Go Missing*.[163] While the article focused on Walgreens in particular, the article shows how the allegations in this complaint were widespread at the chain pharmacies in general, including Walmart. This includes things like the demands chains place on their pharmacists leading to the pharmacists ignoring some safety procedures and the widespread perception among chain pharmacists that there is not enough time to respond to all pharmacy tasks.

237.    Walmart put immense pressure on its pharmacists to fill not only all prescriptions but to fill them quickly. Often, this pressure was directly applied by pharmacy managers.

---

[163] Gabler, Ellen, *At Walgreens, Complaints of Medication Errors Go Missing*, THE NEW YORK TIMES (Feb. 21, 2020), https://www.nytimes.com/2020/02/21/health/pharmacies-prescription-errors.html.

238.    Every day, pharmacy managers would get a printout showing the previous day's data for reimbursement, what the sales volume was, how fast prescriptions were moved, how many prescriptions were filled and other sales metrics. Pharmacy managers were required to review these metrics every day.

239.    Relying on that data, managers would then pressure the pharmacists to increase the speed and, consequently, the volume of dispensing.

240.    The pharmacies' performance was tracked on the "Operational Dashboard." The Dashboard tracked various metrics for pharmacies in a given market.

241.    The prescription count for Dr. Chavez's market ranged from a low of 909 to a high of 2271. On average, the stores in Dr. Chavez's market filled 1662 prescriptions per week. That means, on average, each store was filling 237 prescriptions per day. If a pharmacy was open 12 hours on a given day, the pharmacy was filling about 20 prescriptions per hour, or one every 3 minutes.

242.    Those averages are probably low, however. Walmart also tracked on a daily and hourly basis exactly how many prescriptions were filled at a particular pharmacy. For Dr. Chavez's store, the daily averages Monday-Friday were closer to 300 prescriptions per day. Often, particular hours saw nearly one prescription filled per minute.

243.    At least one state Board of Pharmacy has indicated that filling prescriptions quickly leads to pharmacy errors. The Oklahoma BOP cited a CVS for a pharmacy error where the pharmacy filled 194 prescriptions in a six hour shift. That means the pharmacy was filling an average of 32 prescriptions per hour or nearly one prescription every two minutes.[164]

---

[164] *Id.*

244.    The culture of filling prescriptions quickly to drive volume was built into the electronic software used by Walmart. The order-filling software Connexus would start a countdown to pressure pharmacists to fill the prescriptions more quickly. The system used a stoplight system to ensure that the pharmacist worked quickly. The system pressured the pharmacist to get "back in the green" and on track about prescriptions with yellow flashing to warn off being close to off schedule and red indicating that the pharmacist was not working quickly enough. This system did not take into account the complexities of each prescription, so the system would assign the same amount of time to fill for a customer presenting with numerous red flags the same as one without.

245.    Unlike the data they received about sales metrics, Walmart pharmacy managers did not get information on the pharmacists who were counseling patients, fully evaluating opioid prescriptions, and otherwise acting properly as pharmacists.

246.    Although pharmacists were supposed to be customer service people, at Walmart they could not do customer service because it takes too much time.  Relators and other Walmart pharmacists got into health care because they wanted to help people and Walmart would not allow them to do that.

247.    The pressure to fill every prescription was also compounded through the lack of adequate staffing. Often, pharmacists were left as the only pharmacist at a location for entire shifts. This greatly cut into the ability of the pharmacist to evaluate each prescription carefully and in accordance with the law.

248.    At a Walmart store in Clovis where Dr. Marcilla worked, there was only one pharmacist at a time, aided by two technicians. Despite asking Walmart for help, he received none. He and the technicians filled over 500 prescriptions in a typical ten-hour shift. In Relators'

experience working at Walmart, the priority was always how much, how fast. Given the pressure to fill prescriptions quickly, it was simply impossible to investigate, report, and halt suspicious, inappropriate, or medically unnecessary prescriptions of controlled substances.

249.    The lean staffing of pharmacists and pharmacy staff can be seen in the staffing at Dr. Chavez's store as well. For the week of December 3, 2016 – December 9, 2016, the pharmacy was open for a total of 65 hours (not counting mandatory lunch breaks). Yet the store was only allotted 99 hours of pharmacist time. This meant that for all of Saturday and Sunday, only one pharmacist was working. Since 2016, staffing levels have only decreased at Walmart pharmacies.

250.    Some states have tried to outlaw pharmacists from working alone. California, for example, passed a law saying no pharmacist could be required to work alone. Regrettably, however, it has been largely ignored since taking effect last year, according to leaders of a pharmacists' union.[165]

251.    Walmart has not heeded the warnings and continues to staff its pharmacies leanly while at the same time heaping more and more responsibilities onto pharmacists and passing the buck onto them to identify suspicious prescriptions.

**D.    Lack of Training on How to Properly and Adequately Handle Inappropriate Opioid Prescriptions**

252.    Walmart failed to adequately train its pharmacists and pharmacy technicians on how to properly handle prescriptions for controlled substances, including opioid painkillers. Walmart neglected to train its pharmacists on what constituted a proper inquiry into whether a

---

[165]  Gabler, Ellen, *How Chaos at Chain Pharmacies is Putting Patients at Risk*, THE NEW YORK TIMES (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills supplied for the purpose of illegal diversion and drug trafficking.

253.    The Department of Health & Human Services' Office of the Inspector General ("HHS OIG") has long highlighted the dangerous link between corporate cultures of disregard for compliance, like the one existing at Walmart's pharmacies, and Medicare fraud, finding that "vulnerabilities identified within pharmacies raise concerns about the extent to which sponsors have complied with CMS's requirement to provide effective training and whether fraud, waste, and abuse may be undetected in a pharmacy setting."[166]

254.    The DEA,[167] state pharmacy boards,[168] and national industry associations[169] have provided extensive guidance to pharmacists concerning their duties to the public. The guidance

---

[166] *See* OIG, *Medicare Drug Plan Sponsors' Training to Prevent Fraud, Waste, and Abuse*, OEI-01-10-00060 (July 2011), https://oig.hhs.gov/oei/reports/oei-01-10-00060.pdf; *see also* OIG, *Medicare Drug Plan Sponsors' Identification of Potential Fraud and Abuse*, OEI-03-07-00380, (October 2008), https://oig.hhs.gov/oei/reports/oei-03-07-00380.pdf.

[167] Michele Leonhart *et al.*, *Pharmacist's Manual: An informational outline of the controlled substances act*, Drug Enf't Admin., Diversion Control Div. (Revised 2010), https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/.

[168] *See* OIG, *Medicare Drug Plan Sponsors' Training to Prevent Fraud, Waste, and Abuse*, OEI-01-10-00060 (July 2011), https://oig.hhs.gov/oei/reports/oei-01-10-00060.pdf; *see also* OIG, *Medicare Drug Plan Sponsors' Identification of Potential Fraud and Abuse*, OEI-03-07-00380, (October 2008), https://oig.hhs.gov/oei/reports/oei-03-07-00380.pdf.

[169] Philip Brummond, et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 Am. J. of Health-Sys. Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient.[170] The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

255.    For instance, the industry guidance tells pharmacists how to recognize (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

256.    Until very recently, there was a total lack of training given by Walmart to its pharmacists about how to identify suspicious prescription and medically inappropriate prescriptions. This failure was particularly egregious given the raging opioid crisis.

257.    Essentially, Walmart abdicated its responsibility, and left it completely up to the pharmacists to figure out on their own how to identify medically unnecessary and/or inappropriate prescriptions. One pharmacist described the situation as Walmart just leaving "it up to the feel of the pharmacist." (Pharmacist No. 1). A pharmacy technician described the decision whether to fill a prescription as "mostly at the discretion of the pharmacist… Nothing formal." She further added that "the pharmacists would police dispensing themselves." (Pharmacy Technician No. 1)

258.    One pharmacy technician in Kentucky said that when she filled prescriptions, she was unaware of the prescribing physician's name and was never trained or instructed to note that information. Even if trained, she said that her crushing workload prevented her from doing even

---

[170] Va. Bd. of Pharmacy, *Prescription Drug Abuse: Red flags for pharmacists and pharmacy technicians* (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8; Philip W. Brummond et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 Am. J. of Health-System Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

basic things like that. (Pharmacy Technician No. 1) A different pharmacy technician said that, despite the epidemic environment in her state and the large numbers of opioid patients in her pharmacy, she had "absolutely no formal training on what to do" to identify fraudulent patients or doctors and was made aware of no policies or procedures on when to refuse to fill such prescriptions or how to handle such customers. (Pharmacy Technician No. 2)

259.    Any training that Walmart pharmacy employees did get was largely limited to how to use the pharmacy computer system, how to input prescriptions, and how to operate a handheld scanner used to process medications from distributors. (Pharmacy Technician No. 1)

260.    The lack of training by Walmart did more than just leave its pharmacists and technicians unprepared, it was a signal to them that rigorous evaluation of prescriptions was not important to the company as a whole. Instead, the company only focused on filling prescriptions regardless of validity.

### E.    Lack of Dispensing Protocols or Policies

261.    Walmart's singular focus on filling all prescriptions as quickly as possible meant that it did not have rigorous dispensing protocols or policies. Such policies would not have only resulted in denying more suspicious prescriptions, but would also slow down the speed at which prescriptions were filled. Instead, Walmart has insisted its dispensing practices to operate as a production line.

262.    Walmart's procedure for filling prescriptions, including opioids, was limited to a basic nine-point check – patient name, date of birth, check the physician's name, check the medication, verify the signature, verify the dosage, confirm the patient instructions, check the photo of the drug to see if it is the right one, approve it, then make it ready to dispense.

263.    In Dr. Marcilla's experience working at over 20 Walmart pharmacies in New Mexico, in such a busy, chaotic environment, the last thing Walmart was going to do was have pharmacists and technicians go over some policies and procedures about dispensing narcotics. It simply was not done during the time Relators worked at Walmart.

264.    For store managers like Dr. Chavez, the focus was input accuracy at a rate of 95 percent for technician input and wait times for "in store" prescriptions. Up until 2018, managers were mandated to post "division goals" in a frame in the store. They were expected as managers to grow their business and run the pharmacy as if they "owned" it. The emphasis was on being competitive with respect to the pharmacy's profit and sales generated. There was no conversation generated about the dispensing of narcotics from the corporate level by any form of communication. The term "red flags" was not discussed, nor ever mentioned.  The first time Dr. Chavez had ever heard about the "Holy Trinity" becoming a concern was from the pharmacy board inspector, Mark Kalkis, in 2016.

265.    Critically, Walmart pharmacies did not have any policies or protocols about how to address suspicious prescriptions. There were no Walmart guidelines for a pharmacist or technicians to consult to determine whether a particular prescription was suspicious or medically inappropriate. Walmart had no checklist, guidance, training, or resources for pharmacists or technicians to consult about whether a prescription was medically appropriate and should or should not be filled.

266.    A pharmacy technician said that in her years working at Walmart she never had any discussions with management about suspicious physicians or what to do in the event the came across one. (Pharmacy Technician No. 1)

267.     Even if a pharmacist or technician did identify a prescription that was not medically appropriate, there was a total lack of policies and procedures for the pharmacist to follow after identification. Walmart had no protocol about how to flag prescribers who consistently were writing suspicious or medically inappropriate prescriptions, no protocol about how to flag prescription shopping by customers, or communicate information about trends they were seeing.

268.     Despite filling large quantities of controlled substances, including opioids, and even though Walmart regularly acknowledged publicly that the opioid crisis raging nationally, Walmart did not maintain or share with its pharmacy staff a list or database of suspicious health care providers. "There was nothing put in place for that," said one pharmacy technician. "It was purely up to the discretion of who was working and the pharmacist who was on duty." (Pharmacy Technician No. 2). Ultimately, it was up to the individual stores to keep informal lists (if even that) compiled through word of mouth among pharmacists and technicians.

269.     As one of the largest corporations in the world, Walmart could have easily invested some of its vast resources into developing uniform protocols that would have given concrete guidance to its pharmacy staff. But Walmart did not even use any of the available public guidance to incorporate into its own practices. Instead, it emphasized its profitability metrics, leaving it up to the pharmacy staff to refuse prescriptions at their own risk.

270.     Throughout most of the relevant time, Walmart essentially left the pharmacists and technicians on their own to evaluate prescriptions. This led to endemic inconsistency, with many choosing to fill as many prescriptions as possible, especially given the pressures and incentives to do so built into the structure of Walmart pharmacies' operations.

271.    This problem was particularly acute for hydrocodone prescriptions before 2014. Before that time, hydrocodone was a CIII, not a CII as it is now. That meant that Walmart paid even less attention to what any reasonable pharmacist knew was a potent and powerful opioid.

272.    This complete lack of a compliance function to check the tide of inappropriate and/or medically unnecessary prescriptions for opioids meant that pharmacy staff varied in the kind of diligence they practiced when it came to assessing suspicious customers and prescriptions. "There were unscrupulous pharmacists who really didn't care … and some were just too busy." (Pharmacist No. 1) Another pharmacist said "[s]ome pharmacists were able to get away with anything and everything they were doing." (Pharmacist No. 5)

273.    With some pharmacists being particularly lax in their dispensing habits, there were routinely inappropriate and/or medically unnecessary prescriptions that were filled at Walmart pharmacies, including hundreds of thousands of opioid prescriptions paid for by Government Programs.

274.    Despite reasonably diligent pharmacists who, had they been given the tools and time, might have able to recognize the steadily growing influx of inappropriate opioid prescriptions, Walmart continued to not have pharmacy policies to help the opioid problem from "going off the rails." (Pharmacist No. 1)

275.    Of note, for most of the relevant time period Walmart did not require its pharmacists to check state PDMP databases at all despite the evidence that using this data reduces overdose deaths, doctor shopping, and inappropriate or medically unnecessary reimbursements. In fact, one pharmacist recalled that many pharmacists at her location in Florida did not use the state's PDMP database, and that one pharmacist at her store did not even know her password to logon to Florida's E-FORCSE system. (Pharmacist No. 5)

276.    Having such a requirement would have greatly increased the time it took to fill prescriptions and would have identified many more prescriptions that were medically inappropriate. Predictably, Walmart chose its bottom line over public health.

### F.    Walmart's Unique Opioids Return Policy Led to Further Abuse

277.    Walmart's return policy also attracted inappropriate prescriptions to its pharmacies in particular.

278.    Walmart stores have a generous return policy that allows many items to be returned to a Walmart store without a receipt for store credit.[171] This policy led to a cycle of addicts, dealers, and others shoplifting items from a Walmart store, "returning" the stolen merchandise for store credit, then using the credit to fill prescriptions for controlled substances, particularly opioids. Often, these fraudulently obtained prescriptions were then sold on the street for multiples of their retail value.

279.    The practice was so widespread that a judge in Westmoreland County Pennsylvania dubbed her court "Walmart court." The judge remarked that "With the amount of fraudulent returns I'm seeing, the volume is on a scale that has to be enormous. I don't understand how Walmart can't know that this is a means to an end for an addict. This is how addicts are paying for their drugs." The judge laid the blame at Walmart's feet: "Walmart has to know that they are a huge part of the problem … that they are contributing to this epidemic."[172]

---

[171]    Walmart Policies and Guidelines: Return Policy, Walmart Inc., https://corporate.walmart.com/policies#return-policy.

[172]    Stephen Huba, *Judge takes on Walmart in opioids fight*, TRIBLIVE (Oct. 14, 2017) https://archive.triblive.com/local/westmoreland/12825084-74/judge-takes-on-wal-mart-in-opioids-fight.

**G.** **Walmart Was Well Aware of the Opioid Crisis and Failed to Take Steps to Curtail and Prevent Expansion of the Problem at Its Stores Throughout the U.S.**

280.    Walmart has had knowledge and/or notice of the opioid problem since at least 2002. At any time since, Walmart had it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

281.    Walmart was well aware of the problem. For example, throughout the growing opioid epidemic, there have been widespread reports of pharmacy robberies and burglaries at its stores throughout the U.S. tied to narcotics.  For years, Walmart pharmacies experienced numerous instances of forgery, fraud, theft, and robbery by addicts and criminals seeking oxycodone and similar C-II drugs. A review of news reports reveals repeated the rampant, opioid-related crime afflicting its pharmacies across the country which could not have gone unnoticed by Walmart.

282.    Since 2012 there have been at least 19 robberies at Walmart pharmacies in 13 different states specifically targeting opioids. A list is attached as Appendix A.

283.    Pain clinics and pill mills drive the narcotic burglary problem at pharmacies and the robberies mirror a national rise in the abuse of narcotic painkillers. The robberies, many of which happened at Walmart pharmacies, put it on notice of the growing opioid epidemic all over the country. Yet, even with the knowledge of opioid robberies at its pharmacies, for years Walmart tried to ignore its central role in the opioid epidemic (including its dispensing practices fueling the oversaturation of opioids into American communities) and ways it could have combatted the root causes of the epidemic.

284.    Likewise, the POMs developed with the input and approval of Walmart corporate and regional-level managers, and enforced by District, Market and Regional Directors essentially ignored the opioid epidemic and Walmart's legal obligations as a pharmacy.

285.     Relevant here, the version of POM 1311 (dealing with "Regulatory Affairs:  Proper Prescriber-Patient Relationship") in existence from 2011 to 2017 included no directives for identifying healthcare providers who were writing inappropriate or medically unnecessary opioid prescriptions.  Indeed, illustrating that Walmart did nothing to block what it knew (or could have easily known) to be prescribers who illustrated a pattern of inappropriate or medically unnecessary prescribing, POM 1311 specifically directed that Walmart would not allow its pharmacists to block prescriptions to suspicious providers, so-called "blanket refusals" to fill.

286.     Here is the operative language from POM 1311 extant from 2011 to 2017, making clear Walmart would not allow blocking of prescriptions for any prescriber, even for prescribers who it knew (or should have known) were writing medically unnecessary and/or inappropriate prescriptions:  "**Blanket refusals of prescriptions are not allowed**.  A pharmacist must make an individual assessment of each prescription and determine that it was not issued based on a valid prescriber-patient relationship or for a valid medical reason before refusing to fill." (emphasis added)

287.     This meant that Walmart has condoned the continued filling prescriptions for pill mill prescribers even when it knew (or should have known) there was a pattern of fraudulent prescribing. Walmart thus until only very recently expressly refused to allow its pharmacies to block prescribers under any circumstances – *e.g.*, even if the prescriber has been indicted or (worse yet) found guilty of opioid diversion and abuse.  As a result, Walmart's corporate-controlled SOPs barred pharmacists from blocking what they and/or management knew (or reasonably could have known) were suspicious prescribers and prescriptions.

**H.     Too Little, Too Late: Walmart's Response to the Opioid Epidemic**

288.    Walmart's response to the opioid epidemic put profits over patients. While Walmart has recently taken steps to address the raging epidemic, the steps it has taken could have—and should have—been taken much earlier. Walmart was in a particularly good position to curb the rise of inappropriate opioid dispensing given that it has thousands of pharmacies across the country. With its expansive pharmacy network, it should have identified outlier prescribers or stores and taken steps to address the issues. Furthermore, given that Walmart's pharmacy operations are directed from the top down – *i.e.,* from corporate offices down to the individual pharmacies in the field, a change in corporate policy on things like blanket refusals to fill or additional staffing would have made a large difference. Such policies would be rolled out to thousands of pharmacies at a time greatly increasing their impact. Instead, Walmart chose to be willfully ignorant and continue to squeeze every last ounce of profit from its pharmacies instead of complying with its duties under the law.

289.    Only with waves of litigation on the horizon, did Walmart begin to change. Again, not as a reaction to what was legally required or to prevent medically inappropriate prescriptions from being filled, but rather because Walmart recognized its prior priority on profit and corresponding dispensing of millions of inappropriate prescriptions could give rise to great legal liability.

290.    Ultimately, while Walmart has done more recently to curb inappropriate dispensing, Walmart cannot be given a free pass for trying to put out a fire it stoked in the first place.

    **1.**    ***February 2017:  Walmart Institutes Revised POM 1311 "Blanket Refusal to Fill" Policy***

291.    Starting with changes first made to POM 1311 in February 2017, belatedly for the first time Walmart provided direction that its pharmacists could, if they identified "a pattern of red flags with a prescriber that are [sic] unresolvable, a pharmacist could refuse all controlled substance prescriptions from that prescriber ('Blank Refusal') without evaluating every future controlled substance prescription from that prescriber."

292.    However, even then, POM 1311 provided no explanation of what it meant for a pattern of red flags to be "unresolvable." Instead, POM 1311 required pharmacists to use their "professional judgment" and document their findings in the Rx Notes field of Connexus.

293.    With the February 2017 revisions to POM 1311, each pharmacist was therefore to make an individual decision regarding the blanket refusal to fill, also called "BRTF." In order to document these decisions, Walmart required pharmacists to submit a "Blanket Refusal" form for the prescriber in its Archer compliance monitoring system.

294.    Even then, illustrating just how flawed the new directions were for POM 1311, the pharmacist was then to notify (orally only) all the other local pharmacists of the blanket refusal. There was to be no corporate communication of the BRTF.

295.    Likewise, POM 1311 directs that pharmacists were not to post a list of refused prescribers, or any other similar written documentation. As a result, Walmart's 2017 word of mouth procedure under POM 1311 made sure there was no means by which to confirm such oral communications had ever taken place, particularly to ensure that floater or new pharmacists were aware of blanket refusals to fill.

296.    Moreover, even though POM 1311 purported to put in place a process for pharmacists to document their refusal to fill a prescriber's prescriptions, Walmart had no system in place for months which actually blocked the filling of these prescriptions. Indeed, when she

87

filled out a Refusal to Fill form for an Alamosa nurse practitioner in March 2017, Dr. Chavez learned that not only was it up to her to make sure the block actually went through, due to IT issues it took months for the block to become actually effective in the system.

### 2.    May 7, 2018:  Walmart Institutes New Policies Limiting MME and Days' Supply for Opioid Prescriptions

297.    On May 7, 2018, Walmart issued a press release announcing measures "aimed at helping curb opioid abuse and misuse."[173] Within 60 days, in alignment with the CDC, Walmart would "restrict initial acute opioid prescriptions to no more than a seven-day supply."[174]

298.    In addition, by the end of August 2018, Walmart pharmacists would have access to NarxCare, "a tool that helps pharmacists make dispensing decisions and provides pharmacists with the real-time interstate visibility that currently exists."[175]

299.    And, the Company committed it would conduct additional training and education on "opioid stewardship for its pharmacists, including a pain management curriculum."[176]

300.    The Company followed up with POM 1322 in June 2018, outlining how the new limits on opioid prescribing would be rolled out to pharmacists.  In spite of the fact that Walmart had done very little to this point to ensure that only medically appropriate prescriptions had been dispensed, POM 1322 stated that "[e]xceptions should only apply in extraordinary circumstances"

---

[173] Press Release, *Walmart Introduces Additional Measures to Help Curb Opioid Abuse and Misuse*, May 7, 2018, https://corporate.walmart.com/newsroom/2018/05/07/walmart-introduces-additional-measures-to-help-curb-opioid-abuse-and-misuse.

[174] *Id.*

[175] *Id.*

[176] *Id.*

and that "[a]ssociates who do not comply with this Policy are subject to discipline, up to and including termination."

301.    On June 7, 2018, Dr. Chavez and all other Walmart pharmacists were then to complete a "Pain Management Forum," a series of online video training sessions "focusing on appropriate strategies for preventing and addressing opioid misuse and overdose while ensuring proper management of chronic pain in patients."   The videos presented opioid diversion and abuse scenarios after which attendees were required to answer questions about the appropriate way to handle each situation.   Attendees were required to answer the quiz questions correctly before they could complete the Forum.   Upon successful completion of the Forum, attendees received a "Certificate of Completion:  Pain Management Forum."

302.    This was the first training of its kind concerning opioid prescribing that Walmart had conducted for its pharmacists.

**3.**    ***Walmart's 2018 Training on "Resolution of Red Flags" Illustrates that It Has No Interest in Ensuring that Inappropriate and/or Medically Unnecessary Opioid Prescriptions Are Filled***

303.    Illustrating that the Stewardship campaign was little more than a PR campaign to paper over its problems alleged herein, in a POM 1311/1322 document sent to all Walmart pharmacists in late 2018 to train them how they were to document "resolved" red flags, Walmart's Compliance Department provided guidance of seven (7) sample "resolutions" that, in fact, do not at all resolve the red flags, but instead simply allow for (if not condone) ongoing, indiscriminate filling of inappropriate and medically unnecessary prescriptions.

304.    Illustrating Walmart's focus on filling prescriptions, the training document only has examples of how to resolve individual red flags; it does not give any examples of when a pharmacist should refuse to dispense a prescription. Essentially the document is a list of excuses

to fill *all* prescriptions, not a real example of a pharmacy training its pharmacists to execute their corresponding responsibility under the law.

305.    Another glaring deficiency with the training document is that it does not address the common scenario of a prescription presenting with multiple red flags. A combination of red flags often is what alerts the pharmacy not to fill the prescription. For example, a customer that presents a prescription from a doctor outside the geographic area of the pharmacy is a red flag that theoretically could be explained by the patient being on vacation. But the law requires that a pharmacy resolve all the red flags before dispensing a prescription. The training gives no guidance how to handle a prescription that comes from a doctor outside the geographic area, but also presents additional red flags, such as a cocktail prescription or high dosages. The training suggests simply resolving the single red flag is enough.

306.    The majority of the examples in the training also resolve the red flag with a call to the prescriber. While certainly calling the prescriber is something pharmacists should do as part of their due diligence, calling the prescriber alone is not going to be sufficient in many cases. Fundamentally, many problematic prescribers are not going to admit their prescriptions are inappropriate because they are contacted by a pharmacist. There is no guidance about what to do if the call to the prescriber does not adequately resolve the red flag or flags. Also, practically speaking, many pill-seeking individuals will go to pharmacies when they are busy or after the prescriber's office would be closed like on nights or weekends. There is no guidance about what do in those situations either.

307.    In addition, the suggested "resolutions" continue to put the onus nearly completely on the pharmacist. None suggest (or offer) using Walmart resources, such as aggregated data, to assist the pharmacists. So even if the resolutions in the training are legitimate, Walmart does not

allow pharmacists the time or resources to be able to complete the due diligence given Walmart's other demands on their time and the continued focus on filling all prescriptions quickly.

308.    The POM 1311/1322 training by Walmart Compliance ostensibly instructed pharmacists that documenting resolution of red flag was required, including details "on how they resolved the specific red flags in the Rx Notes field in Connexus." They were supposed to "provide sufficient detail in the documentation that someone not familiar with the details of the situation could understand how the red flags were resolved. The documentation was to include the names of prescribers or prescriber's agents involved in the resolution process and the date of any conversations."

**POM 1311/1322**
**Sample: Red Flag Resolution Documentation/Exception Documentation**

**Overview:**

Documentation of the resolution of red flags is required on every prescription where a red flag is present. The pharmacist must document each red flag and provide details on how they resolved the specific red flags in the Rx Notes field in Connexus.

The pharmacist must provide sufficient detail in the documentation that someone not familiar with the details of the situation could understand how the red flags were resolved. The documentation should include the names of prescribers or prescriber's agents involved in the resolution process and the date of any conversations.   Below are some examples of documentation to assist you in understanding what type of documentation is needed.

309.    However, the POM 1311/1322 training then provides seven different examples of red flag resolutions that demonstrate that the real intent was simply that pharmacists provide only the most cursory excuse so they could continue filling.

310.    This guidance from Walmart Corporate Compliance was provided as part of the training with the Opioid Stewardship program. Many pharmacists were not documenting or clearing red flags adequately. Furthermore, during this time, Walmart management had conference

calls with pharmacists to take questions and have leadership answer what the Company expected for documentation. The Sample Resolutions in the POM 1311/1322 training materials were used to illustrate what management explained was expected of pharmacists in resolving these red flags. However, most of the Sample Resolutions not only do not actually provide adequate documentation of a valid reason to prescribe (*i.e.*, that the prescriptions were written for a legitimate medical purpose within the usual course of professional practice[177]), many are explicitly contrary to clear directives from the DEA and caselaw that such red flags are unresolvable under the CSA.

311. Sample Resolution No. 1 involves a purported resolution by CRIOGI (believed to be Caroline Riogi from Walmart's Compliance Department[178]) for a prescriber who practices outside the trade area. Instead of following the directives for explaining the red flag resolution (including using available resources like NarxCare, state PDMP databases and the patient Connexus profile), the sample resolution only says the pharmacist spoke with the patient who just moved to the area and "does not yet have a prescriber."

---

[177] 21 CFR 1306.04(a).

[178] *See* Caroline Riogi Business Profile, Health & Wellness Director, Corporate Compliance at Sam's Club, Sam's Club, 2101 S.E. Simple Savings Dr., Bentonville, AR, https://www.zoominfo.com/p/Caroline-Riogi/-1931641297.

1.    **Prescriber Outside of Trade Area**

Sample Rx Notes: *Prescriber outside of trade area.*



07-03-2018        CRIOGI
Spoke with patient on 7/1/18.  Red flag resolved because patient recently moved to area and does not yet have a prescriber.

Sample Resolution No. 1 provides reasons the pharmacist found to fill the prescriptions and does not properly clear a red flag.  On top of that, this is exactly the situation which the *Holiday CVS* decision and other decisions have found on their face is "not resolvable."[179]  As such, Walmart was clearly on notice that its Sample Resolution No. 1 was a violation of the CSA for which there was no resolution available.  Instead of counseling its pharmacists how to document how to resolve the red flag, it should have been counseling them how to document the BRTF.

312.    Sample Resolution No. 2 involves a prescriber who provides the same diagnosis for a majority of the patients treated:

---

[179] *See, e.g.*, *Holiday CVS*, 77 Fed. Reg. at 62319; *see also See Paul J. Volkman,* 73 Fed. Reg. 30,630 (2008) (discussing drug cocktails issued by physician for oxycodone, benzodiazepines and carisoprodol, expert testimony of abuse potential of these drugs, and red flag of patient travelling long distance to fill prescriptions); *see also East Main Street Pharmacy*, 75 Fed. Reg. 66,149 (Oct. 27, 2010) (discussing abuse of oxycodone, alprazolam, and carisoprodol and red flag of patients traveling long distances to fill prescriptions); *Your Druggist Pharmacy*, 73 Fed. Reg. 75,774, 75,775 n.1. (2008) (noting that "[w]hile carisoprodol [was] not controlled under Federal law, it is controlled under various state laws and is highly popular with drug abusers, especially when taken as part of a drug cocktail that includes an opiate and a benzodiazepine").

2.    **Prescriber provides same diagnosis for majority of individuals**

Sample Rx Notes:  *Prescriber provides same diagnosis for majority of individuals.*



Sample Resolution No. 2 provides reasons the pharmacist found to fill the prescriptions and does not properly clear a red flag. Not only does CRIOGI have an unexplained thirty (30) day delay between the conversation with the prescriber and the Rx Note explanation, this is an example of the "pattern prescribing" red flag that numerous decisions have held is unresolvable.[180] Likewise, the resolution given (that "it is expected that most patients would have diagnosis") does not at all justify filling the prescription given the clear DEA and CSA interpretative decisions involving patients coming within the same diagnosis is a red flag that is unresolvable.[181]

313.    Sample Resolution No. 3 involves a patient who lives outside the pharmacy's trade area. Instead of following its own directions for explaining the red flag resolution, the sample resolution provides no explanation of how the red flag was resolved, instead providing only a perfunctory reason found to fill the prescription.  Not only that, the note relays a discussion with

---

[180] *See, e.g. Pharmacy Doctors Enterpri*ses, 2019 WL 4565481, at 5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62332, 62333, 62335, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157.

[181] *Holiday CVS*, 77 Fed. Reg. at  62321 n. 25, 62323 n. 29, 62330 n. 41.

the patient that apparently occurred over five weeks earlier, suggesting that the note itself was not contemporaneous with the conversation, but only a belated attempt to give a reason the prescription was filled:



**3.    Patient Outside of Trade Area:**

Sample Rx Notes:  *Patient is outside of trade area*

Sample Resolution No. 3 thus provides reasons the pharmacist found to fill the prescriptions and does not properly clear a red flag. Consistent with the clear directives from the DEA and CSA interpreting decisions, speaking with the patient could not resolve the "Patient Outside of Trade Area" red flag.[182]  Rather, given the nature of the drugs involved, in the view of the DEA and CSA interpreting decisions, this red flag is simply unresolvable.[183]

314.    Sample Resolution No. 4 involves filling a prescription which exceeds state prescribing guidelines:

---

[182] *Holiday CVS*, 77 Fed. Reg. at 62334 ("The kinds of medications that we're talking about here are for chronic health problems and not acute health problems. So, it would be unlikely that someone comes to Florida on vacation, breaks a leg, and has to get oxycodone in these quantities and in these strengths. So it just doesn't add up."  Tr. 854.).

[183] *Id.* at 62336.

**4.    Prescription exceeds state prescribing guidelines**

Sample Rx Notes:  Prescription exceeds state prescribing limits.



In Sample Resolution No. 4, a patient was apparently in a situation of critical care. Based on the physician providing history, the patient had been discharged a month earlier. The patient had used a narcotic, but not consistently and was still considered opiate naïve. Due to the pain of the trachea tube, the provider has given this patient a higher dose that exceeds the state prescribing amounts. The documentation given does not convey that this prescription strength has a legitimate indication for pain given the risk factors associated with the opioid prescribed. The documentation does not clear the dose red flag, but only establishes why the patient is receiving the dose despite concerns. The pharmacist has not documented she is comfortable with the fact that this doctor is a specialist qualified to prescribe a higher dose despite the medical conditions that may stop the patient's breathing. Not only does the Sample Resolution No. 4 fail to provide the doctor's name (as required) or specialty, nothing in the explanation given establishes that exceeding the state prescribing guidelines was based on the pharmacist's judgment that the prescription is for a legitimate medical purpose, nor is it adequate to resolve the red flag simply by only discussing this

with the doctor and the patient.  For example, there is no suggestion that the pharmacist checked the state PDMP database, nor that the pharmacist examined to see if the prescriber had a pattern of prescribing excessive dosages.[184]

315.    Sample Resolution No. 5 also involves a prescription which exceeds state prescribing guidelines:



Sample Resolution No. 5 (by CRIOGI) demonstrates that Walmart resources had been used to document "corresponding responsibility" by citing PDMP, Connexus and Host. The pharmacist has documented the diagnosis and is finding reasons to clear a flag to exceed a state prescribing guideline for narcotics based on a conversation with a patient. However, there is nothing in the documentation to support that the provider is aware of the dose exceeding any state guideline.  Nor does the documentation fully convey that the pharmacist knows that the provider has written a

---

[184] *East Main Street Pharmacy*, 75 Fed. Reg. at 66151.

prescription for a legitimate medical purpose and issued within the usual course of professional practice.[185]

316.     Sample Resolution No. 7:



7.     **Prescription exceeds Walmart Policy POM 1322 limits**

        Sample Rx Notes:

DX G89.29 CHRONIC PAIN  M53.3 LEFT SACROLAC JOIN PAIN  T84.84 ORTHOPEDIC PROSTHETIC
DEVICE  Z47.1 LEFT HIP REPLACEMENT   PT HAS TRIED AND FAILED MANY MEDICATIONS
NORCO/CELEBREX IS APPROPRIATE DX PT HAS BEEN UNDER MD CARE SINCE 2009

03-10-2018
  01-09-2018              Diagnosis/Tx Plan:  Patient had a fall at work in 2009, in which he suffered
a femur fracture.  Needed a bone graft, disc herniation decompression, and eventually total hip
replacements, with the last one being on the left side this past summer.  He has been on chronic
narcotics for the last several years, but just got approved with Celebrex through Worker's Comp.
MD hopes that Norco use will decrease by half or just to PRN use once Celebrex is added.

Accept     Cancel

In Sample Resolution No. 7, the documentation states that the patient provided history on current therapy. It is unclear, however, if the physician or patient hopes to reduce narcotics. The focus is on reasons to keep filling Norco that exceeds limits set out in POM 1322. The patient has had many surgeries and procedures, but even with those milestones, is maintained on a higher than normal number of narcotics. What the documentation does not convey is if the pharmacist filling the current prescription, given the drug and current dosage, is comfortable with the fact that this doctor is a legitimate doctor, and has written a prescription for a legitimate medical purpose and issued within the usual course of professional practice.[186]

---

[185] 21 CFR 1306.04(a).

[186] *Id.*

### 4. *September 2019: Walmart Finally Institutes Central Blocking of Prescribers*

317.    In addition to the changes implemented in 2017 and 2018, finally in September 2019, POM 1323 outlined that Walmart Corporate would in certain circumstances for the first time undertake to "centrally block" prescribers "whose prescribing practices raise concerns about prescribing controlled substances for legitimate medical purposes."  After a "thorough review of prescribers and their prescribing patterns and practices," POM 1323 says the "Home Office" may "place a central block in Connexus on controlled substance prescriptions from certain prescribers." POM 1323 states each prescriber is "evaluated separately based on an independent review":

> Each prescriber is evaluated separately based on an independent review of that specific prescriber. The Central Block of a prescriber does not block all prescribers in a practice location, including mid-level practitioners supervised by a Centrally Blocked prescriber. The prescribing practices that led to the Central Block may or may not be present in those related practitioners. Continue to exercise your corresponding responsibility and professional judgment in these cases and communicate with the Health and Wellness Market Leader or the Controlled Substance Compliance team at RxCSComply@wal-mart.com.

318.    The changes implemented in POM 1323 could have helped prevent what Dr. Chavez saw with the Rice prescriptions, which caused three overdose deaths.  Not only have the changes Walmart made since 2017 to POM 1311, POM 1322, and POM 1323 been too little, too late (coming as they have over a decade into the opioid epidemic), they have been haphazard and misleading, at best.

### 5. *Walmart Failed to Use Its Databases to Monitor and Control Inappropriate and/or Medically Unnecessary Prescribing, and Instead Focused on Speed and Volume of Opioids Prescriptions*

319.    An average Walmart pharmacy fills approximately one hundred and seventy-five to two hundred (175-200) prescriptions daily, with the goal to continuously increase this amount. Many Walmart pharmacies, however, fill many more scripts per day than that.

320.    Walmart's corporate managers, including the Pharmacy Market Directors, closely monitor the speed at which Walmart staff fill prescriptions. These Walmart Pharmacy Market Directors time and track the number of prescriptions filled as well as the precise percentage of those that are filled "on time," generally defined as within twenty (20) minutes of the scheduled pickup time with regard to in-store pickups. These performance metrics are recorded in "Order Completion Performance" reports that are mandatory based on Walmart corporate requirements.

321.    However, to increase the pressure to meet these performance metrics, Walmart employs a computer-based real-time prescription-filling progress system that monitors the prescriptions coming "due" for pickup within thirty (30) minutes, two (2) hours, and forty-eight (48) hours. When a pharmacist is "falling behind" based on an internal, computer-generated schedule to which its pharmacists are not privy, the system begins to flash yellow or red depending on how far "behind" the pharmacist is, based on the above, arbitrary fill-time expectations intended only to maximize fill speed with a conscious, reckless disregard of the negative impact such a system has on the accuracy of the prescription filling process. There is no ability for the timing system to adjust to the complexity of the prescription that needs to be filled or circumstances suggesting the prescription is inappropriate and/or medically unnecessary.

322.    To process and track prescriptions and inventory and to submit claims for payment by payors and Government Programs, Walmart uses its own proprietary software, Connexus,

which electronically records and tracks prescription data manually entered or verified by staff, including the name, dose, quantity, and date of the prescription along with the name of the prescriber and patient.

323.    This beneficiary and prescription information is then aggregated by Connexus and used to determine an electronically stored and updated "Perpetual Inventory," which is the amount of medication left in stock after a prescription is filled.

324.    In the audits that are performed, managers are asked to inspect five C-II prescriptions.  They are informed to inspect for the "required elements" of control substance prescription per DEA "valid prescription requirement." These requirements are the patient's name, physical address, prescriber name, DEA and physical address of practice location. This same type of inspection is required by the Market Director when performing an audit.

325.    As of 2019, Market Directors are required to review the elements of POM 1311 in their audit. They are to document in their laptop their findings and do a sideline discussion with the pharmacy managers. However, there are no "official" emails sent, nor records made of their findings.

326.    C-II shipments to Walmart pharmacies are checked in using a handheld device, and then the pharmacist has to put the order in the controlled substance ordering system (CSOS). The pharmacist accesses CSOS through Connexus. Once in CSOS, the pharmacist confirms the order number, quantity, and name of drug in the order and then enters their sign in ID and password. CSOS allows distributors, pharmacies and manufacturers to transmit C-II orders electronically. The DEA approved the process as legal and there are no more DEA 222 forms filled out to order Schedule II drugs, because they are placed on online, assuming all criteria have been met.

### 6.    *Walmart Did Not Audit Its Pharmacies' Inappropriate Prescribing*

327.    As alleged below, Walmart has required its pharmacy managers to regularly conduct audits of inventory and prescription records. These audits, conducted pursuant to corporate-wide "checklists" and SOPs, have required the pharmacy managers to review and analyze *both* the electronic Connexus records and the physical records prescription and inventory records to determine the "actual" inventory. These inventory checks, referenced in further detail below, occur daily and are referred to as "cycle counts."

328.    These regular audits never examined the dispensing practices of the individual pharmacy. They did not audit things like compliance with state or federal law dispensing laws or whether pharmacists were doing their proper due diligence. The audits were exclusively inventory-focused.

329.    While most Walmart pharmacists worked at one store regularly, Walmart routinely used pharmacists that worked at multiple different Walmart pharmacies depending on where they were needed. These pharmacists were known as "floaters."

## VII.    DEFENDANTS' UNLAWFUL CONDUCT

330.    All DEA registrants like Walmart have a duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[187]  Diversion includes the use of medication outside the usual course of professional practice.

331.    The DEA has repeatedly emphasized that, as DEA registrants, retail pharmacies like Walmart are required to implement systems that detect and prevent diversion and must

---

[187] 21 C.F.R. § 1301.71(a).

monitor for red flags of diversion. The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against diversion in regulatory action after regulatory action.[188]    According to DEA, pharmacists are the "[l]ast line of defense."[189]

332.    The framework of state and federal statutes and regulations, along with industry guidelines, makes clear that all pharmacies like Walmart possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when dispensing of medications outside the usual course of professional practice.

333.    Case law and administrative proceedings interpreting the CSA require that licensed pharmacists recognize "red flags" that indicate addiction, diversion and abuse, including:

- Criminal, civil, or administrative actions against the prescriber[190];

- Patient's use of street slang for certain opioids (e.g., "the M's" or "the Blues")[191];

- Cash payments

---

[188] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order); *East Main Street Pharmacy*, 75 Fed. Reg. 66,149 (Dep't of Justice Oct. 27, 2010) (affirmance of suspension order); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145 (D.D.C. 2012); *Townwood Pharmacy*; 63 Fed. Reg. 8,477 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*; 77 Fed. Reg. 44,069 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*; 76 Fed. Reg. 20,039 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*; 73 Fed. Reg. 363 (Dep't of Justice Jan. 2, 2008) (revocation of registration).

[189]    *See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015), https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/ prevoznik.pdf at 139-40.

[190] *Holiday CVS, LLC v. Holder*, 839 F. Supp.2d 145, 160 (D.D.C. 2012).

[191] *Id.* at 161; *Holiday CVS, LLC*, 77 Fed. Reg. at 62321, 62344 (2012).

- cash payments exceed national average;

- "unusually large" cash transactions:

- cash transactions average 8% or less of all transactions according to DEA)[192];

- Multiple patients with same address/last name/prescription/diagnoses/prescriber/day: (e.g., all prescriptions from doctor have diagnoses of lower lumbar pain; code L-4, L-5, lower back pain; or severe lower back pain)[193];

- Long distance between pharmacy and prescriber (*e.g.*, Western Pennsylvania Pharmacy filling out-of-state prescriptions; 200 miles; Prescribers "not from local area")[194];

- Long distance between patient and prescriber (e.g., "out of state")[195];

- Long distance between pharmacy and patient (e.g., southern West Virginia residence to Western Pennsylvania Pharmacy; 200 miles; Patients "not from local area")[196];

- Prescriptions filled piecemeal over multiple visits[197];

---

[192] *Oak Hill Hometown Pharmacy v. Dhillon*, 2019 WL 5606926, at *6; *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 828 (11th Cir. 2018); *Pharmacy Doctors Enterprises, Inc. v. DEA*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62326, 62331, 62332; *East Main Street Pharmacy*, DEA Affirmance of Suspension Order, 75 Fed. Reg. 66150, 66158 (2010).

[193] *Holiday CVS*, 839 F. Supp. 2d at 161; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62326, 62331, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66159.

[194] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Holiday CVS*, 77 Fed. Reg. at 62321, 62332, 62333; *East Main Street Pharmacy*, DEA Affirmance of Suspension Order, 75 Fed. Reg. at 66163.

[195] *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62326, 62335.

[196] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5; *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 828 (11th Cir. 2018); *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62332, 62333; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150.

[197] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5.

- "Pattern Prescribing":

    o Prescribers writing in a "factory-like" manner, prescriptions for the same drugs, the same quantities, without any kind of variability or change considering the different patients that come into that pharmacy;

    o The presence of an unwavering combination of the same drugs in the same strengths in the same quantities across numerous patients;

    o Multiple patients on a single day with the same combination from a single prescriber;

    o No "individualized therapy" – same prescriptions for multiple patients; or

    o Maximum doses across multiple patients[198];

- High abuse potential prescriptions / "Drug Cocktails":

    o Oxycodone and Xanax;

    o Oxycodone and Alprazolam;

    o Prescriptions for both 15mg and 30 mg strengths;

    o Oxycodone, Alprazolam, and Carisoprodol

    o Prescriptions of an opiate and a benzodiazepine;

    o Oxy 30, Oxy 15, and Xanax (Alprazolam);

    o Oxy 30, Oxy 15, Alprazolam 2mg, and a fourth "filler" drug;

    o Oxy 30, Oxy 15, Xanax 2 mg, Soma, and Flexeril;

    o 210 mg dose prescription of Oxy 30;

---

[198] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Pharmacy Doctors Enterpri*ses, 2019 WL 4565481, at 5; *Holiday CVS*, 77 Fed. Reg. Vol. at 62318, 62332, 62333, 62335, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157.

o   High quantity prescriptions;

o   Prescriptions of large volumes of controlled substances in the highest strengths;

o   Multiple drugs prescribed for the same thing;

o   Drugs in different classes that can cause the same side effects, like respiratory depression;

o   "The Triple": benzodiazepine, narcotic painkiller, and sleeping pill;

o   "The Homerun": benzodiazepine, narcotic painkiller, sleeping pill, and Soma;

o   Multiple narcotic painkillers at the same time;

o   High doses of Oxy: normal dose is 5- 10mg/4 hours;

o   High doses of Xanax (alprazolam): normal dose is 4mg/day;

o   High doses of Valium (diazepam): normal dose is 10mg;

o   Daily dose of 300 mg of oxycodone and 60mg of hydrocodone = overdose;

o   "Duplicate Therapy": multiple drugs in the same class prescribed for the same thing;

o   Multiple prescriptions of same narcotic on same day;

o   Multiple prescriptions of Oxycodone, Xanax, and Soma for single patient; or

o   High doses of opioids in light of overdose statistics.[199]

---

[199] *Jones Total Health Care Pharmacy*, 881 F.3d at 828; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62319, 62322, 62325, 62326, 62331, 62336, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157, 66158, 66159, 66165; U.S. Centers for Disease Control, CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016, 65   Morb.   And   Mort.   Wkly   Rep.   (March   18,   2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

- Patients who arrive together with identical or nearly identical prescriptions[200];

- Patients seeking refills before prescription runs out and/or patients with frequent loss of controlled substance medication[201];

- Prescription numbers are very close sequentially[202];

- Multiple out-of-area patients from the same town/area ("Sponsor Arrangements" in which people from mostly the mountain states come down in buses and vans and drive to the pharmacy to fill opioid prescriptions[203];

- Patient's appearance/behavior (*e.g.*, do not need the medication, or appear high; slurred speech, stumbling walk, drooling)[204];

- Prescribers without a specialty in pain management writing large quantities of prescriptions (*e.g.*, prescription influx from board certified pediatricians or gynecologists; doctors prescribing outside the scope of their usual practice)[205];

- Patients between the ages of 25 and 40 with cash[206];

---

[200] *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5.

[201] *Id*. at 5; *Holiday CVS, LLC*, 77 Fed. Reg. Vol. at 62343; *East Main Street Pharmacy*, 77 Fed. Reg. at 66157.

[202] *Holiday CVS*, 77 Fed. Reg. at 62319.

[203] *Id.* at 62319, 62331.

[204] *Id.* at 62319, 62331; *East Main Street Pharmacy*, 75 Fed. Reg. at 66151.

[205] *Holiday CVS*, 77 Fed. Reg. at 62326, 62331; *Jones Total Health Care Pharmacy*, 881 F.3d at 828.

[206] *Holiday CVS*, 77 Fed. Reg. at 62331.

- Evidence of doctor shopping (*e.g.*, Same/similar prescription prescribed by two or more prescribers at the same time)[207];

- Prescription from physician with an expired/revoked medical license, DEA number[208];

- Patient prescribed only controlled substance medications[209];

- Patient presents controlled substance prescriptions under different patient names[210];

- Patient insists on brand name product[211];

- Other pharmacies refuse to fill prescriptions from certain providers[212];

- Prescriber pattern of larger doses and higher quantities over time[213]; and

- Confluence of out-of-state patients on a single day receiving the same medications in the same quantities from the same in-state prescriber[214].

---

[207] *Id.* at 62331, 62343.

[208] *Id.* at 62342.

[209] *Id.* at 62343.

[210] *Id.* at 62343.

[211] *Id.*

[212] *East Main Street Pharmacy*, 75 Fed. Reg. at 66151.

[213] *Id.* at 66159.

[214] *Holiday CVS*, 77 Fed. Reg. at 62333.

334.    Additionally, a pharmacy may be tipped off to addiction, abuse, and diversion where the overwhelming majority of prescriptions filled by the pharmacy is for opioids.[215] The DEA has frequently met with industry representatives to discuss these "red flags" of diversion.[216]

335.    Walmart had firsthand knowledge of dispensing red flags – such as disparate geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, out-of-state license plates, and cash transactions, and other significant information.

336.    Walmart as a sophisticated, national chain pharmacy had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data would have allowed Walmart to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.[217]

337.    Walmart was on notice of what a compliance program should include. In 2006, the National Association of Chain Drug Stores ("NACDS") issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.[218]   The Model Compliance Manual notes that a Retail Pharmacy may:

---

[215] *See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015), https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf at 139-40.

[216] Rannazzisi Decl. in *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145 (D.D.C. 2012), Case No. 1:12-cv-00191-RBW, Dkt. 19, Ex. 6.

[217] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order) (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

[218] *In Re: National Prescription Opiate Litigation,* Third Amended Complaint (Case No. 17-md-2804) (Dkt. 2613).

- Generate and review reports for its own purposes and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse, including:

  - Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular, numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.

  - Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.

  - Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of the provider who wrote the prescription and should include the location of the dispensing pharmacy.

338. Yet there is no evidence Walmart ever leveraged its resources and troves of information to stop or further question the overwhelming majority of prescriptions written by the criminal prescribers.

339. Walmart failed to fulfill its duties as the last line of defense and failed to ensure that the prescriptions it was filling were issued to a legitimate patient for a legitimate medical purpose

by a practitioner acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by Walmart stores throughout the U.S.

340.    From about 2002 to the present (and ongoing), Defendant Walmart violated the CSA and state pharmacy laws and regulations by dispensing controlled substances in violation of the pharmacist's corresponding responsibility in violation of 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice in violation of 21 C.F.R. § 1306.06.

341.    Walmart violated the CSA and state pharmacy laws and regulations each time it filled a controlled substance prescription without identifying and resolving those red flags because:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. § 829 and thereby violated 21 U.S.C. § 842(a)(1).

- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violated 21 U.S.C. § 841(a).

342.    Walmart failed to maintain effective controls against diversion or conduct due diligence to ensure opioids were not diverted, resulting in the gross over-dispensing of opioids. Walmart thus directly contributed today's opioid epidemic and corresponding harm to Government Programs.

343.    The opioid crisis described herein is a direct and foreseeable result of Walmart's actions. And it was foreseeable that Government Programs would be damaged by Walmart's actions.

344.    Had they known that Walmart dispensed scores of controlled substance prescriptions that were lacking a legitimate medical purpose and/or a medically accepted indication (and therefore did not constitute valid prescriptions under the CSA and state pharmacy law and regulations), Government Programs would have refused to pay for those opioid medications.

345.    Below is just a sampling of the rampant fraud that has occurred at Walmart pharmacies throughout the United States.

**A.    Specific Examples of Unlawful Dispensing Conduct: Colorado**

**1.    *Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Colorado***

346.    The opioid epidemic has had a significant impact on the health and well-being of the State of Colorado.  In 2006, more than 2.9 million opioid prescriptions were written in Colorado, a rate of approximately 62.2 prescriptions dispensed per 100 persons.[219]

347.    Opioid prescribing in Colorado peaked in 2012 at nearly 3.9 million prescriptions, a rate of 73.5 prescriptions per 100 residents.[220] From 2006 to 2012, opioid prescriptions in Colorado increased by about 30%.[221]

---

[219]    CDC, U.S. State Prescribing Rates, 2006, https://www.cdc.gov/drugoverdose/maps/rxstate2006.html.

[220]    CDC, U.S. State Prescribing Rates, 2012, https://www.cdc.gov/drugoverdose/maps/rxstate2012.html.

[221]    CDC, U.S. State Prescribing Rates, 2006, https://www.cdc.gov/drugoverdose/maps/rxstate2006.html; United States Census Bureau, County Intercensal Datasets: 2000-2010 (Dec. 2, 2016), https://www.census.gov/data/datasets/time-series/demo/popest/intercensal-2000-2010-counties.html; CDC, U.S. Prescribing Rates, https://www.cdc.gov/drugoverdose/maps/rxstate2012.html; United States Census Bureau (Mar. 23, 2017), https://www2.census.gov/programssurveys/popest/datasets/2010-2016/counties/totals/.

348.    Prescriptions for opioids have declined in the last couple of years, dropping to approximately 3.3 million prescriptions in 2016, a rate of 59.8 prescriptions per 100 residents.[222] For most years, this translated to an opioid prescription for two out of every three Coloradans.

349.    In Colorado, there were nearly 3,000 overdose deaths between 1999 and 2017 related to natural or semi-synthetic opioids, and a total of 4,287 deaths (excluding heroin) if synthetic opioids are included.[223] During this period, opioid related overdose deaths in Colorado (excluding heroin) increased more than 409%.[224]

350.    Between 2012 and 2014, the rate of opioid-related non-fatal overdose emergency department visits in Colorado was at the rate of 15.2 visits per 100,000 Coloradans, and opioid-related hospitalizations for an overdose were at the rate of 18.6 per 100,000 Coloradans.[225] Overall hospitalizations in Colorado from an opioid-related adverse event ranged from as low as 123 in-patient stays per 100,000 Coloradans in 2008 to a high of 251 in-patient stays per 100,000 Coloradans in 2016.[226]

---

[222]    CDC, U.S. State Prescribing Rates, 2016 (July 31, 2017), https://www.cdc.gov/drugoverdose/maps/rxstate2016.html.

[223]    Colorado Dep't of Public Health & Env't, Vital Statistics Program, Drug poisoning/overdosedeaths by sex, manner of death, and involvement of specific drug types: Colorado residents, 1999-2017, https://colorado.gov/pacific/cdphe/vital-statistics-program.

[224] *Id.*

[225] Colorado Dep't of Public Health and Env't, Colorado Prescription Drug Profile 5-6 (July 2017), available                                                                          at https://www.colorado.gov/pacific/sites/default/files/PW_ISVP_Colorado%20Rx%20Drug%20D ata%20Profile.pdf.

[226] Healthcare Cost and Utilization Project, HCUP Fast States - Opioid-Related Hospital Use (June 26,                                                                                2018), https://www.hcupus.ahrq.gov/faststats/OpioidUseServlet?radio3=on&location1=CO&characteris tic1=01&setting1=IP&location2=US&characteristic2=01&setting2=IP&expansionInfoState=hid e&dataTablesState=hide&definitionsState=hide&exportState=hide.

351.    Despite having some 106 stores located all over the State of Colorado, Walmart's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

352.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Walmart pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|------|------|------|----------|
| 5-Dec-03 | Michael Anthony Spector, MD | Superior, CO | 2 years probation |
| 9-Dec-08 | Christine Ann Connolly, MD | Littleton, CO | 1 year probation |
| 19-Nov-09 | Peter Grigg, MD | Colorado Springs, CO | 5 yr probation |
| 29-Mar-12 | Louis Constantine Hampers, MD | Aurora, CO | 5 years |
| 2-Jan-14 | Kevin Clemmer, DO | Silverthorne, CO | 48 months |
| 4-May-15 | Keith A. Schwartz | Silverthorne, CO | 15 years |
| 8-Feb-16 | Sam Jahani, MD | Grand Junction, CO | 6 months |
| 24-Feb-16 | Eric Peper, MD | Grand Junction, CO | time served |
| 13-May-16 | Joel E. Miller, DO | Craig, CO | 5 years |
| 27-May-16 | Larry Eckstein, MD | Boulder, CO | Probation |
| 24-Apr-19 | John Alan Littleford, DO | Parker, CO | 87 months |
| 30-Jul-19 | Bonifacio Guillena III, DDS | Greeley, CO | 3 years |
| 27-Sep-19 | Agnes Flaum, MD | Colorado Springs, CO | 18 months probation |
| 15-Oct-19 | John Van Wu, MD | Golden, CO | 51 months |
| 25-Oct-19 | Debra Rice, NP | Alamosa, CO | 90 days |
| 13-Jan-20 | Andrew Mark Ho, MD | Denver, CO | 5 years probation |

## 2.    *Alamosa, Colorado (Dr. Chavez)*

353.    As the opioid epidemic arrived in Colorado, 1,022,073,725 prescription pain pills flowed through the state during a seven-year period, according to the DEA's ARCOS data. The

pills hit Alamosa County the hardest. More than 9.4 million oxycodone and hydrocodone pills were distributed in Alamosa County between 2006 and 2012 — or enough for 88 pills per person per year.[227]

354.    Relator Isela Chavez, Pharm.D., has worked at the Walmart store located at 3333 Clark Street, Alamosa, Colorado since 2014.  She has been the store manager since 2016.  Her NPI Number is 1174824668 and she holds License No. 18580 (Colorado).

355.    Dr. Chavez's store services the four top-ranking counties most affected by opioids in the State of Colorado, including Alamosa, Costillo, Huerfano, and Las Animas Counties. These are the poorest counties in Colorado so, except for those over age 65 and on Medicare, almost everyone qualifies for government-funded prescription drug coverage through Medicaid.

356.    Walmart has been at the center of the opioids problem in the San Luis Valley where Alamosa is located.  According to the DEA records, between 2006 and 2014 Dr. Chavez's Walmart dispensed some 2,332,060 dosage units of opioids or some 25,215,745 MME.

357.    Despite the fact that Walmart was well aware of the epidemic devastating communities across America, only when there was a growing number of DEA investigations related to physician prescribing did it begin to ensure that its pharmacies complied with their CSA "corresponding responsibilities."

358.    As a Pharmacy Manager at the Alamosa Walmart, Dr. Chavez received notification emails called "control substance audits."  The only red flags they receive are on the legitimacy of

---

[227] Jessica Seaman, *More than a billion prescription opioid pills streamed into Colorado amid national crisis:  New database tracks the path of oxycodone and hydrocodone pills between 2006 and 2012*, THE DENVER POST (July 26, 2019) https://www.denverpost.com/2019/07/26/colorado-opioid-epidemic-pills/.

the prescriber. The combination of drugs or quantity were not concerns to the company until 2017 when it became concerned about DEA and DOJ investigations into bad doctors.

359. The control substance audits came through by email when the pharmacy ordered an amount that was considered "suspicious." There was no indication of what would flag this audit. For example, if cough and cold season was occurring and her store had to dispense more cough syrup with codeine and she had ordered 4 bottles, she would get that email. However, she was never denied her order. She just had to let it clear the process.

360. As the opioid problem was raging in the San Luis Valley and around the United States, Walmart did very little to ensure its pharmacists ever checked the state PDMP databases. In Dr. Chavez's experience, Walmart did not require its pharmacists to check state PDMP databases despite the evidence that using this data reduces overdose deaths, doctor shopping, and inappropriate or medically unnecessary reimbursements. The only exception was that Walmart required pharmacists to check the PDMP for all Oxycodone 30 mg prescriptions. At no time was there an explanation why Walmart did not require pharmacists to check for other opioid drugs.

361. Walmart's complete lack of emphasis on checking state PDMP databases illustrates just how negligible were its efforts to monitor and control inappropriate and/or medically unnecessary prescribing in its pharmacies. The Company's POM 1316, first adopted in August 2012, sets out its low expectations for checking the state PDMP, and makes clear that checking was not mandatory. POM 1316 sets an expectation that pharmacists document when they utilized the PDMP, by either Narxcare or because they decided to check the PDMP for any given reason. However, POM 1316 does not require that Walmart pharmacists use PDMP as a blanket tool for every control in an effort to continue to identify prescriber patterns and or patient red flags.

362.    Demonstrating its inadequate efforts to monitor whether its pharmacists were actually checking the state PDMP databases, until it was revised in June 2018, there was no requirement that pharmacists ever document whether they had checked the state PDMP.  Only in June 2018 did POM 1316 first require pharmacists document in the Rx notes section of Connexus when they accessed PDMP information and detailed the red flags identified and how each was resolved:

> Any time the pharmacist accesses PMP information either through NarxCare or directly through the state PMP site, the pharmacist must document the access and the details of red flags identified and how the red flag was resolved in the Rx Notes section of Connexus. If the pharmacist refuses to fill the prescription, the pharmacist should complete a refusal to fill form in Archer.

363.    Even then, the Company has been unwilling to require that pharmacists must check the PDMP for all controlled substance prescriptions.  For example, Health & Wellness Market Manager Jason Perry in a January 6, 2016 email to Dr. Chavez's district explained that pharmacists (beyond checking for Oxycodone 30 mg prescriptions) should not check the state PDMP databases for every controlled substance prescription and outlined instead a "streamline[d]" process to "improve" the approval of controlled substance prescriptions:

Jason Perry <Jason.Perry@walmart.com>

Wed 1/6/2016 1:37 PM

Alicia Hurst - ahurst.s01019; Amy Cope - abcope.s00921; Annell Marr - amarr.s00842 +29 othe

Team,

In an efforts to better streamline our processing of controlled substance prescriptions, I would like to set a market wide expectation for checking PDMP databases on CS Rxs. As you all know, the only prescription that Walmart requires we check and document on hardcopy a PDMP database on Oxycodone 30mg prescriptions. From my observations and speaking with pharmacists in the market, previous leadership has required the market to execute a check on every CS prescription. Certainly, professional judgment should be executed on every CS prescription to exercise our corresponding responsibility to make sure CS prescriptions are being used for a legitimate medical purpose. However, I feel we can improve our processing of CS prescriptions if we allow your professional judgment to make the call instead of having a blanket rule to PDMP every CS rx. My expectation is for us to follow company policy on oxycodone 30mg prescriptions and utilize professional judgment for the rest of our CS prescriptions.

364.    Perry's email makes it very clear that Walmart management was focused on dispensing quickly – not upholding their duties under the law. In Walmart management's eyes, doing things like checking like PDMP were impediments for pharmacists rather than sound practice. In reality, Walmart was cloaking the discouragement of proper due diligence under the guise of exercising "professional judgment."

365.    In fact, this direction in 2016 undid previous informal practice of checking all controlled substance prescriptions against the PDMP. Inexcusable at any point, but especially in 2016.

366.    Another example of its utter disregard of its duties under the CSA was the fact that until 2017 it provided no means for Dr. Chavez and other Walmart pharmacists could block what it knew (or should have known) were suspicious prescribers.  In the version of POM 1311 that was in effect from 2011 until 2017, Dr. Chavez and other Walmart pharmacists could not enter so-called "blanket refusals of prescriptions" and instead had to evaluate every prescription separately:

> **Notes:** At all times the pharmacist must remain courteous and professional in communications with both prescribers and patients.
>
> Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not issued based on a valid prescriber-patient relationship or for a valid medical reason before refusing to fill.

367.    This has meant that until 2017 Walmart provided very few tools for Dr. Chavez and other pharmacists could use to report suspicious prescribers, nor a means by which they could investigate Walmart databases to determine whether a prescriber had been blocked by other pharmacists.

368.    Dr. Chavez had taken over as manager in 2016. Prior to her becoming store manager, the previous managers had let a bulk of narcotics dispensed in Alamosa pass through as a result of a lack of Walmart policy and procedure.

369.    In late 2017, Dr. Chavez's region changed configuration and they went from being part of the Colorado Region to the Northern New Mexico Region and Market. In 2018, they were required to complete a pain management forum. The training focused on appropriate strategies for preventing and addressing opioid misuse and overdose while ensuring proper management of chronic pain in patients.  During this time, their new Market Director, Charlene Kalin, held weekly conference calls discussing opioid stewardship and refusal to fill forms.

370.    In 2018, Dr. Chavez began receiving weekly reports of how many "refusal to fill forms" were documented in Archer for each store and was broken down to each pharmacist. Shortly after, they began also receiving information on the percentage of control substances filled per week for each store in their Market.

371.     Walmart also informed managers that, if they did not have at least one refusal to fill in a given week, they would need to reevaluate our understanding of red flags. There was a constant warning from their Regional leadership to the Market level that pharmacists who could not document thoroughly would not have a job with a Walmart.

372.     The documentation process takes time, and recently the pressure to fill along with widespread layoffs has only added more stress to increase their business.

**3.     *Walmart Continues to Fill Inappropriate Prescriptions from Patients of Debra Rice, N.P.***

373.     One example of a problematic prescriber is Nurse Practitioner Debra Rice from Alamosa, Colorado.

374.     Dr. Chavez had seen only a few prescriptions from Rice before 2016, but started to get a significant influx of patients with prescriptions from Rice in late spring into the early summer of 2016. The patients often had questionable prescriptions, including cocktail prescriptions like the "Holy Trinity." Furthermore, Rice exhibited "pattern prescribing" – *i.e.* nearly every patient had the same or similar prescriptions for opioids. But perhaps the most glaring red flag of all was that Dr. Chavez learned that the increased number of Rice's patients coming to Walmart was because other pharmacies in the area, such as Walgreens, had stopped filling all of Rice's prescriptions.

375.     Dr. Chavez not only heard directly from Rice's patients that other pharmacies were refusing to fill her prescriptions, but she also confirmed that fact with her friend Anastascio "AJ" Duran, a manager at the nearby Walgreens. Mr. Duran confirmed that the Walgreens had stopped filling any of Rice's prescriptions, including non-controlled substances.

376.     Given these red flags concerning Rice's prescriptions, Dr. Chavez was concerned about continued dispensing for these patients at Walmart. Despite the obvious red flags and Dr. Chavez's legitimate concerns, there was no Walmart tool available to the pharmacy to investigate this prescribing further, nor a means by which she could put in place a "blanket" refusal to fill these prescriptions.  Indeed, the corporate version of POM 1311 in place at the time would not allow pharmacists to put in place a "blanket" refusal to fill.

377.     After she first began to see the influx of Rice customers in 2016, Dr. Chavez sent an email to her then Market Manager, Jason Perry, explaining that their competitors in the Alamosa area were refusing to fill any of Rice's prescriptions, and as a result their Walmart pharmacy was experiencing an influx of Rice's prescriptions for Schedule II-IV controlled substances.  Dr. Chavez was looking for guidance and support from her management. She ended up sorely disappointed.

378.     Perry did not respond to Dr. Chavez's email, but instead forwarded it to Shelley Tustison, Walmart Director of Ethics and Compliance. Eventually, Tustison replied, but her response provided little guidance and no support, telling her instead to keep following Walmart policy and to use her professional judgment. At the time the Walmart policy was merely to check the PDMP for oxycodone 30mg prescriptions alone.

379.     The response was extremely ambiguous and ultimately unhelpful. At no point did Walmart offer to investigate Rice, give any additional information about Rice's prescribing habits that could be gleaned from Walmart's data (as opposed to Chavez's personal experience), or provide reassurance that Walmart would support Dr. Chavez's decision not to fill.  Nor did Tustison provide any guidance, much less encouragement, to Dr. Chavez about reporting Rice to the proper authorities like the DEA or the State Board of Nursing.

380.    After getting the ambiguous and unhelpful response, Dr. Chavez and her staff pharmacist, Seth Levulis, had a conversation concerning what to do about Rice's questionable prescriptions. Ultimately, they concluded that Walmart was not looking out for their licenses and decided that for Rice's customers, they would no longer just without question fill her "Holy Trinity" prescriptions, and instead would always check the PDMP for all opioids she prescribed (and not just Oxycodone 30mg, which is all that Walmart required at the time).  And they would document everything.

381.    Dr. Chavez explained this was part of their "clinical relevance" and "due diligence" review, and that no opioid prescriptions processed in a pharmacy where she was the manager would be dispensed without proper documentation. Since at the time Walmart did not have any other policies in place other than an optional PDMP review, Dr. Chavez did the best she could to set the expectations, knowing that Walmart would not support her efforts in doing so.

382.    However, given Dr. Chavez's background in poison control, she knew that every record in their data base could be subpoenaed in litigation for wrongful death or injury. She also knew that poison control data had subjective and objective data, and unfortunately in healthcare people do make mistakes and people misuse and abuse. As a pharmacist in poison control, documentation of vitals, and patient history and the plan of action – also referred to as a "SOAP note" – was considered proper documentation. In poison control the initial note at intake of a poisoning or overdose must be documented this way without exception. SOAP notes are taught in pharmacy school as proper documentation.

383.    Before Dr. Chavez applied this training to Rice's prescriptions, she first set up a time for them to have a call to discuss these questionable prescriptions. None of this was part of Walmart policy.

384.    When Dr. Chavez first spoke with Rice, the N.P. was upset with pharmacists for not filling her prescriptions and was threatening the pharmacists' licenses. Rice indicated she had retained a lawyer to represent her suing individual pharmacists. In fact, she did eventually serve papers on AJ Duran of Walgreens.

385.    In her conversation with Rice, Dr. Chavez explained that moving forward at the Alamosa Walmart pharmacy they had to make sure that any prescriptions coming in from Rice's patients would require proper documentation.  Dr. Chavez stressed that the amounts, combinations, diagnosis, strengths, and treatment plan had to all make sense. Rice agreed.

386.    The process Dr. Chavez developed (without support from Walmart) to control Rice's inappropriate prescribing included:

- Calling on every patient from Rice and the initial visit to fill at the Alamosa pharmacy, which meant that the patient may have to wait 24 to 48 hours to receive medications. PDMP was performed on every control prescription.

- Documenting everything and anything – *e.g.*, vitals, x-rays, UAs Rice performed, failed surgeries, failed therapies, diagnosis codes, etc. However, her Alamosa Walmart pharmacy never received or requested copies of any of these exams/reports. The notes were made on the paper prescription, and some were inputted into the prescription or patient notes in Connexus.

- For "Holy Trinity" prescriptions, only filling the combination once and with assurance from Rice directly that her patient would not get the Trinity cocktail again. This information was to be documented in the notes of Connexus. When a Rice customer who got the Trinity once returned, the next round of prescriptions would still undergo PDMP

and, if they had seen any part of the "Holy Trinity" filled at another pharmacy, their pharmacy would refuse to fill any part of the prescription. Furthermore, Dr. Chavez insisted that for Rice customers who got the Trinity prescriptions, the subsequent prescriptions had to include a plan for reducing the dosage, frequency, etc. Otherwise, the Alamosa Walmart would not fill the prescription. For example, if a customer came in with an opioid and a benzodiazepine, the next time the customer came in, there had to be a plan to titrate down the benzodiazepine amount.

- All Rice patients would be maintained on their diabetic medications, asthma meds, etc. This was not optional. If any patient refused to pick up those meds, that meant a call to Rice and refusal to fill their narcotics, but never their maintenance medications (insulin, inhalers, etc.).

- If a patient was disrespectful by word or actions and/or demonstrated aggression toward her or any of her staff, they were to be refused and not allowed back in the pharmacy permanently. They would call Rice's office and have her notified.

387.    None of this was supported by Walmart policy. The lead technician, Melissa Trujillo, assisted Dr. Chavez and the Alamosa staff pharmacist by ensuring they still met proper wait times and expectations.

388.    During this time frame, articles first began to appear in the local newspaper (Valley Courier) of three reported deaths associated with Rice's practice.[228]   All three individuals, two males and one female, had filled prescriptions not only at the Alamosa Walmart pharmacy and at

---

[228]   Ruth Heide, *Chronic Pain – Fatal Practice*, VALLEY COURIER (May 3, 2017), https://alamosanews.com/article/chronic-pain-fatal-practice.

other pharmacies throughout the San Luis Valley. Although these deceased patients' toxicology screens came back positive for "street drugs," the Rice prescriptions immediately preceding their deaths were found in their toxicology reports post-mortem as well.

389. Despite the troubling news of the deaths, Dr. Chavez maintained her ad hoc system through the end of 2016 and into early 2017. Without any assistance from Walmart, it simply was the best she could do in the situation.

390. In March 2017, Dr. Chavez heard from the manager at City Market Pharmacy in the area who informed her that they were not processing Rice's prescriptions. Dr. Chavez suspected this was because Rice no longer had a valid license to prescribe controlled substances.

391. Shortly thereafter, Dr. Chavez was proved correct. She learned through a local newspaper that Rice finally had her license suspended by the State Board of Nursing.[229] According to the Valley Courier: "After conducting an investigation that revealed thousands of controlled substance prescriptions written within a year's time — including prescriptions for the 'holy trinity' of drugs — and the deaths of three patients related to drug intoxication, on March 8 the State Board of Nursing under Program Director Sam Delp issued a summary suspension of the professional nursing license of Alamosa nurse practitioner Debra Rice, R.N., A.P.N., R.X.N., practicing at SoCo Medical Services in Alamosa."[230]

392. According to the Board findings, Rice had written more than 2,400 prescriptions for controlled substances, including oxycodone/acetaminophen, Diazepam, Methadone,

---

[229] *Id.*

[230] Teresa Benns, *Pharmaceutical company exposed as SLV opioid supplier*, CENTER POST DISPATCH (December 20, 2017), https://centerpostdispatch.com/article/pharmaceutical-company-exposed-as-slv-opioid-supplier.

Oxycodone (10 mg, 16 mg and 20 mg) and Tramadol. "From January 1, 2016 through February 25, 2017, Rice wrote more than 7,000 prescriptions for controlled substances including Oxycodone/Acetaminophen, diazepam, methadone, oxycodone (10 mg, 15 mg and 20 mg), morphine and tramadol, according to the state board."[231] According to the news story, three (3) of Rice's patients had died from drug combinations or overdoses while in her care.

393.    The official suspension of Rice's license allowed Dr. Chavez the justification she needed to stop filling Rice's prescriptions altogether, cover that Walmart would not provide. Dr. Chavez decided to submit a "Blanket Refusal to Fill" ("BRTF") form for Rice, using the just-revised procedure which had been announced in POM 1311.

394.    At that point, Troy Rorex was Dr. Chavez's Market Director and he was on leave, so Dr. Chavez had to speak to the person covering for him.  However, Rorex' replacement did not know what to do because Walmart's BRTF process changes to POM 1311 had just become active. In any event, Dr. Chavez filled out the first BRTF form in her Market, and (as directed by POM 1311) she then contacted other stores via telephone or sent them an email to caution them about Rice's inappropriate prescribing. Dr. Chavez had to undertake those efforts purely on her own as there was not yet a central blocking option in the Walmart systems for pharmacists to share information about bad doctors.

395.    Dr. Chavez also contacted the Colorado Board of Pharmacy inspector, Mark Kalkis, by email in March 2017.  He forwarded her email to Sam Delp, Program Director for the Board of Pharmacy.

---

[231] *Id.*

396.     When her Market Manager Troy Rorex came back from leave, they had a Market conference call in May 2017 where Dr. Chavez first learned that Rice's prescriptions were still processing. Even though Walmart had just initiated the new BRTF process, there was apparently no system in place at Walmart to stop Rice's prescriptions from processing. Instead, Dr. Chavez was directed that, in order to stop Rice's prescriptions from processing, she had to call IT to deactivate her prescriptions from the system.

397.     Dr. Chavez then in 2017 contacted the Walmart home office and spoke with IT to deactivate Rice's profile.  Unfortunately, it took several months for IT to deactivate Rice from the system because Walmart had still not implemented "Central Blocking," which Walmart would not adopt until 2019. During this time, Dr. Chavez would periodically check to see if she was still able to process Rice's prescriptions. Sadly, it took nearly two additional months for the block to be fully implemented.

398.     Later in the fall of 2017, DEA agents came into Dr. Chavez's Walmart store and asked her questions regarding Rice's prescribing patterns. Dr. Chavez thereafter reported this to the Walmart corporate office.

399.     Later on, Dr. Chavez received notification from Walmart corporate of which reports concerning Rice they needed to run. Dr. Chavez forwarded this data to Tustison and Debbie Mack, Walmart Healthcare Compliance Consultant, on October 24, 2017. Dr. Chavez did not ever hear back from either of these Walmart Compliance officials concerning the information she had gathered concerning Rice.

400.     In early 2019, the DEA returned to Dr. Chavez's pharmacy and this time they had a subpoena, which gave two weeks to pull the prescriptions requested.

401.     Prescriptions for all three deceased individuals cited in the newspaper articles were included in the DEA subpoena.  The following Rice opioid prescriptions for one male (4), another male (12), and for the female (14) were all filled at the Alamosa Walmart:

Patient 1 (male deceased February 25, 2016), Colorado Medicaid No. L555785:

| Rx No. | Date Picked Up | Drug Name | Schedule | Quantity |
|---|---|---|---|---|
| 2039259 | 10/26/15 | methadone 10mg | C II | 120 |
| 2039676 | 11/30/15 | oxycodone 10 mg | C II | 90 |
| 2039677 | 11/30/15 | amphetamine/dextro combo 10 mg | C II | 90 |
| 2039678 | 11/30/15 | methadone 10mg | C II | 180 |

Patient 2 (male deceased May 24, 2016), Colorado Medicaid No. G464341:

| Rx No. | Date Picked Up | Drug Name | Schedule | Quantity |
|---|---|---|---|---|
| 2039807 | 12/10/15 | methadone 10 mg | C II | 90 |
| 2039809 | 12/10/15 | oxycodone 15 mg | C II | 120 |
| 2040210 | 1/11/16 | methadone 10 mg | C II | 120 |
| 2040211 | 1/11/16 | oxycodone 15 mg | C II | 120 |
| 4094749 | 12/26/15 | diazepam 5 mg | C IV | 30 |
| 4095148 | 1/21/16 | diazepam 5 mg | C IV | 30 |
| 4095148 | 2/9/16 | diazepam 5 mg | C IV | 30 |
| 6697575 | 2/9/16 | | NON CONTROL | |
| 6697575 | 3/3/16 | | NON CONTROL | REFILL |
| 6697576 | 2/9/16 | | NON CONTROL | REFILL |
| 6697576 | 3/3/16 | | NON CONTROL | |

Patient 3 (female deceased July 25, 2016), AARP MedicareRx, BIN: 610097, PCN: 9999, Grp No. PDPIND:

| Rx No. | Date Picked Up | Drug Name | Schedule | Quant. |
|---:|---:|---:|---|---:|
| 2040771 | 2/23/16 | oxycodone 15 mg | C II | 120 |
| 2042204 | 6/20/16 | oxycodone/apap 10/325 | C II | 84 |
| 2042277 | 6/24/16 | methadone 10 mg | C II | 84 |
| 4096788 | 6/24/16 | clonazepam | C IV | 24 |
| 6716742 | 6/21/16 | | Non-controlled | |
| 6716743 | 6/15/16 | | Non-controlled | |
| 6716749 | 6/15/16 | | Non-controlled | |
| 6716750 | 7/19/16 | | Non-controlled | |
| 6716751 | 6/21/16 | | Non-controlled | |
| 6717296 | 6/21/16 | | Non-controlled | |
| 6717298 | 6/21/16 | | Non-controlled | |
| 6721149 | 7/18/16 | | Non-controlled | |
| 6721156 | 7/18/16 | | Non-controlled | |

402.    Illustrating the problem with Walmart's lack of communication and failure to provide pharmacists with the tools to properly evaluate prescriptions, the prescriptions for Patient 1 (Oxycodone, Methadone, and Amphetamine/Dextro) dated November 30, 2015 were filled by a floater pharmacist who was apparently unaware of Dr. Rice's prescribing patterns. With better communication to its pharmacists about problematic prescribers in the area or combinations of drugs, dispensing of those prescriptions could have been avoided.

403.    The DEA subpoenaed a total of 14 patients for whom Walmart was to pull prescriptions.  Between all of them, Dr. Chavez had copied 371 prescriptions that the DEA included as evidence in its complaint against Rice.

404.     The indictment cited over 7000 prescriptions written by Rice between January 2016 and February 2017 just for controlled substances.[232]  Many of those prescriptions had been filled at the Alamosa Walmart.

A sample of the prescriptions:

| Patient Name | Prescription number to reference in spread sheet | MCO ID | MEDICATION | QUANTITY |
|---|---|---|---|---|
| **Patient 4** | 2040249 | B195048 | FENTANYL PATCH 25 MG | 10 |
| **Patient 5** | 2039551 | K102704 | OXYCODONE/APAP 7.5/325 | 120 |
| **Patient 6** | 2036692 | E211479 | OXYCODONE 15 MG | 90 |
| **Patient 7** | 2036958 | E167861 | OXYCODONE 15 MG | 120 |
| **Patient 8** | 2037901 | D360681 | OXYCODONE 10 MG | 120 |
| **Patient 9** | 2042080 | H118002 | OXYCODONE/APAP 10/325 | 120 |
| **Patient 10** | 2034284 | E099932 | OXYCODONE 15 MG | 30 |
| **Patient 11** | 2035477 | J465250 | OXYCODONE 10 MG | 60 |
| **Patient 12** | 2034846 | R785303 | OXYCODONE 10 MG | 120 |
| **Patient 13** | 2038679 | K129129 | FENTANYL PATCH 25 MG | 10 |

405.     Critically, none of the prescriptions above (or for the three people who died from drug overdoses) would have been identified by Walmart's dispensing policies at the time. Walmart only required its pharmacists to check the PDMP for Oxycodone 30mg prescriptions, which was the only thing that Tustison reminded Dr. Chavez to do in response to her concerns about Rice. Clearly, such a policy was woefully insufficient.

406.     Dr. Chavez found herself between a rock and hard place with Rice's prescriptions. Dr. Chavez was exercising her corresponding responsibility as a pharmacist by trying to ensure that Rice's prescriptions were legitimate. Indeed, even without Walmart's help, Dr. Chavez was

---

[232]  Heide, Ruth, *Medical provider faces 50 charges*, VALLEY COURIER (Jan. 11, 2019), https://www.alamosanews.com/article/medical-provider-faces-50-charges.

able to reduce the number of Holy Trinity prescriptions while ensuring that patients got needed maintenance medications by proactively working with Rice.

407.    Yet, without the full support of Walmart management, Dr. Chavez could only do so much as a pharmacist. Nor could she be confident that, if she took a harder line with Rice, that Walmart would support her judgment.  She was not confident that if Rice went after her pharmacist license (*i.e.*, Dr. Chavez's livelihood) that Walmart would support her if she were later sued by Rice. Especially after the initial unhelpful response from Walmart management, Dr. Chavez took many of her actions regarding Rice's prescriptions without the knowledge of her manager (Jason Perry) for those very reasons. As such, Dr. Chavez did the best she could under the circumstances, entirely without guidance or support from Walmart.

> **4.** ***Walmart Discourages Internal Reporting and Notetaking that Would Assist the DEA and the Colorado State Board of Medicine***

408.    In Dr. Chavez's experience, Walmart discourages internal reporting of inappropriate prescriptions and prescribers.

409.    One example has to do with documenting red flags on hard copy prescriptions.  In the summer of 2019, Dr. Chavez's store had a visit from her Regional Leader, Rachel Phillips, from the Phoenix, Arizona office.  Phillips came in and performed an audit of the store based on the new POM 1311.  Following the audit, the one area Phillips raised was concerns that they were documenting potential red flags on the paper prescriptions rather than in the Rx Notes field of Connexus.

410.    During the audit, Phillips had asked the Alamosa staff pharmacist, Daniella (Ella) Roehm, how she documented red flags and what the process of controlled substances consisted of. Roehm explained that they used the same process every time and that Dr. Chavez had trained her

on how to evaluate control substances, which they documented on the hard copy prescription. Roehm went on to show Regional Manager Phillips an example because she was processing a narcotic at that time. This is how Dr. Chavez had trained Roehm as required under the new POM 1311.

411.    After being admonished because her store was documenting red flags on the hard copy prescriptions, Dr. Chavez called another Walmart pharmacist in Canon City, Colorado and learned they too still documented red flags on the hard copy.

412.    Dr. Chavez also contacted Patti Bennett, Senior Manager Human Resources, about this issue, through an email informing Bennett about their concerns regarding the inconsistency in how documentation occurs and why the DEA would disagree with Walmart's position.  In her view, the written documentation could be very helpful to assist the DEA's investigation.

413.    Bennett responded to Dr. Chavez's email with a phone call and told Dr. Chavez that Walmart did not want red flag documentation on hard copy prescriptions because, when it does an investigation, the DEA only reviews hard copy prescriptions and does not request access to Connexus.  In this way, Walmart could avoid sharing with the DEA its pharmacists' handwritten notes.

414.    Additionally, when she emailed her concerns to management regarding Rice, Dr. Chavez was told they must report only to the corporate office and not to the DEA or the State Board of Medicine.

B.    **Specific Examples of Unlawful Dispensing Conduct: Florida**

1.    *Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Florida*

415.    Florida has been a key supplier of diverted powerful prescription opioid medications that supplied not only users in Florida, but throughout the East Coast.[233]  From 2003 to 2010, Florida experienced a proliferation of "pill mills," a category that includes physicians, pain clinics, and other providers that dispense large quantities of prescription drugs, typically for cash only, outside the scope of standard medical practice.[234] By 2010, 90 of the 100 doctors purchasing the most oxycodone nationwide were practicing in Florida.[235] Accompanying increases in pill mills and opioid prescribing was a rapid rise in mortality from prescription opioid overdoses in Florida.[236]

416.    Despite having some 383 stores located all over the State of Florida, Walmart's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

417.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Walmart pharmacies), who were apprehended (and many of

---

[233] Aric Chokey, Skyler Swisher, *5.6 billion opioid pills flooded the state, and rogue South Florida doctors helped get them on the streets*, South Florida Sun Sentinel (July 27, 2019), https://www.sun-sentinel.com/news/florida/fl-ne-opioids-flood-florida-data-20190726-3gltamcwojbltehe45aj73fyoy-story.html.

[234] Malbran P., *What's a pill mill?*, CBS News (May 31, 2007) http://www.cbsnews.com/news/whats-a-pill-mill/.

[235] *Office of National Drug Control Policy, Fact sheet: prescription drug monitoring programs*. (2011) http://www.whitehouse.gov/sites/default/files/ondcp/Fact_Sheets/pdmp_fact_sheet_4-8-11.pdf.

[236] Centers for Disease Control and Prevention, *Drug overdose deaths—Florida, 2003–2009*, 60 Morb. And Mort. Wkly. Rep. 869–872 (2011).

them later convicted) as a result of a DEA or local law enforcement investigation, were identified,

investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 23-Mar-06 | Mario Diaz, MD | Miami, FL | 30 months |
| 4-Apr-06 | Megaly Bethencourt, MD | Miami, FL | 2 years probation |
| 20-Apr-06 | Carlos Manuel Barrera | Miami, FL | 3 years probation |
| 5-May-06 | Jean Dominique, MD | Tampa, FL | 5 years probation |
| 25-Jul-06 | Augustin Castellanos, MD | Palm Beach Gardens, FL | 36 months |
| 30-Aug-07 | John Durfey, MD | Panama City, FL | 240 months |
| 27-Jul-09 | Robert L. Ignasiak, MD | Freeport, FL | 292 months |
| 19-Aug-09 | Craig Bammer, DO | Gulfport, FL | 17 years |
| 11-Sep-09 | Kevin Denny, MD | Tierra Verde, FL | 70 months |
| 2-Oct-09 | John Rew, MD | Tampa, FL | 3 years probation |
| 15-Oct-10 | Jeffrey Friedlander, MD | Tampa, FL | 9 years |
| 18-May-11 | Cesar Deleon, MD | Lake Worth, FL | |
| 24-May-11 | Robert Bourlier, MD | Destin, FL | 30 years |
| 18-Aug-11 | Arthur Carl Haspel, DPM | Boca Raton, FL | 7 years |
| 23-Aug-11 | Beau Boshers, MD | Palm Beach Gardens, FL | 78 months |
| 23-Aug-11 | Michael Aruta, MD | Boca Raton, FL | 72 months |
| 23-Aug-11 | Roni Dreszer, MD | Sunny Isles, FL | 72 months |
| 23-Aug-11 | Patrick Graham, MD | Boca Raton, FL | 4 years |
| 23-Aug-11 | Daniel Hauser, MD | Hollywood, FL | 6 months |
| 23-Aug-11 | Robert Meek, DO | Davie, FL | 66 months |
| 23-Aug-11 | Vernon Atreidis, MD | Ft. Lauderdale, FL | 66 months |
| 23-Aug-11 | Augusto Lizarazo, MD | Jupiter, FL | 36 months home con. |
| 23-Aug-11 | Irwin Beretsky, MD | Boca Raton, FL | |
| 23-Aug-11 | Jacobo Dreszer, MD | Sunny Isles, FL | |
| 2-Sep-11 | Steven Pearlstein, MD | Coral Springs, FL | 12 months |
| 16-Aug-12 | Michael Fronstin, MD | West Palm Beach, FL | |
| 16-Aug-12 | Adeline Essian, MD | Pompano Beach, FL | |
| 16-Aug-12 | Khanh Van Kim Duong, MD | Pompano Beach, FL | |
| 5-Sep-12 | John Anthony Gianoli, MD | St. Petersburg, FL | 5 years |
| 27-Nov-12 | Terrie Jaime, RN | Apopka, FL | 6 years |
| 5-Feb-13 | Ihad "Steve" Barsoum, PharmD | Lutz, FL | 17 years |
| 3-Jul-13 | Vijay Chowdary, MD | Boca Raton, FL | |
| 16-Jul-13 | Scott Becker, MD | Pembroke Pines, FL | 70 months |
| 1-Aug-13 | Cynthia Cadet, MD | Parkland, FL | 66 months |

| | | | |
|---|---|---|---|
| **1-Aug-13** | Joseph Castronuovo, MD | Key Largo, FL | 18 months |
| **24-Apr-14** | Stephen Anthony, MD | Davie, FL | 3 years |
| **2-Jun-14** | Thomas James Rodenberg, MD | Pompano Beach, FL | 220 months |
| **13-Jun-14** | Christopher Wayne, DO | Miami Beach, FL | 70 months |
| **9-Jul-14** | Michael Windley, DVM | Cantonment, FL | 20 months |
| **23-Jul-14** | Martha Otano, PharmD | Cape Coral, FL | 3 years |
| **24-Jul-14** | Ronald John, MD | Brandon, FL | 20 years |
| **12-Feb-15** | Jorge Otano, PharmD | Cape Coral, FL | 3 years |
| **1-May-15** | Richard Vitalis, DO | North Ft. Lauderdale, FL | |
| **27-May-15** | Lynn Averill, MD | Ft. Lauderdale, FL | |
| **8-Jun-15** | Ibem Borges, MD | Orlando, FL | |
| **6-Jul-15** | Brian C. Weller, PharmD | Melbourne, FL | 8 years |
| **23-Jul-15** | Fred Joseph Turner, MD | Sarasota, FL | 151 months |
| **31-Aug-15** | Armando Solis, MD | Miami Beach, FL | 46 months |
| **12-Jan-16** | Jacinta Irene Gillis, MD | Fort Myers, FL | 30 years |
| **21-Mar-16** | Valentine Okonkwo, PharmD | Orlando, FL | 24 years, 4 months |
| **24-May-16** | Kim Xuan Feldman | Tampa, FL | 4 years |
| **25-May-16** | Edward Neil Feldman, MD | Tampa, FL | 25 years |
| **1-Jan-17** | Russell Sachs, MD | Green Cove Springs, FL | 2 years |
| **12-Jul-16** | Thomas Merrill, DO | Panama City, FL | Life |
| **12-Jan-17** | Michael Morgan Dietch | Port Orange, FL | 135 months |
| **25-Jan-17** | John Peter Christensen, MD | West Palm Beach, FL | 4 years |
| **5-Apr-17** | Peter Katz, MD | Boynton Beach, FL | |
| **15-Jun-17** | William Ouw, MD | Pompano Beach, FL | 22 years |
| **30-Aug-17** | Anil Sahijwani | Tampa, FL | 45 months |
| **22-Jun-18** | John M. Gayden, MD | West Melbourne, FL | 19 years |
| **20-Jul-18** | Jeffrey John Abraham, MD | Tampa, FL | 36 months probation |
| **1-Aug-18** | Barry Schultz | West Delray Beach, FL | 157 years |
| **30-Jan-19** | Jayam Krishna Iyer, MD | Clearwater, FL | 6 months |
| **7-Feb-19** | Victor Hugo Espinosa, MD | Ft. Lauderdale, FL | Pled Guilty |
| **7-May-19** | Marta Elena Farinas, MD | Miami Beach, FL | |
| **29-May-19** | Kendrick Eugene Duldulao, MD | Tampa, FL | Convicted |
| **29-May-19** | Medardo Queg Santos, MD | Lakeland, FL | Convicted |
| **6-Jul-19** | Johnny Clyde Benjamin, MD | Vero Beach, FL | Life |
| **26-Aug-19** | Rodolfo Gonzalez-Garcia, MD | Weston, FL | Pled Guilty |
| **26-Sep-19** | Robert Patrick Jensen, MD | Gulf Breeze, FL | Indicted |
| **26-Sep-19** | Michael T. Harris, MD | Gulf Breeze, FL | Indicted |

| **26-Nov-19** | Jeanne E. Germeil, MD | Aventura, FL | 210 months |

### 2.    *Orlando, Florida (Pharmacist No. 5)*

418.    Pharmacist No. 5 was a pharmacist and pharmacy manager for Walmart in Orlando, Florida for ten years, from 2006 to 2017. She was terminated in 2017. As pharmacy manager for Walmart, she reported to Kelly Altman, a Walmart Market Manager.

419.    Pharmacist No. 5 said she had a reputation among other pharmacists for being a vigilant pharmacist in the area. "Everybody knew my name," she said. "I ran a tight ship."

420.    When the DEA allowed controlled substances to be prescribed electronically, she did not feel comfortable doing that. Pharmacist No. 5 wanted prescriptions for opioids and other controlled substances to be handwritten, signed, with the patient in the store. She said she knew other pharmacists who weren't comfortable with the change. Some would fill electronic prescriptions for ADHD drugs for children but not for opioids. To keep things straightforward for her pharmacy technicians, she said would not fill any electronic prescriptions for controlled substances.

421.    She was aware of some practices involving electronic prescriptions that she did not like, such as doctors allowing their nursing staff to file electronic prescriptions.

422.    Pharmacist No. 5 recalled an incident when a patient had two electronic prescriptions for the same controlled substances, one from New York and one from Florida. He had residences in both states.  Using Walmart's data, she found he had filled the prescription in New York. When he came to the store to pick it up, she put a hold on it. Following her refusal, she was fired by her Market Manager, Kelly Altman.

423.    Walmart provided only minimal training on using the state's prescription monitoring program, but did nothing to follow up or enforce its use. There was some "slight" training on using Florida's prescription monitoring program, EFORSCE, but its use was very loosely monitored.

424.    Walmart monitored things like properly disposing of expired controlled substances, and whether controlled substances were filled correctly with all the required information, but it failed to adequately monitor whether basic safeguards were being followed when filling prescriptions for opioids. "Some pharmacists were able to get away with anything and everything they were doing," Pharmacist No. 5 said.

425.    Walmart emphasized sales over safety. "You understood that you needed to grow the business," Pharmacist No. 5 said. "The pharmacies that grew the business, they sold a lot of controlled substances."

426.    Pharmacy managers were given a business plan at the beginning of each year. "That was their expectation of what their numbers should look like," she said. Sometimes she did not meet her numbers for prescription count because of her strictness. That meant not getting a bonus or a raise for the year. She would have been eligible for a $16,000 or $17,000 bonus in 2016, but did not receive a bonus since she did not make her dispensing quota, including opioids.

427.    Pharmacist No. 5 witnessed pharmacists not going to the state's prescription monitoring database to make sure the patients were not getting refills too soon. She saw a pharmacist fill two different prescriptions for different quantities of the same drug, Adderall, on the same day for a customer. One was for a 60-day supply, the other for a 90-day supply.

428.    She also knew of a Walmart pharmacist who did not know her own password to access the Florida PMP, EFORSCE.

429.    These shortcomings occurred because Walmart management prioritized sales and customer satisfaction over safety, Pharmacist No. 5 said. "A lot of pharmacists are doing things that may not be clinically sound or safe for the patient," she said. "They don't want anyone to complain. Walmart does not want to hear any complaints from their customers."

430.    She said she confronted management about this, warning them: "The country is in an opioid epidemic right now and you're allowing these people to fill prescriptions indiscriminately."  But nothing was done.

**C.    Specific Examples of Unlawful Dispensing Conduct: Kentucky**

**1.    *Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Kentucky***

431.    The Commonwealth of Kentucky has been hit especially hard by the opioid epidemic, ranking fifth in the nation for opioid-related deaths in 2015. In 2015, 102 opioid prescriptions were written for every 100 Kentucky residents, 1.5 times the national average. In 2016 alone, there were 1,404 reported fatal drug overdoses in Kentucky—117 per month. Fentanyl was involved in 623—approximately 47%—of those deaths. In 2017, there were 1,565 fatal drug overdoses in Kentucky, which increased the average death rate to approximately 130 deaths per month.

432.    In addition to opioid-related fatalities, the Commonwealth has suffered other serious injuries. Kentucky has seen a dramatic increase in opioid addiction, reflected, in part, in the increase in Medicaid spending for medications to treat such addiction, which doubled in just two years—from $56 million in 2014 to $117 million in 2016.

433.    Children are especially vulnerable to the opioid epidemic. In just one 12-month period, between August 1, 2014 and July 31, 2015, 1,234 infants in Kentucky were born addicted

to opioids, more than 100 newborns per month. Many of these infants must be treated in neonatal intensive care units while they painfully withdraw from the drugs. Children also suffer when removed from their homes due to their parents' opioid abuse and addiction.

434.    Kentucky has had one of the highest rates of pregnant women using opioids in the country. In 2014, the Commonwealth had the third-highest rate of pregnant women with opioid use disorder. In 2017, the number of babies born with NAS in the Commonwealth had increased by 375% since 2007.

435.    Despite having 101 pharmacies located all over the Commonwealth of Kentucky, Walmart's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities in Kentucky.

436.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Walmart pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 18-Aug-03 | David Herbert Procter, MD | South Shore, KY | 11 years |
| 22-Feb-07 | Fortune Williams, MD | Garrison, KY | 20 years |
| 26-Oct-09 | Milton Lee Brindley,  MD | Augusta, KY | 71 months |
| 14-May-10 | Stanley Naramore, MD | Cincinnati, OH | 48 months |
| 12-Dec-11 | Richard Albert, MD | Paintsville, KY | 75 months |
| 3-Aug-12 | Michael D. Leman, owner | Lexington, KY | 15 years |
| 18-Dec-12 | Clara Rodriguez-Iznaga, MD | Plantation, FL | 20 years |
| 14-Jan-13 | Ernest William Singleton, MD | Springfield, KY | 20 years |

| 18-Jun-13 | Gregory B. White | Georgetown, KY | 2 years |
|---|---|---|---|
| 18-Dec-13 | Charles Tenhet, PharmD | London, KY | 10 years |
| 1-Aug-14 | Tammy Cantrell, MD | Paintsville, KY | 9 years |
| 1-Aug-14 | Shelby Lackey | Paintsville, KY | 97 months |
| 29-Aug-14 | Rano Bofill, MD | Paintsville, KY | 4 years |
| 10-Sep-14 | Beverly Lockhart, Pharm Mgr | Pikesville, KY | 72 months |
| 30-Mar-15 | Ronald Hungerbuhler, DDS | Corbin, KY | 1 year |
| 16-Jun-15 | Charles Fred Gott, MD | Warren County, KY | 8 years |
| 13-May-16 | James Guerrero, MD | Louisville, KY | 8 years |
| 1-Jul-16 | Sean P. McDonald, MD | McCracken County, KY | Probation |
| 11-Jul-16 | Alan Craig Schold | Georgetown, KY | |
| 1-Apr-17 | Clelia Hayes, MD | Tompkinsville, KY | 1 year |
| 24-Apr-17 | Ezekiel O. Akande, MD | Somerset, KY | 5 years |
| 5-Jun-17 | George Kudmani | Louisville, KY | 48 months |
| 30-Jun-17 | Lonnie Hubbard, PharmD | Berea, KY | 30 years |
| 29-Sep-17 | James Chaney, MD | Hazard, KY | 180 months |
| 26-Apr-18 | Alan Arnold Godofsky, MD | Cincinnati, OH | 5 years |
| 7-May-18 | Fred Gott, MD | Bowling Green, KY | 96 months |
| 10-Aug-18 | Roy D. Reynolds, MD | Franklin, KY | 50 months |
| 17-Apr-19 | Raymond Noschang, MD | Sycamore Township, KY | Pled guilty |
| 19-Apr-19 | Christopher Nelson, MD | Louisville, KY | |
| 30-Apr-19 | Curtis Edens, MD | Louisa, KY | 2 years probation |
| 29-Jul-19 | Michael Lee Cummings, MD | Albany, KY | 30 months |
| 17-Oct-19 | Mohammed A. H. Mazumder, MD | Prestonburg KY | Pled guilty |

**2.    *Mayfield, Kentucky (Pharmacy Technician No. 1)***

437.    Mayfield, Kentucky is a community of just over 10,000 residents in Western Kentucky located about two hours northeast of Nashville, three hours southwest of St. Louis, and three hours west of Louisville. A quick look at the town's website shows upcoming events like the Mayfield Food Fest, a Rodeo at the Mayfield-Graves County Fairgrounds, an Antique Tractor show, and Religious Art Show hosted by the Mayfield-Graves County Art Guild.[237]

438.    At first blush, Mayfield is not the type of town one might associate with the opioid epidemic. But that is the nature of the opioid epidemic in 2019. It reaches into every corner of our society, from tough inner cities to peaceful country towns like Mayfield where opioids have been pouring in.

439.    In Graves County, where Mayfield is located, there were twenty-three opioid overdose deaths between 2009 and 2013, or an annual rate of 27.1 per 100,000 population.[238]

440.    Walmart's failures under the CSA and state pharmacy laws and regulations have been at the center of the problem in Mayfield. Its pharmacy at 1225 Paris Road dispensed a total of 1,241,855 opioid pills between 2006 and 2012 for a total of 7,953,677 MME.

441.    That means that at the CDC's highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of nearly 36 opioid prescriptions per day. Here is a summary of this Walmart store's dispensing by type of opioid during this time period, particularly Hydrocodone:

---

[237] *See* http://mayfieldky.gov/.

[238] Svetla Savova, et al., Kentucky Injury Prevention and Research Center, *Drug Overdose Deaths in Kentucky, 2000 – 2013*, at 10 (March 6, 2015), http://www.mc.uky.edu/kiprc/projects/ddmarpdak/pdf/KyDrugOverdoseDeaths-2000-2013.pdf.



442.    Despite the opioid epidemic raging in Mayfield, Kentucky at that time, Walmart provided no training on how to recognize and deal with physicians who were suspected of over-prescribing opioids.  Nor did Walmart provide a list of physicians suspected of over-prescribing or of patients suspected of pill shopping.

443.    One Walmart pharmacy technician who worked at the Paris Road Walmart store between October 2016 and October 2018 said her pharmacy never provided her with any training on "red flags" for inappropriate prescriptions, nor did the Walmart pharmacy have a policy or protocol on how to deal with suspicious physicians.  (Pharmacy Technician No. 1)

444.    Because of the significant volume of prescriptions coming through the Paris Road Walmart, she never looked at the Kentucky PDMP for potential pill shopping because her job responsibilities did not give her sufficient time to do so.

445.    At no time during the two years of her employment did the pharmacy do anything to address the ongoing opioid epidemic.  In fact, she was aware of only two patients who were ever denied prescriptions at this pharmacy.

### D.    Specific Examples of Unlawful Dispensing Conduct: New Jersey

#### 1.    *Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in New Jersey*

446.    New Jersey has not been spared from the ravages of the opioid epidemic.  In New Jersey, there were 1,053 confirmed opioid-related drug deaths in 2012. That total rose a staggering 232% to 3,497 confirmed opioid-related drug deaths in New Jersey in 2017—a number that is larger than the population of many New Jersey towns.[239] As reported by the New Jersey 101.5 FM radio station, the epidemic has gotten so bad that staff at the State's libraries—typically the most open buildings in their communities—are being instructed to watch out for users "overdosing inside . . . bathrooms or behind rows of books."[240]

447.    According to national 2009 data analyzed by the National Institute on Drug Abuse, overdose deaths represent only the tip of the iceberg. For every overdose death that year, there were 9 abuse treatment admissions, 30 emergency department visits for opioid abuse or misuse, 118 people with abuse or addiction problems, and 795 non-medical users of opioids. In New Jersey, opioid-related emergency department visits doubled between 2005 and 2014 and rose another 13 percent in 2015. Emergency medical technicians have administered naloxone— the emergency antidote to opioid overdoses—more than 35,000 times from June of 2017 to November 2019.[241]

---

[239]    Drug-Related    Deaths,    New    Jersey    Department    of    Health, https://www.state.nj.us/health/populationhealth/opioid/opioid_deaths.shtml.

[240] David Matthau, *Overdoses in NJ libraries—more signs of the opioid crisis*, New Jersey 101.5 FM Radio (July 6, 2017), http://nj1015.com/overdoses-in-nj-libraries-more-signs-of-the-opioid-crisis/.

[241]    Naloxone    (Narcan    ®)    Incidents,    New    Jersey    Department    of    Health, https://www.state.nj.us/health/populationhealth/opioid/opioid_naloxone.shtml.

448.    Rising opioid use, abuse, and addiction have had negative social and economic consequences far beyond overdoses and hospital visits. According to a 2016 study by a Princeton economist, unemployment increasingly is correlated with use of prescription pain medications. Nearly half of surveyed men not in the labor force said they took pain relievers daily, and two-thirds of them were on prescription medications—compared to just 20% of employed men who reported taking pain medications.[242] Worse still, many of those taking pain medications still said they experienced pain daily—an echo of the CDC's recent conclusion that "there is <u>no good evidence</u> that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely."[243]

449.    According to an analysis by NJ.com, 6.4 of every 1,000 babies in New Jersey were born with NAS in 2014—more than double the 2008 figure. The problem is particularly acute in Atlantic, Cape May and Cumberland counties, where more than one out of every 50 babies in 2014 was born addicted to opioids.[244]

450.    Opioid addiction now outpaces other forms of addiction in demand for substance abuse treatment, and treatment providers are struggling to keep up. In 2016, prescription opioid and heroin abuse accounted for half of the substance abuse treatment admissions (including admissions for alcohol abuse) in New Jersey—more than 37,000 admissions—and accounted for

---

[242] Alan B. Krueger, *Where Have All the Workers Gone?*, Princeton University and National Bureau of Economic Research (Oct. 4, 2016).

[243] 2016 CDC Guideline at 20 (emphasis added).

[244] Stephen Stirling, *'Heroin babies' skyrocketing in N.J. as statewide epidemic grips newborns,* NJ.com (Aug. 12, 2016), https://www.nj.com/healthfit/2016/08/heroin_babies_skyrocketing_in_nj_as_statewide_epidemic _grips_newborns.html.

the overwhelming majority of drug abuse admissions. Yet, the demand for treatment far outstrips the supply. The New Jersey Department of Human Services estimates that 37,000 New Jersey residents needed and wanted substance abuse treatment in 2016 but did not receive it.[245]

451.    A recent, even more sinister problem stemming from the prescription opioid epidemic involves fentanyl—a powerful opioid carefully prescribed for cancer pain or in hospital settings that, in synthetic form, is now making its way into New Jersey communities through a booming trafficking network. Drug dealers are mixing fentanyl into heroin because it can be cheaply produced and creates an intense high. Patients who moved from prescription opioids to heroin may now find themselves graduated to heroin plus fentanyl.

452.    Fentanyl has been linked to an increasing number of the State's overdoses. Fentanyl was a factor in 42 New Jersey overdose deaths in 2015, and rose to be a factor in 1429 deaths in 2017.[246] Fentanyl is 50 times more potent than heroin, and can quickly induce death in opioid-naïve users. And fentanyl abuse is often a game of Russian roulette, with users not knowing what mixture of fentanyl and heroin they are taking.

453.    Despite having some 70 stores located all over the State of New Jersey, Walmart's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

---

[245] Suzanne Borys, *Substance Abuse Overview 2016 Statewide,* NEW JERSEY DEPARTMENT OF HUMAN SERVICES, (June 2017), https://www.nj.gov/humanservices/dmhas/publications/statistical/Substance%20Abuse%20Overview/2016/statewide.pdf

[246]    Drug-Related    Deaths,    New    Jersey    Department    of    Health, https://www.state.nj.us/health/populationhealth/opioid/opioid_deaths.shtml.

454. Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Walmart pharmacies), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 16-Feb-05 | Muni Faswala, MD | Millville, NJ | indicted/fugitive |
| 30-Sep-05 | John Sireci, DO | Woodbury, NJ | 3 years probation |
| 30-Jun-06 | James Stanch, MD | Manahawkin, NJ | 57 months |
| 10-May-07 | Philip Mach, MD | New Brunswick, NJ | 15 months |
| 17-Sep-07 | Joan Jaszczult, MD | Bloomfield, NJ | 132 months |
| 10-Feb-09 | Pravin Vasoya, MD | Mount Laurel, NJ | 57 months |
| 25-Mar-09 | Pankaj Agrawal, MD | Sicklerville, NJ | 63 months |
| 30-Mar-09 | Philip Eatough, MD | Middleton, NJ | 41 months |
| 1-Nov-09 | Bipin Parikh, MD | Jersey City, NJ | 3 years |
| 4-May-10 | Manuel Nigalan, MD | Northfield, NJ | 3 years |
| 1-Jan-12 | Augustine Lee, MD | Trenton, NJ | 1 year, 1 day |
| 13-Jan-12 | Ronald Rahman, MD | Sicklerville, NJ | 25 months |
| 1-Jun-12 | Michael Chung Kay Lam, MD | Fort Lee, NJ | 3 years probation |
| 17-Sep-12 | Eugene Demczuk, MD | Livingston, NJ | 6 months, lost CDS license |
| 1-Oct-12 | William Kropinicki, MD | Lawrence, NJ | 7 years |
| 19-Dec-12 | Priscilla Ilem, MD | Wayne, NJ | 5 years probation |
| 1-Jan-13 | Carnig Shakajian, MD | Park Ridge, NJ | 5 years |

| | | | |
|---|---|---|---|
| **22-Jul-13** | Hassan Lahham, MD | New York, NY | 108 months |
| **29-Jul-13** | Jacqueline Lopresti, MD | Fair Haven, NJ | 57 months |
| **17-Dec-13** | Michael Durante, MD | Nutley, NJ | 136 months |
| **10-Jul-14** | Leonard Stefanelli, PharmD | East Hanover, NJ | 37 months |
| **6-Mar-15** | Paul DiLorenzo | Ocean Township, NJ | 46 months |
| **1-Apr-15** | David C. Lee, MD | Medford, NJ | license suspended |
| **29-Jun-15** | Eugene Evans Jr., MD | Roselle Park, NJ | 5 years |
| **13-May-16** | Jay Rosen, MD | South Jersey, NJ | retired, license permanently revoked |
| **14-Jun-16** | William R. Wolfe, MD | Voorhees, NJ | license suspended |
| **24-Jul-16** | Vincent Esposito, MD | Madison, NJ | 2 years probation |
| **29-Jul-16** | Michael Rutigliano, MD | Paramus, NJ | license suspended |
| **29-Jul-16** | Dyung Kang, MD | Little Falls, NJ | indicted |
| **3-Aug-16** | John R. McGee, MD | Beyonne, NJ | license suspended 5 years |
| **9-Aug-16** | Herbert Rudolph, MD | Tuckerton, NJ | license suspended 5 years |
| **26-Aug-16** | Anthony Greenberg, MD | Newton, NJ | license temporarily suspended |
| **16-Sep-16** | Darius Jasinski, MD | Pequannock, NJ | license suspended, 3 years |
| **28-Oct-16** | James Ludden, DPM | Red Bank, NJ | license suspended |
| **7-Nov-16** | Thomas Newmark, MD | Cherry Hill, NJ | license suspended permanently |
| **11-Nov-16** | Mudassar Sharif, MD | Kearny, NJ | 5 1/2 years |
| **22-Nov-16** | Manoj Patharkar, MD | South Amboy, NJ | license revoked |
| **23-Dec-16** | Vasili Moschowitz, MD | Bernegat, NJ | license revoked |

| | | | |
|---|---|---|---|
| **8-Feb-17** | Ronald Intelisano, DO | Blackwood, NJ | license suspended 5 years |
| **1-Mar-17** | Mohamed Kawam Jabakji, MD | Prospect Park, MJ | license revoked |
| **1-Mar-17** | Kenneth Lewandowski, MD | Middletown, MJ | 6 years |
| **2-Mar-17** | Chowdhury Azam, MD | Edison, NJ | license suspended 5 years |
| **2-Mar-17** | Steven Forman, Podiatrist | Clementon, NJ | license suspended 5 years |
| **2-Mar-17** | Ronald Scott, PA | Toms River, NJ | license revoked |
| **2-Mar-17** | Byung Kang, MD | Little Falls, NJ | indicted |
| **28-Jun-17** | James Morales, MD | Toms River, NJ | 1 year, 1 day |
| **8-Dec-17** | James Cowan, Jr., MD | Ridgewood, NJ | license revoked |
| **22-Dec-17** | Binod Sinha, MD | Central New Jersey | license revoked |
| **4-Mar-18** | Vivienne Matalon, MD | Cherry Hill, NJ | license revoked |
| **10-Sep-18** | Kenneth Sun, MD | Phillipsburg, NJ | license revoked |
| **1-Nov-18** | Martin Fried, MD | Ocean Township, NJ | charged |
| **3-Dec-18** | George Beecher, MD | New Providence, NJ | 10 years |
| **21-Mar-19** | Alan Faustino, MD | Atlantic City, NJ | 4 years |
| **30-Mar-19** | Roberg Lellemand, Jr. | Old Bridge, NJ | Lost license |
| **26-Apr-19** | Craig Gialanella, MD | Essex County, NJ | 5 years suspended |
| **13-May-19** | Robert Delagente, MD | Oakland, NJ | charged |
| **4-Oct-19** | Liviu Hoca, MD | Manahawkin, NJ | 3 years probation, lost license |
| **4-Dec-19** | Morris "Moishe" Starkman, MD | Bordentown, NJ | surrendered license in 2018, criminally charged 12/4/2019 |

### 2. *Deptford Township, New Jersey (Pharmacist No. 1)*

455.    Deptford Township is located in Gloucester County, New Jersey, which is made up of largely quiet suburbs just across the river from Philadelphia and northwest of Atlantic City with a population of just over 290,000 people.  New Jersey state statistics show, however, that in 2015 the opioid epidemic not only infested New Jersey's urban areas, but the more unlikely places where suburban stories of abuse have developed into a sad, profound narrative.  Largely suburban Gloucester County is on that list.[247]

456.    In Gloucester County, the heroin death rate was 17.3 deaths per 100,000 people in 2014 – nearly seven times the national average, according to the New Jersey Department of Health.[248] Between 2004 and 2014, at least 53 people died of heroin or opiate overdoses in Williamstown, an unincorporated community located almost entirely in Monroe Township, Gloucester County.  Williamstown is not alone. From 2004 to 2014, Washington Township, with a population of about 50,000, was the site of at least 23 heroin and opiate-related deaths. Glassboro, home to 20,000 people, had 11 in the same period, and Deptford, which has a population of 30,000, had about 18. Even tiny Newfield, a town of fewer than 2,000 people, had four overdose deaths.

---

[247] Tom Davis, *30 N.J. Towns With The Most Heroin Abuse, New Data Says*, Morristown Patch, (Sept. 1, 2016) https://patch.com/new-jersey/morristown/30-new-jersey-towns-most-heroin-abuse-latest-2016-data-released.

[248] Amy Polhamus, *Inside the N.J. town with a heroin death-rate 25 times the national average*, NJ.com, (Jan. 28, 2016) https://www.nj.com/gloucester-county/2016/01/meet_the_town_leading_the_fight_against_gloucester.html.

457.    The two Walmart stores in Deptford Township dispensed significant amounts of opioids.  Its pharmacy at 2000 Clements Bridge Road between 2006 and 2012 dispensed some 664,405 doses of opioids, or 7,384,960 MME.

458.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 32 opioid prescriptions per day.

459.    The pharmacy at 820 Cooper Street between 2006 and 2012 dispensed some 670,525 doses of opioids, or 6,957,217 MME.

460.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 30 opioid prescriptions per day.

461.    A former Walmart pharmacist (Pharmacist No. 1) who was the store manager at the Deptford, New Jersey store from 2010 to 2019 specifically remembered that, despite concerns that he may be prescribing inappropriate opioids prescriptions, they dispensed opioids even though they suspected the prescribers to be writing inappropriate prescriptions.

462.    One such doctor was Dr. Steven Forman, a podiatrist with a practice in Gloucester County.  This former Walmart pharmacy manager recalls the two pharmacies where he worked regularly filled prescriptions for Dr. Forman even though they suspected he was over-prescribing opioids. Dr. Forman regularly wrote prescriptions for 120 30mg oxycodone tablets (the most often abused oxycodone formulation). Dr. Forman would later lose his medical license and pay fines[249]

---

[249] Tom Davis, *31 N.J. Doctors Lost Jobs In Statewide Opioid Crackdown*, Toms River Patch (March 2, 2017) https://patch.com/new-jersey/tomsriver/31-n-j-doctors-lost-jobs-statewide-opioid-crackdown.

related to investigations going back several years which accused him of indiscriminately prescribing controlled dangerous substances.[250]

463.    This former store manager said that, despite a steadily worsening opioid epidemic in New Jersey, Walmart provided no corporate policies, protocols or requirements for opioids for what to do when they encountered suspicious prescriptions.  This was the case in spite of the fact that the opioid problem in Gloucester County was "going off the rails" as early as 2012.

464.    This changed somewhat in or around 2016.  That year, Walmart provided a list of warning signs for which pharmacists should look out when filling prescriptions.  The company also later added a computer-based learning module to its corporate training courses that outlined how to handle warning signs for suspicious prescriptions.  Even then, however, Walmart did not provide its pharmacists with lists of physicians it suspected of over-prescribing nor of patients it suspected of abusing opioids.

465.    Also, in 2016, Walmart instituted a policy requiring pharmacists to fill out an online form and submit it through the company internal electronic channels if they refused to fill a prescription.  The form asked for the name of the patient, the doctor and the reason for refusing to fill.

466.    According to this former employee, occasionally, but not often, Walmart would issue an internal report about a doctor who had been cut off because the company had received multiple reports that pharmacists were refusing to fill prescriptions.

---

[250] Kevin Kelly, *State disciplines four South Jersey medical providers to combat opioid crises*, Philly Voice (March 2, 2017) https://www.phillyvoice.com/state-disciplines-four-south-jersey-medical-providers-combat-opioid-crises.

467.    Even then, Walmart management still put extraordinary pressure on pharmacists to meet prescription volume goals. The metrics of profit margin and prescription count accounted for 25 percent of the goals needs to be eligible for bonuses and raises.  Nothing in the metrics measured or held them accountable for ensuring only appropriate and/or medically prescriptions were filled.

468.    And bonuses could be significant.  This former manager said he had earned a $19,000 bonus for several years because his prescription volume had grown more exponentially than forecast.

469.    As the epidemic worsened, Walmart eventually eliminated counting the number of prescriptions for controlled substances in the bonus calculation.  However, the company still continued to measure store profit margins, which did include the sale of controlled substances and opioids.

**E.**    **Specific Examples of Unlawful Dispensing Conduct:  New Mexico**

**1.**    ***Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in New Mexico***

470.    Since 2008, New Mexico has had one of the highest rates of drug overdose death in the United States. Between 2008 and 2012, almost every county in New Mexico had a higher drug overdose death rate than the rate for the entire United States. In some New Mexico counties, the overdose death rates were more than five times the national rate. According to CDC, New Mexico had the third highest drug overdose death rate in the nation in 2013, the second highest in 2014, and remained in the highest age-adjusted rate category in the nation in 2015.[251]

---

[251] Hector Balderas, New Mexico Attorney General, *Fighting the Opioids Crisis in New Mexico*, https://www.nmag.gov/fighting-the-opioid-crisis-in-new-mexico.aspx.

471.    The New Mexico Department of Health estimates that in 2007 alone prescription opioid abuse and misuse cost New Mexico $890 million, taking into account costs such as excess medical and prescription costs, lost earnings from premature deaths, and the costs of correctional facility and police services.[252]

472.    Despite having some 53 stores located all over the State of New Mexico, Walmart's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

473.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Walmart pharmacies), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| **15-Sep-04** | Jesse Henry, MD | Albuquerque, NM | 4 years probation |
| **26-Apr-13** | Gloria Vigil, NP | Albuquerque, NM | 41 months |
| **28-Aug-13** | Jason Lucas | Albuquerque, NM | 2 years probation |
| **4-Mar-15** | David Jones, NP | Portales, NM | charged (deceased) |
| **11-Jan-18** | Sophia Ann Villalobos, NP | Carlsbad, NM | 12 months |
| **6-Sep-18** | Orrin K. McLeod, D.O. | Albuquerque, NM | $300,000 |
| **9-May-19** | Pawankumar Jain, MD | Las Cruces, NM | 9 years |
| **25-Jul-19** | Andrei Marchenko, NP | Albuquerque, NM | Charged in three overdose deaths |

---

[252] *Id.*

474.    Since 2008, New Mexico has had one of the highest rates of drug overdose death in the United States. Between 2008 and 2012, almost every county in New Mexico had a higher drug overdose death rate than the rate for the entire United States. In some New Mexico counties, the overdose death rates were more than five times the national rate. According to CDC, New Mexico had the third highest drug overdose death rate in the nation in 2013, the second highest in 2014, and remained in the highest age-adjusted rate category in the nation in 2015.[253]

475.    The New Mexico Department of Health estimates that in 2007 alone prescription opioid abuse and misuse cost New Mexico $890 million, taking into account costs such as excess medical and prescription costs, lost earnings from premature deaths, and the costs of correctional facility and police services.[254]

### 2.    *Alamogordo (Pharmacy Technician No. 2)*

476.    The opioid epidemic has been particularly devastating in Otero County. From 2014 to 2016, there have been 42 drug overdose deaths in Otero County for a drug overdose mortality rate of 22 deaths per 100,000 residents.[255] From 2012 to 2014, there were 41 deaths, and from 2004 to 2010 there were 84 drug poisoning deaths.[256]

477.    According to the New Mexico Department of Health, from 2012 to 2016 there were 66 deaths due to drug overdoses in Otero County for a drug overdose death rate of 20.7.[257] Of

---

[253] Hector Balderas, New Mexico Attorney General, *Fighting the Opioids Crisis in New Mexico*, https://www.nmag.gov/fighting-the-opioid-crisis-in-new-mexico.aspx.

[254] *Id*.

[255] Drug Overdose Deaths, 2016 tab, *County Health Rankings & Roadmaps*, http://www.countyhealthrankings.org/app/new-mexico/2018/measure/factors/138/data.

[256] *Id.* at 2014 tab.

[257] *New Mexico's Indicator-Based Information System (NM-IBIS)*, NEW MEXICO DEP'T OF

those deaths, at least 37 involved prescription opioids.[258] In 2015 there were 14 deaths and in 2014 there were 16 deaths for a death rate of 24.6 that year.[259]

478.    The opioid epidemic is also increasing hospital visits and costs. From 2012 to 2016 there were 101 opioid overdose related Emergency Department visits in the County.[260]

479.    The opioid epidemic is also impacting children. In 2015, 9.9% of 9 to 12th graders in the County had used a painkiller to get high. In addition, 3.9% of those in the County in grades 9 to 12 had used heroin.[261]

480.    According to a former Walmart pharmacy technician who worked at the Alamogordo Walmart at 233 S. New York Avenue, pharmacists would see patients every day who were prescribed relatively large quantities of opioids and for multiple varieties that included hydrocodone, oxycodone and methadone. (Pharmacy Technician No. 2)

481.    This pharmacy technician explained that pharmacies were "ground zero for the [opioids] epidemic." Despite the epidemic environment and that large numbers of patients who filled prescriptions at her pharmacy, she had "absolutely no formal training on what to do" to

---

HEALTH, https://ibis.health.state.nm.us/indicator/view/DrugOverdoseDth.Cnty.html.

[258] New Mexico Dep't Of Health, *New Mexico Substance Abuse Epidemiology Profile (November 2017)* 35, http://www.nmprevention.org/Project_Docs/NM%20Substance%20Abuse%20State%20Epi%20 Profile%202017Nov.pdf.

[259] *Overdose Deaths Decline in Nearly Two-Thirds of New Mexico's 33 Counties*, New Mexico Dep't Of Health (September 20, 2016), https://nmhealth.org/news/information/2016/9/?view=484.

[260] New Mexico Dep't of Health, New Mexico Substance Abuse Epidemiology Profile, *supra*, at 38.

[261] *Id.* at 110.

identify fraudulent patients or doctors.  Nor did Walmart have any policies or procedures in place on when to refuse to fill such prescriptions or how to handle such customers.

482.     The Alamogordo Walmart pharmacy filled enormous amounts of opioids between 2006 and 2012, filling 3,293,346 dosage units or 36,304,509 MME.

483.     That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 157 opioid prescriptions per day. Here is a chart showing the dispensing at this one Walmart between 2006 and 2012:



484.     Despite being a town of approximately 30,000 people, the Alamogordo Walmart was routinely in the top 3-4% of dispensing pharmacies in all of New Mexico, ranking in the top 4% in 2006, top 3% in 2007 and 2008, top 2 % in 2009, top 1% in 2011, and top 4% in 2012.

485.     Many former Walmart pharmacy employees recall filling prescriptions at Walmart for "pill mill" doctors. One former pharmacist who worked in Alamogordo, New Mexico recalled Dr. Mark Beale as being a heavy prescriber. Beale was in his Alamogordo, New Mexico office on

Tuesdays and, because of his copious prescriptions, Tuesdays were usually busy days at the pharmacy. "If you were doctor shopping, that was the doctor you wanted," she said. "He would pretty much write everything you wanted." (Pharmacy Technician No. 2).

486.     Dr. Mark Beale was arrested in April of 2019 for raping six (6) of his patients and also "may have prescribed medications to some of the women without properly diagnosing their symptoms."[262] Twenty-two percent of Dr. Beale's 206 patients had filled at least one prescription for an opioid, compared to an average of 3 percent.[263]

487.     The same pharmacy technician also remembered Dr. Brett Butz as being a heavy opioid prescriber. "We got a ton of scripts from him," she said. "He seemed excessive." Despite Dr. Butz's suspicious prescribing habits, the pharmacy technician did not recall any instances when the pharmacy refused to fill one of his prescriptions.

488.     Despite what it knew was a dire epidemic ravaging the country, including the fact that it was aware of over-prescribing by clearly pill mill doctors whose patients were receiving opioids prescriptions, Walmart did not maintain or share with its pharmacy staffs a list or database of suspicious health care providers who were prescribing or patients who were receiving inappropriate amounts of opioids.  (Pharmacy Technician No. 2)

**3.       *Albuquerque (Dr. Marcilla)***

---

[262] Bethany Freudenthal, *Las Cruces psychiatrist who allegedly had sex with patients charged with rape,* LAS CRUCES SUN NEWS, April 2, 2019, https://www.lcsun-news.com/story/news/local/2019/04/12/las-cruces-psychiatrist-mark-beale-who-allegedly-had-sex-patients-charged-rape/3451904002/.

[263] ProPublica, *Prescriber Checkup: The Doctors and Drugs in Medicare Part D*, https://projects.propublica.org/checkup/providers/1164547709.

489.    The opioid epidemic has been particularly devastating in Bernalillo County. According to the New Mexico Department of Health, from 2013 to 2017 there were 902 deaths due to drug overdoses in Bernalillo County for a drug overdose death rate of 26.3 per 100,000 residents.[264]

490.    Similarly, from 2012 to 2016 there were 923 drug overdose deaths in Bernalillo County for a death rate of 27.1 during that period.[265] Of those deaths, at least 448 involved prescription opioids.[266] More people have died in Bernalillo County due to drugs – and opioids specifically – than in any other county in New Mexico.[267]

491.    The opioid epidemic is also increasing hospital visits and costs. From 2012 to 2016 there were 2,482 opioid overdose related Emergency Department visits in the County for a rate of 72.8 such visits per 100,000 residents.[268]

492.    The opioid epidemic is also impacting children. In 2015, 6.4% of 9th to 12th graders in the County had used a painkiller to get high.[269] In addition, 2.1% of those in the County in grades 9 through 12 had used heroin.[270]

---

[264] *New Mexico's Indicator-Based Information System (NM-IBIS)*, NEW MEXICO DEP'T OF HEALTH, https://ibis.health.state.nm.us/indicator/view/DrugOverdoseDth.Cnty.html.

[265] New Mexico Dep't of Health, New Mexico Substance Abuse Epidemiology Profile, *supra*, at 32.

[266] *Id.* at 35.

[267] *Id.* at 32, 35.

[268] *Id*. at 38.

[269] *Id*. at 110.

[270] *Id*.

493.     Walmart store-level data shows the inappropriate and fraudulent dispensing at the 11 Walmart pharmacies in Bernalillo County. According to DEA ARCOS data, the 10 Bernalillo County Walmart stores dispensed 20,365,421 doses of opioids or 229,015,358 MME between 2006 and 2012. The annual average was 32,716,479 MME per year.

494.     That means that at the highest bounds of the recommended MME per day (90 MME/day) the Walmart stores in Bernalillo were supplying enough opioid prescriptions for an average of 996 regimens of 90 MME/every day for seven years.

495.     Dr. Marcilla worked from 2011 to 2016 at numerous Bernalillo County Walmart pharmacies, including at 310 San Mateo Blvd, 2550 Coors Blvd., NW, 2701 Carlisle Blvd, NE, and 2266 Wyoming Blvd, NE.

496.     During Dr. Marcilla's time working as a floater pharmacist at these Bernalillo County Walmart stores, training for pharmacists was generally limited to how to use the prescription dispensing software, Connexus. The company also trained pharmacy managers in all other policies and procedures that other managers in the store needed to know, but these policies rarely, if ever, applied to the pharmacies.

497.     Dr. Marcilla was totally unprepared for the types of patients he saw at the Bernalillo Walmart pharmacies he worked at, patients who were being treated with multiple medications and some who were being prescribed high doses of opiates.

498.     It was not until New Mexico mandated the use of its PDMP in 2012 that Dr. Marcilla felt he had the data and support needed to identify problem patients and prescribers.

499.     The difficulty then, however, was the PDMP data was not part of the pharmacist's work station computer, which had limited internet access only to Walmart's Connexus database, and no external internet access.  This meant that, in order to check the PDMP database, pharmacists

were required to check a computer being used by the technicians. This inconvenience only added to the pharmacist's intense working environment to meet Walmart's metrics.

500.    And, in Dr. Marcilla's experience, Bernalillo Walmart pharmacists were under extraordinary pressure to meet customer demands and to meet the company's volume- and profit-based performance metrics. In Dr. Marcilla's experience working at more than 20 Walmart stores, pharmacists were evaluated on prescription volume using metrics that are all focused on profits. These metrics had no measurements for patient outcomes. Rather, pharmacists were tasked with filling prescriptions quickly and with meeting other volume-based measurements.

501.    The company had perhaps a dozen or more goals that it set for pharmacists, including the number of prescriptions filled, and number of vaccinations given. District managers reviewed that information with the store multiple times a week, even daily if the store was behind on meeting the goals.

502.    However, Walmart never provided any guidance on what pharmacists should do when they found a suspicious patient through the New Mexico PDMP.

503.    At these Bernalillo Walmart pharmacies, he regularly saw examples of suspicious or inappropriate dispensing. For example, he was asked in 2011 to take over for the Pharmacy Manager, Mike Black, at the 8511 Golf Course Road, NW Walmart pharmacy. When he arrived at the pharmacy, he saw that Black was being escorted from the premises by several Walmart Loss Prevention employees and the District Manager, Jarvis Mixon. He found out later from others working in the pharmacy that Black had been terminated for alleged diversion of controlled substances. Two weeks later, Black died of an apparent opioids overdose.[271]

---

[271] Obituary for Dr. Michael Joseph Black, Pharm.D (May 8, 1981-May 9, 2011), ObitTree,  .

504.    Dr. Marcilla worked for approximately six months at the Golf Course Road Walmart pharmacy.  During that time, he saw numerous questionable prescriptions being filled, including numerous scripts for Phernergan, a drug used with opioids to augment opioid-induced euphoria.  In a number of instances, Dr. Marcilla noted that the Phenergan prescriptions had expired, so he refused to fill them.  When he told customers he would not fill these scripts, they told him that the prior pharmacist (Black) had regularly filled these prescriptions even though they were expired.

505.    Dr. Marcilla also noted that a large Cadillac Escalade being driven by a patient on Medicaid and welfare would regularly appear at the pick-up window to pick up high dose Oxycodone tablets.  He recalls the technicians telling him that they believed the driver of the Escalade was engaged in diversion and had some kind of arrangement with Black to fill scripts that otherwise were questionable.

506.    Dr. Marcilla mentioned these concerns to the replacement store manager at the Golf Course Road store, but to his knowledge nothing was ever done to investigate whether Black had been engaged in any inappropriate activity.  Nor did any Walmart management provide any kind of guidance, nor instruct the Golf Course Road employees about what the diversion issues were that led to Black's being terminated.

### 4.    *Española (Dr. Marcilla)*

507.    Rio Arriba County, just north of Santa Fe, is a Georgia O'Keeffe landscape of juniper-dotted desert and mountain valleys populated mostly by Hispanics who proudly trace their

---

https://obittree.com/obituary/us/new-mexico/albuquerque/daniels-family-funeral-services/dr-michael-black-pharmd/883951/index.php.

lineage to settlers of the 1600s — and who, two decades ago, discovered that their county had the nation's highest per capita rate of deaths from opioid overdoses. Hundreds of Rio Arriba families have been struggling to live with a multigenerational plague of opioids.[272]

508.    Rio Arriba County was reputedly the first U.S. county to be struck by the opioid epidemic in the late 1990s and has been ranked by the CDC as the county with the highest rate of opioid overdose deaths for two decades, only recently dropping to fourth place nationally.[273]  Rio Arriba County had the highest total drug overdose death rate (85.8 deaths per 100,000) among all New Mexico counties during 2011-2015.[274]

509.    Walmart's failures under the CSA and state pharmacy laws and regulations have been at the center of the problem in Española and Rio Arriba County.  According to DEA ARCOS data, its pharmacy at 1610 North Riverside Drive dispensed a total of 2,006,889 opioid pills between 2006 and 2012 for a total of 14,583,685 MME into this town of 10,495 people, or 1,385 MME for every man, woman and child in Española.

510.    That means that at the CDC's highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of nearly 63 opioid prescriptions every day for seven years. Below is a summary taken from DEA ARCOS data of this Walmart store's dispensing by type of opioid during this time period, particularly Hydrocodone:

---

[272] Eric Eckhold, *A Grim Tradition, and a Long Struggle to End It*, New York Times (April 2, 2008), https://www.nytimes.com/2008/04/02/us/02overdose.html.

[273] Resolution No. 2018-064, Rio Arriba County Board of Commissioners, *A Resolution Protesting CDC Designation Of Counties Prioritized For Opioid Funding* (May 31, 2018), http://www.rio-arriba.org/pdf/agendas_and_calendars/2018_05_24/resolution_2018_064.pdf.

[274] New Mexico's Indicator-Based Information System (NM-IBIS), NEW MEXICO DEP'T OF HEALTH, https://ibis.health.state.nm.us/indicator/view/DrugOverdoseDth.Cnty.html.



511.    Dr. Marcilla worked as a floater pharmacist at the Española Walmart and saw first-hand the impact of the opioid epidemic and how little the company was doing to monitor inappropriate prescribing.  He estimates that between 70% and 80% of the customers at the Española store were Medicaid beneficiaries and that at least 40% to 50% of the prescriptions filled were for opioids and benzodiazepines.

512.    Daily there were lines of 10-30 customers all day long at the Española Walmart, seeking opioid prescriptions (frequently multiple prescriptions of hydrocodone in combination with sedative hypnotics, anxiolytics, antiemetics, muscle relaxants and anticonvulsants).  Nearly every day when he arrived to open the Española pharmacy in the morning, there would be a line of 3-4 customers who had received enough opiates at the local hospital emergency room to make it through the night and were wanting their prescriptions filled to feed their addiction.

513.    The lines at the pharmacy were not limited to just the Española Walmart. Dr. Marcilla recalled lines similar to the ones in Española at nearby stores in Santa Fe and nearly every

Walmart where he worked, often snaking from the pharmacy section and out into the other sections in the store.

514.    Nearly weekly Dr. Marcilla learned from family members, technicians, or the store manager that a customer had overdosed and died.  He regularly received affidavits stating a patient had overdosed and died from family members who were there seeking the patient's prescription drug history.  These affidavits were required by Walmart in order to release the drug history, and were stored by the company as part of its HIPAA records.  Clearly, the company was on notice of the magnitude of the deaths occurring in Española and Rio Arriba County and the patient's associated history of taking opioids.

515.    Despite what was clearly an environment where the Española Walmart was fueling the epidemic, Walmart did nothing to change its dispensing practices to enhance its compliance with its obligations under the CSA or state pharmacy laws and regulations.  There was no list provided of physicians who were suspected of writing inappropriate and medically unnecessary prescriptions, nor any training about how they were to handle patients seeking to fill these suspect prescriptions.  Nor did Walmart make any effort to limit the volume of opioids being dispensed at the Española store.

516.    Effectively, Walmart's inaction in the face of this environment at the Española Walmart turned what should have been a place where patients could trust pharmacists to provide medical assistance and appropriate prescriptions into the exact opposite, a place where patients were receiving inappropriate and medically unnecessary prescriptions and then were regularly overdosing and dying.

### 5. *Farmington (Dr. Marcilla)*

517. Farmington, New Mexico and San Juan County have been deeply affected by the opioid crisis. San Juan County reported 111 overdose deaths from 2010 to 2014. In 2016, San Juan County experienced a death due to opioid overdose rate of 17.5 per 100,000 persons.

518. The opioid crisis has reshaped daily reality for San Juan County in numerous ways, including but not limited to increased and intensified emergency medical responses to overdoses; increased drug-related offenses affecting law enforcement, jails, and courts; enormous resources spent on community and social programs to treat those with opioid use disorders; higher workers' compensation costs for prescription opioids and opioid-related claims; and ultimately prevalent opioid abuse throughout the County, including in public places.

519. Walmart store-level data shows the inappropriate and fraudulent dispensing at the Farmington Walmart pharmacies at 4600 E Main Street and 1400 West Main Street. Farmington has a population of 45,626 people. According to DEA ARCOS data, between 2006-2012 the two Farmington Walmart stores dispensed 4,612,504 doses of opioids 61,434,645 MME. The annual average was 8,776,377 MME.

520. That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying enough opioid prescriptions for an average of 267 regimens per day.

521. Dr. Marcilla worked as a floater pharmacist at the Farmington Walmart stores in 2015-2016 and saw first-hand the impact of the opioid epidemic and how little the company was doing to monitor inappropriate prescribing. He estimates that between 70% and 80% of the customers at the Farmington store were Medicaid beneficiaries and that at least 40% to or more of the prescriptions filled were for opioids, anxiolytics, and muscle relaxants.

165

522.    The Farmington West store served as the closest pharmacy to the Navajo Reservation, another community that has been particularly hard hit with substance use disorders. Many native patients received high dose narcotics despite multiple co-morbidities related to alcoholism, diabetes and advanced cardiovascular disease.

523.    Daily there were lines of 10-20 customers all day long at the Farmington Walmart stores, most seeking opioid prescriptions. Nearly every day when he arrived to open the Farmington pharmacy in the morning, there would be a line of 3 to 4 customers who had received enough opiates at the hospital emergency room to make it through the night and were wanting their prescriptions filled to feed their addiction.

524.    Nearly weekly Dr. Marcilla learned from family members, technicians, or the store manager that a customer had overdosed and died.  He regularly received affidavits stating a patient had overdosed and died from family members seeking the prescription drug history.  These affidavits were required by Walmart in order to release the drug history, and were stored by the company as part of its HIPAA records.  Clearly, the company was on notice of the magnitude of the deaths occurring in Farmington and San Juan County and the patient's associated history of taking opioids.

525.    Despite what was clearly an environment where the Farmington Walmart stores were fueling the epidemic, Walmart did nothing to change its dispensing practices to enhance compliance with its obligations under the CSA or state pharmacy laws and regulations.  There was no list provided of physicians who were suspected of writing inappropriate and medically unnecessary prescriptions, nor any training about how they were to handle patients seeking to fill these suspect prescriptions.  Nor did Walmart make any effort to limit the volume of opioids being dispensed at the Farmington stores.

526.    In fact, most of the pharmacist's time, when not dispensing, was spent either reviewing sales and inventory data or reviewing/researching/writing SCRT reports which had become a priority to district managers as a result of high volume of customer complaints.

527.    Effectively, Walmart's inaction in the face of this environment at the Farmington Walmart stores turned what should have been a place where patients could trust pharmacists to provide medical assistance and appropriate prescriptions into the exact opposite, a place where patients were receiving inappropriate and medically unnecessary prescriptions and then regularly overdosing and dying.

### 6.    *Las Cruces (Pharmacist No. 2)*

528.    Doña Ana County, home to Las Cruces, in particular, is no stranger to drug overdoses and drug arrests. Doña Ana County ranks 4th out of 33 counties in New Mexico for opioid-related overdoses.

529.    Las Cruces is the seat of Doña Ana County.  In 2017 the estimated population was 101,712, making it the second largest city in the state, after Albuquerque. Las Cruces is the economic and geographic center of the Mesilla Valley, the agricultural region on the floodplain of the Rio Grande.

530.    The County has the fourth highest number of opioid-related deaths out of 33 counties in New Mexico.[275]

---

[275] Jamie Warren, *Federal grant will help Dona Ana County address opioid abuse*, KVIA, (March 28, 2017), https://www.kvia.com/news/new-mexico/federal-grant-will-help-dona-ana-county-address-opioidabuse/ 421157015.

531.    From 2014 to 2016, 104 people died from drug overdoses in Doña Ana County, for a drug overdose mortality rate of 16 deaths per 100,000 population.[276] Similarly, from 2012 to 2014, another 104 people died from drug overdoses in the County.[277]

532.    From 2012 to 2016, the overdose death rate per 100,000 residents in the County was 17.3 per 100,000 people.[278]

533.    A large contributor to the epidemic in the County was Dr. Pawankumar Jain, a notorious pill mill doctor who operated in Las Cruces, in 2016 pled guilty to prescribing painkillers to patients—including Government Program beneficiaries—with no legitimate medical purpose.[279] Jain had been a licensed physician with a neurology subspecialty who operated a pain management medical practice in Las Cruces. Jain's medical license was suspended in June 2012, and subsequently revoked in December 2012 by the New Mexico Medical Board.

534.    Jain specifically admitted examining one patient on Nov. 25, 2009, who is identified in the indictment as "M.E.B." Jain admitted that he conducted only a superficial examination of M.E.B. before writing M.E.B. two prescriptions for methadone that were outside

---

[276]    County Health Rankings & Roadmap, Drug overdose deaths, 2018 tab, http://www.countyhealthrankings.org/app/new-mexico/2018/measure/factors/138/data.

[277]    *Id.* at 2016 tab.

[278]    NEW MEXICO DEP'T OF HEALTH, *New Mexico's Indicator-Based Information System (NM-IBIS)*, https://ibis.health.state.nm.us/community/highlight/profile/DrugOverdoseDth.Cnty/GeoCnty/13.html.

[279]    Press Release, Dist. of New Mexico U.S. Attorney's Office, Former Dona Ana County Doctor Sentenced to 108 Months for Conviction on Unlawful Distribution of Prescription Painkillers and Health Care Fraud Charges (May 9, 2019), https://www.justice.gov/usao-nm/pr/former-dona-ana-county-doctor-sentenced-108-months-conviction-unlawful-distribution.

the usual course of medical practice and not for any legitimate medical purpose. Each prescription was for 270 tablets of 10 mg methadone. Jain further admitted that he committed health care fraud because he knew these unlawful prescriptions would be submitted to Medicare for payment and that he intended for Medicare to pay for the prescriptions.[280]

535. Jain also acknowledged that M.E.B. died two days after filling the second methadone prescription. According to evidence at the sentencing hearing, M.E.B. died of respiratory depression due to the methadone Jain prescribed.

536. The New Mexico Medical Board suspended Jain's license in June 2012, and revoked his license in December 2012. In 2011, Dr. Jain had been the top prescriber of pain medicines in all of New Mexico, writing prescriptions for more than three million doses of medication to more than 3,200 patients. The second-ranked prescriber was the *entire staff* of residents at the University of New Mexico Hospital, which prescribed 500,000 fewer doses for seven times as many patients.[281]

537. As an example, for just one patient over the course of one year, Jain prescribed 960 tablets of the oxycodone 80mg (the strongest formulation of oxycodone available), 1260 tablets of oxycodone/APAP 10/325mg, and 270 tablets of oxycodone 30mg tablets (the most commonly abused formulation). This included individual prescriptions as high as 180 tablets of oxycodone 80mg and 270 tablets of oxycodone 30mg prescribed the same day.

---

[280] *Id.*

[281] *Id.*

538.    Many of Jain's patients were Government Program beneficiaries. In fact, Jain specifically targeted patients who were Medicare or Medicaid beneficiaries to fill his inappropriate prescriptions.

539.    Despite the insane number of opioids prescribed by Jain and the inappropriate combinations of opioids, Walmart filled those prescriptions without hesitation.

540.    The Walmart location at 1550 S. Valley Drive in Las Cruces was a prime supplier for Dr. Jain. In fact, the Walmart store filled so many prescriptions of controlled substances as a result of Jain's prescribing that the store had to build an extra storeroom just to make room for all the narcotics he was dispensing.  (Pharmacist No. 2)

541.    From 2006-2012, that Walmart in Las Cruces received 3,960,793 opioid pills (4th most in Doña Ana County), for a total of 60,202,357 MME.

542.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 261 opioid prescriptions per day.

543.    Below is a table taken from the DEA's ARCOS database summarizing its filling of opioid prescriptions between 2006 and 2012, showing the huge spike related to prescribing of Oxycodone in 2011 and 2012 (for those years, the Walmart in Las Cruces was a top 6% dispenser of opioids in the entire state of New Mexico), particularly oxycodone:



544.    Clearly, Walmart should have recognized that the volume of opioids as excessive and not medically appropriate. Walmart had visibility into the amounts of opioids being dispensed at its stores yet did nothing, continuing to fill the inappropriate prescriptions and fraudulently billing Government Programs.

545.    Not only did Walmart ignore that the individual prescriptions were for inappropriate amounts for a single individual, Walmart knew how many total opioid prescriptions were coming from Jain across all its pharmacies and ignored the red flags of Jain's prescribing.

### 7.    *Silver City (Pharmacist No. 2)*

546.    Silver City is a small city with a population of just over 10,000 citizens located in Grant County in southwest New Mexico.  The Silver City website describes it as "a vibrant community in Grant County, nestled alongside more than 3 million acres of the Gila Wilderness. With historic ties to mining, ranching and agriculture, our community has grown into a modern town with friendly people, growing businesses and a terrific year-round climate."  But it is also the center for opioid abuse and addiction in southwest New Mexico.

547.    Dr. John A. Flores was a pill mill doctor who operated out of Silver City. His medical license was revoked on May 22, 2017. Flores prescribed a significant number of opioids to Government Program beneficiaries.[282]

548.    Between just August 2014 and August 2015, Flores wrote prescriptions for 510,406 oxycodone units. In total in 2015, Flores prescribed 10,113 opioid contro1led substances amounting to 36,316,511 MME to 680 patients.

549.    In 2016, Dr. Flores wrote 1,281 prescriptions for opioids that were billed to Medicare, with 38 percent of his patients being prescribed generic oxycodone. Another 13 percent of patients were prescribed oxycodone-acetaminophen, and nine percent got OxyContin prescriptions.

550.    On several occasions, Flores placed patients on a regimen of an opioid, a benzodiazepine, and carisoprodol—a combination of controlled substances that is known as the "Holy Trinity" because it can cause fatal drug interactions when prescribed together.

551.    In 2015 alone, Flores prescribed such high amounts and dangerous combinations of controlled substances to four patients causing their deaths. At least one of these deaths was the direct result of toxic effects from multiple controlled substances prescribed to the patient by Flores.

552.    Flores' numerous customers regularly filled prescriptions at Walmart pharmacies. The Walmart pharmacy in Silver City, New Mexico, a mere five-minute drive away from Flores' practice, was one of the top 10 dispensers of opioids by dosage units in the entire state of New Mexico.

---

[282] ProPublica, *Prescriber Checkup: The Doctors and Drugs in Medicare Part D*, https://projects.propublica.org/checkup/providers/1801883533.

553.    Walmart store-level data shows the inappropriate and fraudulent dispensing at the Silver City Walmart pharmacy. Silver City has a population of 9,647. The Silver City Walmart dispensed 63,302,594 MME between 2006-2012. The annual average was 10,550,432 MME per year, and the per day average was 28,905 MME.

554.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 321 opioid prescriptions per day. Below is a table from the DEA's ARCOS database showing the prescriptions filled at the Silver City Walmart between 2006 and 2012.



555.    One former Walmart pharmacist who worked at the Silver City store between 2013 and 2014 explained that the company did not provide any training or direction on refusing to fill prescriptions for known or suspected over-prescribers, nor did Walmart maintain any database or list of prescribers known to be or suspected of over-prescribing or operating "pill mills." (Pharmacist No. 2).

### F.    Specific Examples of Unlawful Dispensing Conduct: Texas

#### 1.    *Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Texas*

556.    Texas has not escaped the prescription opioid crisis. The use of prescription opioids in Texas has skyrocketed. In 2014, for every 100 Texas residents, 67 opioid prescriptions were dispensed.[283] And in some Texas counties, the number of opioid prescriptions substantially exceed the actual number of county residents.[284]

557.    From 1999 to 2015, Texas experienced a 3.5-fold increase in the number of opioid-related deaths.[285] In 2017, the Texas legislature found that deaths resulting from the use of opioids constitute a public health crisis and confirmed the State's compelling interest in closely regulating the prescribing of these drugs.[286] Almost 17,000 Texans have died in opioid-involved deaths.[287] The casualties continue to mount.

558.    Despite having some 590 stores located all over the State of Texas, Walmart's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

559.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Walmart pharmacies), who were apprehended (and many of

---

[283] Div. of Unintentional Injury, Centers for Disease Control & Prevention, *Opioid Overdose: U.S. State Prescribing Rates, 2014* (July 31, 2017), https://www.cdc.gov/drugoverdose/maps/rxstate2014.html.

[284] *Id.*

[285] Center for Health Statistics, Tex. Dep't of St. Health Servs, *Texas Health Data: Opioid-Related Deaths in Texas*, http://healthdata.dshs.texas.gov/Substance/Deaths (hereinafter Opioid-Related Deaths in Texas).

[286] 5 Tex. Occ. Code § 168.003.

[287] Opioid-Related Deaths in Texas, *supra* Note 259.

them later convicted) as a result of a DEA or local law enforcement investigation, were identified,

investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 9-Oct-03 | Cordell Clark, MD | Dallas, TX | 10 years |
| 19-Mar-07 | Bernard Kornell, MD | Duncanville, TX | 10 years |
| 15-Jan-08 | Bruce Alexander Brown, MD | Frisco, TX | 6 months home confinement, 3 years probation |
| 1-Jun-08 | Harold Marshall, MD | Dallas, TX | 10 years probation |
| 1-Sep-08 | Michael L. Williams, MD | Palestine, TX | 2 years home confinement |
| 18-Dec-08 | Callie Herpin, MD | Houston, TX | 120 months |
| 1-Jun-09 | Kiran Sharma, MD | Webster, TX | 8 years |
| 1-Feb-11 | Arun Sharma, MD | Webster, TX | 15 years |
| 4-May-11 | Christopher L. Elder, MD | Houston, TX | 15 months |
| 1-Jul-11 | Anthony F. Valdez, MD | El Paso, TX | 60 months |
| 1-Sep-12 | Gerald Petrash, PA | Montgomery City, TX | |
| 22-May-14 | Mario Bertoni MD | Houston, TX | |
| 22-May-14 | Melanie Mencer Parks, MD | Houston, TX | 2 years |
| 16-Jul-14 | Lisa Hollier, PharmD | Sunnyvale, TX | 5 years |
| 16-Jul-14 | Nicolas Alfonso Padron | Garland, TX | 5 years |
| 1-Oct-15 | Eiechi N. Oti, PA | Dallas, TX | 8 years |
| 1-Feb-16 | Sameer Andoni Fino | Murphy, TX | Plea |
| 31-Mar-16 | Theodore Okechuku, MD | Dallas, TX | 25 years |
| 9-May-16 | John Christopher Esparza, PharmD | Granbury, TX | 72 months |
| 9-Jun-16 | Ronald M. Mansolo, MD | Leander, TX | plea |
| 1-Aug-16 | Habiboola Niamatali, MD | Garland, TX | 78 months |
| 13-Feb-17 | David Devido, PharmD | Houston, TX | 60 months |
| 13-Feb-17 | Richard A. Evans, MD | Houston, TX | 60 months |
| 3-Apr-17 | Agnes Osire, PharmD | Houston, TX | 45 months |
| 3-Apr-17 | Richard Williams, MD | Houston, TX | 60 months |
| 26-May-17 | Richard Andrews, DO | McAllen, TX | 8 years |
| 26-May-17 | Muhammad Faridi, Owner | McAllen, TX | 108 months |
| 26-May-17 | Ndufola Kigham, PharmD | Desoto, TX | 27 months |
| 9-Jun-17 | Kumi Frompong, PharmD | Desoto, TX | 24 months |
| 29-Jun-17 | Waleed Khan, MD | Rosenberg, TX | |
| 29-Jun-17 | Muhammad Arif | Rosenberg, TX | found guilty, sentencing March 2020 |

| | | | |
|---|---|---|---|
| 30-Jun-17 | Fahim Ahmed Khan, MD | Houston, TX | 51 months |
| 25-Jul-17 | Alonzo Peters, MD | Houston, TX | Life |
| 26-Apr-18 | Jerome Pendleton, MD | Corpus Christi, TX | 5 years |
| 9-May-18 | Jorge Zamora Quezada, MD | McAllen, TX | |
| 17-Jul-18 | Michael Pendleton, MD | Corpus Christi, TX | 5 years |
| 20-Sep-18 | Gazelle Craig, DO | Houston, TX | 420 months |
| 20-Sep-18 | Shane Faithful, Owner | Houston, TX | 420 months |
| 1-Oct-18 | Chia Jean Lee, NP | Plano, TX | 16.5 years |
| 1-Oct-18 | Theodore W. Taylor, MD | Plano, TX | 20 years |
| 1-Feb-19 | Carlos Luis Venegas, MD | Dallas, TX | 13 years |
| 25-Mar-19 | Dennis D. Tedford, MD | Brownfield, TX | 5 years |
| 9-May-19 | Howard Gregg Diamon, MD | Sherman, TX | 20 years |
| 31-May-19 | Alfonso Luevano, MD | Carrizo Springs, TX | |
| 31-May-19 | Ofelia Martinez, Employee | Carrizo Springs, TX | |
| 28-Aug-19 | Manuel Bobmanuel, PharmD | Sugar Land, TX | |
| 28-Aug-19 | Ardella Fisher, NP | Tomball, TX | |
| 28-Aug-19 | Amish Kordia, PharmD | Pearland, TX | |
| 28-Aug-19 | Samson Alazar, PharmD | Missouri City, TX | |
| 28-Aug-19 | Kesha Lynette Harris, PharmD | Houston, TX | |
| 28-Aug-19 | Laurel Osazuwa, Owner | Houston, TX | |
| 28-Aug-19 | Barbara Marino, MD | Tomball, TX | |
| 28-Aug-19 | Bobby Hobbs, MD | Houston, TX | |
| 28-Aug-19 | James John Jackson, MD | Houston, TX | |
| 28-Aug-19 | Kondre Graves, Owner | Houston, TX | |
| 28-Aug-19 | Brandy LaDawan Fears, Owner | Houston, TX | |
| 28-Aug-19 | Arthur Billings, Owner | Missouri City, TX | |
| 28-Aug-19 | Frank Cooper, PharmD | Houston, TX | |
| 23-Oct-19 | James Stocks, MD | Tyler, TX | license suspended |
| 23-Oct-19 | David Shafer, MD | Whitehouse, TX | license suspended |
| 4-Nov-19 | Hussamaddin Al-Khadour, MD | Montgomery County, TX | |
| 4-Nov-19 | Miguel Flores, MD | Montgomery County, TX | |
| 4-Nov-19 | Emad Mikhail Bishai, MD | Montgomery County, TX | |
| 4-Nov-19 | Fadi Ghanem, MD | Montgomery County, TX | |

### 2. *Carrollton, Texas (Pharmacist No. 4)*

560.    One former Walmart clinical pharmacist (Pharmacist No. 4) who worked at its huge mail pharmacy in Carrollton, Texas from February 2015 to January 2018 (whose job it was to perform medication therapy reviews for patients around the U.S.) explained how little Walmart was doing to fulfill its obligations to control inappropriate prescribing.

561.    His job was to speak with patients around the country and review the patient's medication list to determine whether it reflected an accurate record.  He frequently dealt with patients receiving drugs as beneficiaries of Government Programs and counseled them on potential issues with their taking opioids.  Despite the fact that nearly every patient he talked with appeared to be taking too many opioids, Walmart provided no training on what to do when confronted with a provider suspected of dispensing or a patient suspected of taking opioids too frequently.

562.    This former employee estimated that at least once a week he encountered situations with patients where he suspected provider fraud, but he was told by Walmart management "not to address that."

563.    Even though he felt they should be reporting these instances of fraud to the DEA, Walmart's policy was to require his team to report such cases only internally because they were to "let corporate deal with it."

564.    Even though he reported these cases at least once a week, he was quite certain his reports never went beyond that, nor did he ever receive any reports back about any actions taken by Walmart.

565.    He also explained that bonus payments for Walmart pharmacists were based on performance metrics, including how many prescriptions were filled, and how many drugs you "push out the door," not whether they complied with the law. (Pharmacist No. 4).

**G.    Specific Examples of Unlawful Dispensing Conduct: Virginia**

**1.    *Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Virginia***

566.    Between 2007 and 2019, 5,410 Virginians have fatally overdosed on prescription opioids.[288] In 2017, 507 deaths in Virginia were attributable to prescription opioids (excluding fentanyl), more than in any other year.[289]

567.    Even when opioid users do not die from an overdose, they may require significant medical intervention and incur health care costs. One such cost is the immediate administration of Narcan (a brand of naloxone), which counteracts the effects of an overdose. Virginia reported 4,076 administrations of Narcan in 2016.[290]

568.    Despite having 150 stores located all over the Commonwealth of Virginia, Walmart's gross inadequacies under the CSA in its obligations to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions are underscored by the following examples of illegal prescribing and diversion activities in Virginia.

---

[288] Va. Dep't of Health, Number and Rate of All Fatal Prescription Opioid (Excluding Fentanyl) Overdoses by Locality of Injury and Year of Death, 2007-2019, http://www.vdh.virginia.gov/content/uploads/sites/18/2019/07/Prescription-Opioids-Ex-Fentanyl.xlsx.

[289] *Id*.

[290] Va. Dep't of Health, *Virginia Opioid Addiction Indicators*, http://www.vdh.virginia.gov/data/opioid-overdose/

569.    Not only did Walmart not conduct adequate investigations, it knowingly and intentionally failed to report or halt inappropriate or medically unnecessary prescriptions.  Indeed, none of the following health care professionals (many of whose prescriptions were filled at Walmart pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 27-Nov-01 | Franklin Sutherland, MD | Grundy, VA | 70 months |
| 15-Nov-02 | Freeman Clark, MD | Bland County, VA | 6 years |
| 13-Jul-07 | William Hurwitz, MD | McLean, VA | 5 years |
| 18-Nov-08 | Ehteshaumul Hague, MD | Norfolk, VA | Plea |
| 1-Aug-09 | James Stanley Ross | Clarksville, VA | 19 months |
| 15-Oct-09 | Sidney S. Loxley, MD | Chesapeake, VA | 77 months (deceased) |
| 9-Nov-12 | Paul Boccone, Owner | Chantilly, VA | 15 years |
| 9-Nov-12 | Charles Brown, CFNP | Chantilly, VA | 5 years |
| 1-Feb-13 | Linda Sue Cheek, MD | Dublin, VA | 33 months |
| 25-Apr-13 | Larren Wade, MD | Alexandria, VA | 70 months |
| 1-Aug-14 | Derron McRae Simon, MD | Arlington, VA | 15 years |
| 1-Sep-14 | Steven Collins, MD | Roanoke County, VA | 10 years |
| 23-Oct-14 | Robin Anne Krohn, Patient | Stafford, VA | 143 months |
| 26-Jun-15 | Nibedita Mohanty, MD | Stafford, VA | 4 years |
| 23-Mar-16 | Gloria Faye Kennedy, FNP | Richlands, VA | 46 months |
| 1-Feb-17 | Heatwole Stanley, MD | Lexington, VA | 3 year probation |
| 1-Feb-17 | Stanley Elmer Heatwole, MD | Staunton, VA | 3 years probation |
| 11-Aug-17 | Clarence Scranage, MD | Fredericksburg, VA | |
| 15-Dec-17 | Felix Eugene Shepard, MD | Norton, VA | 6 months |
| 19-Mar-18 | Gurcharan Kanwal | Wise, VA | 2 years probation |
| 7-Feb-19 | Dwight Bailey, MD | Lebanon, VA | 151 months |
| 13-Feb-19 | Frank Craig Purpera, | Blacksburg, VA | 20 months |
| 26-Apr-19 | Shriharsh L. Pole, MD | Woodbridge, VA | 7 years |
| 19-Jul-19 | Una Fage Ford | Appalachia, VA | |
| 19-Jul-19 | Michael B. Ford | Appalachia, VA | |
| 23-Sep-19 | Dr. Vincent K. Jones | Martinsville, VA | Indicted (deceased) |
| 2-Oct-19 | Joel Adams Smithers, MD | Martinsburg, WV | 40 years |

2.    *Winchester, Virginia (Pharmacist No. 3)*

570.    According to the town website, Winchester, Virginia has long been known as the "Apple Capital" surrounded as it is by vast orchards and constituting one of the largest apple export markets of the nation.[291] Its agricultural heritage belies the more sinister impact the opioid epidemic has had on the city. Winchester is a small city of less than 28,000 people that has suffered particularly from the opioid epidemic ravaging the United States.

571.    In Virginia, fatal drug overdoses are the leading cause of unnatural death, and have been since 2013. In Winchester and its five surrounding counties, opioids killed 40 people in 2017; as of June 2018, they had already killed 13 people.[292]

572.    Winchester City Police Chief Kevin Sauzenbacher explained that "[w]e are on what is known as the Heroin Highway."  The area surrounding Winchester faced a jump of one fatal opioids overdose in 2012 to 33 deaths in 2014. "You can see the chart rise in the number of kids in foster care almost directly correlated with the number of deaths we've had from heroin overdoses," explained the chief.[293]

573.    Newborn babies of opioid addicted mothers in Winchester were also falling victim to the heroin epidemic. "We typically will have somewhere between three and five babies in the

---

[291] Discover Winchester Virginia, *About the Area;* https://visitwinchesterva.com/about-the-area/.

[292] Annabelle Timsit, *One city has created a blueprint for tackling the opioid epidemic*, Quartz (October 21, 2018), https://qz.com/1429001/the-opioid-epidemic-is-tearing-communities-apart-heres-how-one-city-came-together-to-fight-it/.

[293] Jeniffer Donelan and Dwayne Myers, *Heroin Highway: Part 3 - Virginia, A Commonwealth in Crisis*, ABC 7-WJLA (Feb. 17, 2016), https://wjla.com/features/hooked-on-heroin/heroin-highway-part-three-virginia-a-commonwealth-in-crisis.

NICU on a daily basis that are being treated for withdrawal," said Dr. Teresa Clawson, a neonatologist with Mednex, Winchester Medical Center.[294]

574.    Contributing to the torrent of opioids that has been overwhelming Winchester has been the Walmart pharmacy at 501 Walmart Drive, which from 2006 to 2012 dispensed some 3,181,261 doses of opioids or 31,221,050 MME, the largest number of opioids dispensed by any pharmacy in Frederick County, Virginia.

575.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 135 opioid prescriptions per day. Below is a table taken from the DEA's ARCOS database graphically illustrating the glut of opioids that came through this Walmart during this time:



---

[294] *Id.*

576.    A former pharmacist who worked at this Walmart pharmacy from 2012 to 2013 (Pharmacist No. 3) recalled that the Walmart store in Winchester was located next to Interstate 81, the "Heroin Highway."

577.    The Heroin Highway runs from Baltimore, Maryland to Winchester, Virginia, Interstate 70 and Interstate 81 weave through (and near) towns like Frederick, Maryland, Hagerstown, Maryland, Charles Town, West Virginia, Martinsburg, West Virginia, Luray, Virginia, and Winchester, Virginia. This strip of roadway has become sorrowfully known as the "Heroin Highway" due to the high trafficking of the substance through these once unsuspecting towns.  But it was prescription opioids (much of it dispensed at Walmart pharmacies which dotted the landscape) that ignited the conflagration along the Heroin Highway.

578.    Despite this reputation, Walmart did nothing to ensure appropriate and/or medically necessary scripts were being filled, nor did it provide its pharmacy staff with corporate training on warning signs to help identify fraudulent prescriptions or patients. Instead its corporate training regimen for pharmacy staff focused on other policies and procedures, such as how to handle hazardous materials.

### 3.    *Luray, Virginia (Pharmacist No. 3)*

579.    A former Walmart pharmacist (Pharmacist No. 3) who worked as a floater at the Walmart store at 1036 U.S. Hwy 211 West, Luray, which was located just east of I-81, the Heroin Highway, described that this pharmacy "was filling crazy amounts of opioids." He worked as a floater there about 20 times and always dreaded it because it was such a high-volume and hectic store.

580.    He recalled the store filled close to 1,000 prescriptions a day. At least half, or perhaps up to 75 percent, was in Schedule 2 drugs and the "vast majority" of those were opioids,

particularly oxycodone. "It would be an assembly line of Schedule 2s," he said. "That area stuck out in my mind as a real high-volume area for that."

581.    The Luray Walmart pharmacy has been a major contributor to the flow of opioids that has been devastating the area.  The Luray Walmart pharmacy from 2006 to 2012 dispensed some 2,520,025 doses of opioids or 21,381,326 MME.

582.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 92 opioid prescriptions per day. Below is a table taken from the DEA's ARCOS database depicting the glut of opioids dispensed at this Walmart which saturated the Luray area:



583.    From his pharmacist's post, Pharmacist No. 3 could look out and see the line of people waiting to fill their prescriptions at the Luray Walmart store. He half-jokingly remembered seeing someone in line and a half-hour later seeing the same person at the same spot in line.

584.    Because he was a floater, he relied on full-time staff and management to determine policy and protocol for filling these prescriptions.  At the Luray store, "their thing was, if they've filled here before, go ahead and fill it. If it's new, then verify it. Otherwise, keep the assembly line going."

585.    This assembly-line attitude meant that as long as one prescription had been filled previously, subsequent prescriptions would receive little to no scrutiny – an enormous loophole of which unscrupulous customers took full advantage. In fact, there was an unwritten policy at the Luray Walmart that pharmacists were not supposed to check the Virginia PMP database. If the PMP was routinely checked it would mean that fewer prescriptions would be filled because of the time it took to check the database, but also because the PMP would reveal large numbers of suspicious or inappropriate prescriptions.

586.    This protocol was communicated by word of mouth, usually during an overlapping time at the end of one pharmacist's shift and the beginning of another's. He believes word got out among addicts and opioid abusers about the lenient practices at the store, which only increased the intensity of the traffic in opioids. It was a common sight to see lines that snaked through the entire pharmacy area and spilled out into the rest of the retail store area.

587.    Many of the customers of the worst Walmart pharmacies paid for their prescriptions through Government Programs. Pharmacist No. 3 estimated that nearly 50% of the opioid prescriptions filled at the Luray store were paid for by Government Programs. At the other locations, the percentage of customers paying with Government Programs varied between 25% and 50%.

588.    At the Luray store especially, but also at the other Walmart stores where he worked, the company did not hire enough staff to deal with the prescription volume. A typical Sunday shift would be a pharmacist and an intern, not even a technician.

589.    When he complained about staffing, management replied that if volume at the store increased, then staffing would be increased. Staffing was based on volume of prescriptions, which he thought was unrealistic. "You want us to double that (volume) just to get one more person in here?" he said.

590.    There was also regular pressure from management and corporate staff to increase sales and grow volume. That made it difficult to make even a cursory evaluation of opioids prescriptions or to check the state prescription monitoring programs. "It was just a 'keep it rolling' kind of thing," he said of the pharmacy environment.

**H.    Specific Examples of Unlawful Dispensing Conduct:  West Virginia**

    **1.    *Walmart failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in West Virginia***

591.    Opioid abuse and trafficking in West Virginia is widespread. The state has one of the highest prescription rates for opioids in the United States. Statistics show that illicit pharmaceutical drug use contributed to approximately 61 percent of state overdose deaths in 2015.[295] The extraordinarily high abuse rate of opioids is attributed in part to the large number of jobs in heavy manual labor such as mining, timbering, and manufacturing. These professions often

---

[295] DEA Intelligence Report, The West Virginia Drug Situation, DEA-WAS-DIR-024-17 (May 2017), https://www.dea.gov/sites/default/files/2018-07/DEA-WAS-DIR-024-17%20West%20Virginia%20Drug%20Situation%20-UNCLASSIFIED.pdf

cause injuries to workers that are treated with opioid pain relievers, which in turn can lead to addiction.[296]

592.    Opioid abusers and traffickers in West Virginia obtain the drugs from either licensed providers or out-of-state drug traffickers who have expanded into West Virginia. In some instances, doctors and other health care providers, acting outside medical guidelines, write prescriptions for prescription opioids without a legitimate need on the part of the "patient." In other cases, the prescriptions are written by doctors in good faith, for unsuspected "doctor shoppers" who are providing for their own addictions, supplying pills to dealers, or both.

593.    Despite having some 43 stores located all over the State of West Virginia, Walmart's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

594.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Walmart stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Walmart despite their prescribing habits rising to a criminal level:

| Date | Name | Location | Sentence |
|---|---|---|---|
| 24-Mar-06 | Louis Ortenzio, MD | Blacksville, WV | 6 months home detention |
| 1-Mar-07 | Breton Lee Morgan, MD | Point Pleasant, WV | 30 days |
| 1-Mar-08 | Robert J Crake, DO | Wheeling, WV | 36 months probation |
| 7-Jul-08 | Robert Allara, MD | Charleston, WV | 5 months |
| 1-Aug-09 | Danny Ray Wills, MD | Princeton, WV | 6 months |
| 1-Mar-12 | William F Ryckman, MD and owner | Williamson, WV | 6 months |
| 7-Jan-13 | Anita Dawson, DO | Milton, WV | 2 years |

---

[296] David Gutman, How did West Virginia come to lead the nation in overdoses?, Charleston Gazette-Mail; (October 17, 2015), https://www.wvgazettemail.com/news/health/how-did-wv-come-to-lead-the-nation-in-overdoses/article_60c46a00-eec5-5c42-b6b0-2050439074f5.html.

| 1-Mar-13 | Myra Sue Miller, Office Manager | Williamson, WV | 6 months |
|---|---|---|---|
| 3-Sep-13 | Fernando Gonzales-Ramos, MD | Logan City, WV | 5 years 11 months |
| 12-Sep-14 | Mario Blount, PharmD | Bridgeport, WV | 3 years |
| 1-Oct-14 | Hogan, Robert Timothy II Doctor and owner | Wood City, WV | 48 months |
| 12-May-15 | Edita Milan, MD | Harrison City, WV | 5 years 11 months |
| 1-Jan-16 | Jose Jorge Abbud Gordinho, MD | Glen Daniel, WV | 8 years |
| 28-Jun-16 | Tressie Duffy, MD | Martinsburg, WV | 1 year and 1 day |
| 8-Jul-16 | Iraj Derakhshan, MD | Charleston, WV | probation, home confinement |
| 3-Apr-17 | Donald Chaney, MD | Barboursville, WV | 6 months |
| 23-Aug-17 | Michael Kostenko, DO | Daniels, WV | 20 years |
| 21-May-18 | Manuel Barit, MD | Mullens, WV | Restitution |
| 1-Nov-18 | Roland Chalifoux, DO | McMechen, WV | Restitution and supervision |
| 29-Nov-18 | Teresa Emerson | Beckley, WV | 3 years probation |
| 10-Jan-19 | John Pellegrini, DO | Beckley, WV | 87 months |
| 1-Apr-19 | David M Wasanyi, Pharmacist | Martinsburg, WV | 3 years 11months |
| 30-Apr-19 | George P. Naum, MD | Wheeling, WV | 6 months |
| 29-May-19 | Chad Poage | Morgantown, WV | 5 years probation |
| 8-Aug-19 | James H Blume, DO | Beckley, WV | |
| 24-Aug-19 | Muhammed Samer Nasher-Alneam, MD | Charleston, WV | |
| 28-Aug-19 | Michael T. Moran, MD | Beckley, WV | |
| 28-Aug-19 | Sanjay Mehta, DO | Beckley, WV | |
| 28-Aug-19 | Brian Gullett, DO | Beckley, WV | |
| 28-Aug-19 | Vernon Stanley, MD | Beckley, WV | |
| 28-Aug-19 | Mark Clarkson, DO | Beckley, WV | |
| 28-Aug-19 | William Earley, DO | Beckley, WV | Pled Guilty (sentencing May 11, 2020) |
| 28-Aug-19 | Paul W. Burke, MD | Beckley, WV | Pled Guilty |
| 28-Aug-19 | Roswell Tempest Lowry, MD | Beckley, WV | Pled Guilty (sentencing May 4, 2020) |
| 3-Sep-19 | Mark J. Spelar, MD | Huntington, WV | Pled Guilty; License revoked |
| 24-Sep-19 | Michael Shramowiat, MD | Vienna, WV | |
| 24-Sep-19 | Ricky Houdersheldt, MD | Ona, WV | |
| 24-Sep-19 | Seraglio Kari, MD | Charleston, WV | |

| 17-Dec-19 | Jeffery Addison, MD | Charleston, WV | 18 months |

### 2.    *Charles Town, West Virginia (Pharmacist No. 3)*

595.    Opioid abuse and trafficking in West Virginia is widespread. The state has one of the highest prescription rates for opioids in the United States. Statistics show that illicit pharmaceutical drug use contributed to approximately 61 percent of state overdose deaths in 2015.[297] The extraordinarily high abuse rate of opioids is attributed in part to the large number of jobs in heavy manual labor such as mining, timbering, and manufacturing. These professions often cause injuries to workers that are treated with opioid pain relievers, which in turn can lead to addiction.[298]

596.    Opioid abusers and traffickers in West Virginia obtain the drugs from either licensed providers or out-of-state drug traffickers who have expanded into West Virginia. In some instances, doctors and other health care providers, acting outside medical guidelines, write prescriptions for prescription opioids without a legitimate need on the part of the "patient." In other cases, the prescriptions are written by doctors in good faith, for unsuspecting "doctor shoppers" who are providing for their own addictions, supplying pills to dealers, or both.

597.    Charles Town is located in Jefferson County.  Jefferson County Attorney Matt Harvey recently requested the West Virginia governor declare a "state of emergency" to provide the Eastern Panhandle with the resources needed to fight the opioid crisis.  "We are losing a

---

[297] Drug Enforcement Agency Intelligence Report, *The West Virginia Drug Situation,* 2 (May 2017), https://www.dea.gov/sites/default/files/2018-07/DEA-WAS-DIR-024-17%20West%20Virginia%20Drug%20Situation%20-UNCLASSIFIED.pdf.

[298] David Gutman, *How did WV come to lead the nation in overdoses*?, Charleston Gazette-Mail; (October 17, 2015), https://www.wvgazettemail.com/news/health/how-did-wv-come-to-lead-the-nation-in-overdoses/article_60c46a00-eec5-5c42-b6b0-2050439074f5.html.

generation of people to opioid addiction," Harvey said in a letter to the governor. "Our local police, firefighters, EMS and my office are committing all our resources to fighting back, but we need help," he said. Harvey cited state figures that were released in January that show 23 people died in Jefferson County due to an overdose in 2016, and 21 of those deaths involved at least one opioid.[299]

598.    On April 17, 2018, the Charles Town City Council unanimously passed a Resolution declaring a public nuisance related to the opioids epidemic, stating (in part): "The dumping of millions of pain pills into our state and community has spawned a public health and safety hazard to the residents of the City of Charles Town, devastated our families, hurt our economy, wasted our public resources, and created a generation of narcotic dependence."[300]  The Resolution also stated that "the data collected from the City's Police CAD system from September 2014 to March 2018 reveal that, over the past several months, the Police Department responded to 56 overdoses and the overwhelming majority of overdoses were directly tied to heroin followed by prescription pills. Of the 56 reported overdoses, 11 were fatal and 45 survived."[301]

599.    Contributing to the flood of opioids that has been drowning Charles Town was the Walmart pharmacy at 188 Flowing Springs Rd., which from 2006 to 2012 dispensed some 2,626,500 doses of opioids or 21,159,486 MME.

---

[299] Matthew Umstead, *Prosecutor: W.Va. needs to declare opioid emergency*, HeraldMedia.com (March 17, 2017), https://www.heraldmailmedia.com/news/tri_state/west_virginia/prosecutor-w-va-needs-to-declare-opioid-emergency/article_b8280ba8-0b63-11e7-9ed9-577186995115.html.

[300] The City of Charles Town, West Virginia Resolution on the Opioid Epidemic: Resolution No. 2018-002 (April 18, 2018).

[301] *Id.*

600.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 92 opioid prescriptions per day every day for seven years.  Below is a table taken from the DEA's ARCOS database graphically illustrating the glut of opioids that came through the Flowing Springs Walmart during this time:



601.    According to a former pharmacist who worked at the Flowing Springs Walmart (Pharmacist No. 3), he was not aware of any database that Walmart created or maintained concerning potentially inappropriate prescriptions. Nor did Walmart maintain a database or list of potential pill mill doctors. Occasionally, but rarely, pharmacy staff would receive an email about a suspected pill mill doctor or questionable prescriber.

### 3.    *Martinsburg, West Virginia (Pharmacist No. 3)*

602.    West Virginia has the highest overdose death rate in the country. Opioids have devastated the state's Eastern Panhandle, which includes the town Martinsburg, the county seat

for Berkeley County. Like nearly all of the residents there, the majority of the addicts are white, were born in the area, and have modest incomes.[302]

603.    In Berkeley County, which has a population of 114,000, when someone under sixty dies, and the cause of death is not mentioned in the paper, locals assume that it was an opioids overdose. It has become the default explanation when an ambulance stops outside a neighbor's house, and the best guess for why someone is sitting in his car on the side of the road in the middle of the afternoon.[303]

604.    One well known pill mill doctor, Dr. Tressie Duffy, M.D., ran a wellness clinic in Martinsburg. A grand jury in U.S. District Court in Martinsburg indicted Dr. Duffy on 100 felony counts of aiding and abetting the distribution of four controlled substances from April 2010 to February 2012. Duffy was accused of signing blank prescription orders, then allowing employees to issue 157 of them to 96 patients without being seen by a physician. The substances involved were oxycodone, oxymorphone, methadone, and methylphenidate, a drug used to treat attention deficit-hyperactivity disorder.[304]   In 2016, she was sentenced to a year in federal prison, was ordered to give up her West Virginia medical license, and was barred from ever applying for another license anywhere in the United States.[305]

---

[302]   Margaret Talbot, *The Addicts Next Door*, The New Yorker (May 29, 2017), https://www.newyorker.com/magazine/2017/06/05/the-addicts-next-door.

[303] *Id*.

[304] John Raby, *Martinsburg doctor accused of illegal pill prescriptions*, Times West Virginian (Sept. 18, 2014), https://www.timeswv.com/news/west_virginia/martinsburg-doctor-accused-of-illegal-pill-prescriptions/article_9d9754ce-3ef1-11e4-a376-631dcf004465.html.

[305] Joel Ebert, *Martinsburg doctor faces prison time after pleading guilty to drug charges*, Charleston        Gazette-Mail        (Dec.        23,        2015), https://www.wvgazettemail.com/news/cops_and_courts/martinsburg-doctor-faces-prison-time-

605.    The Walmart pharmacy at 800 Fox Croft Ave. has been a major contributor to the flow of opioids that has been devastating Martinsburg.  Located mere yards from I-81, the store saw immense prescription volume. Often the store filled more than 1,000 prescriptions per day, with around 30% being for controlled substances.

606.    Despite the immense prescription volume, Walmart did not adequately staff the pharmacy. Often there was only one pharmacist and two pharmacy technicians to handle all of the volume. This forced the pharmacists to spend less time doing their due diligence on prescriptions than they should have been. This was especially true for dispensing controlled substances – there simply was not enough time to do all of steps necessary. (Pharmacist No. 3)

607.    For example, only pharmacists are allowed to get the CIIs (which includes nearly all the opioids) from the control cabinet, count the pills, print the label, enter the information into the perpetual inventory system, and dispense the drugs. This means that the pharmacy technicians were not able to relieve the crush of the volume when it came to dispensing CII controlled substances.

608.    As with all the high-volume Walmart stores, the inadequate staffing meant that instead of having around 15 minutes or more to properly vet controlled substance prescriptions, Walmart pharmacists typically had less than five minutes.

609.    The Fox Croft Walmart pharmacy from 2006 to 2012 dispensed some 3,911,990 doses of opioids or 43,919,216 MME.

---

after-pleading-guilty-to-drug/article_d21dbe9f-8189-5ee0-9971-e7dc8ada140a.html.

610.     That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 190 opioid prescriptions per day every day for seven years. Below is a table taken from the DEA's ARCOS database depicting the glut of opioids dispensed at this Walmart which saturated Martinsburg:



611.     One former pharmacist who worked at the Fox Croft Walmart (Pharmacist No. 3) recalled that, despite the epidemic of opioids overwhelming the area surrounding Martinsburg, "[t]here was nothing specific [provided by Walmart] about being on the lookout for opioid addicts or anything like that," he said. That type of information was passed on only by word of mouth between the pharmacists and the technicians, and the level of information varied from store to store and usually depended on who the pharmacist in charge was.

612.    Another topic of discussion among the pharmacists was the nickname for the cluster of pharmacies in the area: "the Devil's Triangle." The pharmacists gave this moniker to the area because of the high rates of addicts and pill pushers that frequented the surrounding pharmacies.

613.    Despite these half-hearted attempts from Walmart's corporate office, Walmart still dispensed inappropriate prescriptions. In one instance, a pharmacist denied a patient who had identical prescriptions for both oxycodone and Xanax (a potentially deadly combination) from multiple doctors. But a few days later, a different customer came in with the very same prescription for both oxycodone and Xanax. Because the patient had a matching ID to the prescription and did not have multiple prescriptions, the pharmacist dispensed the medication. Subsequently, the pharmacist then saw the patient walk out and hand the prescription directly to the same woman whose prescription he had denied to fill earlier.

614.    While this former employee assumed that this information was passed up the chain to corporate management but "what they ended up doing with it, I'm not sure."

615.    For 2006 and 2007, the Walmart at 800 Fox Croft Ave. had been in the top 5% of all pharmacies in the state of West Virginia in MME dispensed.

616.    Instead of cracking down on the inappropriate dispensing in the "Devil's Triangle" Walmart chose to exploit it. Eventually the high volume of prescriptions at the Fox Croft Walmart induced Walmart to open a second Walmart with a pharmacy up the road in Martinsburg. The new Walmart at 580 Hammonds Mill Road in Martinsburg was under 9 miles away, and it too was mere yards from the Heroin Highway, I-81. Walmart had no qualms about opening the new store despite the notorious reputation of the area as the Heroin Highway and the extremely high dispensing of opioids at its other location just down the road.

617.    As a result of the Hammonds Mill store opening, in 2008 the Fox Croft store dropped to top 8% in all of West Virginia in MME dispensed.

618.    The Hammonds Mill Walmart pharmacy from 2008 to 2012 dispensed some 1,114,290 doses of opioids or 10,152,671 MME.

619.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the store was supplying an average of 44 opioid prescriptions per day.

620.    From 2008-2012, the two Walmart pharmacies in Martinsburg, both right next to I-81 and a mere 9 miles apart, dispensed a total of 38,084,817 MME (27,932,145 at the Fox Croft store and 10,152,672 MME at the Hammonds Mill store).

621.    That means that at the highest bounds of the recommended MME per day (90 MME/day) the stores were supplying an average of 231 opioid prescriptions per day.

622.    The Hammonds Mill store also suffered from the same lack of training and short staffing issues as the other Walmart stores, causing its pharmacists to not properly vet controlled substance prescriptions.

## VIII.    INJURY TO GOVERNMENT PROGRAMS RESULTING FROM WALMART'S ACTIONS

623.    Walmart is a registered pharmacy which owned, operated, and was in charge of DEA-registered pharmacies throughout the U.S., and (a) knowingly or recklessly dispensed controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and intentionally dispensed controlled substances outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C.§ 841(a) and corresponding state statutes.

624.     Walmart repeatedly failed to exercise its corresponding responsibility as a DEA registrant to ensure that controlled substances were dispensed only pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice.  Walmart knowingly and/or recklessly ignored readily identifiable red flags that the controlled substances prescribed were being diverted, abused, or otherwise were not for legitimate medical purposes and dispensed these prescriptions despite unresolved red flags.

625.     Walmart's pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances when its pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer.

626.     Moreover, even in instances in which a prescriber told a Walmart pharmacist that a suspicious prescription had been issued for a legitimate medical purpose, Walmart willfully ignored its independent, legally-mandated duty to examine the other, often glaring, evidence that the prescription had, in fact, not been issued for a legitimate medical purpose or that the prescriber had acted outside of the usual course of his or her professional practice and dispensed the prescription.

627.     Despite the fact that Walmart knew, or had reason to know, from its own robust data collection databases and from red flags, including the sheer volume of opioid drugs being dispensed at numerous of its pharmacies, that many hundreds of thousands of prescriptions were not valid, it nonetheless failed to use its own readily-available and extensive information and resources from its own data bases to fulfill its obligations under the CSA and ensure that the prescriptions it dispensed were issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice.

628.    Walmart knew, or had reason to know, the prescriptions were not valid and not only dispensed those prescriptions, but also failed to notify any authority of these issues. Instead, Walmart committed affirmative acts to conceal the ongoing and rampant fraud under way, such as by its continued filling inappropriate and medically unnecessary prescriptions for opioids. By filling these prescriptions while the fraud was ongoing, Walmart dispensed many hundreds of thousands of opioid pills based on illegitimate and/or medically unnecessary prescriptions.

629.    Government Programs have been damaged by Walmart's unfair, false, misleading, or deceptive acts or practices in the conduct of the pharmaceutical business by failing to investigate, report, and cease fulfilling suspicious, inappropriate, and/or medically unnecessary prescriptions of controlled substances in its pharmacies.

630.    Government Programs have been damaged by Walmart's negligent and/or intentional and reckless actions by its failing to investigate, report, and halt suspicious, inappropriate, or medically unnecessary prescriptions of controlled substances dispensed at its pharmacies.

## IX.    CAUSES OF ACTION

### COUNT I

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

631.    The United States incorporates herein by reference the preceding paragraphs of the First Amended Complaint as though fully set forth herein.

632.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the

United States of America false or fraudulent claims for payment or approval of Opioids, in violation of 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A).

633.    Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT II

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

634.    Relators incorporate herein by reference the preceding paragraphs of the First Amended Complaint as though fully set forth herein.

635.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2)and 31 U.S.C. § 3729(a)(1)(B).

636.    The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Opioids prescribed to patients enrolled in Federal Programs.

637.    Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT III

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))

638.    Relators incorporate herein by reference the preceding paragraphs of the First Amended Complaint as though fully set forth herein.

639.    Defendant knowingly conspired, and may still be conspiring, with the various health care professionals identified and alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. § 3729(a)(1) & (a)(2), and 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B).  Defendant and these health care professionals committed overt acts in furtherance of the conspiracy as alleged above.

640.    Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

### COUNT IV

**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G))**

641.    Relators incorporate herein by reference the preceding paragraphs of the First Amended Complaint as though fully set forth herein.

642.    Walmart knowingly avoided or decreased its obligation to pay or transmit money to the Government.  Specifically, Walmart:  (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) Walmart knew that the records or statements were false.

643.    Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

### COUNT V

**(Violation of California False Claims Act)**

644.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

645.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

646.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

647.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

648.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

649.    Because of Defendant's actions, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

## COUNT VI

### (Violation of Colorado Medicaid False Claims Act)

650.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

651.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

652.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

653.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

654.    The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

655.    Because of Defendant's actions, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VII

**(Violation of Connecticut False Claims Act for Medical Assistance Programs)**

656.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

657.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of Conn. Gen. Stat. § 4-275(a)(1).

658.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of Conn. Gen. Stat. § 4-275(a)(2).

659.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions in violation of Conn. Gen. Stat. § 4-275(a)(7).

660.    The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or

statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

661.    Because of Defendant's actions, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII

### (Violation of Delaware False Claims and Reporting Act)

662.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

663.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201(a)(1).

664.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

665.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit

money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

666.    The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health care programs funded by the State of Delaware.

667.    Because of Defendant's actions, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT IX

### (Violation of District of Columbia False Claims Act)

668.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

669.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381.02(a)(l).

670.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(2).

671.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(6).

672.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the District.

673.    Because of Defendant's actions, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X

### (Violation of Florida False Claims Act)

674.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

675.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

676.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used,

false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

677.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

678.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance plans funded by the State of Florida or its agencies.

679.    Because of Defendant's actions, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT XI

### (Violation of Georgia False Medicaid Claims Act)

680.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

681.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

206

682.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

683.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

684.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

685.    Because of Defendant's actions, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XII

### (Violation of Hawaii False Claims Act)

686.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

687.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an

officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

688.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made and used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

689.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

690.    The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

691.    Because of Defendant's actions, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIII

### (Violation of Illinois False Claims Act)

692.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

208

693.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

694.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

695.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

696.    The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

697.    Because of Defendant's actions, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIV

### (Violation of Indiana False Claims and Whistleblower Protection Act)

698.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

699.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

700.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

701.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

702.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

703.    Because of Defendant's actions, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XV

### (Violation of Iowa False Claims Act)

704.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

705.    Defendant, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

706.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

707.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

708.    The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or

statements, paid for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

709.    Because of Defendant's actions, the State of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVI

### (Violation of Louisiana Medical Assistance Programs Integrity Law)

710.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

711.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

712.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

713.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

714.    The State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department, unaware of the falsity of the claims and/or statements made by Defendant, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendant's claims and/or statements in paying for Opioids prescriptions for medical assistance program recipients.

715.    Because of Defendant's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department have been, and may continue to be, severely damaged.

## COUNT XVII

### (Violation of Maryland False Health Claims Act)

716.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

717.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

718.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

719.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

720.    The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

721.    Because of Defendant's actions, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVIII

### (Violation of Massachusetts False Claims Act)

722.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

723.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

724.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used,

false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

725.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

726.     The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

727.     Because of Defendant's actions, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIX

### (Violation of Michigan Medicaid False Claims Act)

728.     Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

729.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

730.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

731.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendant has applied for or is receiving a benefit with intent to obtain a benefit to which Defendant were not entitled or in an amount greater than that to which Defendant were entitled, in violation of Mich. Comp. Laws § 400.603(3).

732.    Defendant, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented, or caused to be made or presented, and may still be making, presenting, or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

733.    The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

734.    Because of Defendant's actions, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XX

### (Violation of Minnesota False Claims Act)

735.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

736.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

737.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

738.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

739.    The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

740.    Because of Defendant's actions, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXI

### (Violation of Montana False Claims Act)

741.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

742.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

743.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

744.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

745.    The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

746.    Because of Defendant's actions, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXII

### (Violation of Nevada False Claims Act)

747.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

748.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

749.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

750.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used,

false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

751.    The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

752.    Because of Defendant's actions, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIII

### (Violation of New Jersey False Claims Act)

753.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

754.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer, or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

755.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

756.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

757.     The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

758.     Because of Defendant's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIV

## (Violation of New Mexico Fraud Against Taxpayers Act)

759.     Relators incorporate herein by reference the preceding paragraphs of the First Amended Complaint as though fully set forth herein.

760.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of New Mexico, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 44-9-3(A)(1).

761.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used,

false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the State of New Mexico, or its political subdivisions, in violation of N.M. Stat. Ann. § 44-9-3(A)(2).

762.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico, or its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 44-9-3(A)(8).

763.    The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

764.    Because of Defendant's actions, as set forth above, the State of New Mexico and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXV

### (Violation of New York False Claims Act)

765.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

766.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

767.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

768.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

769.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

770.    Because of Defendant's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI

### (Violation of North Carolina False Claims Act)

771.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

772.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

773.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

774.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

775.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

776.    Because of Defendant's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVII

### (Violation of Oklahoma Medicaid False Claims Act)

777.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

778.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

779.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

780.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

781.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

782.    Because of Defendant's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVIII

### (Violation of Rhode Island False Claims Act)

783.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

784.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

785.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

786.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

787.    The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

226

788.    Because of Defendant's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIX

### (Violation of Tennessee Medicaid False Claims Act)

789.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

790.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

791.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

792.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

793.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of the Medicaid program.

794.    Because of Defendant's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXX

### (Violation of Texas Medical Assistance Program, Damages, and Penalties Act)

795.    Relators incorporate herein by reference the preceding paragraphs of the First Amended Complaint as though fully set forth herein.

796.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

797.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

798.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and may still be making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

799.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

800.     The State of Texas, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

801.     Because of Defendant's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXI

### (Violation of Vermont False Claims Act)

802.     Relators incorporate herein by reference the preceding paragraphs of the First Amended Complaint as though fully set forth herein.

803.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under

the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(1)-(2).

804.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

805.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and may still be making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(2).

806.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for products that were inappropriate, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

807.    The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

808.    Because of Defendant's actions, as set forth above, the State of Vermont and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXII

### (Violation of Virginia Fraud Against Taxpayers Act)

809.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

810.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

811.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

812.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

813.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

814.    Because of Defendant's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXIII

### (Violation of Washington Medicaid False Claims Act)

815.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

816.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of Wash. Rev. Code § 74.66.020(1)(a).

817.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

818.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money

to the State of Washington, or its political subdivisions, in violation of Wash. Rev. Code § 74.66.020(1)(g).

819.    The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

820.    Because of Defendant's actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXVI

### (Violation of Chicago False Claims Act)

821.    Relators incorporate herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

822.    This is a claim for treble damages and penalties against all Defendant on behalf of the City of Chicago under the Chicago False Claims Act, Municipal Code of Chicago § 1-22-010-§1-22-060.

823.    By virtue of the above-alleged acts, among others, Defendant knowingly and willfully promoted Opioids for unapproved and unsafe uses.

824.    By virtue of the above-alleged acts, Defendant knowingly made or caused to be made false claims for Defendant's drugs to the City of Chicago.

825.    By virtue of the above-alleged acts, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the City of Chicago to approve and pay such false and fraudulent claims.

826.    The Chicago City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements and/or business practices.

827.    By reason of the Defendant's unlawful acts, the City of Chicago has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## COUNT XXXVI

### (Violation of Hallandale Beach False Claims Ordinance)

828.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

829.    By virtue of the above-described acts, Defendants knowingly and willfully promoted Opioids for unapproved and unsafe uses.

830.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Hallandale Beach City Government.

831.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hallandale Beach City Government to approve and pay such false and fraudulent claims.

832.    The Hallandale Beach City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

833.    By reason of the Defendants' unlawful acts, the City of Hallandale Beach has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## COUNT XXXVII

### (Violation of Broward County False Claims Ordinance)

834.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

835.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Broward County Government.

836.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Broward County Government to approve and pay such false and fraudulent claims.

837.    The Broward County Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

838.    By reason of the Defendants' unlawful acts, Broward County has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## COUNT XXXVIII

### (Violation of Miami-Dade False Claims Ordinance)

839.    Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

840.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for Defendants' drugs to the Miami-Dade County Government.

841.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Miami-Dade County Government to approve and pay such false and fraudulent claims.

842.    The Miami-Dade County Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

843.    By reason of the Defendants' unlawful acts, Miami-Dade County has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## X.    PRAYER FOR RELIEF

**WHEREFORE,** Relators prays for judgment against Defendant as follows:

A.    That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; Conn. Gen. Stat. §§ 4-274 *et seq.*; Del. Code Ann. tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*; Ga. Code Ann. §§ 49-4-168 *et seq.*; Haw. Rev. Stat. §§ 661-21 *et seq.*; 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; Ind. Code §§ 5-11-5.7 *et seq.*; Iowa Code tit. 15 §§ 685.1 *et seq.*; La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; Md. Code Ann., Health Gen. §§ 2-601 *et seq.*; Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; Mich. Comp. Laws §§ 400.601 *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code Ann. §§ 17-8-401 *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*; N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; N.M. Stat. Ann. §§ 44-9-3(C)(1) *et seq.*; N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; Okla. Stat. tit. 63, §§ 5053 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code Ann. §§ 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; Va. Code

Ann. §§ 8.01-216.1 *et seq.*; Vt. Stat. Ann. tit. 32, §§ 630 *et seq.*; Wash Rev. Code §§ 74.66.005 *et seq.*; 2018 P.R. Act 154 (H.B. 1627); Chicago Mun. Code §§ 1-21-010 *et seq.*; Hallandale Beach Code of Ordinances §§ 8-201 *et seq.*; Broward Cnty. Code of Ordinances §§ 1-276 *et seq.*; Miami-Dade Cty. Code §§ 21-255 *et seq.*;

B.      That judgment be entered against Defendants in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3),[306] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Cal. Gov't Code § 12651(a),[307] to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than the minimum

---

[306] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

[307] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      E.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Conn. Gen. Stat. § 4-275(b)(1),[308] to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      F.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      G.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more

---

[308] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

than eleven thousand dollars ($11,000) per false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses

resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim, as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim,[309] as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various schemes

---

[309] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no less than five thousand five hundred dollars ($5,500) and no more than eleven thousand dollars ($11,000) per false claim, plus payment of interest as provided for in La. Rev. Stat. Ann. § 46:438.6(C)(1)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O.      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) per false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P.      That judgment be entered in Relators' favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and

damages, as provided by Mass. Gen. Laws ch. 12. § 5B,[310] to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q.      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendants' unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relators, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R.      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relators, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

---

[310] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

S.      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T.      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927)  per false claim, pursuant to Nev. Rev. Stat. § 357.040(2)(c),[311] to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, to the extent such multiplied penalties shall fairly

---

[311] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V.     That judgment be entered in Relators' favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. Stat. Ann. § 44-9-3(C), multiplied as provided for in N.M. Stat. Ann. § 44-9-3(C)(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided by N.M. Stat. Ann. § 44-9-3(C)(2), to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by N.M. Stat. Ann. § 44-9-3(C)(3)-(4);

W.     That judgment be entered in Relators' favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) per false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X.     That judgment be entered in Relators' favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as

provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA.     That judgment be entered in Relators' favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied

as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) per false claim, pursuant to Tenn. Code Ann. § 71-5-182(a)(l),[312] to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB.    That judgment be entered in Relators' favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a) and Tex. Hum. Res. Code Ann. § 32.039, multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus an administrative penalty not to exceed twice the amount paid, as provided by Tex. Hum. Res. Code. Ann. § 32.039(c)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Tex. Hum. Res. Code Ann. § 36.052(a)(3)(A) & (B), plus an administrative penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act, pursuant to Tex. Hum. Res. Code. Ann. § 32.039(c)(2)(A) & (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

---

[312] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

CC.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Vermont or its political subdivisions, multiplied as provided for in Vt. Stat. Ann. tit. 32, § 631(b)(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per false claim, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(1), as well as the costs incurred by the State of Vermont, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(3), in order to fairly compensate the State of Vermont or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

EE.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in Wash. Rev. Code § 74.66.020 (1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Wash. Rev. Code § 74.66.020(1) and Wash. Admin. Code § 44-02-010,[313] to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the

---

[313] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

FF.    That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Puerto Rico and its political subdivisions, multiplied as provided for in 2018 P.R. Act 154 (H.B. 1627), § 4.01(1)(d), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 2018 P.R. Act 154 (H.B. 1627), § 4.01(1)(d),[314] as well as the costs incurred by Relators and the Commonwealth of Puerto Rico, as provided by 2018 P.R. Act 154 (H.B. 1627), § 4.01(3), in order to fairly compensate the Commonwealth of Puerto Rico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

GG.    That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the City of Chicago, multiplied as provided for in Chicago Mun. Code § 1-22-020, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Chicago Mun. Code § 1-22-020, as well as the costs incurred by Relators and the City of Chicago, as provided by Chicago Mun. Code § 1-22-020, in order to fairly compensate the City of Chicago for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

HH.    That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the City of Hallandale Beach, multiplied as provided for in Hallandale Beach Code of Ordinances § 8-204(c)(1), plus civil penalties, as provided by Hallandale Beach

---

[314] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

Code of Ordinances § 8-204(c)(5), as well as the costs incurred by Relators and the City of Hallandale Beach, as provided by Hallandale Beach Code of Ordinances § 8-207(a), in order to fairly compensate the City of Hallandale Beach for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

II.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by Broward County, multiplied as provided for in Broward Cty. Code of Ordinances § 1-279(c)(1), as well as the costs incurred by Relators and Broward County, as provided by Broward Cty. Code of Ordinances § 1-283(a)-(b), in order to fairly compensate Broward County for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

JJ.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by Miami-Dade County, multiplied as provided for in Miami-Dade Cty. Code § 21-258(3)(a), as well as the costs incurred by Relators and Broward County, as provided by Miami-Dade Cty. Code §§ 21-258(3)(c), -262(1)-(2), in order to fairly compensate Miami-Dade County for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

KK.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

LL.     That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit;

MM.     That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein; and

NN.     That this Court award such further relief as it deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.


Dated:  March 24, 2020

BARON & BUDD, P.C.

By:   */s/ Scott Simmer*                                       

Maureen A. Sanders
**SANDERS & WESTBROOK, P.C.**
102 Granite Ave NW
Albuquerque, NM 87102
mas@sanwestlaw.com
Telephone: (505) 243-2243

W. Scott Simmer
ssimmer@baronbudd.com
Will Powers
wpowers@baronbudd.com
**BARON & BUDD, P.C.**
The Watergate, 10th Floor
600 New Hampshire Ave. NW
Washington, DC  20037
Telephone:  (202) 333-7352
Facsimile:  (202) 337-1039


Attorneys for Plaintiffs/Relators